UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street N.E.<br>Washington, D.C. 20549,<br><div align="center">Plaintiff,</div><br>v.<br><br>e-Smart Technologies, Inc.,<br>IVI Smart Technologies, Inc., n/k/a e-Smart<br>Technologies International, Inc.,<br>Intermarket Ventures, Inc.,<br>Mary A. Grace,<br>Tamio Saito,<br>Kenneth A. Wolkoff,<br>George Sobol, and<br>Robert J. Rowen,<br><div align="center">Defendants.</div> | : <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: <br>: | COMPLAINT<br><br>JURY DEMANDED |

Plaintiff U.S. Securities and Exchange Commission (the "Commission") alleges as follows:

<u>SUMMARY OF THE ACTION</u>

1.    Defendants perpetrated a series of illegal acts in violation of the federal securities laws, each involving e-Smart Technologies, Inc. ("e-Smart"), a publicly traded company.

2.    Defendants e-Smart, Mary A. Grace ("Grace"), and Tamio Saito ("Saito") each violated the anti-fraud provisions of the federal securities laws by making materially fraudulent statements to the public in e-Smart's 2006 annual report filed with the Commission on October 24, 2007 ("2006 Form 10-KSB"). In that filing, Grace and Saito falsely represented the state of e-Smart's technology by claiming, among other things, that the company had "smart cards"

ready "for deployment today" and that the company's "smart cards" had certain technical capabilities that did not exist at that time. In truth and in fact, the smart cards were not ready for deployment nor did they possess all of the claimed technical capabilities.

3.      Grace signed the document as Chief Executive Officer ("CEO") and as a director of e-Smart. Saito signed the document as e-Smart's Chief Technology Officer ("CTO"). As a result of the false statements in e-Smart's 2006 Form 10-KSB, e-Smart, Grace, and Saito materially misled investors and potential investors.

4.      Defendants e-Smart and Grace also violated the anti-fraud provisions of the securities laws by failing to disclose that critical technology personnel, including Saito, had left e-Smart in mid-2006. These individuals had been previously described by e-Smart in its prior public filings as "key persons." When e-Smart and Grace finally disclosed that these individuals had left the company – more than six months after their actual departure – e-Smart and Grace failed to tell the complete story about what had occurred.

5.      In addition, e-Smart issued a press release on February 26, 2008, claiming that it had executed a contract with Samsung S1 Corporation ("Samsung S1"), a division of the well-known South Korean company. e-Smart claimed that it had received an order to deliver twenty million "smart cards" to Samsung S1. In actuality, Samsung S1 had executed a supply contract with e-Smart but had never agreed to buy even a single "smart card" from e-Smart. Grace, as CEO, Chief Financial Officer ("CFO"), president and Chairman of the Board of Directors of e-Smart, caused the press release to be published for e-Smart and was quoted in that press release touting the size and importance of the agreement.

6.      Moreover, from approximately early 2005 through 2007, Defendants e-Smart, IVI Smart Technologies, Inc. ("IVI"), Intermarket Ventures, Inc. ("Intermarket"), Grace, Kenneth A.

Wolkoff ("Wolkoff"), George Sobol ("Sobol"), and Robert J. Rowen ("Rowen") violated the registration requirements of the federal securities laws through an unregistered stock offering of approximately four hundred million shares of e-Smart which generated tens of millions of dollars in ill-gotten gains.

7.     Defendant Grace conceived of and oversaw this unregistered distribution of e-Smart stock as e-Smart's CEO, president, CFO and Chairman of the Board of Directors, as well as in her role as the CEO and president of Defendants IVI and Intermarket, two companies she controlled that facilitated the unregistered offering. Defendants Wolkoff, Sobol, and Rowen acted as unregistered brokers and were compensated for bringing investors to the illegal offering.

8.     In 2006 and 2007, e-Smart violated the books and records and internal controls provisions of the federal securities laws by failing to make and keep books and records which accurately reflected the assets of the company and failed to create proper accounting controls. Grace substantially assisted in e-Smart's violation. As a result, e-Smart systematically failed accurately to disclose its activities to investors and potential investors. Grace substantially assisted in e-Smart's failure.

9.     As e-Smarts's CEO and CFO, Grace was required under federal securities laws to certify the accuracy of e-Smart's periodic reports filed with the Commission. Grace violated the federal securities laws by falsely certifying that the company's 2006 Form10-KSB and the company's third quarter 2006 Form 10-QSB were accurate.

10.     During the relevant period, both Grace and Saito personally owned large amounts of e-Smart shares and conducted personal transactions involving e-Smart shares. As officers and directors of e-Smart, Grace and Saito were required by the federal securities laws to file with the Commission forms identifying both their personal ownership of e-Smart shares and all personal

transactions involving e-Smart shares. Grace and Saito have never filed any such forms with the Commission.

