# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

U.S. SECURITIES AND EXCHANGE
COMMISSION,

      **Plaintiff,**

        **v.**

e-SMART TECHNOLOGIES, INC., *et al.*,

      **Defendants.**

Civil Action No.  11-895 (JEB)

## MEMORANDUM OPINION

Defendant e-Smart Technologies, Inc. bills itself as a cutting-edge technology firm dedicated to producing "smart cards," wallet-sized credit or ID cards with a built-in identity-verification system.  According to e-Smart, those smart cards can lock and unlock information – *e.g.*, access to a credit card account or a secure facility – based on biometric data such as a user's fingerprint.  In an era where identity theft is a reality and cyber threats increase in prominence, having a simple means to verify a user's identity could be a true boon – and e-Smart had the technology.  At least, that is what the company's unwitting investors believed.

According to the Securities and Exchange Commission, however, the cards do not work as advertised and have never been anywhere near ready for production, despite e-Smart's promises.  Because e-Smart is a publicly traded company, the SEC brought this suit alleging that e-Smart, its officers, and two affiliated companies defrauded investors; neglected to file several required reports, including a registration statement for a massive sale of stock; and failed to keep their accounts in order, all in violation of U.S. securities laws.  Three brokers who participated in the sale of unregistered e-Smart stock were also named as Defendants.  The Clerk has since

entered default against the corporate Defendants, and the Court approved a consent judgment against two of the brokers.

Now, two of the company's executives, Chief Executive Officer Mary Grace and Chief Technology Officer Tamio Saito, who are acting *pro se*, have separately moved to dismiss the SEC's First Amended Complaint. They contend, in essence, that the Commission gets the facts of the case wrong. Unfortunately for Defendants, at this stage of the litigation, the Court must accept the factual allegations in the SEC's Complaint as true, and it, accordingly, will deny the Motions to Dismiss.

## I.  Background

The SEC contends here that e-Smart's CEO Grace and its CTO Saito violated a number of U.S. securities laws. The allegations range from not crossing T's and dotting I's in e-Smart's bookkeeping to an elaborate scheme to sell unregistered stock. See Am. Compl., ¶¶ 113-41. The accusations at the heart of the case, however, involve Grace, Saito, and e-Smart's lying to investors about the very core of the company's business. See id., ¶¶ 113-15. For the purpose of Grace and Saito's Motions to Dismiss, the Court must "treat the complaint's factual allegations as true," Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000), and must rely solely on matters set forth therein. See Fed. R. Civ. P. 12(d). All facts recounted below are, therefore, drawn from the First Amended Complaint and public filings that the Complaint incorporates by reference.

At the time the fraud allegedly occurred, Grace "operated e-Smart" – an advanced research and development company – "from her personal residence in Washington, D.C." Am. Compl., ¶ 19. She "has controlled e-Smart since its inception in 2000" and "is now, and at all relevant times has been, e-Smart's president, CEO, CFO, and Chairman of the Board of

Directors." Id. Other than a brief absence in 2006-07, Saito has also been with the company since its founding as its resident technology tsar. See id., ¶ 20. Although he is an American citizen, he currently resides in Tokyo. See id.

The fraud perpetrated by e-Smart supposedly occurred in its 2005 and 2006 10-KSB annual reports filed with the SEC. The company filed its 2006 10-KSB in October 2007 and its Amended 2005 10-KSB in March 2008. See id., ¶ 2. In those reports, e-Smart claimed that it had "smart cards" ready "for deployment today," which had certain technical capabilities that made them uniquely secure and yet compatible with existing technologies. Id. According to the SEC, however, e-Smart's claims were inaccurate, as Saito and Grace either knew or should have known. See id., ¶¶ 24-25, 133.

Specifically, in its 2006 Form 10-KSB, which was submitted to the SEC and is available to the public online, e-Smart claimed:

- The smart card was "multifunctional" – it could work "as an ID card, debit card, debit/credit card, driver's license and/or physical access card" all at the same time, id., ¶ 26;

- "One card can contain multiple, independent and secure applications. For example, the technology will permit/deny access (physical and logical), identify precise location and/or movement of personnel and/or watch list parties while at the same time operating other secure applications, each completely and securely isolated one from the other," id. (quoting 2006 10-KSB at 5);

- It possessed a "Zero/Zero System," which "internal studies" show "reduces the false reject rate" for thumbprints, id. (quoting 2006 10-KSB at 5);

- The card met international standards, "ensuring that the card was able to work with various card readers," id.;

- e-Smart was "the first, and currently the only company offering a commercially available dual ISO 7816 (contact) and ISO 14443-B (wireless) compatible smart card," id. (quoting 2006 10-KSB at 5); and

- The card was ready "for deployment today." Id. (quoting 2006 10-KSB at 5).

According to the SEC, none of this was true. See id., ¶¶ 26-27. Not only did the card lack the technological capabilities that e-Smart outlined, but the company "did not have a fully developed manufacturing process for" the "card and was not close to being able to" produce actual smart cards. Id., ¶ 27.

The company's Chief Operating Officer raised similar concerns with e-Smart's counsel, noting "that certain of the claims in the draft technology section" of the 2006 10-KSB "were untrue." Id., ¶ 35; see id., ¶¶ 32-39. Counsel conveyed these concerns to Grace and Saito. See id., ¶ 38. The CEO and CTO nevertheless signed the 10-KSB and allowed it to be filed with the SEC. See id., ¶¶ 39-41. Grace later signed an Amended 10-KSB for 2005 that included substantially similar claims about the smart cards. See id., ¶ 43.

