**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    :
SECURITIES AND EXCHANGE COMMISSION,   :
                                                    :
                           Plaintiff,           :
                                                    :
                    v.                              :  No. 11-cv-00895 (JEB)
                                                    :
e-SMART TECHNOLOGIES, INC., et al.,         :
                                                    :
                           Defendants.        :
_____:


**PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT AS TO DEFENDANT MARY GRACE,
SUBMITTED PURSUANT TO LOCAL RULE 7(h)**

**I.**      ***Grace Completely Controls e-Smart and Two Related Private Companies***

1.      e-Smart Technologies, Inc. ("e-Smart") is a Nevada Corporation.  Its stock, registered

under 12(g) of the Exchange Act, trades in the over-the-counter market.  e-Smart is engaged "in

the business of creating, marketing, manufacturing, installing operating and maintaining

biometric identification systems."  From its inception through the end of 2008, the last date for

which information is available, e-Smart had a total of $39,717 in revenue.  At this time, it has no

ongoing U.S. business operations.

**Support**:  Defendants' e-Smart Technologies, Inc.'s, IVI Smart Technologies, Inc.'s,
Intermarket Ventures, Inc.'s, Mary A. Grace's, and Tamio Saito's First Amended Joint Answer
to Complaint and Jury Demand ("Def. Ans.") ¶ 16; Att. 165 to the Maher Declaration (filed
herewith), e-Smart 2006 10-K (at 3); Att. 171, e-Smart 2007 10-K (at 21); Att. 127, Ex. 21 to the
Deposition of David Howe (at Bates-label CV 1545).

2.      IVI Smart Technologies, Inc.("IVI") is a privately held corporation that owns the rights

to the technology e-Smart developed and marketed.  IVI is e-Smart's principal shareholder,

holding 61% of the total number of e-Smart's shares outstanding.  IVI "has historically had and

will continue to have the ability to control the outcome of all matters requiring" e-Smart

stockholder approval.  IVI's only two employees are Mary Grace ("Grace") and Tamio Saito

("Saito").  IVI has no business operations.  IVI is a related party to e-Smart.

**Support**: Def. Ans. ¶ 19; Att. 171, e-Smart's 2007 10-K (at 24); Att. 191, August 23, 2007 email
from Mary Grace to Richard Barrett, et al., Bates-labeled SEC-Barrett-EM-0000078.

3.      Intermarket Ventures, Inc., ("Intermarket") is a privately held corporation that owns 7%

of e-Smart.  Intermarket's only two employees are Grace and Saito.  Intermarket is IVI's

principal shareholder.  Intermarket has no business operations.  Intermarket is a related party to

e-Smart.

**Support**: Def. Ans. ¶ 20; Att. 171, e-Smart's 2007 10-K (at 24).

4.      Grace is the CEO, CFO and Director of e-Smart.  Grace is also the CEO, president and

majority shareholder of IVI and Intermarket.  In memos and emails, Grace repeatedly made clear

that IVI and Intermarket should maintain control of e-Smart.

**Support**: Def. Ans. ¶¶ 16, 19, 20; Att. 171, e-Smart's 2007 10-K; Att. 102, Ex. 19 to the Grace
Depo.; Att. 103, Ex. 20 to the Grace Depo.

5.      Grace has exclusive control over all of e-Smart's business and financial matters,

including the issuance of stock.  Board members, investors, employees and service providers

have all described Grace as e-Smart's unopposed authority.  Grace controls all of e-Smart's, IVI

and Intermarket's active accounts and wire transfers.

**Support**: Att. 67, Transcript of the Deposition of Stuart Hung ("Hung Depo. Tr."), 52:23-59:5,
94:23-95:4, 121:4-8, 133:21-24; Att. 70, Transcript of the Deposition of Anthony Russo ("Russo
Depo. Tr.") 22:19-23:5, 54:18-56:4, 81:22-82:3, 92:15-94:5, 95:17-96:14, 122:7-12; Att. 65,
Transcript of the Deposition of Beverly O'Meally ("O'Meally Depo. Tr.") 36:11-37:13; Att. 74,
Transcript of the Deposition of Roger Rosenberg, 21:17-21, 29:9-21; Att. 72, Transcript of the
Deposition of Thomas Volpe ("Volpe Depo. Tr.") 17:7-15; Att. 66, Leshkowitz Depo. Tr. 13:18-
25, 58:2-9; Att. 23, Transcript of the Investigative Testimony of Douglas Borwick ("Borwick
Invest. Tr.") 26:5-9; Att. __, Ex. 5 to the Deposition of Charlie Black; e-Smart 2007 10-K; Att.
85, Ex. 21 to the Deposition of William McVey ("McVey Depo.") (at 29)[1]; Att. 200, February

---

[1] Due to the manner in which the documents were produced, certain exhibits cited herein, including
Exhibits 2 and 4 to the Mollett deposition, 2 and 21 to the McVey deposition, and 20, 21 and 22 to the
Howe deposition, actually contain multiple independent documents.  Both here and in the _____

25, 2008 email from Mary Grace to Beverly O'Meally, Bates-labeled ESMT 051868; <u>Att. 179</u>, June 23, 2006 email from Mary Grace to Antonio Radaeli and others, Bates-labeled ESMT 021707; <u>Att.'s 1, 5, 6, 7, 8</u>, Account opening documents Bates-labeled BOA 000003, BOA 000136-137, BOA 000177-178, BOA 000187-188, BOA 000241-242.

6.     A memo drafted in 2007 by e-Smart's long-time outside auditors, referring to Grace, stated that "Management is dominated by one person, the CEO, who unilaterally makes the decisions for the company."

**Support**: <u>Att. 131</u>, Ex. 3 to the Russo Depo

7.     Grace had exclusive control over the decision whether to allocate money from IVI to e-Smart.

**Support**: <u>Att. 65</u>, O'Meally Depo. Tr. 33:3-10; <u>Att. 70</u>, Russo Depo. Tr. 66:24-67:8

8.     No e-Smart Boardmember, outside consultant, accountant or auditor reviewed IVI or Intermarket's accounts and other financial records.

**Support**: <u>Att. 66</u>, Leshkowitz Depo. Tr. 58:2-9; <u>Att. 67</u>, Hung Depo. Tr. 41:7-15; <u>Att. 70</u>, Russo Depo. Tr. 22:24-23:5; <u>Att. 68</u>, Transcript of the Deposition of Charles Black ("Black Depo. Tr.") 52:17-22; <u>Att. 72</u>, Volpe Depo. Tr. 14:8-13.

9.     As CEO and control-person of e-Smart, IVI and Intermarket, Grace stood on both sides of transactions between those companies.

**Support**: <u>Att. __</u>, Hung Depo. Tr. 135:1-18; <u>Att. __</u>, Russo Depo. Tr. 121:7-122:12; <u>Att. 123</u>, Ex. 5 to the Black Depo.

10.     Although investors and e-Smart's Board strongly criticized her performance, Grace refused to step down as e-Smart's CEO and relinquish control.  In communications with e-Smart investors and others, she described herself as essential.

**Support**: <u>Att. 68</u>, Black Depo. Tr. 86:15-87:22, 102:3-11; <u>Att. 125</u>, Ex. 17 to the Black Depo.; <u>Att. 71</u>, Transcript of the Deposition of Gary Messina ("Messina Depo. Tr.") 50:11-

---

Declaration, filed herewith, the SEC has identified the specific document – either by page or, where available, Bates-number – being used as support.

51:11; Att. 98, Ex. 14 to the Grace Depo.; Att. 85, Ex. 21 to the McVey Depo. (at 56); Att. 92, Ex. 3 to the Grace Depo.

**II.** ***e-Smart Had No Money, So Grace Solicited Investments By Falsely Claiming That e-Smart Had Commitments For Financing and Contracts That Will Lead To Revenues***

11.     e-Smart had virtually no revenues and was almost always low on cash.  Service

providers, Board members, consultants and employees routinely went unpaid.

**Support**:  e-Smart 2007 10-K; Att. 63, Transcript of the Deposition of Mary Grace ("Grace Depo. Tr.") 35:5-13, 155:4-156:3, 158:8-16; Att. 98, Ex. 14 to the Grace Depo.; Att. 68, Black Depo. Tr. 50:2-4, 94:5-14; Att. 72, Volpe Depo. Tr. 97:11-22; Att. __, Hung Depo Tr. 37:18-38:8; Att. 66, Leshkowitz Depo. Tr. 21:13-21; Att. __, Ex. 4 to the Deposition of Henry Mollett ("Mollett Depo.") (at 58, 229); Att. __, Russo Depo. Tr. 40:9-23; Att. 82, Ex. 16 to the McVey Depo.; Att. 85, Ex. 21 to the McVey Depo. (at 49, 51).

12.     To raise funding, Grace repeatedly solicited money from investors, both directly and

indirectly.

**Support**:  Att. 58, Transcript of the Deposition of William McVey ("McVey Depo. Tr.") 27:13-28:19;  Att. 59, Mollett Depo. Tr. 38:20-39:18, 42:12-25; Att. 88, Ex. 5 to the Mollett Depo.; Att. 25, Elek Invest. Tr. 36:10-23; Att. 56, Transcript of the Deposition of Kenneth Wolkoff ("Wolkoff Depo. Tr.") 30:2-31:6, 37:20-40:3; Att. __, Transcript of the Deposition of Douglas Borwick ("Borwick Depo. Tr.") 10:2-11:2, 14:18-15:7, 19:15-21:6; Att. 78, Ex. 2 to the McVey Depo. (at 4); *see also* Paragraphs 15 through 31 below.

13.     In response to Grace's solicitations, investors either purchased stock, or provided loans or

other funding and received stock and other securities in return.

**Support**[2]:  Att. 57, Borwick Depo. Tr. 6:2-15:10; Att. 58, McVey Depo. Tr. 13:2-10, 23:18-24:12, 32:5-20; Att. 59, Mollett Depo. Tr. 11:14-15:4; Att. 56, Wolkoff Depo. Tr. 10:15-11:8, 13:7-14:16, 15:7-16:5; Att. 25, Elek Invest. Tr. 20:14-22:13, 25:13-17, 59:9-60:7.

14.     As but one example, William McVey – a frequent recipient of Grace's solicitations –

"paid to e-Smart $839,500 for 20,513,000 shares" between 2005 and 2010.  (McVey also made

indirect purchases of stock and loans totaling additional hundreds of thousands of dollars.)

---

[2] In addition to the support located throughout this Statement of Facts, numerous investors provided hundreds of pages of confirmations, certificates and other material verifying their stock purchases.  To reduce the size of this filing, those documents have been omitted, but could be provided should the Court require them.

**Support**: <u>Att. 78</u>, Ex. 2 to the McVey Depo. (at 3).

15.     In soliciting these investments, beginning no later than 2006 and continuing through

2011, Grace routinely and repeatedly claimed and implied that e-Smart had signed, or was about

to sign, lucrative contracts and/or major funding agreements.

**Support**: <u>Att. 63</u>, Grace Depo. Tr. 314:11-315:17; <u>Att. 98</u>, Ex. 14 to the Grace Depo.; <u>Att. 100</u>, Ex. 17 to the Grace Depo.; <u>Att. 101</u>, Ex. 18 to the Grace Depo.; <u>Att. 104</u>, Ex. 27 to the Grace Depo.; <u>Att. 105</u>, Ex. 28 to the Grace Depo.; <u>Att. 109</u>, Ex. 34 to the Grace Depo.; <u>Att. 115</u>, Ex. 42 to the Grace Depo.; <u>Att. 116</u>, Ex. 43 to the Grace Depo.; <u>Att. 56</u>, Wolkoff Depo. Tr. 32:8-15, 34:23-35:4, 37:12-39:19; <u>Att. 77</u>, Ex. 11 to the Wolkoff Depo.; <u>Att. __</u>, Oct. 26, 2006 email from Mary Grace to Ken Wolkoff and attachments (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo.); <u>Att. 188</u>, November 1, 2006 email from Mary Grace to Ken Wolkoff (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo.); <u>Att. 59</u>, Mollett Depo. Tr. 22:5-14; <u>Att. 86</u>, Ex. 2 to the Mollett Depo (at 68, 69, 86, 87, 100, 109); <u>Att. 88</u>, Ex. 5 to the Mollett Depo.; <u>Att. 58</u>, McVey Depo. Tr. 23:18-22; <u>Att. 78</u>, Ex. 2 to the McVey Depo. (at 4, 22); <u>Att. 80</u>, Ex. 11 to the McVey Depo.; <u>Att. 81</u>, Ex. 13 to the McVey Depo.; <u>Att. 82</u>, Ex. 16 to the McVey Depo.; <u>Att. 83</u>, Ex. 17 to the McVey Depo.; <u>Att. 84</u>, Ex. 18 to the McVey Depo.; <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 12, 15, 61, 62-63, 66); <u>Att. 124</u>, Ex. 11 to the Black Depo.; <u>Att. 57</u>, Borwick Depo. Tr. 10:2-11, 13:4-12, 31:13-19; <u>Att. 23</u>, Borwick Invest. Tr. 41:24-42:21, 128:21-129:22; <u>Att. 25</u>, Elek Invest. Tr. 39:19-40:9, 58:13-19; *see also* paragraph 25 below.