11.    Because of the conduct described herein, Defendants e-Smart, Grace, and Saito violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]. In addition, Defendants e-Smart, IVI, Intermarket, Grace, Wolkoff, Sobol, and Rowen violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and (c)]. Defendants Wolkoff, Sobol, and Rowen violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]. Defendant e-Smart violated Sections 13(a) [15 U.S.C. § 78m(a)], 13(b)(2)(A) and (B) [15 U.S.C. §§ 78m(b)(2)(A) and (B)] and Exchange Act Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R. § 240.13a-13]. Defendant Grace violated Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14] and aided and abetted violations of Sections 13(a) [15 U.S.C. § 78m(a)] and 13(b)(2)(A) and (B) [15 U.S.C. §§ 78m(b)(2)(A) and (B)] of the Exchange Act and Exchange Act Rules 12b-20 [17 C.F.R. § 240.12b-20], 13a-1 [17 C.F.R. § 240.13a-1], 13a-11 [17 C.F.R. § 240.13a-11] and 13a-13 [17 C.F.R. § 240.13a-13]. Finally, Defendants Grace and Saito violated Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)] and Exchange Act Rule 16a-3 [17 C.F.R. § 240.16a-3].

12.    By this action, the Commission respectfully requests that the Court enjoin each defendant from further violations of the foregoing securities laws, order each defendant to disgorge the unlawful profits from their violations with prejudgment interest, impose civil money penalties on each defendant, prohibit Defendants Grace, Saito, Wolkoff, Sobol and Rowen from participating in penny stock offerings, bar Defendants Grace and Saito from serving as officers or directors of public companies, and order such other relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

13.    The Commission brings this action, and this Court has jurisdiction over this matter

pursuant to Securities Act Sections 20(b), 20(d), and 22(a) [15 U.S.C. §§ 77t(b), (d), and 77v(a)]

and Exchange Act Sections 21(d)(1), 21(e), and 27 [15 U.S.C. §§ 78u(d)(1), (e), and 78aa].

14.    The defendants, directly or indirectly, singly or in concert with others, made use of

the means or instruments of transportation and communication in interstate commerce, or of the

mails, or of the facilities of a national securities exchange in connection with the acts,

transactions, and practices alleged in this Complaint.

15.    Venue in this district is proper pursuant to Securities Act Section 22(a) [15 U.S.C. §

77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa] because, *inter alia*, substantial events,

acts, or transactions constituting the violations alleged in this Complaint occurred within this

judicial district.

## DEFENDANTS

16.    **e-Smart Technologies Inc.** is a Nevada corporation, with a corporate office in

New York, NY.  Between 2005 and 2008, e-Smart operated primarily from the residence of its

CEO, Mary A. Grace, in the Georgetown area of Washington, DC.  e-Smart has a class of equity

securities registered with the Commission pursuant to Section 12(g) of the Exchange Act, with

730,000,000 common shares and 17,500,000 convertible preferred shares believed to have been

authorized.  At all relevant times, the company claimed to be engaged in the business of creating

and selling a multi-functional biometric identification verification system called a "smart card."

At present, e-Smart appears to have no ongoing U.S. business operations aside from its pursuit of

certain claims in litigation against one of its co-founders and its former manufacturer regarding

ownership of certain technology allegedly stolen from e-Smart.

17. **Mary A. Grace,** age 67, and presently residing in New York, NY, has controlled e-Smart since its inception in 2000. Grace is now, and at all relevant times has been, e-Smart's president, CEO, CFO, and Chairman of the Board of Directors. During the period of the conduct alleged in this Complaint, Grace operated e-Smart from her personal residence in Washington, D.C.

18. **Tamio Saito**, age 64, is an American citizen who on information and belief resides in Tokyo, Japan. Aside from the period between mid-2006 and March 2007, Saito has led the technology development at e-Smart since the company's formation in 2000. He is an officer of e-Smart and currently holds the title of Chief Technology Officer ("CTO"). He has also served as a director. Saito holds a large number of shares of e-Smart. Saito is also an officer of, and a major shareholder in, both IVI and Intermarket.

19. **IVI Smart Technologies, Inc.** ("IVI") n/k/a e-Smart Technologies International, Inc., a Delaware corporation, owns approximately 61% of e-Smart. Grace is its president and CEO and a majority shareholder. It has no employees other than Grace and Saito and has no business operations. IVI owns the rights to the technology developed and marketed by e-Smart. It shares e-Smart's New York address.

20. **Intermarket Ventures Inc.** ("Intermarket"), a Utah corporation, owns approximately 7% of e-Smart. Grace is its president and CEO and a majority shareholder. It has no employees other than Grace and Saito and has no business operations. It shares e-Smart's New York address.