In addition, the SEC alleges that e-Smart "failed to disclose certain material events" relating to the "loss of key personnel" in a "timely or adequate fashion." Id., ¶ 47. In 2006, "CTO Saito, the entire research and development staff," and "the company's sole manufacturer[]" all cut ties with the company." Id. According to the SEC, this was a material event that e-Smart was required to timely disclose. See id., ¶¶ 47-49. Saito even e-mailed Grace to inform her that the departure of the CTO and tech staff were "material events." Id., ¶ 50. Still, e-Smart "made no public disclosure about the loss of e-Smart's technology team" until February 2007, over six

months after the departures and only a month before Saito ultimately returned to e-Smart.  Id.,
¶¶ 20, 51-52.  At that time, e-Smart claimed that research and development would be done by an
affiliated company, IVI Smart Technologies, but IVI had no technology team either.  See id.,
¶¶ 53-54.

The SEC contends, moreover, that "Grace repeatedly lied to potential and current
investors and to the e-Smart Board of Directors about major funding commitments and lucrative
contracts she claimed to have obtained for e-Smart."  Id., ¶ 56.  As an example, from 2006
through 2009, "Grace told numerous investors, employees and the Board . . . that an organization
named 'Louis XVII,' led by an individual named 'John Duff,' was going to inject hundreds of
millions of dollars into e-Smart."  Id., ¶ 60.  Over the years, she also promised that "tens of
millions of dollars" would be flowing in from "affiliates of Adnan Khashoggi" in Dubai.  Id.,
¶ 61.  Those claims were false, as Grace either knew or should have known.  Id., ¶¶ 63, 68.

Grace also had a habit of heralding non-existent contracts to purchase e-Smart cards to
the Board and would-be investors.  See id., ¶¶ 56-59, 63.  In one instance, she approved a press
release stating that e-Smart had signed a contract "to deliver to Samsung 20 million" smart cards.
Id., ¶ 71.  The release claimed that "[d]eliveries of the first order of 10 million cards are planned
to begin in June 2008 and continue through March 1st 2009, with the orders of the second 10
million delivered over the following 12 months."  Id.  The company estimated that "the Samsung
orders may produce profits in excess of $100 million."  Id.  Grace was specifically quoted as
saying, "[W]e believe [it] is the largest order of its kind placed in the world to date for a
biometric smart card," and "I anticipate that this is the first of a series of orders for our advanced
'I AM'™ card, not only for Samsung and Korea but for many more countries with whom we

have been closely working." Id. After the press release was issued, "both the price of e-Smart's shares and the volume of trading in e-Smart shares increased." Id., ¶ 73.

According to the SEC, however, Samsung had not ordered any cards from e-Smart. Rather, the two companies had executed a supply contract, which gave Samsung "the option of purchasing cards from e-Smart" under agreed-upon terms, "but Samsung S1 was also entitled to choose not to place any purchase orders from e-Smart." Id., ¶ 74. The company later "apologiz[ed] to Samsung S1 for the confusion related to e-Smart's press release," but the company never publicly corrected its misstatements. Id., ¶ 79; see id., ¶ 80.

The SEC also accuses e-Smart of selling hundreds of millions of unregistered shares of stock by disguising the stock as payment for sham "loans." The SEC contends that "Grace conceived of and oversaw this unregistered distribution of e-Smart stock," which involved e-Smart and two private companies that Grace controlled and oversaw as President, IVI Smart Technologies and Intermarket Ventures, Inc. Id., ¶ 8; see id., ¶ 7. The allegation is that investors were solicited to provide "bogus 'loans'" to IVI and Intermarket. Id., ¶ 9. IVI and Intermarket, however, never had any intention of repaying the loans, which all defaulted. Id., ¶¶ 9, 85, 89. Instead, the investors had been promised (and were then issued) cheap, unrestricted e-Smart stock – which served as collateral for the loans – in place of repayment. Id., ¶¶ 85-86. Then e-Smart gave IVI and Intermarket additional stock to replenish their preexisting store of securities, which had been sold in exchange for the "loans." Id., ¶ 87. The money for this disguised sale of e-Smart stock did not go to e-Smart, but instead went to IVI or to finance Grace's exorbitant lifestyle. See id., ¶ 9. This stock distribution was never registered with the SEC. See id., ¶ 7.

The SEC further alleges that "[d]espite the fact that e-Smart had virtually no revenues," e-Smart – as well as IVI – "paid for Defendant Grace's business, personal and living expenses."

Id., ¶ 97.  This arrangement was not fully disclosed until May of 2009.  Id., ¶ 100.  Those "payments amounted to millions of dollars, and included such extravagances as huge bills at resort hotels, ultra-high end designer clothes purchased at French boutiques, jewelry, cosmetics, lavish meals and travel, and 'longevity' medicine."  Id., ¶ 102.  In addition, "e-Smart also paid for gifts to family and friends, including an $18,000 Cartier watch, hundreds of thousands of dollars ostensibly for consultant fees and travel payments, and tens of thousands of dollars in salary and travel payments for Grace's children."  Id.

E-Smart's bookkeeping has also purportedly been deficient.  During its operations, "e-Smart failed to make and keep books and records which accurately reflected the transactions and disposition of assets of the company."  Id., ¶ 106.  As a result, "[t]he last periodic report e-Smart filed was its annual report for the period [that] ended December 31, 2007, which it filed on May 28, 2009."  Id.  Since then, e-Smart failed to file quarterly or annual statements for 2008, 2009, 2010, or 2011.  Id.  The company's records of stock transactions, board meetings, loans, and inter-company dealings are all incomplete or improperly kept.  Id., ¶ 107.  When accountants or auditors tried to reconcile the accounts, Grace ensured that they were fired or denied payment.  Id., ¶ 105.