16.     Grace made these representations directly to investors William McVey, William Sandler,

Henry Mollett, Kenneth Wolkoff, Douglas Borwick, Michael Elek, Robert Aronowitz and Harry

Wills, among others.  She also made representations indirectly through James Desmond, while

also forwarding to investors emails by Richard Kim containing claims of imminent contracts and

revenues.  Through Wolkoff, she made these representations indirectly to numerous other

investors.

**Support**: *See* 15, above.

17.     A July 30, 2006 email solicitation from Grace to investors Henry Mollett and William

McVey describes "three large funding commitments" that will be "a good source of funding for

the company for the next 3-6 months."  In the email, Grace says the "commitments" are

temporarily delayed, compelling her to ask Mollett and McVey to "loan" e-Smart for over

$500,000 to cover purported patent filings, the "delivery" of "10,000 cards" to a counterparty,

listing e-Smart on AMEX, and concluding a deal with NEC.  The loan would be partially re-paid

in stock, but will also be re-paid from what Grace, referring to the "commitments" she details,

calls the "first funding" to e-Smart.

**Support**: <u>Att. 100</u>, Ex. 17 to the Grace Depo.

18.     An October 22, 2008 email solicitation from Grace to Michael Elek and his wife states

that Grace has a "signed agreement for funding and one more who I expect to be able to put in at

least $2.5 million next week . . . [and] can fund up to $20m."  However, Grace states further that

$400,000 is "urgently needed" for a trade show that will change e-Smart's "whole valuation" and

get the company "across the finish line first."

**Support**: <u>Att. 101</u>, Ex. 18 to the Grace Depo.

19.     An October 26, 2006 email from Grace to Kenneth Wolkoff attached a memo claiming

that e-Smart has a "joint venture" in Korea that will earn it "$150M per year once the program

reaches its full operating capacity."  The memo also claims that e-Smart is "finalizing two

investment opportunities of $50M each," but that e-Smart "needs an immediate short-term bridge

of approximately $250,000, primarily for legal and accounting to complete the larger investment

opportunities, which it anticipates to close in the next 30 days."

**Support**: <u>Att. 182</u>, October 26, 2006 email from Mary Grace to Kenneth Wolkoff and
attachments (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo.).

20.     On October 7, 2009, Grace wrote to William Sandler and Henry Mollett seeking

"emergency funds."  According to Grace, the emergency funds were a short-term measure to

forestall "serious problems," since, Grace promised, millions would soon be in e-Smart accounts.

Indeed, "[w]ith the Saudi's it is not a matter of if, we have their commitment."  Grace added that,

"We have commitments from two banks for additional funds and factoring and discounting of

[t]he Purchase Orders.  They have committed to and are excited about investing in the Company also."  Grace planned to meet with the banks, which had apparently already met with the Saudi "funding partners."

**Support**:  Att. 85, Ex. 21 to the McVey Depo. (at 62).

21.     As e-Smart Board member Thomas Volpe explains, "factoring means you have a genuine receivable that a bank will give you some value for."  Volpe also testified that, "We never saw any evidence that specific financing was officially completed, done, and any funds were transmitted."

**Support**: Att. 72, Volpe Depo. Tr. 56:11-57:7, 83:1-3.

22.     An April 27, 2010 email from Grace to Mollett, McVey and other investors forwarded another email she wrote to investor Robert Aronowitz, who was an associate of Mollett and McVey.  In the forwarded email, Grace describes two groups that "are trying to advance [e-Smart] money" and that have purportedly said they can "release funds . . . in May, after May 10-15th."  However, Grace asks the original email recipient to "think of any existing shareholder" that can help "get the $550,000 to Korea by Friday."

**Support**: Att. 84, Ex. 18 to the McVey Depo.

23.     An October 31, 2011 email to Mollett, McVey and other investors in which Grace condemns them for refusing to provide an additional $250,000 in "emergency funds."  Grace claimed in the email that e-Smart is on the verge of "deliver[ing] cards," which would allow e-Smart "to close the financing deals with the Funds."

**Support**: Att. 98, Ex. 14 to the Grace Depo.

24.     In a draft of an email to Grace he shared with other investors, Aronowitz stated that

Grace was "the officer and director of the company who orchestrated our investments and loans

to the company."

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 29).

25.     eSmart also repeatedly made press releases and published investor updates touting

lucrative contracts and business partnerships.  As CEO, Grace authorized, edited, and was quoted

in these press releases and updates.  Grace also communicated with investors and Board

members about the significance of these press releases and updates, including during an investor

conference call in December of 2007.

**Support:** <u>Att. 230</u>, May 18, 2007 Press Release, Bates-labeled HC 052114; <u>Att. 95</u>, Ex.9 to the
Grace Depo; <u>Att. 190</u>, May 23, 2007 email from Mary Grace to Kelly O'Meara, Bates-labeled
Omeara-E-0050491; <u>Att. 189</u>, May 16, 2007 email from Mary Grace to Emile Merzoug and
others, Bates-labeled Omeara-E-0050519;  <u>Att. 105</u>, Ex.28 to the Grace Depo.; <u>Att. 106</u>, Ex.29 to
the Grace Depo.; <u>Att. 107</u>, Ex. 30 to the Grace Depo.; <u>Att. 108</u>, Ex.31 to the Grace Depo; <u>Att.
109</u>, Ex. 34 to the Grace Depo.; <u>Att. 153</u>, November 2007 "News From the Chairman," Bates-
labeled O'Meara-P-4335; <u>Att. 193</u>, November 5, 2007 email from Mary Grace to O'Meara and
Fritz, with attachment, Bates-labeled O'Meara-P-4345; <u>Att. 79</u>, Ex. 6 to the McVey Depo.; <u>Att.
25</u>, Elek Invest. Tr. 34:11-35:10.

26.     During a December 2007 shareholder call, Grace described numerous "agreements to

deliver our technology," various partnerships with established companies, "rollouts" of the e-

Smart card, "potential revenues" that are expected to be "substantial," "two substantial financing

offers" which Grace and others were "assured" would close, and a major "commitment" that has

not been reduced to writing, but that Grace will "finalize" after the New Year.

**Support** : <u>Att. 109</u>, Ex. 34 to the Grace Depo.

27.     In a February 2008 press release, which quoted Grace at length, e-Smart claimed that

Samsung had contracted with e-Smart to make "irrevocable" purchases of e-Smart's cards.  The

press release stated that "the Company believes the Samsung orders may produce profits in excess of $100 million."

**Support**: <u>Att. 108</u>, Ex. 31 to the Grace Depo.

28.     In the February 2008 press release, Grace called the Samsung contract "the largest order of its kind placed in the world to date for a biometric smart card."  The press release emphasized that Samsung "*shall* make an irrevocable purchase order," and that e-Smart "*will* deliver 20 million [smart cards] over a two year period to Samsung." (emphasis added).  Further, the press release declared that e-Smart "believes the Samsung orders may produce profits in excess of $100 million."

**Support**: <u>Att. 108</u>, Ex. 31 to the Grace Depo.

29.     In direct communications with directors and investors around the time of the February 2008 press release, Grace made similar claims.  Language about the scale of profits was included in the press release at Grace's insistence.

**Support**: <u>Att. 104</u>, Ex. 27 to the Grace Depo.; <u>Att. 105</u>, Ex. 28 to the Grace Depo.; <u>Att. 106</u>, Ex. 29 to the Grace Depo.; <u>Att. 107</u>, Ex. 30 to the Grace Depo.; <u>Att. 25</u>, Elek Invest. Tr. 58:2-59:4.

30.     The night before e-Smart issued the press release, Grace wrote a long email to e-Smart's Board and counsel stating that "we have irrevocable purchase orders," that "[t]his is a very large and important contract," and that "we have a responsibility to let our shareholders know, as best we can estimate, that the contract may be very profitable for the company."

**Support**: <u>Att. 107</u>, Ex. 30 to the Grace Depo.

31.     Grace echoed these claims in an email to an investor a few days before the press release was issued, telling him that "today we signed a contract with Samsung for $20 [sic] million cards at $21 a card.  (Our cost will be $4)  Samsung is giving us an Irrevocable Purchase Order and it

is bankable.  This is the largest order for biometric smart cards ever placed."  Prior to making

these claims and the claims in the press release, Grace never communicated directly with anyone

at Samsung about the contract.

**Support**:  Att. 105, Ex. 28 to the Grace Depo.; Att. 63, Grace Depo. Tr. 226:22-230:8.

32.     By 2008, when e-Smart still had not made its own card sensor, an item the Amended

2005 10-K called "a key component," the cheapest commercially available sensor alone cost – as

Grace knew – between $15 and $21.  e-Smart's "phase 1" plan was to attempt to bring that cost

to $9.

**Support**: Att. 235, e-Smart Technologies Development Report, Bates-labeled ESMT
042921; Att. 162, e-Smart Amended 2005 10-K (at 10); Att. 127, Ex. 21 to the Deposition of
David Howe, at Bates-label CV 1465.

33.     Contrary to Grace's repeated claims, including in the February 2008 press release, the

2008 Samsung agreement did not compel Samsung to purchase cards from e-Smart.  Although e-

Smart eventually disclosed the Samsung contract well after the 2008 press release – in a March

2008 8-k that repeated the press release's claims – Grace never corrected her and e-Smart's

misrepresentations.

**Support**:  Att.'s 173, 174, e-Smart's 8-K dated March 13, 2008 and exhibit; Att. 63, Grace
Depo. Tr. 237:18-21; Att. 68, Black Depo. Tr. 96:9-97:2.

34.     The contract stated that "'Samsung S1' shall adjust the quantity and the deadline of the

product based on the individual orders after the notification to 'e-Smart.'"  Further, "the initial

date and quantity of delivery shall be determined by 'Samsung S1' and 'e-Smart' after separate

negotiation."  The contract contained no minimum card purchase.

**Support**: Att.'s 173, 174, e-Smart's 8-K dated March 13, 2008 and exhibit.

35.     The 2008 Samsung contract did not bring in any revenue for e-Smart.

**Support**: Att. 63, Grace Depo. Tr. 320:4-321:1; Att. 68, Black Depo. Tr. 97:19-21.

36.     When asked if he believed that the February 2008 press release mischaracterized the

Samsung contract, Board member Charlie Black testified that he "could see how a reasonable

man would think that."

**Support**:  Att. 68, Black Depo. Tr. 98:17-99:7.

37.     The Samsung contract described in the February 2008 press release was extremely

important to both e-Smart and investors.  The announcement of the purported deal caused a spike

in the price and trading volume of e-Smart stock.

**Support**: Att. 25, Elek Invest. Tr. 34:20-35:10; Att. 63, Grace Depo. Tr. 204:6-14; Att. 68, Black
Depo. Tr. 95:21-96:3; Att. 175, Declaration of Stephen P. Glascoe and Exhibits.

38.     None of the contracts or financing Grace described, including the 2008 Samsung

contract, ever amounted to any significant money or revenues for e-Smart.

**Support**: 2007 10-K; Att. 117, Ex. 44 to the Grace Depo.; Att. 63, Grace Depo. Tr. 320:4-
321:1; Att. 78, Ex. 2 to the McVey Depo. (at 9); Att. 87, Ex. 4 to the Mollett Depo. (at 150,
151); Att. 85, Ex. 21 to the McVey Depo. (at 23, 29, 61); Att. 68, Black Depo. Tr. 97:19-21.

39.     Investors repeatedly noted the lack of third-party corroboration for Grace's contract

claims.

**Support**: Att. 225, August 6, 2011 email from Tom Howard to Henry Mollett, Bates-labeled
SEC-MOLL 0000289-90; Att. 198, Dec. 20, 2007 email from Everett Senter to
shareholderrelations@e-smart.com, Bates-labeled Omeara-E-0014910.

40.     Throughout the time period when Grace, or e-Smart at her direction, made these claims,

investors directly relied on them in making investments and other commitments to e-Smart, and

in some cases provided money specifically so that deals could be finalized or completed.

Investors regularly pressed Grace and her surrogates James Desmond and Kenneth Wolkoff for

information on the deals.

**Support**: Att. 115, Ex. 42 to the Grace Depo.; Att. 116, Ex. 43 to the Grace Depo.; Att. 59,
Mollett Depo. Tr. 35:4-13; Att. 87, Ex. 4 to the Mollett Depo. (at 59, 150, 151); Att. 58, McVey

Depo. Tr. 27:4-30:13; Att. 78, Ex. 2 to the McVey Depo. (at 8-10); Att. 85, Ex. 21 to the McVey
Depo. (at 2, 23, 27-28, 29, 55-56, 57-58, 64-65); Att. 25, Elek Invest. Tr. 34:13-35:13; Att. 23,
Borwick Invest. Tr. 39:18-43:6; Att. 187, April 11, 2007 email from Halden Shane to Maranda
Fritz, Mary Grace and George Sobol, Bates-labeled HC 003583; Att. 219, May 3, 2011 email
from Robert Aronowitz to Jim Desmond and others, Bates-labeled SEC-MOLL 0000220; Att.
217, January 21, 2011 email from Henry Mollett to Robert Aronowitz and William Sandler,
Bates-labeled SEC-MOLL 0000137; Att. 210, October 1, 2010 email from Mary Grace to Robert
Aronowitz and others, Bates-labeled SEC-MOLL 0000196; Att. 211, November 18, 2010 email
from Alan Clements to media@e-smart.com, Bates-labeled SEC-MOLL 0000125.

41.     When e-Smart invited investor questions prior to a December 2007 shareholder call, most

questions concerned Grace's claims about contracts and financing.