21. **Kenneth A. Wolkoff,** age 64, of Park City, Utah, brokered e-Smart stock sales disguised as loans and received e-Smart shares in return as commissions. Although he served as an underwriter of the illegal offering, he has never been associated with a registered broker-

dealer.

22. **Robert J. Rowen,** age 62, of Sebastopol, CA, brokered e-Smart stock sales disguised as loans and received e-Smart shares in return as commissions. Although he served as an underwriter on the illegal offering, he has never been associated with a registered broker-dealer.

23. **George Sobol**, age 65, of Beverly Hills, CA, brokered e-Smart stock sales disguised as loans and received e-Smart shares in return as commissions. Although he served as an underwriter on the illegal offering, he has never been associated with a registered broker-dealer.

## FACTS

I.     **e-Smart's Fraudulent 2006 Form 10-KSB**

24. e-Smart claimed to be engaged in the business of creating and selling a multi-functional biometric identification verification system called a "smart card." In its 2006 Form 10-KSB, filed with the Commission and publicly disseminated to investors on October 24, 2007, e-Smart made false claims regarding the state of technology it was purporting to develop. Specifically e-Smart falsely claimed:

- that its card was "multifunctional," i.e., that it could function at the same time as an ID card, debit card, debit/credit card, driver's license and/or physical access card.

- that "[o]ne card can contain multiple, independent and secure applications. For example, the technology will permit/deny access (physical and logical), identify precise location and/or movement of personnel and/or watch list parties while at the same time operating other secure applications, each completely and securely isolated one from the other."

- that it was continuing "the development and refinement" of technology, known as "Presto-Chango," that had the ability to recognize attempts to obtain unauthorized information and, in such circumstances, would scramble the data, making it indecipherable.

7

- that it possessed a "Zero/Zero System" which its "internal studies" had verified "reduces the false reject rate," that is, the number of times the "smart card" incorrectly denies access to an authorized individual or allows access for an unauthorized individual.

- that its "smart card" met international "smart card" standards, ensuring that the card was able to work with various card readers.

- that its card was commercially available "for deployment today."

25.   Despite the claims in its 2006 Form 10-KSB, e-Smart had never fully developed the manufacturing process for a multi-functional card and was not close to being able to do so when its claims of readiness were made.

26.   e-Smart's product was not commercially available for deployment in either 2006 or 2007.

27.   On information and belief, e-Smart's card was never tested for certification against accepted industry standards and would not have passed, because it lacked the necessary security chip.

28.   In the fall of 2006, e-Smart hired a smart card technology consultant to be an expert witness and technology consultant in litigation brought by e-Smart against a co-founder and its former manufacturer.

29.   In the litigation, e-Smart claimed that the co-founder and former manufacturer stole e-Smart's technology after severing relations with the company.

30.   As part of his duties working for e-Smart, the technology consultant hired by e-Smart to work on the litigation became familiar with the state of e-Smart's existing technology. In May 2007, the technology consultant was asked by Grace to become COO of e-Smart. The consultant agreed and continued in this position until October 2007, when he left the company.

31.   According to the technology consultant/COO ("e-Smart's COO"), the "Presto-

Chango" technology did not exist on e-Smart's card and the card was not capable of performing multiple applications during the entire time he worked for the company.

32.    In late July 2007, while working for e-Smart, e-Smart's COO was asked by Grace to review and edit a draft of the technology section of the 2006 Form 10-KSB.

33.    In mid-August 2007, e-Smart's COO informed counsel for e-Smart who was working on the Form 10-KSB that certain of the claims in the draft technology section were untrue.

34.    Specifically, e-Smart's COO informed counsel for e-Smart via email on August 16, 2007 that a section describing "'zero/zero' fingerprint recognition" was inaccurate because it "was highly speculative and not based on actual technical development."  e-Smart's COO described the draft section as "pure fiction."

35.    At this same time, e-Smart's COO also informed counsel for e-Smart that a section titled the "Hardware Based, Software Enhanced, Multi-application System" did not adequately describe what was currently available and should be edited to reflect that the alleged capabilities of the card would be available in "future product developments."

36.    Shortly thereafter, e-Smart's counsel raised these issues with Grace and Saito.

37.    Despite the fact that e-Smart's COO had put the company on notice that some of the technology claims in its Form 10-KSB were inaccurate, Grace and Saito allowed the 2006 Form 10-KSB to be filed with the Commission.

38.    Grace signed the Form 10-KSB on October 24, 2007 as the President, Chief Executive Officer and Director of the Board.

39.    Saito signed the Form 10-KSB on October 24, 2007 as the Chief Technology Officer.

40.    When asked by Commission staff about the technology claims in the 2006 Form 10-KSB, both Grace and Saito asserted their Fifth Amendment privilege against self-incrimination.