Finally, the SEC alleges that Grace and Saito failed to file required statements of ownership.  The "Exchange Act requires executive officers, directors, and those who own more than 10% of a registered class of equity securities to file with the Commission initial statements of beneficial ownership (Form 3), reports of changes in ownership (Form 4), and annual reports concerning their ownership (Form 5)."  Id., ¶ 110.  Grace was an officer and director of e-Smart, and Saito was an officer; both owned large amounts of e-Smart shares but never filed an ownership statement.  Id., ¶ 12.

In its First Amended Complaint, the SEC contends that Grace, Saito, and others violated Section 10(b) and Rule 10b-5 of the Exchange Act by defrauding investors (Count I); that Grace and others violated Securities Act Sections 5(a) and 5(c) by selling unregistered stock (Count II); that Grace and Saito violated Exchange Act Section 16(a) and Rule 16a-3 by failing to file ownership statements (Count V); that Grace contravened Exchange Act Rule 13a-14 by certifying filings that knowingly made material misrepresentations (Count VI); and that Grace aided and abetted the violation of Exchange Act Sections 13(a), 13(b)(2)(A), 13(b)(2)(B), and multiple Rules by ensuring that e-Smart's books and reports remained in disarray (Count VII). (Counts III and IV relate only to e-Smart's violation of certain reporting and bookkeeping requirements, while Count VIII pertains to the sole remaining stockbroker Defendant.)

Although the original Complaint was filed in 2011 and the parties have been engaging in protracted discovery since then, it was the filing of the SEC's Amended Complaint in October 2013 that triggered the submission of Grace and Saito's separate Motions to Dismiss.

## II.     Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted."  In evaluating Defendants' Motions to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The notice-pleading rules are "not meant to impose a great burden upon a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S.

336, 347 (2005), and he must thus be given every favorable inference that may be drawn from the allegations of fact.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 584 (2007).

Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, id. at 555, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).  Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint.  Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).  Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 555 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level."  Id.  at 556.

A motion to dismiss under Rule 12(b)(6) must rely solely on matters within the pleadings, see Fed. R. Civ. P. 12(d), which includes statements adopted by reference as well as copies of written instruments joined to the complaint as exhibits.  See Fed. R. Civ. P. 10(c). Where the Court must consider "matters outside the pleadings" to reach its conclusion, a motion to dismiss "must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); see also Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003).

Grace and Saito's Motions rely heavily on material outside of the Amended Complaint. Only in their Replies, however, do they ask the Court to treat their respective Motions to Dismiss as Motions for Summary Judgment under Rule 56.  See Fed. R. Civ. P. 12(d) (allowing courts to

convert motion to dismiss into motion for summary judgment, but only if all parties are "given a reasonable opportunity to present all the material that is pertinent to the motion"). The Court declines that invitation, as discovery is not yet complete and the SEC has had no opportunity to properly oppose the request or present its own evidence. See, e.g., Flynn v. Veazey Const. Corp., 310 F. Supp. 2d 186, 189 (D.D.C. 2004) ("If the movant raises arguments for the first time in his reply . . . the court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments"); see also Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 196 (D.C. Cir. 1992) (considering arguments raised for first time in reply is "manifestly unfair" to respondent); Rollins Envtl. Servs. v. EPA, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991) ("Issues may not be raised for the first time in a reply brief."); Corson & Gruman Co. v. NLRB., 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) ("We require petitioners and appellants to raise all of their arguments in the opening brief to prevent 'sandbagging' of appellees and respondents and to provide opposing counsel the chance to respond."). The Court's legal analysis, then, will employ the standard governing only a motion to dismiss.

### III. Analysis

The SEC claims that Grace and Saito have together violated at least five separate mandates of security statutes and regulations. The Court examines each count in turn.

### A. Defrauding Investors (Count I)

The SEC principally argues that both Grace and Saito defrauded investors by knowingly (or extremely recklessly) making a series of misstatements in their filings with the Commission. In particular, the SEC alleges that Grace and Saito violated Section 10(b) of the Exchange Act, codified at 15 U.S.C. §78j(b), and Rule 10b-5, found at 17 C.F.R. §240.10b-5.

Section 10(b) of the Exchange Act prohibits securities fraud:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). The primary rule that the SEC has "prescribe[d]" to implement Section 10(b) is Rule 10b-5:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

As this Court has previously noted, "Rule 10b-5 encompasses only conduct already prohibited by § 10(b)." SEC v. Familant, 910 F. Supp. 2d 83, 91 (D.D.C. 2012) (quoting Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)). In other words, Congress proscribed certain activities as illegal in Section 10(b), and in Rule 10b-5 the SEC merely clarified that proscription – it did not and could not add any additional unlawful activities beyond the scope of Section 10(b).

Despite the complex language of the statute and regulation, the elements of securities fraud under Rule 10b-5 are fairly straightforward: The SEC must show that a defendant "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or

used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999). "[U]nlike a plaintiff in a private damages action, the SEC need not prove actual harm." Graham v. SEC, 222 F.3d 994, 1001 n.15 (D.C. Cir. 2000).

The Court, then, must consider whether the SEC has alleged facts sufficient to support each element of securities fraud.

### 1. Material Misrepresentations or Omissions

To begin with, the SEC has set forth facts that, if true, show that Grace and Saito "made" misrepresentations that could be considered "material." Courts "have consistently held that the signer of a corporate filing is its 'maker,'" because signing a filing implies "ultimate control" over its contents. SEC v. Brown, 878 F. Supp. 2d 109, 116 (D.D.C. 2012). The SEC claims that Grace and Saito, company officers responsible for authorizing and ratifying the company's filings, signed 10-KSBs containing false statements. See Am. Compl., ¶¶ 2-3. If those filings contained misrepresentations, therefore, they were "made" by Grace and Saito. As the SEC explained, the 10-KSBs claimed that the smart cards sold by e-Smart had a multitude of capabilities that the cards did not, in fact, possess. See id., ¶¶ 24-46. The cards, moreover, were not even ready for sale, contrary to the 10-KSBs' promises. See id., ¶¶ 2, 44-45. Plaintiff, then, has adequately pled that the 10-KSBs contained misrepresentations "made" by Saito and Grace.