**Support**:  Att. 196, December 18, 2007 email from Mary Grace to Fritz, et al., Bates-labeled
O'Meara-E-14959; Att. 197, December 18, 2007 email from Gerard Casale to Grace et al.,
Bates-labeled O'Meara-E-15050; Att. 237, Document titled "Shareholder Questions," Bates-
labeled O'Meara-E-50165; Att. 199, December 27, 2007 email from Doug Borwick to
shareholders, Bates-labeled DB9.

42.     In an April of 2007 email, investor Douglas Borwick told Grace that "I believe that

millions of dollars were raised over the last two years by telling investors that funding was about

to take place . . . . There are many investors that believe they were told a lie regarding imminent

funding, just to get their money."

**Support**: Att. 115, Ex. 42 to the Grace Depo.

43.     In an October of 2006 email, Kenneth Wolkoff told Grace that another investor had just

called him, and "[f]eels that we are fraudulent and open for criminal prosecution. . . . Feels that

we lied and defrauded him about the funding that we said was in which lead he and friends to put

in more money."

**Support**: Att. 116, Ex. 43 to the Grace Depo.

44.     In an April 11, 2007 email to Maranda Fritz, Mary Grace and George Sobol, the investor

Halden Shane described his reliance on Grace's claims that e-Smart had contracts "worth

billions."  Shane also says that Grace emphasized that none of the revenues and financing would

be realized unless he provided emergency funds, and that "time was of the essence."  Shane

forwarded $250,000 in response to Grace's "constant pressure" but demanded it back after

deciding that e-Smart was, as he put it, "starting to look like a scam."

**Support**: <u>Att. 187</u>, April 11, 2007 email from Halden Shane to Maranda Fritz and Mary Grace,
Bates-labeled HC003583.

45.      In a March 19, 2010 email, after giving Grace another $175,000 in "emergency" funds,

investor Robert Aronowitz told Grace that "the financing you've been courting since our first

loan in November 2009 . . . has either collapsed or vanished.  This is disappointing but not

entirely unexpected, as you've continually promised and represented positive results, but in

actuality have achieved little with the exception of securing our sole funding."

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 56).

46.      In an October 21, 2011 email, investor William McVey told Grace: "Mary, I am sure we

would all help (if we had the money) if we thought you ACTUALLY HAD A DEAL.  We are

always told that you can't show us any proof that you have a deal . . . . It is always a verbal

promise that never seems to ever materialize.  And then when the crisis for money occurs we are

told that a new deal is only a week or two away."

**Support**: <u>Att. 78</u>, Ex. 2 to the McVey Depo. (at 4).

47.      By 2009, the Board challenged Grace on her "repeated" claims.  In a subsequent letter to

the Board, Grace nonetheless continued to insist that funding and revenues were imminent.

**Support**: <u>Att. 117</u>, Ex. 44 to the Grace Depo.; <u>Att. 110</u>, Ex. 35 to the Grace Depo.; <u>Att. 92</u>, Ex. 3
to the Grace Depo.

48.      Grace continued to make these claims despite the fact that, as early as 2006 and

repeatedly thereafter, e-Smart investors, employees, affiliates, and Board members told Grace

that they questioned her claims' validity.  Many investors accused Grace of misleading them.

**Support**: Att. 89, Ex. 11 to the Saito Depo. (¶¶ 7-15, 26); Att. 184, February 18, 2007 email from Mary Grace to Ken Wolkoff (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo.); Att. 112, Ex. 39 to the Grace Depo.; Att. 115, Ex. 42 to the Grace Depo.; Att. 116, Ex. 43 to the Grace Depo.; Att. 117, Ex. 44 to the Grace Depo.; Att. 87, Ex. 4 to the Mollett Depo. (at 151); Att. 85, Ex. 21 to the McVey Depo. (at 55, 56, 60); Att. 187, April 11, 2007 email from Halden Shane to Maranda Fritz, Mary Grace and George Sobol, Bates-labeled HC 003583; Att. 205, December 7, 2008 email from Gary Messina to Mary Grace and reply, Bates-labeled EC02496; Att. 211, November 18, 2010 email from Alan B. Clements to media@e-smart.com, Bates-labeled SEC-MOLL 0000125; Att. 213, Dec. 2, 2010 email from Henry Mollett to Mary Grace and response, Bates-label SEC-MOLL 0000206-07; Att. 124, Ex. 11 to the Black Depo.

49.     As but one example, in a January 26, 2010 email, e-Smart shareholder Christine Dolan told Grace that she does not believe Grace's claims "for ever so many years" about financing from the "Saudi Group."  Dolan added that "You have left people drowning in anxiety, living at financial risk, living the nightmare you created while continuing to lie, deflect, defame, and neglect your fiduciary duty to this public company!"

**Support**: Att. 124, Ex. 11 to the Black Depo.

50.     From no later than 2006 through 2011, Grace often claimed that deals would close if only investors gave her additional funds, and that these investors must act to protect their already substantial investment.

**Support**: Att. 25, Elek Invest. Tr. 28:14-29:5, 43:20-44:24; Att. 187, April 11, 2007 email from Halden Shane to Maranda Fritz, Mary Grace and George Sobol, Bates-labeled HC 003583; Att. 58, McVey Depo. Tr. 28:6-19; Att. 82, Ex. 16 to the McVey Depo.; Att. 84, Ex. 18 to the McVey Depo.; Att. 85, Ex. 21 to the McVey Depo. (at 15, 22, 62-63, 64-65); Att. 98, Ex. 14 to the Grace Depo.; Att. 99, Ex. 16 to the Grace Depo.; Att. 101, Ex. 18 to the Grace Depo.; Att. 87, Ex. 4 to the Mollett Depo. (at 62-63); Att. 88, Ex. 5 to the Mollett Depo.; Att. 214, December 11, 2010 email from Mary Grace to Howard Wills, et al., Bates-labeled SEC-MOLL 0000144; Att. 218, January 26, 2011 email from Mary Grace to Robert Aronowitz, et al., Bates-labeled SEC-MOLL 0000185-86.

51.     Examples include an October 19, 2011 email to Aronowitz, McVey, Mollett and others, in which Grace claimed repeatedly that emergency money is needed to "fulfill the funding requirement" in a purported deal, and that "funds were urgently needed in order to deliver to this

project, so we can make a deal to finance the manufacture and delivery of our product with the

Funds." That email was consistent with a long-established pattern.  Grace told Kenneth Wolkoff

in a March 27, 2006 email that a $500,000 investment is needed "by the end of the week" so as

to "trigger" major financing that has been promised but is being held up by "Compliance" at "the

bank."   Grace claimed in that email that she had an "agreement in principle" for $250 million of

financing, which is "finalized except for some legalizations," as well as a signed, "potentially

lucrative" contract in Indonesia, but that the $500,000 is needed right away "to insure we have

no setbacks at the last minute."

**Support**:  Att. 98, Ex. 14 to the Grace Depo.; Att. 99, Ex. 16 to the Grace Depo.

52.     Grace also claimed that lawyers and fund-raisers would help e-Smart if investors

provided her sizable "retainers," or paid for "filing costs" of up to hundreds of thousands of

dollars.  When investors refused, Grace blamed the investors for failing to protect their

investment, and for the lack of documentation.  For example, when Henry Mollett again pressed

Grace to provide documentation for the purported deals, Grace stated in an October 26, 2011

email that: "Unfortunately we could have had all the agreements completed with the Funders but

until now you all were not willing to pay lawyers to draft agreements for the company."

**Support**: Att. 98, Ex. 14 to the Grace Depo.; Att. 99, Ex. 16 to the Grace Depo.; Att. 100, Ex. 17
to the Grace Depo.; Att. 218, January 26, 2011 email from Mary Grace to Jim Desmond, et al.,
Bates-labeled SEC-MOLL 0000185-86; Att. 85, Ex. 21 to the McVey depo. (at 22).

53.     Investors repeatedly demanded that Grace and her surrogate James Desmond provide

documentary support for the purported deals.

**Support**:  Att. 23, Borwick Invest. Tr. 41:24-44:6; Att. 87, Ex. 4 to the Mollett Depo. (at
90); Att. 85, Ex. 21 to the McVey depo. (at 22, 29, 43-44, 56); Att. 219, May 3, 2011 email from
Robert Aronowitz to James Desmond, et al., Bates-labeled SEC-MOLL 0000220; Att. 220, June
14, 2011 email from James Desmond to Robert Aronowitz, et al., Bates-labeled SEC-MOLL
0000019.

54.     Grace nonetheless continued to claim that deals were imminent through the Fall of 2011,

imploring and berating these investors not to cut her off.

**Support**: Att. 98, Ex. 14 to the Grace Depo.; Att. 85, Ex. 21 to the McVey Depo. (at 15,
22); Att. 227, December 4, 2011 email from Mary Grace to James Desmond et al., Bates-labeled
SEC-MOLL 0000238.

55.     Grace repeatedly claimed to be personally negotiating, finalizing and closing many of

these purported contracts and funding commitments.  She claimed to travel extensively in

support of concluding these arrangements.

**Support**: Att. 192, September 21, 2007 email from Mary Grace to
Christopher@brightsideintl.com, et al., Bates-labeled O'Meara-P-2286; Att. 43, Ex. 68 to the
investigative testimony of Anthony Russo; Att. 45, Ex. 154 to the investigative testimony of
Elliot Cole; Att. 113, Sept. 10, 2007 email from Mary Grace to Charlie Black, et al., Bates-
labeled CB43; Att. 143, Ex. 4 to the Messina Depo.; Att. 144, Ex. 6 to the Messina Depo.; Att.
85, Ex. 21 to the McVey Depo. (at 46-48, 64-66); Att. 87, Ex. 4 to the Mollett Depo. (at 62-
63); Att. 63, Grace Depo. Tr. 132:19-133:14, 136:18-137:7; Att. 93, Ex. 7 to the Grace
Depo.; Att. 98, Ex. 14 to the Grace Depo.; Att. 99, Ex. 16 to the Grace Depo.; Att. 101, Ex. 18 to
the Grace Depo.; Att. 113, Ex. 40 to the Grace Depo.; Att. 114, Ex. 41 to the Grace Depo.; Att.
83, Ex. 17 to the McVey Depo.; Att. 195, December 2, 2007 email from Mary Grace to e-Smart
Board members, Bates-labeled HC 043785; Att. 129, Ex. 1 to the Russo Depo.

56.     Grace failed to meet Board member and investor requests for proof that the deals and the

counter-parties existed, keeping them, as one investor put it, "in the dark."  She also frequently

claimed that there were merely short-term delays in paperwork.  For example, in the October 7,

2009 email described at number 20 above, Grace stated that the bank that will fund e-Smart just

needs "the time it takes to do the work to complete it including the legal work and bank

paperwork process."

**Support**: Att. 85, Ex. 21 to the McVey Depo. (at 29, 43-44, 56, 57-58, 59); Att. 78, Ex. 2 to the
McVey depo. (at 4); Att. 226, October 26, 2011 email from Mary Grace to Henry Mollett, et al.,
Bates-labeled SEC-MOLL 0000263-264; Att. 204, December 3, 2008 email from Mary Grace to
Michael Elek, Bates-labeled EI 000044; Att. 72, Volpe Depo. Tr. 82:1-8; Att. 208, September 8,

2009 email from Thomas Volpe to Mary Grace, Bates-labeled CB-2943; <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 62).

57.     Grace frequently refused to provide corroborating documents for the purported deals, often claiming that she could no longer disclose "confidential" information.  In many cases, particularly after 2008, investors had nothing to go on besides her repeated verbal assurances.

**Support**: <u>Att. 184</u>, February 18, 2007 email from Mary Grace to Ken Wolkoff (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo); <u>Att. 224</u>, July 29, 2011 email from James Desmond to William Sandler, et al., Bates-labeled SEC-MOLL 0000285; <u>Att. 223</u>, July 25, 2011 email from Robert Aronowitz to William Sandler and Henry Mollett and reply, Bates-labeled SEC-MOLL 0000027; <u>Att. 216</u>, January 13, 2011 email from William Sandler to Henry Mollett, Bates-labeled SEC-MOLL 0000136; <u>Att. 212</u>, November 22, 2010 email from Mary Grace to Henry Mollett, et al., Bates-labeled SEC-MOLL 0000211; <u>Att. 204</u>, December 3, 2008 email from Mary Grace to Michael Elek, Bates-labeled EI 000044.

58.     For investors who had relied on Grace's grandiose claims, her "confidentiality" tactic was often a source of significant frustration.  In a July 13, 2011 email to other investors, Robert Aronowitz proposed to say to Grace that: "[I]t is our view that it is not acceptable to maintain a 'dead silence' regarding the affairs of the company on the pretext of a purported attorney's counsel or recommendation.  Certainly, such a communication 'restriction' did not thwart any of your efforts to raise capital from any of us; to our reckoning it was only when the funding spigot was turned 'off' did you substantially suspend communication with many of us."

**Support**: <u>Att. 222</u>, July 13, 2011 email from Robert Aronowitz to William Sandler and others, Bates-labeled SEC-MOLL 0000026.

59.     By October 2011, long-term investors Henry Mollett, William McVey and others declined to provide Grace more "emergency funds," emphasizing that they could no longer rely on Grace's word alone.

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 22-23).

60.     As Mollett put it in an October 24, 2011 email to Grace: "As a suggestion send

documentation of your deals to all of us who have signed confidentiallys [sic]."

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 22).