41.    The false statements in the 2006 Form 10-KSB, described above, were materially misleading.

## II.    E-Smart Failed to Disclose Loss of Key Personnel

42.    E-Smart also failed to disclose certain material events in a timely or adequate fashion. Due to the loss of key personnel, e-Smart lost the ability to produce any technology in 2006 when CTO Saito, the entire research and development staff, an e-Smart co-founder and critical employee, and the company's sole manufacturer, all cut ties with the company in mid-2006. e-Smart failed to disclose any of these material events when they occurred, as required by Exchange Act Rule 12b-20, Items 401(b) and 401(c) of Regulation S-K, and Item 5.02(b) of Form 8-K.

43.    The loss of Saito in July 2006 was particularly harmful to e-Smart. e-Smart had described him as a "key person" in both its 2005 and 2006 Forms 10-KSB, stating that the loss of his efforts could bring into question the company's continued viability. The co-founder was similarly described in the 2005 Form 10-KSB.

44.    Further damaging its ability to produce technology, Saito laid off e-Smart's entire research and development staff one month before his own departure in mid-2006.

45.    Saito emailed Grace around the time of his departure and specifically informed her that he believed his departure and the departure of the technology development staff were material events.

46.    e-Smart and Grace made no public disclosure about the loss of e-Smart's technology team and failed timely to disclose these events to investors in mid-2006 by filing a

Form 8-K or otherwise.

47.   In fact, e-Smart and Grace failed to disclose the loss of key personnel until February 13, 2007, more than six months after the employees' departures, when e-Smart filed its third quarter 2006 Form 10-QSB.  In that document, e-Smart for the first time disclosed, under the heading "Other Matters," that Saito and all other engineers had left the company and that e-Smart would no longer "perform research and development."

48.   Although e-Smart finally revealed the loss of its technology team, e-Smart claimed that technology research and development would be done in the future by a separate company, IVI.

49.   e-Smart did not disclose that IVI was unlikely to be in a position to conduct the necessary research and development.  Grace was IVI's sole employee.  Grace was not an engineer and was incapable of performing the research and development functions required to get the smart card fully functional.

50.   Moreover, e-Smart's third quarter 2006 Form 10-QSB also claimed that e-Smart had hired a Chief Operating Officer ("COO") and a Chief Enterprise Architect ("CEA"), neither of which was true.  e-Smart did not hire a COO until May 2007—three months after the third quarter 2006 Form 10-QSB was filed.  e-Smart never hired a CEA.

**III.   e-Smart's Fraudulent February 26, 2008 Press Release**

51.   e-Smart issued a materially false and misleading press release on February 26, 2008.  The press release titled, "e-SMART® Technologies To Deliver 20 Million "I AM"™ Super SMART™ Cards to Samsung S1," stated:

> e-SMART® Technologies, Inc., (Pink Sheets: ESMT); with its parent company, IVI Smart Technologies, Inc., ("e-SMART"® or the "Company") is pleased to announce that it has executed a contract with the Samsung S1 Corporation, (part of the Samsung family of companies) to deliver to Samsung 20 million "I AM"™ cards,

the Company's most advanced Super SMART™ Card.

Pursuant to the contract, Samsung S1 shall make an irrevocable purchase order for each order and shall pay the full amount in cash to e-SMART® within 30 days of the placement of each order. e-SMART® will deliver 20 million "I AM"™ Super SMART™ Cards over a two year period to Samsung S1. Deliveries of the first order of 10 million cards are planned to begin in June 2008 and continue through March 1st 2009, with the orders of the second 10 million delivered over the following 12 months. Although it is too early to predict exact profitability, the Company believes the Samsung orders may produce profits in excess of $100 million. As announced in previous press releases, it is the Company's intention to move in the immediate future to the Bulletin Board, followed by a move to the NASDAQ or the American Stock Exchange as soon as possible.

Mary Grace, CEO of e-SMART® said, "We are pleased to announce this contract, which we believe is the largest order of its kind placed in the world to date for a biometric smart card such as e-SMART's® "I AM"™ card. As Samsung is one of the leaders in smart card technology in the world, this contract confirms their opinion of the uniqueness and value of e-SMART's® "I AM"™ Super SMART Cards™. The contract order is renewable and I anticipate that this is the first of a series of orders for our advanced "I AM"™ card, not only for Samsung and Korea but for many more countries with whom we have been closely working with over the last year."

52.    Grace wrote the initial draft of the press release and approved the final version.

Grace also signed e-Smart's March 13, 2008 Form 8-K containing the press release that was filed

with the Commission.

53.    After the press release was issued, both the price of e-Smart's shares and the

volume of trading in e-Smart shares increased.

54.    Despite e-Smart's claims, at the time of the press release, the only contract executed

by Samsung S1 and e-Smart was a "supply contract" which was filed with the Commission on

March 13, 2008. The "supply contract" specified certain details of the relationship between

Samsung S1 and e-Smart, if Samsung S1 was in fact to choose, at some future date, to order any

cards from e-Smart. Under the terms of the supply contract, Samsung S1 had the option of

purchasing cards from e-Smart, but Samsung S1 was also entitled to choose not to place any

purchase orders from e-Smart.