The SEC also claims that Grace told the Board and investors that major funding was forthcoming from investors in Dubai and a company called Louis XVII when no such funding actually existed. See id., ¶¶ 57-62. In addition, Grace touted major purchase agreements – such as the agreement with Samsung cited in her press release – that were also nonexistent. See id.,

¶¶ 58-59, 71-72.  As outlined in the Complaint, these too are misrepresentations allegedly "made" by Grace.

Finally, the SEC highlights the fact that, for over six months, Grace failed to alert investors to the fact that Saito, the research and development team, and e-Smart's sole manufacturer had all severed their relationships with the company.  See id., ¶¶ 47-55.  This would constitute a relevant omission "made" by Grace under securities laws.

Each of these statements or omissions, moreover, could be considered material.  A fact is material if there is a "substantial likelihood that a reasonable investor would consider it important."  SEC v. Steadman, 967 F.2d 636, 643 (D.C. Cir. 1992) (quoting TSC Indus. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotation marks omitted).

Other courts have sensibly reasoned that if a defendant "never had a marketable product or a means to manufacture that product, and never had sales orders that would produce revenue, a reasonable investor would likely find this information material in making an investment decision."  Latham v. Matthews, 662 F. Supp. 2d 441, 461 (D.S.C. 2009).  Under that logic, the 10-KSB misrepresentations, which concealed the fact that e-Smart had no product, would be material.  The same logic applies to Grace's misrepresentations regarding funding and revenue: A reasonable investor would likely find it important that the company had no real prospect of solvency in the near future.  In addition, the omission of the fact that e-Smart's tech team had left and that the card's manufacturer had disassociated itself from the company could also be significant to investors.  After all, e-Smart existed solely to design and produce smart cards, and

the loss of the research staff and manufacturer would cripple the company's ability to do just

that. Each misrepresentation or omission outlined by the SEC, therefore, could be considered

material for purposes of Rule 10b-5.

2. *Scienter*

To prove scienter, the SEC must show that Defendants acted with "intent to deceive,

manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 (1976). The conduct

must amount to intentional wrongdoing or "extreme recklessness." Dolphin & Bradbury, Inc. v.

SEC, 512 F.3d 634, 639 (D.C. Cir. 2008). Extreme recklessness goes beyond "a 'should have

known' standard" and involves conduct that "presents a danger of misleading buyers or sellers

that is either known to the defendant or is so obvious that the actor must have been aware of it."

Id. (internal quotation marks, citations, and emphasis omitted). For purposes of pleading, the

SEC may show scienter by alleging "facts to show that defendants had both motive and

opportunity to commit fraud or . . . facts that constitute strong circumstantial evidence of

conscious misbehavior or recklessness." Stevens v. InPhonic, 662 F. Supp. 2d 105, 115 (D.D.C.

2009) (internal quotation marks omitted).

In terms of the 10-KSBs, the SEC has alleged that e-Smart's counsel told Grace and Saito

that the annual reports contained misstatements about the technological capabilities of the cards.

See Am. Compl., ¶ 38. According to the SEC, then, Grace and Saito intentionally included the

misrepresentations. Even if this were not true, as the CTO, Saito certainly must have been aware

of the cards' capabilities. As CEO, CFO, and President of the Board, Grace also must have been

aware that the cards did not work – if what the SEC alleges about the cards' capabilities is

correct. Stating that the cards were fully functional and ready "for deployment" would, in this

case, be so obviously misleading "that the actor[s] must have been aware of it." Dolphin &

Bradbury, Inc., 512 F.3d at 639.  The same reasoning applies to Grace's claims that funding was always imminent and, especially, to her claims that Samsung had ordered millions of smart cards from e-Smart.  See Am. Compl., ¶¶ 56-80.  Even a cursory examination of the actual contract makes clear that such a claim was false.  See Supply Contract, e-Smart March 2008 8-K at 1 ("'SAMSUNG SI' shall adjust the quantity and the deadline of the product based on the individual orders after the notification to 'e-SMART'"), available at http://www.sec.gov/ Archives/edgar/data/1112999/000119312508055299/dex101.htm.  The fact that Grace ignored Saito's warning that his departure was a "material" event that needed to be reported also evinces "conscious misbehavior."  Id., ¶¶ 50-52.

In addition, Grace and Saito "had both motive and opportunity to commit fraud." Stevens, 662 F. Supp. 2d at 116.  Each possessed a large stake in e-Smart and thus would profit from the misrepresentations, and each was responsible for the company's filings.  See Am. Compl., ¶ 12.  This is especially important where the company had no actual revenue to use to pay salaries.  In particular, the SEC claims that outside investment in e-Smart financed Grace's lavish lifestyle as she went jet-setting around the world.  See id., ¶¶ 97-102.  Preserving (at times exorbitant) gains from an allegedly sham company could certainly be classed as a motive for fraud.

### 3.  In Connection with Purchase or Sale of Securities

The SEC must also support the allegation that the misrepresentations and omissions were made "in connection with" the purchase or sale of securities.  "The Supreme Court has held that the 'in connection with' element is a broad and flexible standard and that any activity 'touching the sale of securities' will suffice."  SEC v. Levine, 671 F. Supp. 2d 14, 31 (D.D.C. 2009) (quoting Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971)).  "Where

the fraud alleged involves public dissemination in a document such as a press release, annual report, [or] investment prospectus . . . on which an investor would presumably rely," then this burden is met. SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir.1993); see also Securities and Exchange Commission v. Savoy Indus., Inc., 587 F.2d 1149, 1171 (D.C. Cir. 1978) ("requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon"). Because 10-KSBs and press releases are public documents "on which an investor would presumably rely," and because Grace's misrepresentations about revenues and funding were allegedly made to induce investment, the Complaint satisfies this element of securities fraud.