61.     In response to Mollett's email, Grace wrote that there is no written agreement yet, but

there would have been if investors had been "willing to pay lawyers to draft an agreement for the

company."

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 22).

62.     McVey was even more direct in an October 22, 2011 email to Grace, cc'ing other

investors: "We are always told that you can't show us any proof that you have a deal, even

though we have all signed a confidentiality agreement.  *It is always a verbal promise that never*

*seems to ever materialize*.  And then when the crisis for money occurs we are told that a new

deal is only a week or two away."

**Support**: <u>Att. 85</u>, Ex. 21 to the McVey Depo. (at 23).

63.     Grace continued to claim imminent arrangements with certain entities for years, even

when no money ever materialized.  For example, Grace first made promises about funding from

John Duff and his Louis XVII organization in 2006, but, despite never receiving any promised

funds, continued to claim in 2007, 2008 and until at least July of 2009 that Duff was going to

provide funding.  Grace was also warned in 2006 by Tamio Saito, both in an email and in a

sworn declaration in a court proceeding, that Duff was a "scam."  Despite making repeated

promises to numerous parties about John Duff and Louis XVII, Grace now claims not to "even

know what or where the Louis whatever foundation is."

**Support**: <u>Att. 110</u>, Ex. 35 to the Grace Depo.; <u>Att. 111</u>, Ex. 37 to the Grace Depo.; <u>Att. 112</u>, Ex. 39 to the Grace Depo.; <u>Att. 113</u>, Ex. 40 to the Grace Depo.; <u>Att. 114</u>, Ex. 41 to the Grace Depo.; <u>Att. 86</u>, Ex. 2 to the Mollett Depo. (at 100, 107); <u>Att. 77</u>, Ex. 11 to the Wolkoff

Depo.; <u>Att. 89</u>, Ex. 11 to the Saito Depo.; <u>Att. 63</u>, Grace Depo. Tr. 306:3-13; <u>Att. 72</u>, Volpe Depo. Tr. 84:22-85:22.

64.     Claims about Samsung also lasted for years, as did claims about business in Korea.  E-Smart listed Samsung as a partner as early as 2005.  By early 2009, Grace was still promising the Board that e-Smart would profit from "irrevocable" purchase orders from Samsung and other Korean entities.

**Support**: <u>Att. 110</u>, Ex. 35 to the Grace Depo.; <u>Att. 47</u>, Ex. 253 to the Elek Invest. Tr.; <u>Att. 25</u>, Elek Invest. Tr. 58:8-20; <u>Att. 146</u>, Ex. 9 to the Messina Depo.; <u>Att. 182</u>, October 26, 2006 email to Ken Wolkoff  (produced as part of a thumb drive that is Exhibit 2 to the Wolkoff Depo); <u>Att. 98</u>, Ex. 14 to the Grace Depo.; <u>Att. 194</u>, Nov. 29, 2007 email from Thomas Volpe to Mary Grace, et al., Bates-labeled HC040002; <u>Att. 151</u>, March 2005 "News From the Chairman"; <u>Att. 77</u>, Ex. 11 to the Wolkoff Depo; <u>Att. 72</u>, Volpe Depo. Tr. 82:16-84:21.

65.     In describing the state of these deals, Grace used words and phrases like "bankable," "in the bank," "closing," "irrevocable," "signed," "agreed," "finalized," "commitment," "in writing," "factor," "executed," "guaranty," "as soon as the wire is received," "expect to have a confirmation from the bank," "delivering our card," "revenues will begin," "revenues have begun," "our profits will be enormous," and other phrases to imply that deals were imminent. The SEC has found no record of e-Smart suing a purported counter-party for breach of a finance, sales or distribution contract.

**Support**:  *See* 15-37 above; *see also* <u>Att. 63</u>, Grace Depo. Tr. 317:2-318:3; <u>Att. 72</u>, Volpe Depo. Tr. 82:16-83:3; <u>Att. 44</u>, Ex. 139 to the investigative testimony of Charlie Black; <u>Att. 48</u>, Ex. 254 to the investigative testimony of Michael Elek; <u>Att. 152</u>, January 2007 "News From the Chairman."

66.     Although e-Smart received nothing from these promised deals, and despite the fact that e-Smart never manufactured or delivered more than a few cards, Grace continually made representations about deals without ever first waiting until e-Smart had actually received funding or purchase orders.

**Support**:  <u>Att. 63</u>, Grace Depo. Tr. 313:16-315:17.

67.     The contracts Grace or e-Smart actually had were primarily agreements to cooperate in the exploration and development of a card system.  They were short contracts with little detail that did not compel any counterparty to buy any cards or pay e-Smart money.  They simply described a basic framework for discussions about future projects.

**Support**:  Att.'s 154, 155, 156, 157, 158, 159, 160, 161, exhibits to e-Smart's 2004 10-K, filed May 9, 2005; Att.'s 168, 169, e-Smart's 8-K dated August 4, 2005 and Exhibit.

68.     In describing these agreements, however, Grace implied that these skeleton contracts were meaningful agreements that would generate massive e-Smart revenues.  She claimed, for example, in a memo provided to Kenneth Wolkoff, that "e-Smart has ALREADY SIGNED CONTRACTS to deploy its Technologies to 40,000,000 people," and that the "e-Smart Signed Contracts are geared to generate minimum transaction fees to e-Smart averaging approx. U.S.$ 0.10/day/person."  Grace also suggested to another investor that the MyBi contract, which was simply a highly qualified agreement to cooperate on a plan to use and market cards, was potentially worth billions.

**Support**: Att. 77, Ex. 11 to the Wolkoff Depo.; Att. 164, e-Smart's 8-K dated August 4, 2005; Att. 187, April 11, 2007 email from Halden Shane to Maranda Fritz, Mary Grace and others, Bates-labeled HC003583.

69.     Grace often paid substantial sums to consultants such as Christopher Harriman and Adnan Khasshogi to procure contracts.  All but two of the purported agreements cited by Grace in her Memorandum in Support of Her Motion to Dismiss, Docket #181at 12, are with entities these consultants contacted.  The record does not contain signed contracts for most, and the document Grace cites as support for their existence openly acknowledges that the prospects for funding are unresolved and tenuous.

**Support**: Att. 63, Grace Depo. Tr. 140:13-141:10; Att. 122, Ex. 23 to the Clisham Depo.; Att. 64, Clisham Depo. Tr. 210:12-211:2.

70.     When consultants actually introduced potential investors to e-Smart, Grace failed to

provide requested information or follow-through in any way.  One of the consultants testified

that, "We had brought all these people to the table, you didn't follow through.  You can't even

go through a due diligence process.  You can't even provide basic information.  It doesn't make

sense."

**Support**: Att. 64, Clisham Depo. Tr. 207:3-211:2.

71.     e-Smart's contract with World Development Corporation ("WDC") was not for a

guaranteed "$50 million."  The contract only provided that WDC would explore joint ventures

with IVI, permitting it to provide zero dollars, which is nearly what occurred.  The Letter of

Guaranty is for an amount "up to" $50 million.  Grace noted to the Board that the announcement

of WDC's deal – misleading described as being a deal with e-Smart – had causes e-Smart's stock

to rise.

**Support**:  Att. 40, Ex. 54 to the Investigative Testimony of Emile Merzoug; Att. 39, Ex. 50 to
the Merzoug Invest. Tr.; Att. 24, Investigative Testimony of Emile Merzoug ("Merzoug Invest.
Tr.") 60:8-13; Att. 95, Ex. 9 to the Grace Depo.

72.     Moreover, e-Smart simply did not perform on the 2007 WDC contract.  Despite repeated

requests by WDC's CEO Emile Merzoug, Grace and e-Smart failed to provide the required

funding for the joint venture, could not demonstrate that they held a necessary patent, and did not

provide engineers for client demonstrations.

**Support**:  Att. 24, Merzoug Invest. Tr. 67:23-68:2, 100:9-102:2, 126:21-127:20, 129:12-
130:19; Att. 71, Messina Depo. Tr. 40:1-45:18.

73.     Grace often highlighted an agreement with an entity known as Bintusa.  That entity was

in fact led by a convicted fraudster named Barry Yaker.  In April of 2007, echoing her statements

to investors, Grace asked Yaker, to "write a letter, or have a letter written by the bank, saying

that $75m is in a [sic] account for the benefit of IVI subject to finalization of the agreement."

The purpose of the letter was to deceptively reassure a counterparty known as MYbi that e-Smart was capable of proceeding on their contract.

**Support**: <u>Att. 188</u>, April 16, 2007 email from Mary Grace to Barry Yaker, Bates-labeled BY 000568; <u>Att. 228</u>, Notice of suspension of license of Barry Yaker to practice law.

74.     In late 2008 and early 2009, Grace circulated purportedly signed purchase orders, letters of intent and distribution agreements to the e-Smart Board and members of an organization known as Civitas (the "2008/09 Agreements").  Grace provided the documents as a condition of Civitas's willingness to help e-Smart establish a business relationship with the Japanese company NEC.

**Support**:  <u>Att. 127</u>, Ex. 21 to the Howe Depo. (at Bates-labels CV 1475-1541).

75.     Grace described the 2008/09 Agreements as creating "irrevocable" and "required" purchase obligations.  Not one of them, however, actually led to any revenues.

**Support**:  <u>Att. 110</u>, Ex. 35 to the Grace Depo.; <u>Att. 127</u>, Ex. 21 to the Howe Depo. (at Bates-labels CV 1542-44).

76.     In fact, the 2008/09 Agreements, to the extent they were legitimate at all, are highly contingent.  Grace explained in one email that e-Smart would not be able to deliver ordered cards until the purchaser/distributor paid e-Smart millions – without which, e-Smart and/or IVI had no ability to manufacture cards.  In fact, one of the agreements involved a loan to IVI, so that it could "pay[] for the new sensors" and other "installation" and "manufacturing" costs.  Another listed numerous "conditions," such as "e-Smart New Sensor applied."

**Support**: <u>Att. 127</u>, Ex. 21 to the Howe Depo. (at Bates-labels 1530-33); <u>Att. 128</u>, Ex. 22 to the Howe Depo. (at Bates-labels 1554, 1557).

77.     Moreover, a number of the 2008/09 Agreements appeared to require e-Smart to deliver cards at a cost significantly below what is what costing e-Smart to make the cards.  Grace herself

acknowledged in connection with the agreements that e-Smart's current sensor alone cost $21, while e-Smart would be delivering cards at $15.

**Support**: <u>Att. 127</u>, Ex. 21 to the Howe Depo. (at Bates-labels CV 1514, 1542-44);

78.     Third party entities were not persuaded that the 2008/09 Agreements were valid, enforceable and likely to produce revenues.  Grace requested that hedge funds and banks "factor" the 2008/09 agreements – in other words, view them as legitimate and guaranteed – and thus provide financing modestly discounted from the agreements' projected value.  Grace also provided the 2008/09 agreements to Civitas to support her claim that e-Smart was a viable entity about to enjoy huge revenues and profits.  No financing was provided, while Civitas deemed the 2008/09 Agreements and other materials inadequate as a basis to proceed.

**Support**:  <u>Att. 100</u>, Ex. 17 to the Grace Depo.; <u>Att. 110</u>, Ex. 35 to the Grace Depo.; <u>Att. 128</u>, Ex. 22 to the Howe Depo. (at Bates-label CV 1720); <u>Att. 127</u>, Ex. 21 to the Howe Depo. (at Bates-labels 1345-46, 1430, 1474); <u>Att. 69</u>, Transcript of the Deposition of David Howe ("Howe Depo. Tr.") 100:14-101:17.

79.     After speaking to "a couple hedge funds" about financing based on the purported purchase orders and letters of intent, Civitas executive Robert Swindell told Grace the following:

•       The "validity of the PO as a secure contract [was] not understood"

•       That his analysis depends on "assuming the contract is valid"

•       That a "legal review of the PO" and an e-Smart "review of delivery risk" – in other words, the risk that e-Smart cannot meet requests for cards – "would be essential before you speak to your investors."

**Support**: <u>Att. 128</u>, Ex. 22 to the Howe Depo. (at Bates-label 1720).

80.     e-Smart's accountants and auditors were compelled to seek explanations from Grace for her spending and stock grants.  According to e-Smart's long-time accountant, the state of e-

Smart's books would make it extremely difficult for any legitimate party to conduct due

diligence, and that in fact Grace obstructed due diligence efforts.

**Support**: Att. 70, Russo Depo. Tr. 26:19-27:15, 29:19-30:25; 48:2-49:25; 68:12-76:18; Att. 131, Ex. 3 to the Russo Depo.; Att. 132, Ex. 4 to the Russo Depo.; Att. 133, Ex. 5 to the Russo Depo.; Att. 134, Ex. 6 to the Russo Depo.;  Att. 135, Ex. 7 to the Russo Depo.; Att. 136, Ex. 8 to the Russo Depo.; Att. 137, Ex. 10 to the Russo Depo.; Att. 138, Ex. 11 to the Russo Depo.; Att. 139, Ex. 12 to the Russo Depo.; Att. 140, Ex. 13 to the Russo Depo.; Att. 141, Ex. 14 to the Russo Depo.; Att. 67, Hung Depo. Tr. 39:17-40:17, 49:21-50:17, 64:3-6, 94:4-96:17, 110:4-113:15.