55.    The press release represented that e-Smart "has executed a contract with the

Samsung S1 Corporation, (part of the Samsung family of companies) to deliver to Samsung S1

20 million "I AM"™ cards, the Company's most advanced Super SMART™ Card." In fact,

Samsung S1 and e-Smart had not contracted for e-Smart to deliver 20 million cards. The

companies had only executed a "supply contract" which gave Samsung S1 the right but not the

obligation to order cards from e-Smart according to agreed-upon terms.

56.    Similarly the press release stated: "Samsung S1 shall make an irrevocable purchase

order for each order." e-Smart's language, specifically that Samsung S1 "shall" rather than

"may" make a purchase order, implied that Samsung S1 was obligated to purchase cards from e-

Smart. However, under the terms of the supply contract – the only contract executed between

Samsung S1 and e-Smart – Samsung S1 was not obligated to place any order and was free to

exercise discretion to choose whether to purchase any cards from e-Smart.

57.    As quoted in the press release, Grace stated that "we believe" "this contract" is "the

largest order of its kind placed in the world to date for a biometric smart card such as e-

SMART's® "I AM"™ card." This statement is misleading as Samsung S1 had not yet placed

any actual order for cards from e-Smart.

58.    The press release further stated, "e-SMART® will deliver 20 million "I AM"™

Super SMART™ Cards over a two year period to Samsung S1. Deliveries of the first order of

10 million cards are planned to begin in June 2008 and continue through March 1st 2009, with

the orders of the second 10 million delivered over the following 12 months." In reality, Samsung

S1 had not placed an order for any cards from e-Smart, let alone 20 million cards. Because

Samsung S1 had not actually placed an order for any cards, there were no deliveries of cards

"planned to begin in June 2008 and continue through March 1st 2009, with the orders of the second 10 million delivered over the following 12 months."

59.     Over six months after e-Smart issued the press release, on September 30, 2008, e-Smart sent a letter to Samsung S1 apologizing to Samsung S1 for the confusion related to e-Smart's press release. In that letter, e-Smart stated that it "regrets any confusion regarding publicity" connected to e-Smart's statements.

60.     Although e-Smart sent a letter of apology to Samsung S1, e-Smart never publicly corrected its misleading press release.

## IV.     E-Smart's Unregistered Stock Offering

### A. Unregistered e-Smart Shares Sold to Investors

61.     E-Smart engaged in an unregistered offering of millions of shares of its securities in violation of Section 5 of the Securities Act.

62.     All transactions involving the sale of securities must be either registered with the Commission or exempt from the registration requirement.

63.     Starting in 2005 and continuing through as late as November 2007, e-Smart distributed approximately 400 million unrestricted shares in hundreds of separate transactions raising approximately $30 - $40 million.

64.     This distribution of shares was actually a convertible loan scheme. In this illegal offering, investors purchased unrestricted shares of e-Smart in sales purporting to be short-term loans collateralized by e-Smart shares. Investments ranged from a few thousand dollars to more than $150,000.

65.     The scheme generally worked as follows: (1) an investor sent money to e-Smart and later signed documents purporting to evidence a very short-term "convertible loan" to IVI or

Intermarket, companies controlled by e-Smart CEO Mary Grace; (2) the documents stated that IVI or Intermarket promised to repay the "loan" in a matter of a week or two; (3) as collateral for the investor's "loan," IVI or Intermarket pledged e-Smart shares, which e-Smart had issued to IVI or Intermarket over time as restricted shares; (4) IVI or Intermarket defaulted on the "loan"; (5) upon default, the investor requested e-Smart shares, generally receiving them at a discount to the market price; (6) purporting to rely on a legal opinion letter which improperly invoked Rule 144(d)(3) under the Securities Act, Grace, acting for IVI or Intermarket, authorized its transfer agent to issue e-Smart shares from IVI or Intermarket.

66. The shares were issued to the investor free of resale restrictions, on the premise that IVI or Intermarket had held the shares for more than two years and allegedly the transfer was pursuant to the default of a "bona fide" loan, as to which the securities had been pledged as collateral.

67. In the final step of the scheme, e-Smart issued additional restricted shares to IVI and Intermarket to replace the shares IVI and Intermarket transferred to the investor who made the loan. This "replenishment" of shares to IVI and Intermarket was done to preserve Intermarket's and IVI's respective ownership shares in e-Smart.

68. These purported convertible "loans" were sales of securities designed to look like loans in order to evade registration under the Securities Act. IVI and Intermarket served as conduits for a distribution of unrestricted shares from e-Smart to investors in circumvention of federal securities laws that restrict the distribution of unrestricted shares by e-Smart directly.