### 4. Rule 9(b)

Under Federal Rule of Civil Procedure 9(b), which applies in cases of fraud, a plaintiff "must state with particularity the circumstances constituting fraud," though scienter may still be pled generally. See Brown, 740 F. Supp. 2d at 155. To meet this standard, the SEC "must state the time, place and content of the false misrepresentations, the fact misrepresented and what was retained or given up as a consequence of the fraud." Feng v. Lim, 786 F. Supp. 2d 96, 103 (D.D.C. 2011) (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994)).

Although Grace and Saito take issue with the specificity of the pleadings, the SEC has met the Rule 9(b) standard. The time and place of the misrepresentations generally involve documents: 10-KSBs or press releases filed on a date certain. In enumerating the contents, the SEC quotes specific misrepresentations (or omissions) from those documents. The SEC also claims that investors bought and sold stocks based on those misrepresentations. Because the SEC need not prove harm to investors in this case, see Graham, 222 F.3d at 1001 n.15, it is

unclear whether such an allegation is even necessary.  In any event, the Amended Complaint's details are more than sufficient to satisfy Rule 9(b).

Grace's misstatements outside of the actual documents are, of course, pled with less particularity: The SEC claims that certain misrepresentations were about incoming funding from a company called Louis XVII or affiliates of Adnan Khashoggi in Dubai.  The SEC lists date ranges for those misrepresentations, but not exact dates.  A plaintiff does not, however, have "to allege every fact pertaining to every instance of fraud when a scheme spans several years," as the scheme does here.  United States v. Toyobo Co., 811 F. Supp. 2d 37, 44 (D.D.C. 2011).  The specifics offered – a date range and names of purported investors – are sufficient to notify Grace "of the particular circumstances for which she will have to prepare a defense at trial," as Rule 9(b) requires.  Id.

### 5. *Defenses*

To counter the SEC's claims, Grace and Saito generally contest the facts of the case: They claim that the cards worked as promised, that they relied on professional advice and harbored no fraudulent intent when filing the 10-KSBs, that investors did not rely on their representations, and that they had no knowledge that the claims contained in the relevant documents were false.  The Court certainly understands Grace and Saito's eagerness to deny Plaintiff's accusations.  In this lawsuit, which they have been fighting since 2011, they have been accused of serious wrongdoing by the SEC.  Defendants, in addition, are acting *pro se*, with no attorney to explain when and how they will be able to test the veracity of the SEC's claims.

While the Court gives *pro se* defendants like Grace and Saito a significant amount of leeway in filing pleadings, see, e.g., Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999) ("[c]ourts must construe *pro se* filings liberally"); Voinche v. FBI, 412 F. Supp. 2d 60, 70

(D.D.C. 2006) (and "[t]his Court gives *pro se* parties the benefit of the doubt and may ignore some technical shortcomings of their filings"), the fact of the matter is that the Court is considering their Motions to Dismiss under Rule 12(b)(6). At the motion-to-dismiss stage, the Court must "treat the complaint's factual allegations as true." Sparrow, 216 F.3d at 1113. That is, if the plaintiff and defendant tell two different stories, the Court must take the plaintiff's story to be true. Beyond that, as the Court must rely solely on matters within the pleadings at this stage, see Fed. R. Civ. P. 12(d), it cannot consider any of Defendants' extrinsic evidence. As a result, although Grace and Saito will have the chance to contest the SEC's factual allegations at a later date – indeed, at a stage where mere allegations must be substantiated by record evidence – for now the Court must credit the Government's story. It cannot, therefore, rely on Grace and Saito's characterization of the facts to dismiss this case.

Grace and Saito do, however, also raise several legal defenses. First, Grace argues that the fraudulent statements at issue here were "mere puffery." Proclamations are considered puffery – and thus not actionable – when they are "generalized statements of optimism that are not capable of objective verification." Freeland v. Iridium World Commc'ns, Ltd., 545 F. Supp. 2d 59, 76 (D.D.C. 2008). Grace's and Saito's statements in the 10-KSBs and the press release were not, however, "generalized statements of optimism." Rather, they were specific, verifiable statements about whether and how the cards worked and how many cards had (or had not) been purchased. Even the statements regarding funding from Dubai and Louis XVII were more specific than "the future looks rosy"; instead, they disclosed specific funding negotiations with specific investors that were "signed," "finalized," or "bankable." Am. Compl., ¶ 58. None of those statements could be considered puffery.

Next, Grace and Saito argue that they are entitled to a "safe harbor" because their 10-KSBs cautioned investors about the risks inherent in crediting "forward-looking statements" about the company's future. The "limitation of liability for forward-looking statements," however, "applies only in private actions, not enforcement actions brought by the SEC." SEC v. U.N. Dollars Corp., No. 01- 9059, 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003) (not reported); see 15 U.S.C. § 77z-2(c); 15 U.S.C. § 78u-5(c). This doctrine, then, is of no use to Grace and Saito. Even if it were, the misrepresentations at issue here deal with the present business condition of the company – *i.e.*, the state of e-Smart's technology and of its signed contracts – not with future-oriented projections. See Burman v. Phoenix Worldwide Indus., Inc., 384 F. Supp. 2d 316, 335-36 (D.D.C. 2005) ("Statements, either written or oral, indicating that a contract has been signed is not a forward-looking statement or a statement of prediction, rather, they are statements of the present business condition of the company."). The safe harbor for forward-looking statements, as a consequence, would not apply here.