## III.  _Grace Solicited Investments By Falsely Claiming That e-Smart Had and Could Produce a Viable, Technologically Advanced, Biometric Card_

81.     In its 2006 Form 10-KSB (the "2006 10-K"), signed by Grace and filed on October 24,

2007, e-Smart stated that:

- "We believe we are the first, and currently the only company offering a

  commercially available dual ISO 7816 (contact) and ISO 14443-B (wireless)

  compatible smart card with a fingerprint sensor onboard, biometric matching

  engine onboard and multi-application processor for deployment today."

- e-Smart's "product is also 'dual-interface,'" – in other words, that it works both as

  a card that comes in contact with a reader _and_ as a card that can operate as a

  wireless, non-contact device.

- The card was "water-proof, ESD proof, scratch-proof and c[ould] detect

  'liveness.'"

- The card's "design" purportedly included "competitive advantages" such as a

  "unique" sensor, a complete resistance to tampering and counterfeiting, a "multi-

  application system . . . each completely and securely isolated from the other," and

  a system to make both "false rejects" and "false positives" almost zero.

**Support**: Att. 165, e-Smart 2006 10-K (at 4-5).

82.    In its amended 2005 Form 10-KSB (the "Amended 2005 10-K"), signed by Grace and

filed on March 20, 2008, e-Smart stated that:

- The card "contains a microprocessor, [and] can process information and run
  multiple applications."

- The card was "dual-interface," contained a "unique" sensor, and was "durable and
  easy to use."

- The card was a "multifunctional" card that "could function at the same time as an
  ID card, debit card, debit/credit card, driver's license and/or physical access
  card."

- "As of the date hereof . . . the Super Smart Card is the only dual-interface
  biometrically activated, microprocessor-based smart card product available for
  deployment today."

- And, that e-Smart had also developed a "BVS 2" system, which was a "digital
  architecture for financial or data systems . . . routed through a secure group of
  networked servers that can access an almost unlimited number of database
  systems through e-Smart [sic] exceptional data translation system."

**Support**: Att. 162, e-Smart Amended 2005 10-K (at 5-11).

83.    On November 4, 2008, e-Smart issued a press release introducing a "Next Generation"

card containing a "proprietary" sensor and wireless capabilities.  The card was described as "the

only technology of its kind."

**Support**:  Att. 234, November 4, 2008 press release Bates-labeled ESMT 020288_0001.

84.     Grace also made oral representations to investors, including Henry Mollett, William McVey and Michael Elek, consistent with the statements in e-Smart's 2006 and Amended 2005 10-K's, including that the card could function wirelessly, and that it contained a multi-application function.  She told Douglas Borwick and Kenneth Wolkoff that the card contained "24 databases," and told Mollett and McVey that the card could perform multiple applications. She also told Mollett that the card was impregnable, and that the Defense Department had tried and failed to corrupt it.

**Support**: Att. 57, Borwick Depo. Tr. 33:18-39:7; Att. 59, Mollett Depo. Tr. 16:10-22:4; Att. 58, McVey Depo. Tr. 18:6-12; Att. 25, Elek Invest. Tr. 18:14-22.

85.     In March and July of 2007, she stated to Gary Messina, who owned e-Smart stock and was a former Board member, that e-Smart had card technology that could recognize DNA, do facial recognition, work on existing wireless networks, communicate with satellites, and detect "suicide bombers before they can attack, at a distance of 2.5 miles."

**Support**:  Att. 146, Ex. 9 to the Messina Depo.

86.     As Grace claimed to Michael Elek, e-Smart had "game-changing technology, . . .it's going to change the world, and it's going to be another Microsoft."

**Support**: Att. 25, Elek Invest. Tr. 18:19-23.

87.     However, e-Smart's Chief Technology Officer, Tamio Saito, testified that it was not until "2011 or 2012" that e-Smart purportedly developed a card that was both wireless and contained a multi-application processor.

**Support**: Att. 62, Transcript of the Deposition of Tamio Saito ("Saito Depo. Tr.") 141:6-144:12.

88.     The card and technology were in a perpetual state of development.  By July of 2008, e-Smart was still at what Saito testified was the "starting point" in e-Smart's efforts to create a viable wireless card.

26

**Support**: <u>Att. 62</u>, Saito Depo. Tr. 141:6-143:4.

89.     Marcello Soliven, a key e-Smart engineer, testified that it was 2008 at the earliest before e-Smart had "the first iteration of a wireless card."  As he explained, "everything up to that point that was really salable was contact."  Whatever wireless capability that had previously been developed was not sufficient to power a commercially viable card.

**Support**: <u>Att. 55</u>, Transcript of the Deposition of Marcelo Soliven ("Soliven Depo. Tr.") 176:12-177:7, 181:2-5.

90.     Saito testified that the only "multiple applications" it had were the various steps required to biometrically verify a fingerprint.

**Support**: <u>Att. 62</u>, Saito Depo. Tr. 71:17-73:3.

91.     Soliven testified that he "think[s] some small amounts" of multi-application features were installed in "the '08/'09 version."

**Support**: <u>Att. 55</u>, Soliven Depo. Tr. 26:2-27:5.

92.     Thomas Huffman, who Grace retained in 2007 to work on a card processing system, testified that through at least 2008, he never saw an e-Smart card that had "multi-application capabilities."

**Support**: <u>Att. 73</u>, Transcript to the Deposition of Thomas Huffman ("Huffman Depo. Tr.") 89:5-9; 90:3-21.

93.     e-Smart never licensed a system that Saito, under oath in a prior proceeding, declared was the "only one that would allow e-Smart's Super Smart Card to perform securely in a multifunctional environment."

**Support**: <u>Att. 60</u>, Transcript of the Deposition of Todd Carper ("Carper Depo. Tr.") 56:9 - 61:12; <u>Att. 89</u>, Ex. 11 to the Saito Depo. (at ¶¶ 16-17).

94.     The card had numerous other defects.  In July 2008, an internal e-Smart email that Grace forwarded to investor Michael Elek disclosed that the card has a "fragile sensor," that the

algorithms are still going through a "debugging process," that the power source "is not stable," that the card lacks "authentication from certified organizations," including ISO, that the card has not been tested for reliability or for the "yield" from mass manufacturing, and that the card is still using another company's sensor.

**Support**: <u>Att. 47</u>, Ex. 253 to the Elek Invest. Tr.

95.     By August of 2008, e-Smart was still working to design a reliable card sensor and, according to an email accidentally forwarded by Grace to Civitas personnel, "the manufacturing has still not been stabilized, various methods are under consideration."  e-Smart engineer Ananth Krishnan testified that e-Smart had decided by 2006 that the silicon sensor it was using was too brittle to survive in a pocket or wallet.

**Support**: Ex. 21 Howe Depo. (at Bates-labels CV 1264-1267); <u>Att. 61</u>, Deposition Transcript of Ananth Krishnan, 247:4-248:13.

96.     In 2009, an investor retained a Swiss engineer to write a report on the state of e-Smart's business and technology.  Even though Grace accompanied the engineer to interviews with e-Smart's engineers and marketers, the report, published in August of 2009, made clear that e-Smart was not even close to manufacturing a meaningful number of reliable, cost-effective cards. In particular, the report stated that:

- e-Smart was still trying to develop a sensor through an "ill advised" and "costly" process that had "paralyzed" e-Smart's sales effort.  Worse, "[a]fter two years the new sensor is still not available at an industrial level.

- The existing sensor, however, was "expensive and not reliable [and] was also friable."  It would not pass Korean or ISO7816 certifications.

- Nearly 30% of the small number of existing e-Smart cards with the prior sensor were "defective."

- "The overall manufacturing process has not been thoroughly industrialized."

- Even assuming a new sensor is developed, the "elapsed time to reach full fletched [sic] production is in the order of 18 to 20 months."

- "The cards could not and cannot be provided in high volumes."

- "The solution has not yet undergone a [sic] industrial stress test."

- There is a "lack of transparency on company finances."

- Even with a new sensor, production costs will be at least $16 per card.

**Support**: <u>Att. 91</u>, Ex. 65 to the Saito Depo. (at 27, 28, 30, 33, 39, 64).

97.     In his testimony, Saito confirmed that as late as 2009 – more than a year after Grace projected profits of $100 million from the 2008 Samsung contract based on an assumption that e-Smart's cost to manufacture would be only $4 – the card sensor alone cost $20 and was not "economically feasible."  Other card parts cost $6.00.

**Support**: <u>Att. 62</u>, Saito Depo. Tr. 171:15-22; <u>Att. 231</u>, Purchase order dated September 7, 2007, Bates-labeled FPR124A-0000130.

98.     By 2007, Grace had been informed by multiple senior engineers that e-Smart did not have a viable card or the means to manufacture one.  In July of 2007, Richard Barrett, who Grace had retained as e-Smart's Chief Operating Officer, observed that e-Smart's demo card was not marketable.  The card was fragile and could not interact with a card reader or remote systems.

**Support**: <u>Att. 172</u>, Barrett OSHA testimony at 102-165[3]; <u>Att. 22</u>, Investigative Testimony of Richard Barrett 78:17-98:13

---

[3] While the transcript of Richard Barrett's OSHA testimony is somewhat choppy, the SEC notes that the ALJ in Barrett's suit against e-Smart for wrongful termination based his findings of fact on Barrett's testimony.  *Barrett v. e-Smart Tech., Inc.,* Decision and Order (September 9, 2011) (docketed in this matter as number 85-1).  Barrett's victory – based in large part on the ALJ's finding that his belief e-Smart had no viable card was "objectively reasonable" – was affirmed last year by the Department of Labor's Administrative Review Board.  *Barrett v. e-Smart*, ARB Case No.'s 11-088, 12-013, Final Decision and Order (April 25, 2013).  (Attached to the Maher Declaration as <u>Attachments 173 and 174</u>.)

99.     The following month, Grace asked Barrett to edit e-Smart's draft 2006 10-K.  Barrett

proposed edits to reflect that: there was no card with a multi-processor; there was no basis for e-

Smart's claims about false positives and negatives; and, the technology was not unique, among

other limitations.  Barrett provided those edits directly to Grace.  In an email to e-Smart's

counsel, Maranda Fritz, Barrett called e-Smart's public disclosures "fabulous (as fables)."  Fritz

also forwarded the edits to Grace, asking if she could discuss, given how sweeping Barrett's

proposed changes were.

**Support**:  *See* 98 above; *see also* <u>Att. 119</u>, Ex. 179 to the Grace Depo.; <u>Att. 120</u>, Ex. 182 to the
Grace Depo.; <u>Att. 118</u>, Ex. 176 to the Grace Depo.; <u>Att. 53</u>, Ex. 286 to Fritz Invest. Test.

100.    Grace, who habitually reviewed and edited public filings, discussed Barrett's edits with

counsel Maranda Fritz, Saito and Anthony Russo.  Grace was "adamant" that Barrett's changes

not be made.

**Support**: <u>Att. 27</u>, Fritz Invest. Tr. 177:12-25; <u>Att. 70</u>, Russo Depo. Tr. 145:15-147:8.

101.    Grace "went ballistic" about Barrett's edits.  Then, in an August 23, 2007 email, Grace

denounced Barrett for informing a potential investor that it would take a year to produce cards.

**Support**: <u>Att. 70</u>, Russo Depo. Tr. 144:8-146:4; <u>Att. 191</u>, August 23, 2007 email from Mary
Grace to Richard Barrett and others, Bates-labeled SEC-BARRETT-EM-0000078.

102.    Grace also retained Alistair Clisham in August 2007 to help develop and sell e-Smart's

technology.  But Clisham, alarmed, soon noted that e-Smart only had a single, non-wireless

demo card with numerous unresolved flaws, including problems with its basic sensor and

matching algorithm, no realistic business or development plan, and no way to reliably

manufacture cards.  As Clisham testified, "the company definitely wasn't at a stage to start

producing 3,000 cards."

**Support**:  <u>Att. 64</u>, Clisham Depo. Tr. 23:4-3, 34:16-36:14, 54:4-55:9, 58:19-58:22, 60:7-17,
178:19-179:12, 212:7-20.

103.   Grace became irate when Clisham informed her that the card was not commercially viable in September of 2007, claiming that he must be wrong.

**Support**: Att. 64, Clisham Depo. Tr. 92:17-97:14, 208:8-209:12.

104.   Dr. Penrose Albright, formerly with the organization Civitas and a prior head of Lawrence Livermore National Laboratory, testified that the e-Smart card he reviewed in 2008 was a deeply flawed, non-wireless product.  Albright stated that there was no testing or data to support many of e-Smart's claims, and that the staff at Civitas implored Grace and others at e-Smart to have the card tested by independent third parties.

**Support**: Att. 75, Transcript of the Deposition of Penrose Albright ("Albright Depo. Tr.") 50:13-52:7, 53:1-54:6, 60:11-61:13; Att. 147, Ex. 17 to the Albright Depo.

105.   Civitas was a consulting organization with ties to e-Smart Board member Charlie Black. Its focus was on promoting products to various government agencies, particularly for security applications.  To varying degrees from 2003 through 2005 and 2008 through 2009, Civitas attempted to collaborate with e-Smart to promote its card.

**Support**: Att. 75, Albright Depo. Tr. 14:5-18, 44:10-19; Att. 69, Howe Depo. Tr. 20:18-21:9.

106.   Civitas personnel were highly skeptical about the card.  They doubted that it actually possessed the claimed features, much less that it could meet industry standards.  As Albright put it in a July 2008 email to other Civitas personnel, it was unclear whether Grace's claims about the card were "real" or "just vugraphs."