69.    On information and belief, neither IVI nor Intermarket had any operations, assets or cash flow to repay any of the purported loans by any means other than transfer of the e-Smart shares pledged as collateral.

70.    On information and belief, not a single "loan" was ever paid back by IVI or Intermarket before "default." At default, investors received shares at a rate—generally $0.10 each—that was significantly below the then-current market value of e-Smart.

71.    There was no "bona fide" loan of funds to either IVI or Intermarket. Because the transfer of shares did not relate to repayment of a "bona fide" loan, the transfer of unrestricted e-Smart shares from IVI and Intermarket did not satisfy any exemption from the registration requirements of Section 5 of the Securities Act or the resale restrictions of Rule 144 thereunder.

**B.    Grace's Role in the Illegal Offering**

72.    Grace, as e-Smart's CEO, CFO, president, and Chairman of the Board of Directors, was the central participant in the illegal offering.

73.    Grace originated the offering, coordinated the transfer of money from IVI and Intermarket to e-Smart as necessary, and provided the instructions to the transfer agent to send unrestricted shares to investors.

74.    Grace recruited an attorney to write at least three opinion letters directing the transfer agent to issue unrestricted shares, and Grace kept the illegal offering going through misrepresentations to the transfer agent regarding the existence of attorney opinion letters for subsequent requests for the issuance of unrestricted shares.

**C.    Wolkoff, Sobol, and Rowen's Sale of e-Smart Stock**

75.    Wolkoff, Sobol, and Rowen solicited investors to purchase e-Smart stock, starting in 2005 and continuing until as late as November 2007. Their sales efforts account for as much

16

as twenty-five percent of all the e-Smart shares sold through the loan scheme, with Grace responsible for the rest. The three promoters were paid a 5-10% commission, in the form of e-Smart shares, for each sale of e-Smart shares they facilitated.

76.    Wolkoff began working with e-Smart in April 2005 and continued through at least June 2006. Wolkoff completed at least 115 transactions which brought in over $2,600,000 and sold over 26 million e-Smart shares.

77.    Sobol began working with e-Smart in March 2005 and continued through at least June 2006. Sobol completed at least 19 transactions which brought in over $890,000 and sold over 8.8 million e-Smart shares.

78.    Rowen began working with e-Smart in August 2005 and continued through June 2006. Rowen accomplished at least 20 transactions which brought in over $350,000 and sold over 4.5 million e-Smart shares.

79.    During this period, none of the three promoters was registered with the Commission as a broker-dealer or associated with a registered broker-dealer. Transfer agent records indicate that the three received some, if not all, of the commissions they were promised in the form of e-Smart shares.

## V.    e-Smart Failed to Make Accurate and Timely Reports to Investors

80.    e-Smart failed to make and keep books and records which accurately reflected the transactions and disposition of assets of the company. The last periodic report e-Smart filed was its annual report for the period ended December 31, 2007, which it filed on May 28, 2009. e-Smart has not filed quarterly or annual statements for 2008, 2009, or 2010 and has not filed quarterly reports for 2011.

81.    e-Smart has been unable to properly track stock transactions, has been unable to

keep full and proper records of the meetings of its board of directors, and has kept inadequate records of both loans payable and intercompany transactions.

82.  During all relevant periods, e-Smart's accounting controls and procedures were not effective. e-Smart had an understaffed accounting department that lacked accounting discipline and that was unable to perform year-end accounting duties.

83.  During all relevant periods, Grace has been the CEO, President, CFO, and Chairman of the Board of Directors of e-Smart. Grace certified as both CEO and CFO that e-Smart's 2006 and 2007 annual statements fairly and accurately stated the company's condition.

## VI.  Grace and Saito Failed to File Ownership Reports

84.  Section 16(a) of the Exchange Act requires executive officers, directors, and those who own more than 10% of a registered class of equity securities to file with the Commission initial statements of beneficial ownership (Form 3), reports of changes in ownership (Form 4), and annual reports concerning their ownership (Form 5) and to provide a copy of these filings to the company.

85.  There has never been a filing to the Commission in response to Section 16(a) related to e-Smart. The Company admits in its Preliminary Form 14(C), filed with the Commission on June 25, 2009, that none of the executive officers or directors of the company have filed any documents pursuant to Section 16(a).

86.  For all relevant periods, Grace has been an officer and director of e-Smart. Saito has been an officer from sometime in early 2007 to the present and has acted as a director at various times since at least 2005. Both Grace and Saito own shares of e-Smart and were founding executives of e-Smart. Neither Grace nor Saito has ever made a filing with the Commission to declare ownership or change of ownership of stock.