Finally, Grace claims that she should be insulated from liability because the 10-KSBs contained a number of disclaimers, as well as language that "bespeaks caution" regarding future risks. Again, however, "the bespeaks-caution doctrine applies only to statements that are forward-looking." Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd., 620 F.3d 137, 142 (2d Cir. 2010). That is, even the most self-flagellating disclaimers warning of a company's near-certain future collapse will not protect a company or officer who materially misrepresents the present business condition of the company. And that is just what the SEC has alleged here. None of Grace and Saito's defenses, then, renders the First Amended Complaint deficient regarding Count I. Dismissal of this count is thus inappropriate.

B.  Unregistered Sales (Count II)

Count II of the Complaint alleges that Grace violated Sections 5(a) and 5(c) of the Securities Act.  15 U.S.C. §§ 77e(a), (c).  Those Sections "prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration."  Zacharias v. SEC, 569 F.3d 458, 464 (D.C. Cir. 2009).  "To show a violation of Sections 5(a) and 5(c), the SEC must show that the investments offered are securities, and that the Defendants offered or sold these securities without first filing a registration statement."  SEC v. Milan Group, Inc., No. 11- 2132, 2013 WL 4505714, at *7 (D.D.C. 2013) (internal quotation marks and citation omitted).  Grace is liable if she was a "necessary participant or substantial factor" in the Section 5 violation, and she bears the burden of showing that an exemption applies. SEC v. Calvo, 378 F.3d 1211, 1215 (11th Cir. 2004) (internal quotation marks omitted); see Zacharias, 569 F.3d at 464.  Most circuits have held that the SEC does not have to prove scienter in Section 5 cases – although the D.C. Circuit has not adopted a position on the issue.  See SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1256 (9th Cir. 2013) (collecting cases from other circuits); Zacharias, 569 F.3d at 466 (declining to make a determination in this Circuit).[1]

Even assuming a scienter requirement, the SEC has met its burden for pleading a Section 5 violation.  See SEC v. e-Smart Tech., Inc., 926 F. Supp. 2d 231 (D.D.C. 2013) (similar facts outlined in original Complaint sufficiently pled Section 5 violation against broker defendant). The SEC has alleged that e-Smart sold around 400 million unrestricted shares of stock – that is, e-Smart "offered securities" – by disguising the sale as a series of loans from investors to two affiliated companies, IVI and Intermarket, which owned substantial shares of e-Smart.  See Am. Compl., ¶¶ 83-86, 88-90; SEC v. Edwards, 540 U.S. 389, 393 (2004) (definition of "security"

---

[1] In its briefing, the SEC suggested that, per Zacharias, 569 F.3d 458, the issue is settled in the D.C. Circuit and that scienter is not required in Section 5 cases.  That is not what Zacharias says, and, as far as the Court can tell, the issue remains open.

includes "stock").  Investors would offer "loans" to those companies, and when the loans

defaulted – as they were meant to do – the lenders were repaid in e-Smart stock.  <u>See</u> Am.

Compl., ¶¶ 83-90.  Finally, e-Smart would replenish IVI and Intermarket's store of e-Smart

stock.  <u>See</u> <u>id.</u>  The sale was made "without first filing a registration statement."  <u>Milan Group,</u>

<u>Inc.</u>, 2013 WL 4505714, at *7; <u>see</u> Am. Compl., ¶ 81.  Grace both organized the scheme and

solicited sales and thus was a "necessary participant or substantial factor" in the transaction.

<u>Calvo</u>, 378 F.3d at 1215 (internal quotation marks omitted); <u>see</u> Am. Compl., ¶¶ 91-93.

The SEC has also pled scienter here: The Commission alleges that Grace initially

recruited attorneys to write opinion letters authorizing the transfer of stock pursuant to a "bona

fide" loan and then misrepresented that she possessed similar opinion letters for subsequent

transfers.  <u>See</u> Am. Compl., ¶ 93.  Lying about whether or not one's actions are authorized is

"enough to raise" an inference of knowledge of wrongdoing "above the speculative level."

<u>Twombly</u>, 550 U.S. at 555.

Grace raises several objections, arguing that the loans were bona fide and that she relied

on her attorney's opinion that the transactions were legal.  "It appears to be an open question in

this circuit whether reliance on the advice of counsel is" even a valid "defense to a securities

violation."  <u>Zacharias</u>, 569 F.3d at 467.  The Court, however, need not dwell on the issue, as

considering either defense would require resort to evidence outside of the Amended Complaint,

which is improper at this stage.

Grace also argues that the Court does not have subject-matter jurisdiction over the

Section 5 violation.  The jurisdictional argument set forth in Grace's 45-page-long "Motion" is

devoid of citation and its logic is difficult to follow.  In her 45-page "Memorandum" in support

of her "Motion," Grace characterizes the "threshold issue" as "whether the loans constituted an

offer and sale of securities for the purpose of the Securities Act and Exchange Act." Grace Mem. at 32. If that is Grace's argument, it fails for the reasons explained above. According to the SEC's Amended Complaint, the loans were a mere cover for Intermarket, IVI, e-Smart, and Grace's collective sale of e-Smart stock. Because the sale of stock is indisputably the sale of a security, the Court has jurisdiction over this claim. Count II thus survives Defendant Grace's Motion.

The Court takes this opportunity to caution Defendants to observe the rules on page limitations – with which, at this point, Defendants are fairly familiar. The Court will not, in the future, allow Defendants to circumvent Local Civil Rule 7(e) by styling one 45-page document as a "Motion" and another as a "Memorandum." The Court also notes that filings should be, at the very least, presentable. Defendants are, respectively, the CEO and CTO of a publicly traded company. The Court assumes that they possess at least minimal word-processing skills. In no event should future pleadings feature every font available in Microsoft Word and every color in the rainbow, with cut-and-paste e-mails and other outside materials sprinkled throughout the legal argument without demarcation. Further filings should satisfy the basic demands of readability. With that, the Court proceeds to Count V.