**Support**: Att. 75, Albright Depo. Tr. 75:1-8, 77:11-78:17; Att. 148, Ex. 20 to the Albright Depo.; Att. 69, Howe Depo. Tr. 92:2-93:17.

107.   Civitas officer David Howe testified that, despite Civitas's interest in promoting a wireless card, he never saw a demo of e-Smart's claimed technology, or even of a wireless card that worked.

**Support**: Att. 69, Howe Depo. Tr. 28:2-29:20, 32:13-33:11, 108:8-17.

108.     In fact, a March 2008 demo for Civitas of a basic, single-function contact card was a

failure.  Grace communicated afterwards with an e-Smart engineer about the failures.

**Support**: Att. 75, Albright Depo. Tr. 78:6-80:7; Att. 126, Ex. 20 to the Howe Depo. (at Bates-labels CV 0868-0873).

109.     Civitas implored Grace to have the card evaluated by a qualified third party.  As another

email to Grace put it, e-Smart lacked, but needed, "validation of the card features to be confident

that they will pass the standards."

**Support**: Att. 69, Howe Depo. Tr. 60:20-61:13, 84:2-22, 85:19-86:21, 92:2-93:17, 103:16-104:22; Att. 126, Ex. 20 to the Howe Depo. (at Bates-labels CV 0949-0956).

110.     Yet by December 2008 Civitas personnel and e-Smart Board member Charlie Black were

still discussing the fact that e-Smart had not yet gotten appropriate third-party verification.

**Support**: Att. 128, Ex. 22 to the Howe Depo. (at Bates-label CV 1582); Att. 69, Howe Depo. Tr. 103:16-104:22.

111.     Civitas attempted to aid e-Smart in establishing a partnership with the Japanese company

NEC.  As part of that effort, Civitas requested extensive documentation from e-Smart about its

finances and technology.  While Grace did provide Civitas with financials – showing no

revenues in 2008 – and purported "irrevocable" purchase orders, letters of intent, and distribution

agreements, Civitas concluded that the information was not adequate or sufficiently reliable to

proceed.

**Support**: Att. 127, Ex. 21 to the Howe Depo. (at Bates-labels 1345-46, 1430, 1474); Att. 69, Howe Depo. Tr. 100:14-101:17.

112.     The one third-party to whom Grace did provide the card in 2008, Exponent, received only

$13,000 to evaluate it.

**Support**: Att.54, Transcript of the Deposition of Brad McGoran ("McGoran Depo. Tr.") 96:18-24; Att. 69, Howe Depo. Tr. 109:12-16.

113.     The Exponent engineer testified that, among other limitations: the card initially crashed;

the card was not wireless; the card had a sensor that was not ISO compliant; the card was unable

to enroll fingers for a number of individuals; and the testing did not lead to statistically

meaningful results, did not fully evaluate the card for ISO compliance, and did not involve a

detailed look at the card's technology or algorithms.  Exponent also notified e-Smart that its card

had crashed.

**Support**: Att. 54, McGoran Depo. Tr. 70:3-12, 72:24-73:10, 78:21-79:9, 85:7-23, 86:9-12,
88:10-15, 95:14-96:2, 125:2-6, 158:19-159:24; Att. 76, Ex. 18 to the McGoran Depo.

114.     Grace knew that e-Smart's entire technical staff, including its Chief Technology Officer

and the card's purported inventor, had the left the company in June of 2006.   During that time,

no work wasdone on the card.  Saito, who informed Grace in 2006 that his departure was a

material event that needed to be reported, did not return until March of 2007.

**Support**:  Att. 89, Ex. 11 to the Saito Depo. (at ¶ 25); Att. 90, Ex. 45 to the Saito Depo.; Att. 62,
Saito Depo. Tr. 127:4-12; Att. 28, Ex. 4 to the Investigative Testimony of Richard Barrett; Att.
46, Ex. 216 to the Investigative Testimony of Beverly O'Meally.

115.     In 2006 and thereafter, Grace and e-Smart vigorously pursued litigation against former e-

Smart personnel, alleging that they had stolen much of e-Smart technology and its "physical

smart cards, schematics, product design and specifications."  Grace described the stolen items

"as absolutely necessary for a manufacturer to be able to manufacture a product."  In fact, much

of the effort Grace directed in 2007 – including hiring Barrett and Huffman – went towards

reverse engineering the purportedly lost technology.

**Support**: Att. 109, Ex. 34 to the Grace Depo. (at 4-5); Att. 175, Memorandum and Order re:
Civil Contempt in *e-Smart Tech., Inc. v. Drizin, et al.* No. 3:06-05528, 2011 WL 1884195
(N.D.Cal. May 18, 2011); Att. 62, Saito Depo. Tr. 135:6-136:10; Att. 185, February 19, 2007
email from Mary Grace to Maranda Fritz and others, Bates-labeled SEC-Barrett-EM-0002732.

116.    Investors have testified that they considered Grace's and e-Smart's claims about the card to be highly material.

**Support**: <u>Att. 58</u>, McVey Depo. Tr. 33:24-34:2; <u>Att. 57</u>, Borwick Depo. Tr. 35:4-9.

117.    As William McVey put it, he invested after being told e-Smart's card "was going to revolutionize all cards."  Contemporaneous emails support that testimony.  McVey emphasized to Grace in 2011: "If you have what you claim, it should be very easy to market."

**Support**: <u>Att. 58</u>, McVey Depo. Tr. 13:16-19; <u>Att. 78</u>, Ex. 2 to the McVey Depo. (at 9).

118.    In August and September of 2007, Grace and e-Smart were working with an organization known as Brightside International to help find investors and business partners.  Responding to requests by potential investors, Brightside implored e-Smart to update its public disclosures. Grace thus engaged in significant discussions about updating e-Smart's public filings so they could be used with potential investors.

**Support**: <u>Att. 64</u>, Clisham Depo. Tr. 98:22-101:18, 123:5-17, 207:3-208:3; <u>Att. 121</u>, Ex. 3 to the Clisham Depo.

119.    Beginning no later than 2004, Grace was kept abreast of developments in the card's purported technical features and was proficient in describing those features.  For example, in one email, she wrote: "BioAPI tests are just being completed . . . . I want get you the newest cards with the LCD screens on them along with the new flex sensor and RF/wireless, etc."

**Support**: <u>Att. 177</u>, July 12, 2004 email from Tamio Saito to Mary Grace, Bates-labeled SEC-BARRETT-EM-0002765; <u>Att. 178</u>, January 21, 2006 email from Tamio Saito to Mary Grace, Bates-labeled SEC-BARRETT-EM-0003074; <u>Att. 201</u>, email exchange between Mary Grace and Michael Elek, Bates-labeled EI-000018-20; <u>Att. 59</u>, Mollett Depo. Tr. 24:5-11; <u>Att. 207</u>, July 21, 2009 email from Mary Grace to Brad McGoran, Bates-labeled EXP 0413.

120.    In many respects, Grace controlled what components were on the card.  Grace emphasized to a chip manufacturer that no one else as e-Smart is "authorized to give instructions

regarding, the payment or the delivery of product" or authorized to make any agreements "that are not approved and signed by myself."

**Support**: <u>Att. 180</u>, June 23, 2006 email from Mary Grace to Antonio Radaelli, Bates-labeled HC 056159-60.

### IV.     *Grace Diverted Millions of Dollars of Investor Money To Her Personal Use*

121.    Over the course of up to nine years, a core group of investors in e-Smart, including Douglas Borwick, Kenneth Wolkoff, Henry Mollett, William Sandler, William McVey, Jim Desmond and some of their affiliates, including Robert Aronowitz and Tom Howard, gave Grace and e-Smart over $25 million – a figure Grace herself cites in at least two emails.  Another investor, Michael Elek, gave Grace and e-Smart $4 million, some of it through an investor and advisor to e-Smart named Roland Day.  Numerous other investors solicited directly or indirectly by Grace gave millions more.

**Support**:  <u>Att. 166</u>, e-Smart 2007 10-K (at 31); <u>Att. 87</u>, Ex. 4 to the Mollett Depo. (at 68, 208-210, 230-31, 232-34); <u>Att. 78</u>, Ex. 2 to the McVey Depo. (at 8-12); <u>Att. 221</u>, June 27, 2011 email from Robert Aronowitz to Jim Desmond, Bates-labeled SEC-Aroniwitz 0000638; <u>Att. 229, 233</u>, Records Bates-labeled EI-000182, 188-190; <u>Att. 209</u>, July 8, 2010 email from Mary Grace to Robert Aronowitz, Bates-labeled SEC-Aroniwitz 0000728-729; <u>Att. 186</u>, April 3, 2007 email from Mary Grace to Douglas Borwick, et al., Bates-labeled HC036913; <u>Att. 57</u>, Borwick Depo. Tr. 8:10-17; <u>Att. 56</u>, Wolkoff Depo. Tr. 13:7-12; <u>Att. 59</u>, Mollett Depo. Tr. 14:20-15:4; <u>Att. 58</u>, McVey Depo. Tr. 13:14-15; <u>Att. 25</u>, Elek Invest. Tr. 29:9-21; <u>Att. 203</u>, December 7, 2007 email from Michael Elek to Rowland Day, Bates-labeled EI-000006.

122.    Grace's behavior and lifestyle led investors and other to suspect that she mostly spent the money on herself.

**Support**:  <u>Att. 85</u>, Ex. 21 to the McVey depo. (at 57-58); <u>Att. 26</u>, Transcript of the Investigative Testimony of Francisca Imperiali, 68:22-71:12; <u>Att. 145</u>, Ex. 8 to the Messina Depo.; <u>Att. 71</u>, Messina Depo. Tr. 43:19-45:12; <u>Att. 25</u>, Elek Invest. Tr. 51:15-52:21; <u>Att. 70</u>, Russo Depo. Tr. 38:14-42:17.

123.    The individual who served as e-Smart's accountant did not see investments amounting to tens of millions of dollars come in to e-Smart's accounts.

**Support**: <u>Att. 70</u>, Russo Depo. Tr. 41:18-42:17, 48:2-49:25.

124.     In fact, despite her role as CEO of, and fiduciary to, e-Smart, Grace diverted much of that

money to accounts controlled by IVI and Intermarket.  She often directed e-Smart's investors

and potential business partners to deposit money directly into IVI and e-Smart Korea accounts,

in exchange for which those investors would receive e-Smart stock.

**Support**:  Att. 94, Ex. 8 to the Grace Depo.; Att. 23, Borwick Invest. Tr. 57:2-25; Att. 70, Russo
Depo. Tr. 20:15-21:10, 41:18-42:17, 48:2-49:25, 54:18-56:4; 61:2-8; Att. 206, April 24, 2009
email from William Sandler to Jenny Pan, Bates-labeled FPR124A-0006067 ; Att. 86, Ex. 2 to
the Mollett Depo. (at 85-92, 94-104); Att. 78, Ex. 2 to the McVey Depo. (at 22); Att. 202,
October 22, 2008 email from Mary Grace to Michael Elek, Bates-labeled EI-000093; Att. 229,
Records Bates-labeled EI-000182, 188-190; Att. 232, Letter from Mary Grace to Holliday Stock
Transfer, Bates-labeled HST 03493.

125.     In addition, Grace sometimes moved cash from e-Smart to IVI, including $100,000 on

April 5, 2007.

**Support**:  Att. 8, Account Opening Document, Bates-labeled BOA-000241; Att. 2, Bank Record
Bates-labeled BOA-000024.

126.     In at least one instance, while serving as e-Smart's CEO, Grace told an investor that IVI

was a superior investment to e-Smart.  Grace also directed that the potential loans and proceeds

from the 2008/09 Agreements described above be put in IVI accounts.

**Support**:  Att. 25, Elek Invest. Tr. 26:2-12, 59:23-60:7; Att. 201, July 10, 2008 email from
Michael Elek to Mary Grace, Bates-labeled EI-000024; Att. 127, Ex. 21 to the Howe Depo. (at
Bates-label CV 1475).

127.     IVI and Intermarket had no business activity besides the patents it purportedly held and

licensed to e-Smart.

**Support**: Def. Ans. ¶¶ 19, 20; Att. 63, Grace Depo. Tr. 49:9-53:12.

128.     Grace also diverted intellectual resources and patents to IVI, and insisted that IVI was

entitled to millions of dollars in e-Smart stock and other compensation in exchange for the

license it granted e-Smart.  Grace claimed in her testimony not to know if IVI had any revenues.

**Support**: <u>Att. 123</u>, Ex. 5 to the Black Depo.; <u>Att. 181</u>, July 13, 2006 email from Mary Grace to David Ritchie, et al., Bates-labeled HC 000915; <u>Att. 138</u>, Ex. 11 to the Russo Depo.; <u>Att. 141</u>, Ex. 14 to the Russo Depo.; <u>Att. 63</u>, Grace Depo. Tr. 49:9-50:17.

129.    On one occasion, Grace told outside counsel: "As President of IVI Smart, I insist that this patent must be filed under IVI Smart."

**Support**: <u>Att. 181</u>, July 13, 2006 email from Mary Grace to David Ritchie and others, Bates-labeled HC000915.

130.    Despite requests by e-Smart's outside auditor and counsel, and despite stating to the outside auditor and the e-Smart Board that she would, Grace never hired an independent examiner to analyze the value of the licensed technology.

**Support**: <u>Att. 70</u>, Russo Depo. Tr. 89:3-91:14; <u>Att. 138</u>, Ex. 11 to the Russo Depo.; <u>Att. 67</u>, Hung Depo. Tr. 110:8-111:19.