18

## FIRST CLAIM FOR RELIEF

**(Violations of Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and
Exchange Act Rule 10b-5 [17 C.F.R. §240.10b-5])
(Defendants e-Smart, Grace and Saito)**

87. Paragraphs 1 through 86 are realleged and incorporated by reference herein.

88. By their conduct, described above, Defendants e-Smart, Grace, and Saito,

knowingly or recklessly, in connection with the purchase or sale of securities, by the use of any

means or instrumentalities of interstate commerce or of the mails, or of any facility of any

national securities exchange, directly or indirectly (a) employed devices, schemes, or artifices to

defraud; (b) made untrue statements of material fact or omitted to state material facts necessary

in order to make the statements made, in light of the circumstances under which they were made,

not misleading; or (c) engaged in acts, practices, or course of business which operates or would

operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

89. By engaging in the conduct described above, Defendants e-Smart, Grace and Saito

violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**(Violations of Securities Act Sections 5(a) and (c)
[15 U.S.C. §§ 77e(a) and 77e(c)])
(Defendants e-Smart, IVI, Intermarket, Grace, Wolkoff, Sobol and Rowen)**

90. Paragraphs 1 through 86 are realleged and incorporated by reference herein.

91. Defendants e-Smart, IVI, Intermarket, Grace, Wolkoff, Sobol, and Rowen, by

engaging in the conduct set forth above, directly, or indirectly, through use of the means or

instruments of transportation or communication in interstate commerce or of the mails, offered to

sell or sold securities or carried or caused such securities to be carried through the mails or in

interstate commerce, for the purpose of sale or delivery after sale.

92.    No registration statement was filed with the Commission or was in effect with respect to the securities offered by Defendants prior to the offer or sale of these securities.

93.    By reason of the foregoing, Defendants e-Smart, IVI, Intermarket, Grace, Wolkoff, Sobol, and Rowen have directly or indirectly violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## THIRD CLAIM FOR RELIEF

**(Violations of Exchange Act Section 13(a) [15 U.S.C. § 78m(a)]
and Exchange Act Rules 12b-20, 13a-1,  13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20,
240.13a-1, 240.13a-11, 240.13a-13])
(Defendant e-Smart)**

94.    Paragraphs 1 through 86 are realleged and incorporated by reference herein.

95.    Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, 13a-11, 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13] thereunder, require issuers of registered securities to file with the Commission factually accurate annual, quarterly, and current reports.

96.    By engaging in the conduct alleged above, Defendant e-Smart violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, 13a-11, 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13].

## FOURTH CLAIM FOR RELIEF

**Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)
[15 U.S.C. §§ 78m(b)(2)(A) and (b)(2)(B)])
(Defendant e-Smart)**

97.    Paragraphs 1 through 86 are realleged and incorporated herein by reference.

98.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires issuers to make and keep books, records, and accounts which, in reasonable detail, accurately

and fairly reflect the transactions of the company and dispositions of its assets.

99.     Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires

issuers to devise and maintain a system of internal accounting controls sufficient to provide

reasonable assurances that transactions were recorded as necessary to permit preparation of

financial statements in conformity with U.S. Generally Accepted Accounting Principles

("GAAP") and to maintain the accountability of assets.

100.    By engaging in the conduct alleged above, Defendant e-Smart violated Exchange

Act Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## FIFTH CLAIM FOR RELIEF

### (Violation of Exchange Act Section 16(a) [15 U.S.C. § 78p] and Exchange Act Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3] (Defendants Grace and Saito)

101.    Paragraphs 1 through 86 are realleged and incorporated by reference herein.

102.    Section 16(a) of the Exchange Act [15 U.S.C. § 78p] and Rule 16a-3 thereunder [17

C.F.R. § 240.16a-3] require that any person that directly or indirectly beneficially owns more

than 10% of a company's class of stock registered under Section 12 of the Exchange Act, or who

is a director or an officer of the issuer of such security, to notify the Commission within 10 days

of the acquisition.  Additionally, Section 16(a) of the Exchange Act requires that if there has

been a change of such ownership during a month, the reporting persons shall file with the

Commission a statement indicating their ownership at the end of the calendar month and the

changes in that ownership that occurred during the month.  Exchange Act Rule 16a-3 requires

that initial statements of beneficial ownership be filed on Form 3, and that statements of changes

in beneficial ownership be filed on Form 4.

103.    By engaging in the conduct alleged above, Defendants Grace and Saito violated

Section 16(a) of the Exchange Act [15 U.S.C. §78p(a)] and Rule 16a-3 thereunder [17 C.F.R. 240.16a-3].

### SIXTH CLAIM FOR RELIEF

**(Violation of Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14]**
**(Defendant Grace)**

104. Paragraphs 1 through 86 are realleged and incorporated by reference herein.

105. Grace certified both e-Smart's 2006 Form 10-KSB and its third quarter 2006 Form 10-QSB.

106. Specifically, Grace certified that she had reviewed the reports and that, based on her knowledge, each did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and based on her knowledge, the financial statements and other financial information included in both the annual and the quarterly reports, fairly presented in all material respects the financial condition, results of operations and cash flows of e-Smart of, and for, the periods presented in the annual report.