### C. Ownership Statement (Count V)

Section 16(a) of the Exchange Act demands that "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security, shall file the statements required by this subsection with the Commission." 15 U.S.C. § 78p. Rule 16a-3 contains the requirements for such an ownership statement. 17 C.F.R. § 240.16a-3. The D.C. Circuit, again, has not

determined whether scienter is required for a Section 16(a) violation, see SEC v. Prince, 942 F. Supp. 2d 108, 137 n.14 (D.D.C. 2013), although other courts have held that it is not. See SEC v. Verdiramo, 890 F. Supp. 2d 257, 274 n.14 (S.D.N.Y. 2011). In addition, the D.C. Circuit has held that a similar registration provision does not require scienter. See Savoy Indus., 587 F.2d at 1167 (no scienter required for violation of Section 13(d)(1), which mandates reports be filed by owners of 5% of certain securities). Neither Defendant mounts a legal argument as to why scienter should be required, so the Court will assume for the purposes of these Motions that the SEC need not plead it.

The SEC has, accordingly, alleged all the essential elements of a Section 16(a) claim. It notes that Grace is an officer, director, and indirect majority owner of e-Smart. The Commission also contends that Saito "has been an officer from sometime in early 2007 to the present and has acted as a director at various times since at least 2005." Am. Compl., ¶ 112. Both own e-Smart stock. Id. Grace and Saito, nonetheless, did not file the required statements. Id. The SEC has thus offered sufficient facts to support its allegations of a Section 16(a) infringement.

Grace and Saito counter that they relied on the advice of counsel, who told them not to file ownership statements. This argument, however, depends on evidence outside of the Amended Complaint. At this stage, the Court cannot consider such evidence of Defendants' lack of intent – especially where they are likely strictly liable for their actions.

D.  Certification (Count VI)

The SEC has also properly alleged that Grace violated Exchange Act Rule 13a-14. 17 C.F.R. § 240.13a-14. Rule 13a-14 states that "[e]ach report, including" 10-KSBs "must include certifications" of the truthfulness of the filings and that "[e]ach principal executive and principal financial officer of the" company "must sign a certification." Id. That certification, under 15

U.S.C. § 7241, must in turn state that "based on the officer's knowledge, the report does not contain any untrue statement of a material fact or omit to state a material fact." 15 U.S.C. § 7241(a)(2). The certification must also state that "based on such officer's knowledge, the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer." Id. § 7241(a)(3). The SEC does not claim that Grace failed to sign the certification, but rather that she certified the filings and that the filings turned out to be false. There is some debate as to whether the requirement to "sign a certification" creates a separate cause of action if the documents are certified as true but actually contain misrepresentations. See Brown, 740 F. Supp. 2d at 164. Courts in this District, however, have allowed Rule 13a-14 cases based on misrepresentations to proceed. See id. at 165. At any rate, Grace has not challenged the SEC's right to bring a claim based on Rule 13a-14, so the Court need not decide the issue. Indeed, it is difficult to discern whether Grace specifically objected to Count VI at all.

Assuming Grace's general denials of wrongdoing apply to Count VI, the SEC has nevertheless met its burden. Grace, after all, signed a certification for the 2006 and Amended 2005 10-KSBs as e-Smart's CEO. Am. Compl., ¶¶ 43, 131. Her certification stated that she had reviewed the reports, that they did not contain material misrepresentations or omissions, and that the financial reports fairly presented e-Smart's financial condition. Id., ¶ 132. As outlined in Section III.A, *supra*, the SEC alleges that Grace knew or was extremely reckless in not knowing that those statements were false. For the same reasons discussed in that Section, the facts detailed in the Amended Complaint support the SEC's allegation. Count VI, therefore, also survives.

E.   Reports and Bookkeeping (Count VII)

Count VII alleges that Grace aided and abetted e-Smart's violations of an additional smattering of reporting and bookkeeping provisions: Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13, as well as Sections 13(b)(2)(A) and 13(b)(2)(B).  Section 13(a) deals primarily with reporting.  It requires every "issuer" of registered securities to file with the SEC any annual reports, quarterly reports, or information and documents that the SEC requires.  15 U.S.C. § 78m(a).  Implementing that requirement, Rules 13a-1 and 13a-13 command issuers of registered securities to file annual (Form 10-K) and quarterly (Form 10-Q) reports.  See 17 C.F.R. §§ 240.13a-1, 240.13a-13.  Rule 13a-11 directs issuers to file current (Form 8-K) reports. See 17 C.F.R. § 240.13a-11.  All of those reporting requirements "are satisfied only by the filing of complete, accurate, and timely reports."  Savoy Indus., Inc., 587 F.2d at 1165 (citation omitted).  Rule 12b-20 adds a related obligation:  "In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made[,] not misleading."  17 C.F.R. § 240.12b-20.

Section 13(b) deals largely with bookkeeping.  Section 13(b)(2)(A) requires every "issuer" of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A).  Section 13(b)(2)(B) requires issuers to develop and maintain adequate internal accounting controls.  15 U.S.C. § 78m(b)(2)(B).

The Amended Complaint characterizes Grace as an aider and abettor of e-Smart, the issuer of securities in this case.  As articulated by the D.C. Circuit, "three principal elements are required to establish liability for aiding and abetting" a securities violation:  "(1) that a principal

committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter' – *i.e.*, that she rendered such assistance knowingly or recklessly." Graham, 222 F.3d at 1000.