131.    Once investor money was in IVI accounts, Grace spent it lavishly on herself and family and friends.  For example, in one month in September 2007, Grace spent over $177,000 from IVI accounts on rooms at the Hotel Carlyle, purchases at ultra high-end European clothiers and jewelers, first-class travel to and within Europe, gourmet restaurants, and other extravagances.

**Support**:  <u>Att. 96</u>, Ex. 11 to the Grace Depo.

132.    Also in September 2007, Grace also spent over $78,000 from one e-Smart account in a similar manner.

**Support**: <u>Att. 4</u>, Bank record Bates-labeled BOA-0000052.

133.    That kind of spending was typical.  From 2006 to 2011, the bank records available to the SEC show that Grace spent more than two million from IVI and e-Smart accounts on stays at some of the world's finest hotels, expensive restaurants and boutiques, luxury apartments and catering, spas and expensive travel.

**Support**: <u>Att. 171</u>, Declaration of Jeffrey Anderson, CPA, at ¶ 6.

134.    Grace apparently resided primarily in Cannes and other parts of Europe from 2007

through 2009, spending investor money the entire time to maintain her lifestyle.

**Support**: Att. 70, Russo Depo. Tr. 28:4-29:18, 39:9-40:3; Att. 85, Ex. 21 to the McVey Depo.
(at 57-58).

135.    Grace lavished money on friends.  She paid Adnan Khasshoggi over $100,000,

purportedly in connection with his efforts to procure funding for e-Smart.  Grace also bought him

an $18,000 watch.  He failed to procure any meaningful funding.

**Support**: Att. 9, Bank record Bates-labeled BOA-000305; Att. 3, Bank record Bates-labeled
BOA-000039; Att. 10, Bank record Bates-labeled BOA-000315; Att. 97, Ex. 12 to the Grace
Depo.; Att. 63, Grace Depo. Tr. 138:17-141:12.

136.    Grace also spent prodigiously on herself from e-Smart accounts.  e-Smart paid for all of

Grace's business and personal expenses, including beauty, dental and alternative medicine

expenses, an arrangement that was not disclosed until May of 2009.

**Support**: e-Smart 2007 10-K (at 43); Att. 63, Grace Depo. Tr. 144:4-149:16; Att. 70, Russo
Depo. Tr. 36:10-39:8, 137:7-138:21.

137.    Grace took the position as early as 2006 with e-Smart's accountants and auditors that,

because she was working virtually non-stop, e-Smart should pay for all of her expenses.

**Support**: Att. 130, Ex. 2 to the Russo Depo.

138.    While e-Smart claimed in 2009 that Grace had to pay for her personal expenses, the

money for those personal expenses also apparently came from e-Smart accounts, on the theory

that because Grace had not taken the salary to which she was entitled, the money spent on her

personal expenses would act as a discount from the salary e-Smart owed her.

**Support**: *See* 136-137 above.

139.    Grace would simply transfer money from e-Smart, e-Smart Korea, or IVI accounts to her

personal accounts, or would write checks to herself.  Grace made cash withdrawals of $397,501

from corporate accounts.  Grace made retail purchases of $409,038 from corporate accounts.

Grace spent at least $1,114,243 on hotel charges from corporate accounts.  Grace spent at least $59,310 on restaurants and $356,917 on non-hotel travel spending from corporate accounts.

**Support**: Att. 171, Declaration of Jeffrey Anderson, CPA at ¶ 6b-g.

140.    Grace also diverted at least $1,371,456 of investor money directly from corporate accounts to her personal accounts.  For example, in the two and a half months between October 16, 2008 and January 7, 2009, Grace transferred $238,000 from e-Smart, IVI and e-Smart Korea accounts to one personal account.  During that time period, Grace spent that money on, among other things: nearly $22,000 at the Mirage in Dubai; over $11,000 at the Four Seasons in London; over $100,000 at Claridge's in London; over $6,000 at the Hyatt Regency in Paris; approximately $4,000 at the Hotel Delano in Miami Beach; over $16,000 at the Mariott Grand Hotel Resort in Florida; over $12,000 on an unspecified event in Cannes; thousands of dollars on what appear to be the daily expenses of someone enjoying a ski trip to Vail and Boulder; nearly $4,000 to a Palm Springs life extension spa; and retail purchases commensurate with this lifestyle, including almost $4,000 at the clothier "Just Cavalli" in Rome, nearly $4,000 at Godiva, over $1,100 at Luisa Spagnolli Rome, and $420 at Sephora.  Grace also gave over $27,000 to family members.

**Support**: Att. 171, Declaration of Jeffrey Anderson, CPA at ¶ 6a; Att. 8, Account Opening Documents for IVI Account Number -3202, Bates-labeled BOA000241-42; Att. 13, Account Statements for Grace Account Number -2047, Bates-labeled BOA 0000422-480; Att. 14, Account Records for IVI Account Number -3202, Bates-labeled BOA 0000688-702.

141.    e-Smart's long-time auditor tried repeatedly and unsuccessfully to get an explanation from Grace of $600,000 in transfers from an e-Smart account to an unknown account located in Georgetown, where Ms. Grace resided.

**Support**: Att. 135, Ex. 7 to the Russo Depo.; Att. 70, Russo Depo. Tr. 73:9-12; Att. 67, Hung Depo. Tr. 116:6-117:9, 129:20-130:16.

142.     Despite repeated questioning by e-Smart's auditor, Grace also failed in early 2008 to explain why she had provided e-Smart stock valued at millions of dollars to a long list of friends, family, "consultants," IVI, and a Grace controlled charity.

**Support**: Att. 140, Ex. 13 to the Russo Depo.; Att. 139, Ex. 12 to the Russo Depo.; Att. 138, Ex. 11 to the Russo Depo.; Att. 137, Ex. 10 to the Russo Depo.; Att. 70, Russo Depo. Tr. 59:16-63:5, 92:5-93:14, 94:25-97:14, 100:11-104:20; Att. 67, Hung Depo. Tr. 112:11-113:15.

143.     In 2010 and 2011, Grace transferred money from accounts at e-Smart Korea to a personal account at Wells Fargo.

**Support**: Att. 171, Declaration of Jeffrey Anderson, CPA at ¶6a.

144.     Grace repeatedly told investors that e-Smart and its employees were destitute in 2010 and 2011.

**Support**: Att. 98, Ex. 14 to the Grace Depo; Att. 218, January 26, 2011 email from Mary Grace to James Desmond, et al., Bates-labeled SEC-MOLL 0000185; Att. 213, December 3, 2010 email from Mary Grace to Henry Mollett, et al., SEC-MOLL 0000206; Att. 85, Ex. 21 to the McVey Depo. (at 51); Att. 84, Ex. 18 to the McVey Depo.; Att. 63, Grace Depo. Tr. 162:9-17.

145.     Grace spent the money from the Wells Fargo account on lavish hotel accommodations, dinners, travel and luxury items.  In January of 2011, she also gave $19,000 to the same cosmetic surgeon she had earlier paid $10,000.

**Support**: Att. 236, Bank Records from Wells Fargo and screenshot for Richard Ellenbogen, MD; Att. 19, Bank Record For Grace Account Number -7908, Bates-labeled PNCMG-000053.

146.     In January of 2011, as Grace knew, long-time employee Beverly O'Meally could not pay her rent after failing to receive any salary for two months.

**Support**: Att. 215, January 7, 2011 email from Beverly O'Meally to Henry Mollett; Att. 65, O'Meally Depo. Tr. 24:14-25:6

147.     Grace also wrote personal checks to herself, each worth tens of thousands of dollars, from e-Smart and IVI accounts.

**Support**: Att. 15, Record Bates-labeled BOA 1874; Att. 16, Record Bates-labeled PNC-000040; Att. 11, Record Bates-labeled BOA 000353; Att. 12, Record Bates-labeled BOA

000392; Att. 18, Record Bates-labeled PNC-00277; Att. 20, Record Bates-labeled PNCMG 000058; Att. 21 Record Bates-labeled PNCMG 0000060.

148.    Grace also gave family members at least $311,319 from corporate accounts.

**Support**: Att. 171, Declaration of Jeffrey Anderson, CPA at ¶6e.

149.    During the time period in question, Grace had no meaningful source of income besides

payments from e-Smart, IVI and e-Smart Korea accounts.

**Support**:  Att. 63, Grace Depo. Tr. 161:3-162:5

150.    By 2011, investor James Desmond was wiring $590,930 directly to Grace's personal

accounts at Wells Fargo.

**Support**: Att. 171, Declaration of Jeffrey Anderson, CPA at ¶7.

151.    During the time period in question, e-Smart, IVI, and Intermarket had, in total, less than

$40,000 in revenues.  The only money in the accounts for those entities came from investors.

**Support**: e-Smart 2007 10-K (at 21); Att. 127, Ex. 21 to the Howe Depo. at Bates-label 1545; Def. Ans. ¶¶ 19, 20.

152.    Neither Grace nor any of e-Smart's auditors or accountants is able to estimate how much

money was spent on Grace's expenses.

**Support**:  Att. 63, Grace Depo. Tr. 124:19-125:9; Att. 70, Russo Depo. Tr. 39:9-40:17; Att. 67, Hung Depo. Tr. 93:2-7; Att. 66, Leshkowitz Depo. Tr. 43:12-16.

## *V.    Grace Sought To Conceal Her Misconduct*

153.    In 2008, e-Smart's long-time counsel, outside auditor and accountant all raised a number

of questions about the relationship between IVI, Intermarket and e-Smart, as well as Grace's role

in that relationship.

**Support**:  Att. 123, Ex. 5 to the Black Depo.; Att. 137, Ex. 10 to the Russo Depo.; Att. 138, Ex. 11 to the Russo Depo.; Att. 70, Russo Depo. Tr. 83:12-94:5; Att. 67, Hung Depo. Tr. 109:20-111:19.

154.    In August of 2008, e-Smart's counsel, Maranda Fritz, wrote a lengthy letter to the Board detailing Grace's diversion of resources from e-Smart to IVI, her disregard of corporate structure and basic controls, her failure to conduct herself properly as the management of a public company, her use of investor money to support herself and her family, and her fabrication of a 2007 opinion letter.  In the letter, Fritz accused Grace of a "pattern of specific misrepresentations."

**Support**: Att. 123, Ex. 5 to the Black Depo.

155.    Fritz's letter details the basis for these allegations, including examples of how Grace used investor money for her personal benefit, as well as how Grace worked to benefit IVI while saddling e-Smart – the public company of which she was CEO – with debt and other obligations.

**Support**: Att. 123, Ex. 5 to the Black Depo.

156.    Among Fritz's allegations was that Grace had spent $2 million from an Intermarket account and was now seeking to have that money classified as a "loan" from Intermarket to Grace and e-Smart.  She also accuses Grace of failing to disclose information about e-Smart's ownership of technology that renders "the current public filings . . . misleading and/or false," and that the value of the purported technology that IVI licensed to e-Smart does not support the consideration e-Smart has given to IVI.

**Support**: Att. 123, Ex. 5 to the Black Depo.; e-Smart 2007 10-K.

157.    The Board reacted by requiring Grace to hire an independent counsel to examine Fritz's allegations.

**Support**:  Att. 68, Black Depo. Tr. 140:15-142:16; Att. 72, Volpe Depo. Tr. 60:10-17.

158.    Despite the Board's repeated insistence that Grace pay the independent counsel to conduct the examination, Grace never did.  The examination was not performed.  e-Smart's Board resigned in 2009.

**Support**: <u>Att. 92</u>, Ex. 3 to the Grace Depo.; <u>Att. 63</u>, Grace Depo. Tr. 64:7-69:1; <u>Att. 68</u>, Black Depo. Tr. 140:15-142:16.

159.    Grace terminated Fritz in 2008 after refusing to pay over $400,000 e-Smart owed to Fritz

and her firm.

**Support**: <u>Att. 27</u>, Fritz Invest. Tr. 30:17-32:12.

160.    In February of 2008, e-Smart's long-time accountant, Anthony Russo, together with e-

Smart's long-time outside auditor, Horowitz & Ullman, sought an audience with e-Smart Board

member Thomas Volpe to discuss concerns over e-Smart's books and records and Grace's use

and diversion of corporate assets.

**Support**:  <u>Att. 142</u>, Ex. 20 to the Russo Depo.; <u>Att. 70</u>, Russo Depo. Tr. 152:12-153.

161.    Horowitz & Ullman had repeatedly expressed , or attempted to express, concerns to

Grace and to e-Smart's accountant about unexplained transactions and other matters on e-

Smart's books.

**Support**:  <u>Att. 67</u>, Hung Depo. Tr. 37:2-5, 40:18-41:6, 43:16-44:15s, 46:2-47:5, 53:15-24, 60:3-61:22, 94:4-95:4, 96:1-10; <u>Att. 129</u>, Ex. 1 to the Russo Depo.; <u>Att. 132</u>, Ex. 4 to the Russo Depo.; <u>Att. 133</u>, Ex. 5 to the Russo Depo.; <u>Att. 134</u>, Ex. 6 to the Russo Depo.; <u>Att. 135</u>, Ex. 7 to the Russo Depo.

162.    Among Horowitz & Ullman's concerns were unexplained interparty transfers,

undocumented transfers of hundreds of thousands of dollars to unspecified accounts, and claims

by Grace that IVI was entitled to substantial value for licensing certain technology to e-Smart,

when in fact the value of that technology had never been independently verified.