107. Grace knew or should have known that the reports she certified contained untrue statements of material fact and omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

108. By engaging in the conduct alleged above, Defendant Grace violated Rule 13a-14 [17 C.F.R. § 24013a-14].

## SEVENTH CLAIM FOR RELEIF

**(Aiding and Abetting Violations of Exchange Act Sections 13(a) [15 U.S.C. §
78m(a)], 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]
and Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20,
240.13a-1, 240.13a-11, 240.13a-13])
(Defendant Grace)**

109. Paragraphs 1 through 86 are realleged and incorporated by reference herein.

110. Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 13a-1, 13a-11,

and 13a-13 [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13] thereunder, require issuers of

registered securities to file with the Commission factually accurate annual, quarterly, and current

reports.

111. Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] requires

issuers to make and keep books, records, and accounts which, in reasonable detail, accurately

and fairly reflected the transactions of the company and dispositions of its assets. Section

13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] requires issuers to devise and

maintain a system of internal accounting controls sufficient to provide reasonable assurances that

transactions were recorded as necessary to permit preparation of financial statements in

conformity with GAAP and to maintain the accountability of assets.

112. By engaging in the conduct alleged above, Defendant Grace knowingly and

substantially assisted Defendant e-Smart's violations of Exchange Act Sections 13(a) [15 U.S.C.

§ 78m(a)], 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] and

Exchange Act Rules 12b-20, 13a-1, 13a-11 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1,

240.13a-11 and 240.13a-13], in violation of Exchange Act Section 20(e).

## EIGHTH CLAIM FOR RELIEF

### (Violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]
### (Defendants Wolkoff, Sobol and Rowen)

113.   Paragraphs 1 through 86 are realleged and incorporated by reference herein.

114.   Defendants Wolkoff, Sobol, and Rowen, directly or indirectly, made use of the

mails or means or instrumentalities of interstate commerce to effect transactions in, or to induce

or attempt to induce, the purchase or sale of securities, without being registered as brokers or

dealers in accordance with Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

115.   By engaging in the conduct described above, Defendants Wolkoff, Sobol, and

Rowen each violated, and unless restrained and enjoined will continue to violate, Section 15(a)

of the Exchange Act, 15 U.S.C. § 78o(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Final

Judgment that:

1.   Permanently enjoins:

    a.   Defendant e-Smart from further violations of Exchange Act Sections 10(b),

        13(a), 13(b)(2)(A) and (B) and  Rules 10b-5, 12b-20, 13a-1, 13a-11 and 13a-

        13 thereunder and from further violations of Securities Act Sections 5(a) and

        (c);

    b.   Defendant Grace from further violations of Exchange Act Sections 10(b) and

        16(a) and Rules 10b-5, 13a-14, and 16a-3 thereunder; from aiding and

        abetting violations of Exchange Act Sections 13(a) and 13(b)(2)(A) and (B)

        and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder; and from further

                violations of Securities Act Sections 5(a) and (c);

    c.  Defendant Saito from further violations of Exchange Act Sections 10(b) and 16(a) and Rules 10b-5 and 16a-3 thereunder;

    d.  Defendants IVI, Intermarket, Wolkoff, Sobol, and Rowen from further violations of Securities Act Sections 5(a) and (c); and

    e.  Defendants Wolkoff, Sobol, and Rowen from further violations of Exchange Act Section 15(a).

2.  Orders each defendant to disgorge, with prejudgment interest, all ill-gotten gains received as a result of the unlawful conduct alleged in this Complaint and provide an accounting of monies they received;

3.  Orders each defendant to pay a civil money penalty pursuant to Securities Act Section 20(d)(1) [15 U.S.C. §77t(d)(1)] and Exchange Act Section 21(d)(3) [ 15 U.S.C. §78u(d)(3)];

4.  Prohibits defendants Grace, Saito, Wolkoff, Sobol and Rowen from engaging in any offering of penny stock pursuant to Securities Act Section 20(g) [15 U.S.C. § 77t(g)] and Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)];

5.  Permanently bars defendants Mary Grace and Tamio Saito from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

6.   Grants such other and further relief as the Court deems just and appropriate.

Respectfully submitted,

Of Counsel:                               Sarah L. Levine
Gerald W. Hodgkins                        Frederick L. Block (DC Bar No. 492358)
Gregory G. Faragasso
Thomas B. Rogers                          Attorneys for Plaintiff
                                          U.S. Securities and Exchange Commission
                                          100 F Street, NE
                                          Washington, DC 20549-4030
                                          Tel. (202) 551-4511 (Levine)
                                          Fax (202) 772-9245 (Levine)

Dated:  May 13, 2011