The SEC has adequately pled each element. First, the SEC claims that e-Smart filed materially false reports months or even years after they were due, and in some cases never filed at all. See Section III.A, *supra*; Am. Compl., ¶¶ 2, 4, 5, 24-55; id., ¶ 106 ("e-Smart has not filed quarterly or annual statements for 2008, 2009, or 2010 and has not filed quarterly reports for 2011."). The SEC further avows that the company's books were in disarray: "e-Smart has been unable to properly track stock transactions, has been unable to keep full and proper records of the meetings of its board of directors, and has kept inadequate records of both loans payable and intercompany transactions." Id., ¶ 107. The Government also outlines an absence of accounting controls, stating that "e-Smart had an understaffed accounting department that lacked accounting discipline and that was unable to perform year-end accounting duties." Id., ¶ 108.

Next, the SEC claims that Grace "substantially assisted" those violations by both certifying that the reports were accurate and by "obstruct[ing] efforts by e-Smart's accountant and auditors to resolve discrepancies" in e-Smart's accounting. Id., ¶ 105. Specifically, "[i]n 2008, when e-Smart's long-time counsel, accountant and outside auditor raised questions about the improper relationships between e-Smart and IVI, they were fired or denied payment, or both." Id. Grace also spearheaded the unregistered stock offering through IVI and Intermarket, which further distorted e-Smart's books. See Section III.B, *supra*.

Finally, the SEC's pleadings show that Grace assisted e-Smart's violations knowingly or recklessly. Grace's alleged efforts to obstruct accountants and auditors suffice to show that she knew that the books were not in good order and that accounting controls were not in place, but

wanted to keep things that way. In addition, as discussed above, Grace purportedly knew about the 10-KSB's misrepresentations and the fraudulent nature of the loans-for-stock scheme. See Sections III.A, III.B, *supra*. The SEC has therefore met its burden of pleading that Grace aided and abetted e-Smart's violation of Section 13 and the affiliated Rules.

  F.  Other Defenses

  Grace and Saito raise two general defenses to the SEC's accusations. First, they assert that the allegations relating to the 10-KSBs are time-barred. Defendants advance two theories as to why the Amended Complaint violates the applicable five-year limitations period. See 28 U.S.C. § 2462. First, they claim that the fraudulent misrepresentations the SEC highlights were present in earlier 10-KSBs, which were filed before the 2006 10-KSB and before the Amended 2005 10-KSB. That is, the original misrepresentations were made over five years before May 2011, when this suit commenced. Because the SEC did not catch the falsehoods the first time they were filed, Defendants claim, they are immune from suit – free to renew the misrepresentations year after year and quarter after quarter, into perpetuity. That, obviously, is not the case. As the D.C. Circuit has held, "[A]n action, suit or proceeding to assess or impose a civil penalty must be commenced within five years of the date of the violation giving rise to the penalty." 3M Co. (Minnesota Min. & Mfg.) v. Browner, 17 F.3d 1453, 1462 (D.C. Cir. 1994) (emphasis added). Each time e-Smart and Defendants filed a new 10-KSB, they made their misrepresentations anew, violated the statute anew, and exposed themselves to liability anew. The fact that e-Smart had published the same falsehoods for years prior is immaterial.

  Defendants' second theory is that the SEC's allegations related to the Amended 2005 10-KSB are time-barred because they appear only in the Amended Complaint, which was filed in October 2013. As the Amended 2005 10-KSB was filed in March 2008 – over five years before

the allegations were added to the Amended Complaint – Defendants maintain that such claims are untimely. The new allegations are permissible, however, if they "relate back" to the misconduct outlined in the original Complaint. See Fed. R. Civ. P. 15(c). Rule 15(c) states that "[a]n amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading." Id. Relation back is improper when the amendment "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005). An addition that "attempts to introduce a new legal theory based on facts different from those underlying the timely claims" also does not relate back. United States v. Hicks, 283 F.3d 380, 388 (D.C. Cir. 2002). "The underlying question" thus "is whether the original complaint adequately notified the defendants of the basis for liability the plaintiffs would later advance in the amended complaint." Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 866 (D.C. Cir. 2008).

Here, the original Complaint provided Defendants with adequate notice. To begin with, the new facts arise out of the conduct set forth in the original Complaint. Both Complaints allege a series of misrepresentations amounting to securities fraud. To be sure, the original Complaint relied only on the 2006 10-KSB, not on the Amended 2005 10-KSB. The two 10-KSBs, however, contain essentially the same misrepresentations and relate to a unified scheme to defraud investors by dressing a sham company in high-tech clothing. Importantly, the Amended Complaint does not add any new counts or previously unmentioned theories of liability. The original Complaint was thus sufficient to "adequately notif[y] the defendants of the basis for liability" advanced in the Amended Complaint. Meijer, Inc., 533 F.3d at 866. The new allegations, then, are not time-barred.

Finally, Grace and Saito argue that the Amended Complaint cannot stand because it relies on information from a "confidential informant," in contravention of the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (1995).  See Applestein v. Medivation, Inc., 861 F. Supp. 2d 1030, 1036-37 (N.D. Cal. 2012).  The SEC, however, is not bringing a claim under the PSLRA as a private litigant; rather, the Government is suing directly under the Securities Act and the Exchange Act.  Special PSLRA pleading rules related to confidential informants, therefore, do not apply.  See generally In re Reserve Fund Secs. and Derivative Litig., 732 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2010).  In addition, the Amended Complaint does not appear to rely on the statements of any confidential witness.  The COO of e-Smart is quoted, but all parties involved know that the COO during the relevant period was Richard Barrett.  See Pl. Opp. to Grace's Mot. at 26 n.14.  As a result, this defense presents no obstacle to the Amended Complaint.

## IV.   Conclusion

Because the Amended Complaint was timely filed and sets out the essential elements of each claim in requisite specificity, the Court will deny Defendants' Motions to Dismiss.  A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  March 12, 2014