**Support**:  *See* 161 above.

163.    In fact, the lead auditor at Horowitz & Ullman had earlier drafted a document identifying

numerous control deficiencies at e-Smart that created a heightened risk of "fraud."  These

deficiencies nearly all concerned Grace's conduct, management and unfettered use of corporate

assets.  It was Horowitz & Ullman's practice to provide such an analysis to officers of the client company.

**Support**: Att. 131, Ex. 3 to the Russo Depo.; Att. 67, Hung Depo. Tr. 53:15-24.

164.    Horowitz & Ullman stopped providing services to e-Smart in 2008 as a result of nonpayment.  However, because the questions it asked Grace were never answered to its satisfaction, Horowitz & Ullman refused to certify e-Smart's prior financial statements in e-Smart's 2007 10-K, which was filed in May of 2009.

**Support**: Att. 67, Hung Depo. Tr. 25:6-13, 129:20-130:16; e-Smart 2007 10-K.

165.    Grace also fired anyone that challenged her characterization of e-Smart's finances and technology. In September of 2007, Grace discharged e-Smart's Chief Operating Officer after he informed Grace that e-Smart's public claims about its technology were not truthful.  The COO, Richard Barrett, prevailed on a claim against e-Smart that he was wrongfully discharged for engaging in protected activity related to his efforts to correct e-Smart's public claims.

**Support**:  Att. 173, Decision and Order *In the Matter of Richard Barrett v. e-Smart*; Att. 174, Final Decision and Order of the DOL Administrative Review, dated April 25, 2013.

166.    Grace also refused to keep working with Allister Clisham, another senior technology specialist that informed Grace in September of 2007 that e-Smart had no viable card and no means to manufacture it.

**Support**: Att. 64, Clisham Depo. Tr. 123:5-130:11, 219:9-221:1, 222:11- 225:2, 230:12-232:9

167.    In 2008, Grace also terminated Anthony Russo, who had served as e-Smart's accountant.  Russo had raised many of the same concerns as Horowitz & Ullman.  Prior to being terminated, Russo strenuously objected to Grace's claim in 2008 that e-Smart owed IVI $12 million.

**Support**: Att. 141, Ex. 14 to the Russo Depo.; Att. 70, Russo Depo. Tr. 41:18-47:3, 105:3-16, 109:20-113:5, 154:3-21.

## VI.    *Grace Was An Essential Participant In A Plan To Raise Millions of Dollars By Offering Hundreds of Millions of Shares of Unregistered Stock*

168.    From approximately early 2005 through 2007, Defendants e-Smart, IVI Smart

Technologies, Inc., Intermarket Ventures, Inc., Grace, Kenneth A. Wolkoff ("Wolkoff"), George

Sobol ("Sobol"), and Robert J. Rowen ("Rowen") raised millions of dollars through an

unregistered stock offering of approximately 113,102,557 shares of e-Smart.

**Support**: Att. 166, e-Smart 2007 10-K (at 31).

169.    No registration statement existed for those shares.

**Support**: Att. 176, U.S. Securities and Exchange Commission Attestation, April 15, 2014.

170.    Grace's co-Defendants Kenneth Wolkoff, George Sobol and Robert Rowen acted as

unregistered brokers and were compensated for bringing investors to the illegal offering.

**Support**: Final Judgments, Dkt. # 57; Att. 149, Ex. 2 to the Deposition of Robert Rowen ("Rowen Depo."); Att. 150, Ex. 3 to the Rowen Depo.

171.    The scheme generally worked as follows: (1) an investor sent money to e-Smart and later

signed documents purporting to evidence a very short-term "convertible loan" to IVI or

Intermarket, companies controlled by e-Smart CEO Mary Grace; (2) the documents stated that

IVI or Intermarket promised to repay the "loan" in a matter of a week or two; (3) as collateral for

the investor's "loan," IVI or Intermarket pledged e-Smart shares, which e-Smart had issued to

IVI or Intermarket over time as restricted shares; (4) IVI or Intermarket defaulted on the "loan";

(5) upon default, the investor requested e-Smart shares, generally receiving them at a discount to

the market price; (6) purporting to rely on a legal opinion letter which improperly invoked Rule

144(d)(3) under the Securities Act, Grace, acting for IVI or Intermarket, authorized its transfer

agent to issue e-Smart shares from IVI or Intermarket to the investor.

**Support**: Att. 63, Grace Depo. Tr. 173:13-178-2, 189:9-192:21; Att. 102, Ex. 19 to the Grace Depo.; Att. 103, Ex. 20 to the Grace Depo.

172.     Unrestricted shares of e-Smart were issued to the investors, on the premise that IVI or Intermarket had held the shares for more than two years and the transfer was pursuant to the default of a "bona fide" loan, as to which the securities had been pledged as collateral.

**Support**: Att. 27, Fritz Invest. Tr. 63:10-80:9; Att. 49, Ex. 258 to the Fritz Invest. Test.

173.     In the final step of the scheme, e-Smart issued additional restricted shares to IVI and Intermarket to replace the shares IVI and Intermarket transferred to the investor who made the loan.  This "replenishment" of shares to IVI and Intermarket was done to preserve Intermarket's and IVI's respective ownership shares in e-Smart.

**Support**: Att. 103, Ex. 20 to the Grace Depo.

174.     There was no "bona fide" loan of funds to either IVI or Intermarket as investors expected shares, not repayment.

**Support**: Att. 56, Wolkoff Depo. Tr. 15:25-16:5; Att. 23, Borwick Inv. Tr. 73:5-78:17.

175.     Kenneth Wolkoff and Douglass Borwick, who both invested in the convertible loan scheme and helped Grace run it, confirmed in their depositions that the lender/investors expected to get e-Smart shares.  Wolkoff testified that while, technically, investors could have chosen not to convert their loan, "[m]ost of the people, in fact, coming in had the intention just like I did to convert because they wanted the free trading shares."  Borwick's testimony is virtually identical:  "Q: Okay.  Did they [investors] tell you that they were entering into this transaction because it was an advantageous way for them to obtain free trading stock in e-Smart?  A: I think they all understood that clearly. Q: Okay.  And is your recollection that's why they sent their money to e-Smart? A: Yes."

**Support**: Att. 56, Wolkoff Depo. Tr. 29:5-7; Att. 57, Borwick Depo. Tr. 20:24-21:6.

176.     The record contains emails sent to Grace and others where investors claimed default the same or the next business day after making their loan.  As one investor's email to Grace puts it, "I understand the Intermarket Ventures loan will be defaulting." That email was sent the same day the "loan" was made.

**Support**: <u>Att. 33</u>, Ex. 21 to the Investigative Testimony of Douglas Borwick; <u>Att. 34</u>, Ex. 22 to the Investigative Testimony of Douglas Borwick.

177.     The loans had no basis in financial reality.  Neither IVI nor Intermarket had any operations, assets or cash flow to repay any of the purported loans by any means other than transfer of the e-Smart shares pledged as collateral.  Despite authorizing a scheme wherein investors would loan money to IVI and Intermarket, Grace claimed at her testimony not to know whether IVI or Intermarket had revenues of any type with which they could have repaid the loans.

**Support**: Def. Ans. ¶¶ 19, 20; <u>Att. 63</u>, Grace Depo. Tr. 48:17-53:12.

178.     In a June 2006 financing "update" to the e-Smart Board, Grace reassured the Board that "there is not a shortage of shareholders who would buy stock at \$.10.  The market is at \$.12 and e-Smart was Pink Sheets.com's recommended stock to buy on Monday, Wednesday and Thursday last week."

**Support**: <u>Att. 52</u>, Ex. 268 to the Investigative Testimony of Maranda Fritz.

179.     Upon default, investors received shares generally at \$0.10 a share.

**Support**: <u>Att. 30</u>, Ex. 17 to the Investigative Testimony of Douglas Borwick; <u>Att. 23</u>, Borwick Inv. Tr. 73:9-78:17.

180.     The "loan" paperwork provided to investors was a sham regularly performed only after investors had wired money to e-Smart.

**Support:** <u>Att. 23</u>, Borwick Invest. Tr. 92:16-93:9; <u>Att. 36</u>, Ex. 29 to the Investigative Testimony of Douglas Borwick.

181.    Grace contacted investors to the illegal offering and negotiated terms with them.

**Support**: Att. 56, Wolkoff Depo. Tr. 22:8-23:11; Att. 23, Borwick Inv. Tr. 92:7-93:9;

182.    On at least two occasions, in a January 5, 2005 memo and in a frantic March 30, 2006

email, Grace explained to others at e-Smart precisely how the scheme was going to, and did,

work.  Although Grace denies writing the 2005 memo, it bears her name, and appears to have

been distributed to e-Smart personnel.  Grace neither denies having received it nor disputes its

contents.

**Support**: Att. 102, Ex. 19 to the Grace Depo, Att. 103, Ex. 20 to the Grace Depo.

183.    In both the 2005 memo and the 2006 email, Grace emphasized that the convertible loan

scheme must not have the effect of diminishing IVI and Intermarket's control of e-Smart.

**Support**: *See* 182 above.

184.    The record is saturated with emails to and from Grace that reflect her immersion in the

mechanics of the scheme: lists of current and potential investors; complaints from investors

about not getting shares; directions to, and questions from, the stock transfer company;

conversion notices; and instructions to counsel.

**Support**: Att. 29, Inv. Ex. 16 to the Investigative Testimony of Douglas Borwick; Att. 30, Ex. 17
to the Investigative Testimony of Douglas Borwick; Att. 31, Ex. 19 to the Investigative
Testimony of Douglas Borwick; Att. 32, Ex. 20 to the Investigative Testimony of Douglas
Borwick; Att. 33, Ex. 21 to the Investigative Testimony of Douglas Borwick; Att. 34, Ex. 22 to
the Investigative Testimony of Douglas Borwick; Att. 35, Ex. 24 to the Investigative Testimony
of Douglas Borwick; Att. 37, Ex. 40 to the Investigative Testimony of Kenneth Wolkoff; Att. 38,
Ex. 41 to the Investigative Testimony of Kenneth Wolkoff; Att. 41, Ex. 61 to the Investigative
Testimony of Maranda Fritz; Att. 42, Ex. 67 to the Investigative Testimony of Maranda
Fritz; Att. 43, Ex. 68 to the Investigative Testimony of Anthony Russo.

185.    Borwick and Wolkoff make it clear that Grace was the scheme's key

participant.  Borwick emphasizes that it was Grace who told him that the convertible loan

scheme was in fact "a very advantageous way to invest" in e-Smart, and that he could obtain

free-trading shares "effectively at a lower price than what it was trading out in the marketplace."  Wolkoff echoes that testimony, emphasizing that it was Grace who provided him with the talking points he used to persuade investors.

**Support**: Att. 57, Borwick Depo. Tr. 19:15-20:6; Att. 56, Wolkoff Depo. Tr. 20:9-13, 39:20-40:3, 42:16-43:10.

186.    Grace asked an attorney to write opinion letters directing the transfer agent to issue unrestricted shares.  In May 2007, Grace provided e-Smart's transfer agent a version of one of Fritz's 2005 opinion letters modified to fit different facts, but unsigned and with numerous typographical errors.  The opinion letter was a modified version of one of Fritz's 2005 opinion letters, but it had an incorrect address for Ms. Fritz, numerous typographical errors, purported to be from "Maranda E. Fritz, P.C." more than a year after Fritz had stopped practicing as a solo practitioner, and lacked Fritz's signature.  It was not Fritz's work.

**Support**: Att. 27, Fritz Invest. Test. 81:10-103:19. Att. 51, Ex. 266 to the Fritz Invest. Test.

187.    In her testimony and filings, Grace acknowledges that money was raised in the manner described above "under the opinion letter of Maranda Fritz."

**Support**: Att. 63, Grace Depo. Tr. 163:8-164:5; Def. Motion to Dismiss, Docket # 181, pp. 37-39.

188.    In May of 2007, Grace also soothed the transfer agent's repeated concerns, including dealing with emails where the transfer agent said it "WAS NOT AWARE OF THIS TRANSACTION AND DO NOT FEEL COMFORTABLE." (emphasis in original).

**Support**: Att. 50, Ex. 265 to the Fritz Invest. Test.

189.    Defendants Wolkoff and Sobol settled with the Commission on April 27, 2012, each consenting to final judgments under Sections 5(a) and 5(c) of the Securities Act of 1933 [§§

77e(a) and 77e(c)] relating to the illegal offering and Section 15(a) of the Securities Exchange Act of 1934 [15 U.S.C. § 78o(a)] relating to acting as unregistered brokers.

**Support**: Final Judgments, Dkt. #57.

## <u>CERTIFICATE OF SERVICE</u>

   I certify that on June 2, 2014, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve by email any counsel who has appeared in this case and any pro se defendant who has answered the Complaint.

   I also certify that on June 2, 2014, I caused the foregoing to be served by electronic mail on the following persons at the addresses listed below:

Mary A. Grace
16 Chautauqua Park
Boulder, Colorado 80302
mgrace@e-smart.com
marygrace.esmart@gmail.com;

Tamio Saito
78Tateminani Watari Mchi
Watari gun Myagi ken
JAPAN
atenmonad@gmail.com

Robert J. Rowen
321 South Main Street #537
Sebastopol, CA 95472; and
drrowen@Att.net

         /s/ Daniel J. Maher
         Daniel J. Maher