**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
|  :
SECURITIES AND EXCHANGE COMMISSION,   :
|  :
                    Plaintiff,   :
|  :
              v.   : No. 11-cv-00895 (JEB)
|  :
e-SMART TECHNOLOGIES, INC., et al.,   :
|  :
             Defendants.   :
_____:

**SECURITIES AND EXCHANGE COMMISSION'S**
**MEMORANDUM IN SUPPORT OF ITS MOTION FOR**
**SUMMARY <u>JUDGMENT AGAINST DEFENDANT MARY GRACE</u>**

Plaintiff U.S. Securities and Exchange Commission ("SEC") submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 56(a), for summary judgment on the SEC's claims against Defendant Mary Grace ("Grace") for violating Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Section 5 of the Securities Act, 15 U.S.C. § 77e (the "Motion").  For the reasons set forth below, the SEC respectfully asks that the Court grant its Motion and find Grace liable on its Section 10(b) and Section 5 claims.[1]

**<u>PRELIMINARY STATEMENT</u>**

Grace, the Chief Executive Officer ("CEO") and controlling shareholder of e-Smart Technologies, Inc. ("e-Smart"), defrauded investors by repeatedly misrepresenting both e-Smart's financial position and the features and readiness of its only product.  Over at least a five year period, from 2006 through 2011, Grace persuaded investors to place tens of millions of dollars under her exclusive control by repeatedly claiming that e-Smart had entered, or was about

---

[1] The SEC will move for summary judgment against Defendants Tamio Saito and Kenneth Rowen in a separate filing.  At that time, the SEC will also move for final judgment against all Defendants.  The SEC also reserves its right to move for summary judgment on its other claims against Grace.

to enter, into contracts that would provide major financing or generate substantial revenues. Grace further induced investors by claiming in public filings and other communications that e-Smart had developed a wireless biometric "smart" card that was tested, reliable, and ready to be commercially deployed.

Those statements were false.  e-Smart had no commercially viable card and never saw the financing or revenues Grace promised.  As reflected in testimony by numerous investors, e-Smart Board members, and former e-Smart employees and affiliates, and as seen in hundreds of emails, press releases and other documents, Grace continuously described products and funding that did not exist.  And, while much of what Grace claimed was a complete illusion, Grace also grossly mischaracterized the few contracts and demo cards that e-Smart did have.

Grace made these statements to solicit investments and convertible "loans."  By 2011, in direct reliance on her claims, investors gave her over $30 million.  Little, if any, of that money was put to legitimate use.  Grace consumed most of it funding her lavish lifestyle.  She drained corporate accounts, including by transferring at least $1.3 million to her personal accounts and making hundreds of thousands of dollars in cash withdrawals.  While e-Smart perpetually lacked funding to develop and manufacture a card, and while e-Smart employees, consultants and service-providers regularly went unpaid, Grace traveled the world like an aristocrat.  She spent millions at some of the world's most luxurious hotels, clothiers, jewelers, and restaurants.  She gave hundreds of thousands of dollars of cash and millions of dollars of stock to family and friends.  Lacking any income apart from investor funds, Grace routinely tapped corporate accounts to buy such personal items as vitamins, jewelry, make-up, spa and "life extension" treatments, groceries, and plastic surgery.  Her repeated misrepresentations directly led to her enormous enrichment.

As set forth in this memorandum, a reasonable jury could find only that Grace's conduct was intentional or extremely reckless.  Grace was more than just e-Smart's long-term CEO – she was its exclusive, unopposed, hands-on authority.  She was also e-Smart's primary promoter and the foremost beneficiary of investor funds.  She cannot claim ignorance, or even mere negligence, about e-Smart's funding or the status of its only product.  e-Smart sought to develop one product and never had more than a handful of employees.  Its office was a single room in New York, which also functioned as a studio for Grace's son.  Its corporate accounts were intertwined with her personal finances, as well as with the fortunes of two related, private companies she controlled.  Grace directly controlled bank accounts, statements to investors, and the issuance of stock.  She claimed to be personally negotiating many of the deals that failed to materialize.  She discussed card demonstrations, and made and edited card descriptions. In short, she was directly familiar with every aspect of e-Smart's business.

Grace continued to make highly material misrepresentations to investors despite being warned, as early as 2006 and regularly thereafter, that investors and e-Smart personnel considered her claims misleading.  In 2008, e-Smart's long-time counsel, accountant and outside auditor all raised concerns that Grace had severely breached her duties as e-Smart's CEO, with e-Smart's counsel accusing Grace, in a letter to the Board, of a "pattern of specific misrepresentations."  Grace effectively terminated all three.  Although the Board insisted that Grace allocate e-Smart money to fund an outside investigation of the counsel's claims, no funds were provided; the investigation never occurred.  Meanwhile, discussions with legitimate business partners never progressed, as e-Smart failed to provide requested information or a viable card.

Finally, as a necessary and substantial participant in, and the primary beneficiary of, a "convertible loan" scheme to distribute unregistered securities, Grace violated Section 5 of the Securities Act.  Grace contrived to have investors "loan" money to IVI and Intermarket, two private companies Grace controlled.  The loans were for a term of only one or two weeks, with e-Smart stock held by IVI and Intermarket pledged as collateral.  IVI and Intermarket had no revenues.  Upon their prompt and pre-ordained default, investors sought, and were provided, the e-Smart stock.  That the scheme also had the effect of diverting investor funds to companies Grace controlled – while Grace effectively used e-Smart stock as an incentive, thus also diluting existing e-Smart shareholders – reveals a great deal about the scheme's true purpose, and about Grace's respect for her fiduciary duties.

## THE AMENDED COMPLAINT

The SEC's Amended Complaint makes four primary allegations against Grace: (1) that she misrepresented the features and readiness of e-Smart's "smart" card both in direct communications with investors and in public filings she reviewed and signed; (2) that she lied repeatedly to investors and others about the existence, status and content of contracts to provide funding and revenues to e-Smart; (3) that she diverted millions of dollars of investor funds to her personal use; and that (4) she orchestrated the unlawful distribution of unregistered e-Smart stock.  These claims arise out of Grace's efforts to use e-Smart as a lure to unwitting investors. The SEC's instant motion seeks summary judgment against Grace with regard to all elements of its Section 10(b) and Section 5 claims.

## THE RECORD EVIDENCE

The substantial record in this case consists of tens of thousands of emails, pleadings and other court filings, legal agreements, memos and other documents, public disclosures, press

releases, notes, bank records[2] and dozens of days of witness testimony.  That record

overwhelmingly and unequivocally supports each of the undisputed facts set forth below.[3]

Those material facts show that Grace repeatedly made fraudulent statements in connection with

the purchase or sale of a security, then diverted much of the proceeds of that fraud to her

personal use.  The material facts also show that Grace was the essential participant in an

unlawful scheme to offer and sell unregistered stock.  As a result, the SEC is entitled to judgment

against Grace as a matter of law.

## I.     Grace Completely Controls e-Smart, IVI and Intermarket

e-Smart is a public company "engaged in the business of creating, marketing,

manufacturing, installing, operating and maintaining biometric identification systems."  (SEC's

Local Rule 7(h)(1) Statement of Facts ("SOF") ¶ 1).  From its inception in 2001, e-Smart has

reported a total of $39,717 in revenue, and currently has no business operations.  (*Id*).  IVI and

Intermarket are privately held corporations with no business operations.  (*Id*. ¶¶ 2, 3).

Grace controls every aspect of e-Smart, IVI and Intermarket, and serves as the CEO of all

three entities.  (*Id*. ¶¶ 4, 5).  Board members, investors, employees and service providers have all

described Grace as e-Smart's unopposed authority.  (*Id*. ¶¶ 5, 6).  Grace's management style was

hands-on; she controlled everything from public statements to wire transfers.  (*Id*. ¶¶ 5, 6, 25).

By 2009, e-Smart's Board and long-time counsel, auditor and accountant had all resigned or

---

[2] The SEC is still seeking additional bank records from Grace. *See* Dkt. No.'s 298, 309, 319.  As set forth in the SEC's filings, there is substantial evidence that Grace diverted investor funds to accounts for which records have not been produced.

[3] While this Memorandum provides numerous specific illustrations of Grace's fraudulent conduct, the SEC respectfully directs the Court to the SEC's Local Rule 7(h) Statement and the documents cited therein for a fuller discussion of the extent to which the record supports each statement of fact.  Grace cannot genuinely dispute facts that are drawn from hundreds of documents containing her words, her public statements, her bank records and her admissions, as well as from communications and other documents she plainly received and reviewed.  Nor can she gainsay the consistent testimony, corroborated by documents, from investors, Board members, accountants, auditors and others.

been fired, further consolidating Grace's authority.  (*Id.* ¶¶ 158, 159, 164).  As e-Smart's long-time outside auditor observed in a memo, "[m]anagement is dominated by one person, the CEO, who unilaterally makes the decisions for the company."  (*Id.* ¶ 6).

Grace is the majority shareholder of IVI and Intermarket and, through IVI's 61% ownership of e-Smart's stock and her own position, is e-Smart's *de facto* majority shareholder. (*Id.* ¶¶ 2, 4).  In memos and emails, Grace repeatedly made clear that IVI and Intermarket should maintain control of e-Smart.  (*Id.* ¶ 4).  Despite sharp criticism from investors and e-Smart Board members, Grace refused to step down as e-Smart CEO, and, in communications with investors, described herself as essential to e-Smart's business.  (*Id.* ¶ 10).  Grace's control extended to all e-Smart, IVI and Intermarket bank accounts, as well as decisions about how to allocate money between those entities.  (*Id.* ¶ 5, 7).  No one but Grace reviewed IVI and Intermarket's accounts and other financial records.  (*Id.* ¶ 8).

## II.     Grace Solicited Investments By Claiming That e-Smart Had Entered Into, or Was About to Sign, Lucrative Contracts

e-Smart was perpetually low on cash, with e-Smart employees, service providers, Board members, and consultants routinely going unpaid.  (*Id.* ¶ 11).  As a result, Grace continuously solicited money from investors, both directly and indirectly.  (*Id.* ¶ 12).  Those investors purchased stock, or provided loans and other funding and received stock and other securities in return. (*Id.* ¶ 13).

In soliciting these investments, beginning no later than 2006 and continuing through 2011, Grace routinely and repeatedly claimed and implied that e-Smart had signed, or was about to sign, lucrative contracts and/or major funding agreements.  (*Id.* ¶¶ 15-23, 25-31). Representative emails include:

- A July 30, 2006 email solicitation from Grace to investors Henry Mollett and William McVey describing "three large funding commitments" that will be "a good source of funding for the company for the next 3-6 months." (*Id*. ¶ 17). In the email, Grace said the "commitments" are temporarily delayed, compelling her to ask Mollett and McVey to "loan" e-Smart over $500,000 to cover purported patent filings, the "delivery" of "10,000 cards" to a counterparty, listing e-Smart on AMEX, and concluding a deal with NEC. The loan would be partially re-paid in stock.

- An October 22, 2008 email solicitation from Grace to Michael Elek and his wife stating that Grace has a "signed agreement for funding and one more who I expect to be able to put in at least $2.5 million next week . . . [and] can fund up to $20m." (*Id*. ¶ 18). However, Grace states that $400,000 is "urgently needed" for a trade show that will change e-Smart's "whole valuation" and get the company "across the finish line first."

- An October 26, 2006 email from Grace to Kenneth Wolkoff attaching two documents. (*Id*. ¶ 19). The attached memo claims e-Smart has a "joint venture" in Korea that will earn it "$150M per year once the program reaches its full operating capacity." The memo also claims that e-Smart is "finalizing two investment opportunities of $50M each," but that e-Smart "needs an immediate short-term bridge of approximately $250,000, primarily for legal and accounting to complete the larger investment opportunities, which it anticipates to close in the next 30 days."

- On October 7, 2009, Grace wrote to William Sandler and Henry Mollett seeking "emergency funds." (*Id*. ¶ 20). According to Grace, the emergency funds were a short-term measure to forestall "serious problems," since, Grace promised, millions would soon be in e-Smart accounts. Indeed, "[w]ith the Saudi's it is not a matter of if, we have their commitment." Grace added that, "We have commitments from two banks for additional funds and factoring[4] and discounting of [t]he Purchase Orders. They have committed to and are excited about investing in the Company also."

- An April 27, 2010 email from Grace to investors, in which she forwarded an email she wrote describing two groups that "are trying to advance [e-Smart] money" and that have purportedly said they can "release funds . . . in May, after May 10-15th." (*Id*. ¶ 22). However, Grace asked the original email recipient to "think of any existing shareholder" that can help "get the $550,000 to Korea by Friday."

- An October 31, 2011 email to Mollett, McVey and other investors in which Grace condemned them for refusing to provide an additional $250,000 in "emergency funds." (*Id*. ¶ 23). Grace claimed in the email that e-Smart is on the verge of "deliver[ing] cards," which would allow e-Smart "to close the financing deals with the Funds."

---

[4] As e-Smart Board member Thomas Volpe explains, "factoring means you have a genuine receivable that a bank will give you some value for." (*Id*. ¶ 21).

e-Smart also published numerous press releases and investor updates touting lucrative contracts and business partnerships.  (*Id*. ¶ 25).  As CEO, Grace authorized, edited, and was quoted in these press releases and updates.  (*Id*.).  During a December 2007 shareholder call, Grace described numerous "agreements to deliver our technology," various partnerships with established companies, "rollouts" of the e-Smart card, "potential revenues" that are expected to be "substantial," "two substantial financing offers" which Grace and others were "assured" would close, and a major "commitment" that has not been reduced to writing, but that Grace will "finalize" after the New Year.  (*Id*. ¶ 26).

Grace made these representations directly to investors and, through the press releases, to the broader public.  (*Id*. ¶¶ 16-25, 40).  She also made representations indirectly by using investors James Desmond and Kenneth Wolkoff as proxies to convey her claims about imminent contracts. (*Id*. ¶¶ 16).  As investor Robert Aronowitz put it, Grace was "the officer and director of the company who orchestrated our investments and loans to the company."  (*Id*. ¶ 24).

Grace repeatedly claimed to be personally negotiating, finalizing and closing many of these purported contracts and funding commitments.  (*Id*. ¶ 55).  She frequently emphasized that she traveled extensively in support of concluding these arrangements.  (*Id*.).  Grace provided assurance that deals were "bankable," "in the bank," "executed," "closing," or "signed," that there was a "commitment" or "guaranty," or that contracts were being "finalized."  (*Id*. ¶ 65).

## III.    The Promised Contracts Were All Either Complete Illusions or Gross Mischaracterizations of the Few Contracts e-Smart Did Have

### A.   *Grace Made the Same Empty Promises For Years*

e-Smart and its investors never received the revenues and financing Grace described. (*Id*. ¶ 38).  Grace nonetheless continued to claim that deals were completed or imminent through the

Fall of 2011, imploring and berating investors not to cut her off.  (*Id*. ¶ 54).  But even as alleged deal after deal failed to bear fruit, Grace always made promises about the next deal before e-Smart had actually received funding or purchase orders.  (*Id*. ¶ 66).  As Board member Thomas Volpe testified, "We never saw any evidence that specific financing was officially completed, done, and any funds were transmitted."  (*Id*. ¶ 21).  And, while Grace claimed repeatedly that contracts were "signed" or that there were "commitments," and provided other assurances, the SEC has found no record of e-Smart ever suing one of those parties for breach of a finance, sales, or distribution contract.  (*Id*. ¶ 65).

The condition of e-Smart's technology and finances[5] meant there was no realistic chance of a deal.  Importantly, by August of 2007, Grace had been informed by multiple senior engineers that e-Smart did not have a viable card or the means to manufacture one.  (*Id*. ¶¶ 101-103, 165).  Yet Grace continued to claim that investors planned to inject tens of millions into e-Smart, and that e-Smart would soon provide tens of thousands, if not millions, of cards to businesses and governmental entities.  (*Id*. ¶¶ 15-23, 25-31).  The card described in e-Smart's 2007 and 2008 public statements was still much more dream than reality.  (*Id*. ¶¶ 87-113).  Grace was aware that the card had numerous defects, failed to perform properly even at basic demonstrations, lacked third-party verification, and was not equipped with the features she and e-Smart claimed.  (*Id*. ¶¶ 94, 96, 98-103, 108, 109).  Grace had also claimed that former e-Smart

---

[5] e-Smart had serious accounting issues that could cripple any serious effort by another party to conduct due diligence.  (*Id*. ¶¶ 80, 123, 141-142, 161-163).  In fact, e-Smart's long-time outside auditor, Horowitz & Ullman, drafted a memo detailing e-Smart's control deficiencies, nearly all of which concerned Grace's conduct, management practices and unfettered use of corporate assets.  (*Id*. ¶ 163).  By early 2008, Horowitz & Ullman repeatedly expressed concerns to Grace and to e-Smart's accountant about unexplained transactions and other matters on e-Smart's books.  (*Id*. ¶¶ 160-163).  When Grace proved unable or unwilling to answer its questions, Horowitz & Ullman refused to certify its previous work for e-Smart's 2007 10-K, filed May 28, 2009.  (*Id*. ¶ 164).

employees had stolen e-Smart's purported technology, meaning that in 2007 e-Smart was still reverse engineering the card it claims it used to have.  (*Id.* ¶ 115).

Grace also continued to promise deals for revenue and financing despite the fact that, as early as 2006 and repeatedly thereafter, e-Smart investors, employees, affiliates, and Board members told Grace that they questioned her claims' validity.[6]  (*Id.* ¶ 48).  Investors repeatedly demanded that Grace and her surrogate James Desmond provide documentary support for the purported deals.  (*Id.* ¶ 53).  Many investors accused Grace of misleading them.  (*Id.* ¶ 48).  By early 2009, the e-Smart Board challenged Grace in writing on these "repeated" claims.  (*Id.* ¶ 47).  In a subsequent letter to the Board, Grace nonetheless continued to insist that funding and revenues were imminent.  (*Id.*).  The Board would soon resign.  (*Id.* ¶ 158).

With regard to specifics about purported deals, Grace kept others, as one investor put it, "in the dark."  (*Id.* ¶ 56).  Grace frequently refused to provide corroborating documents for the purported deals, often claiming that she could no longer disclose "confidential" information to investors.  (*Id.* ¶¶ 56-57).[7]  In many cases, investors stated that they had nothing to go on besides her repeated verbal assurances.  (*Id.* ¶ 57).

---

[6] As but one example, in a January 26, 2010 email, e-Smart shareholder Christine Dolan told Grace that she does not believe Grace's claims "for ever so many years" about financing from the "Saudi Group." (*Id.* ¶ 49).  Dolan added that "You have left people drowning in anxiety, living at financial risk, living the nightmare you created while continuing to lie, deflect, defame, and neglect your fiduciary duty to this public company!" (*Id.*).

[7] For investors who had relied on Grace's grandiose claims, her "confidentiality" tactic was often a source of significant frustration.  In a July 13, 2011 email to other investors, Robert Aronowitz proposed to say to Grace that: "[I]t is our view that it is not acceptable to maintain a 'dead silence' regarding the affairs of the company on the pretext of a purported attorney's counsel or recommendation.  Certainly, such a communication 'restriction' did not thwart any of your efforts to raise capital from any of us; to our reckoning it was only when the funding spigot was turned 'off' did you substantially suspend communication with many of us." (*Id.* ¶ 58).

Notwithstanding these investor concerns, Grace often claimed that deals would close if only investors gave her additional funds, and that investors must act to protect their already substantial investment.  (*Id*. ¶ 50).[8]  Grace also claimed that lawyers and fund-raisers would help e-Smart if investors paid for "filing costs" or "retainers" of up to hundreds of thousands of dollars.  (*Id*. ¶ 52).  If investors refused, Grace blamed them for failing to protect their investment, and for the lack of documentation.  (*Id*.)  For example, when Henry Mollett again pressed Grace to provide documentation for the purported deals, Grace stated in an October 26, 2011 email that "Unfortunately we could have had all the agreements completed with the Funders but until now you all were not willing to pay lawyers to draft agreements for the company."  (*Id*.).

By October 2011, long-term investors Henry Mollett, William McVey and others declined to provide Grace more "emergency funds," emphasizing that they could no longer rely on Grace's word alone.  (*Id*. ¶ 59).  As Mollett put it in an October 24, 2011 email to Grace: "As a suggestion send documentation of your deals to all of us who have signed confidentiallys [sic]."  (*Id*. ¶ 60).  McVey was even more direct in an October 22, 2011 email to Grace, cc'ing other investors: "We are always told that you can't show us any proof that you have a deal, even though we have all signed a confidentiality agreement.  *It is always a verbal promise that never seems to ever materialize*.  And then when the crisis for money occurs we are told that a new deal is only a week or two away."  (*Id*. ¶ 61) (emphasis added).

---

[8] The emails described at page 7 above are part of a long-established pattern.  Grace told Kenneth Wolkoff in a March 27, 2006 email that a $500,000 investment is needed "by the end of the week" so as to "trigger" major financing that has been promised but is being held up by "Compliance" at "the bank." Grace added that she had an "agreement in principle" for $250 million of financing, which is "finalized except for some legalizations," as well as a signed, "potentially lucrative" contract in Indonesia, but that the $500,000 is needed right away "to insure we have no setbacks at the last minute."  (*Id*. ¶ 51).

B. *Grace Mischaracterized the Few Contracts e-Smart Did Have*

The handful of contracts Grace or e-Smart actually disclosed were primarily agreements to cooperate in the exploration and development of a card system. (*Id.* ¶ 67). Many of them were abbreviated contracts with little detail that did not compel any counterparty to buy a substantial number of cards or pay e-Smart money. (*Id.*). They simply described a basic framework for discussions about potential projects. (*Id.*). Given e-Smart's lack of technical, financial and manufacturing resources, (*id.* ¶¶ 11, 76, 87-113, 166), further progress was unlikely. In describing these agreements, however, Grace implied that these skeleton contracts were meaningful agreements that would generate massive e-Smart revenues. (*Id.* ¶ 68). She claimed, for example, in a memo provided to investor Kenneth Wolkoff, that "e-Smart has ALREADY SIGNED CONTRACTS to deploy its Technologies to 40,000,000 people," and that the "e-Smart Signed Contracts are geared to generate minimum transaction fees to e-Smart averaging approx. US$ 0.10/day/person." (*Id.*) (emphasis in original).

The other "commitments" Grace cited or disclosed were either mischaracterized or contained requirements that e-Smart could not fulfill. In particular, e-Smart issued a February 2008 press release, which quoted Grace at length, claiming that Samsung had contracted with e-Smart to make "irrevocable" purchases of e-Smart's cards. (*Id.* ¶ 28). The press release stated that "the Company believes the Samsung orders may produce profits in excess of $100 million." (*Id.*). The purported Samsung contract was extremely important to both e-Smart and its investors. (*Id.* ¶ 37).

But contrary to Grace's repeated claims, the 2008 Samsung agreement did not compel Samsung to purchase cards from e-Smart. (*Id.* ¶ 33). The contract stated that "'Samsung S1' shall adjust the quantity and the deadline of the product based on the individual orders after the

notification to 'e-Smart.'" (*Id.* ¶ 34).  Further, "the initial date and quantity of delivery shall be

determined by 'Samsung S1' and 'e-Smart' after separate negotiation." (*Id.*).  The contract

contained no minimum required card purchases. (*Id.*).  In the press release, however, Grace

called the contract "the largest order of its kind placed in the world to date for a biometric smart

card." (*Id.* ¶ 28).  The press release emphasized that Samsung "***shall*** make an irrevocable

purchase order," and that e-Smart "***will*** deliver 20 million [smart cards] over a two year period to

Samsung." (*Id.*) (emphasis added).

The language about profits in the press release was included at Grace's insistence. (*Id.* ¶

29).  The night before e-Smart issued the press release, Grace wrote a long email to e-Smart's

Board and counsel stating that "we have irrevocable purchase orders," that "[t]his is a very large

and important contract," and that "we have a responsibility to let our shareholders know, as best

we can estimate, that the contract may be very profitable for the company."[9] (*Id.* ¶ 30) Grace

echoed these claims in an email to an investor a few days before the press release was issued,[10]

telling him that "today we signed a contract with Samsung for $20 [sic] million cards at $21 a

card.  (Our cost will be $4)  Samsung is giving us an Irrevocable Purchase Order and it is

bankable.  This is the largest order for biometric smart cards ever placed." (*Id.* ¶ 31).  Grace

never spoke to anyone at Samsung before making these claims. (*Id.* ¶ 31).

Moreover, as discussed above and in Section IV below, e-Smart did not even have the

ability to manufacture a small number of reliable cards, much less "20 million."  Although e-

Smart eventually disclosed the Samsung contract – well after the 2008 press release and Grace's

---

[9] The quoted profit potential appears to be based on the assumption that the card will only cost $4 to
manufacture. (*Id.* ¶ 31).  However, the record consistently shows that, well into 2009, the card involved
manufacturing costs of $20 per card or more. (*Id.* ¶ 32, 77, 96. 97).

[10] Emails such as this illustrate that Grace's concerns about "confidentiality" were not sincere.  Where it
suited her purposes, she did not hesitate to share "confidential" information with investors.

claims to investors, and in an 8-K that repeated the same deceptive claims – Grace never corrected her and e-Smart's misrepresentations, nor disclosed the true state of e-Smart's rudimentary card.  (*Id.* ¶ 33).  Understandably, then, when asked if he believed that the February 2008 press release mischaracterized the Samsung contract, Board member Charlie Black testified that he "could see how a reasonable man would think that." (*Id.* ¶ 36).

The failure of the other contracts Grace sometimes disclosed – including in filings with this Court (*see, e.g.,* Dkt. #181, Memorandum at 12) – speaks for itself.  The Bintusa[11] and Louis XVII agreements were with counterparties that either are, or are very likely to be, fraudulent. (*Id.* ¶¶ 63, 73).  Still other agreements were vague arrangements with entities affiliated with e-Smart consultants Christopher Harriman and Adnan Khasshogi, who were receiving payments and stock from e-Smart.  (*Id.* ¶ 69).  The record does not contain signed contracts for most, and the document Grace cites as support for their existence openly acknowledges that the prospects for funding are unresolved and tenuous.  (*Id.*).  Indeed, Brightside, the consultants Grace hired, implored her, without success, to follow-through with potential investors and to make full disclosure of e-Smart's financial status and corporate operations.[12]   (*Id.* ¶ 118).

---

[11] In April of 2007, echoing her statements to investors, Grace asked Bintusa's CEO, the convicted criminal and fraudster Barry Yaker, to "write a letter, or have a letter written by the bank, saying that $75m is in a [sic] account for the benefit of IVI subject to finalization of the agreement."  The purpose of the letter was to deceptively reassure a counterparty known as MYbi that e-Smart was capable of proceeding on their contract. (*Id.* ¶ 73).

[12] The contract with World Development Corporation ("WDC") was not for "$50 million." (*Id.* ¶ 71).  As WDC's CEO emphasized in his investigative testimony, the contract only provided that WDC would explore joint ventures with IVI, permitting it to provide zero dollars, which is what nearly occurred.  (*Id.* ¶ 71).  Moreover, e-Smart simply did not perform on the 2007 WDC contract.  (*Id.* ¶ 72).  Despite repeated requests by WDC's CEO, Grace and e-Smart failed to provide the required funding for the joint venture, could not demonstrate that they held a necessary patent, and did not provide engineers for client demonstrations.  (*Id.*).

Grace circulated another set of purported agreements in late 2008 and 2009 for purportedly "irrevocable" and "required" purchase obligations. (*Id*. ¶¶ 74-75). Those contracts, purchase orders and letters of intent were full of conditions, featured largely obscure entities as counterparties, and appeared to be premised on the concept that the purchasing party would first provide millions to e-Smart so that it could develop a card and begin production. (*Id*. ¶¶ 76-77). Notably, one agreement stated that the purchaser would have to pay at most $15 per card. (*Id*. ¶ 77). Grace conceded in a contemporaneous email, however, that the card sensor *alone* was still costing e-Smart $21. (*Id*.). Further, in an attempt to obtain financing, Grace presented these agreements as valid and legitimate to banks, hedge funds and an organization affiliated with Board member Charlie Black. (*Id*. ¶ 78). None of them deemed the agreements sufficiently reliable to act upon. (*Id*.).

C. *Grace Continued To Claim Imminent Arrangements With the Same Counterparties For Years, Even When No Money Ever Materialized.*

Grace's claims about contracts with certain entities were especially dubious. Grace first made promises about funding from John Duff and his Louis XVII organization in 2006, but, despite never receiving any promised funds, continued to claim until at least July of 2009 that Duff was going to provide funding. (*Id*. ¶ 63). These claims persisted even though Grace had been warned in 2006 by co-Defendant Tamio Saito, both in an email and in a sworn declaration in a court proceeding, that Duff was a "scam." (*Id*.). Despite making repeated promises to investors, Board members and others about John Duff and Louis XVII, Grace now claims not to "even know what or where the Louis whatever foundation is." (*Id*.).

Empty claims about Samsung also lasted for years. (*Id*. ¶ 64). e-Smart listed Samsung as a partner as early as 2005. (*Id*.). By early 2009, Grace was still promising the Board that e-

Smart would profit from "irrevocable" purchase orders from Samsung and other Korean entities. (*Id*.).

IV.  **Grace Solicited Investments By Falsely Claiming That e-Smart Had and Could Produce a Viable, Technologically Advanced, Biometric Card**

In its 2006 Form 10-KSB (the "2006 10-K"), signed by Grace and filed on October 24, 2007, e-Smart stated that: "We believe we are the first, and currently the only company offering a commercially available dual ISO 7816 (contact) and ISO 14443-B (wireless) compatible smart card with a fingerprint sensor onboard, biometric matching engine onboard and multi-application processor for deployment today."  (*Id*. ¶ 81).  e-Smart emphasized that its "product is also 'dual-interface,'" – in other words, that it works both as a card that comes in contact with a reader *and* as a card that can operate as a wireless, non-contact device.  e-Smart added that the card was "water-proof, ESD proof, scratch-proof and c[ould] detect 'liveness.'"  (*Id*.).  The card's "design" purportedly included "competitive advantages" such as a "unique" sensor, a complete resistance to tampering and counterfeiting, a "multi-application system . . . each completely and securely isolated from the other," and a system to make both "false rejects" and "false positives" almost zero.  (*Id*.).

In its amended 2005 Form 10-KSB (the "Amended 2005 10-K"), signed by Grace and filed on March 20, 2008, e-Smart stated that the card "contains a microprocessor, [and] can process information and run multiple applications."  e-Smart repeated the claim that the card was "dual-interface," contained a "unique" sensor, and was "durable and easy to use."  (*Id*. ¶ 82). "As of the date hereof," e-Smart stated, "the Super Smart Card is the only dual-interface biometrically activated, microprocessor-based smart card product *available for deployment today*." (*Id*.) (emphasis added).

16

On November 4, 2008, e-Smart issued a press release introducing a "Next Generation" card containing a "proprietary" sensor and wireless capabilities.  The card was described as "the only technology of its kind."  (*Id*. ¶ 83).  Grace made oral representations to investors consistent with the statements in e-Smart's 2006 and Amended 2005 10-K's, including that the card could function wirelessly, and that it contained a multi-application function. (*Id*. ¶¶ 84-85).  And, in March and July of 2007 emails, she informed shareholder Gary Messina that e-Smart had technology for a card that could recognize DNA, do facial recognition, work on existing wireless networks, communicate with satellites, and detect "suicide bombers before they can attack, at a distance of 2.5 miles."  (*Id*. ¶ 85).

Grace's and e-Smart's claims had no basis in reality at the time they were made.  e-Smart's Chief Technology Officer, Tamio Saito, testified that it was not until "2011 or 2012" that e-Smart purportedly developed a card that was both wireless and contained a multi-application processor.  (*Id*. ¶ 87).  The card and technology were in a perpetual state of development.  In particular, the card was not even close to being functionally wireless at the times e-Smart filed its 2006 10-K and its Amended 2005 10-K.  By July of 2008, e-Smart was still at what Saito testified was the "starting point" for research on a viable wireless card.  (*Id*. ¶ 88).  Marcello Soliven, a key e-Smart engineer, testified that it was late 2008 at the earliest before e-Smart had "the first iteration of a wireless card."  (*Id*. ¶ 89).  As he explained, "everything up to that point that was really salable was contact."  (*Id*.).  Whatever wireless capability that had previously been developed was not sufficient to power a commercially viable card. (*Id*.).

Moreover, through at least 2008, e-Smart neither licensed nor possessed a card that could perform multiple applications – in other words, a card that could function as an access control

card, bank card, subway card and credit card, among other uses.  (*Id*. ¶¶ 90-93).  Soliven testified

that he "think[s] some small amounts" of multi-application features were installed in "the '08/'09

version."  (*Id*. ¶ 91).  Saito testified that the only "multiple functions" the card had were the

series of steps it performed to evaluate a fingerprint.  (*Id*. ¶ 90).  Thomas Huffman, who Grace

retained in 2007 to work on a card processing system, testified that through at least 2008, he

never saw an e-Smart card that had "multi-application capabilities."  (*Id*. ¶ 92).  e-Smart never

licensed a system that Saito, under oath in a prior proceeding, declared was the "only one that

would allow e-Smart's Super Smart Card to perform securely in a multifunctional environment."

(*Id*. ¶ 93).

    The card had numerous other defects.  In July 2008, an internal e-Smart email that Grace

forwarded to an investor disclosed that the card has a "fragile sensor," that the algorithms are

still going through a "debugging process," that the power source "is not stable," that the card

lacks "authentication from certified organizations," including ISO, that the card has not been

tested for reliability or for the "yield" from mass manufacturing, and that the card is still using

another company's sensor.  (*Id*. ¶ 94).  A month later, Grace accidentally forwarded an email

observing that "the manufacturing has still not been stabilized."  (*Id*. ¶ 95).

    Numerous engineers and other experts noted these many defects.  In July of 2007,

Richard Barrett, who Grace had retained as e-Smart's Chief Operating Officer, observed that e-

Smart's demo card was not marketable.  (*Id*. ¶¶ 98-103).  The card was fragile and could not

interact with a card reader or remote systems.  (*Id*. ¶¶ 95, 96, 98).  The following month, Barrett

proposed edits to e-Smart's draft 2006 10-K to reflect that: there was no card with a multi-

processor; there was no basis for e-Smart's claims about false positives and negatives; and, the

technology was not unique, among other limitations.  (*Id*. ¶ 99).

Grace also retained Alistair Clisham in August 2007 to help develop and sell e-Smart's technology.  (*Id.* ¶ 102).  But Clisham, alarmed, soon noted that e-Smart only had a single, non-wireless demo card with numerous unresolved flaws, including problems with its basic sensor and matching algorithm, no realistic business or development plan, and no way to reliably manufacture cards.  (*Id.*).  As Clisham testified, "the company definitely wasn't at a stage to start producing 3,000 cards."  (*Id.*).

Penrose Albright, formerly with the organization Civitas[13] and a prior head of Lawrence Livermore National Laboratory, testified that the e-Smart card he reviewed in 2008 was a deeply flawed, non-wireless product.  (*Id.* ¶ 104).  Albright stated that there was no testing or data to support many of e-Smart's claims, and that the staff at Civitas implored Grace and others at e-Smart to have the card tested by independent third parties.  (*Id.*).  Civitas personnel were highly skeptical about the card.  (*Id.* ¶ 106).  They doubted that it actually possessed the publicly claimed features, much less that it could meet industry standards.  (*Id.*).  As Albright put it in a July 2008 email to other Civitas personnel, it was unclear whether Grace's claims about the card were "real" or "just vugraphs."  (*Id.*).  Civitas executive David Howe testified that he never saw a demo of e-Smart's claimed technology, or even of a wireless card that worked.  (*Id.* ¶ 107).  In fact, a March 2008 demo for Civitas of a basic, single-function contact card was a failure.  (*Id.* ¶ 108).  Grace afterwards communicated with an e-Smart engineer about the card's failures at that demo.  (*Id.*).

Civitas implored Grace to have the card evaluated by a qualified third party.  (*Id.* ¶ 104, 109)  As another email to Grace put it, e-Smart lacked, but needed, "validation of the card

---

[13] Civitas was a consulting organization with ties to e-Smart Board member Charlie Black.  (*Id.* ¶ 105). Its focus was on promoting products to various government agencies, particularly for security applications.  (*Id.* ¶ 105).  To varying degrees from 2003 through 2005 and 2008 through 2009, Civitas attempted to collaborate with e-Smart to promote its card.  (*Id.*).

features to be confident that they will pass the standards." (*Id*. ¶ 109).  Yet by December of 2008 Board member Charlie Black and Civitas were still discussing the fact that e-Smart had not yet gotten sufficient third-party verification.[14]  (*Id*. ¶ 110).

In August 2009, nearly two years after e-Smart filed its misleading 2006 10-K, a third-party review commissioned by an e-Smart investor vividly described e-Smart's continued lack of a commercially viable card.  (*Id*. ¶ 96).  e-Smart claimed in the 2006 10-K and in the Amended 2005 10-K that the card had a "unique" and durable "sensor" – the very component that makes biometric identification possible.  But the report, based in part on interviews that Grace attended with engineers and marketing staff, stated that:

- e-Smart was still trying to develop a sensor through an "ill advised" and "costly" process that had "paralyzed" e-Smart's sales effort.  Worse, "[a]fter two years the new sensor is still not available at an industrial level."

- However, the prior sensor, which was manufactured by a third party, was "expensive and not reliable [and] was also friable."  It would not pass Korean or ISO7816 certifications.

- Even assuming a new sensor is developed, the "elapsed time to reach full fletched [sic] production is in the order of 18 to 20 months."

- "The cards could not and cannot be provided in high volumes."

- "The solution has not yet undergone a [sic] industrial stress test."

- Even with a new sensor, production costs will be at least $16 per card.[15]

Grace was intimately aware of the card's flaws.  Beginning in 2004, engineers routinely described card technology to Grace.  (*Id*. ¶ 119).  In turn, she was proficient in describing it to

---

[14] The one third party to whom Grace did provide the card in 2008, Exponent, received only $13,000 to evaluate it.  (*Id*. ¶ 112).  The Exponent engineer testified that, among other limitations: the card initially crashed; the card was not wireless; the card had a sensor that was not ISO compliant; the card was unable to enroll a number of individuals; and the testing did not lead to statistically meaningful results, did not involve a detailed look at the card's technology or algorithms, did not fully evaluate the card for ISO compliance and did not check to see whether the card would confuse two person's fingers.  (*Id*. ¶ 113).

[15] For good measure, the report noted that there is a "lack of transparency on company finances."

others.  (*Id*.).  In September 2007, Clisham informed an irate Grace that e-Smart had no viable

card, and would not for years.  (*Id*. ¶ 103).  Grace knew about – and objected to – Barrett's

proposed edits to the 2006 10-K.  (*Id*. ¶¶ 100-101).  Grace discussed the failed March 2008 demo

for Civitas.  (*Id*. ¶ 108).  Grace also forwarded Michael Elak a July 2008 email in which the head

of e-Smart Korea specified the card's many unresolved defects.  (*Id*. ¶ 94).  And, in 2009, Grace

attended discussions with engineers that formed the basis for the 2009 report described above.

(*Id*. ¶ 96).

      Importantly, Grace also knew that e-Smart's entire technical staff had left the company in

2006, with Saito not returning until March of 2007.  (*Id*. ¶ 114).  During that time, no work

progressed on the card.  (*Id*.).  And, Grace and e-Smart vigorously pursued litigation against

former e-Smart personnel, alleging that they had stolen much of e-Smart technology.  (*Id*. ¶ 115).

In fact, much of the effort Grace directed in 2007 – including hiring Barrett and Huffman – went

towards reverse engineering the purportedly lost technology.  (*Id*.).

**V.**     **Investors Considered Grace's Claims About Contracts and e-Smart's Cards To Be Extremely Important, and Relied On Those Statements In Making Their Investments or Loaning e-Smart Money**

    *A.*   *Grace Knew That Investors Considered Her Claims About Contracts and Financing To Be Extremely Important*

      Investors considered Grace's claims about e-Smart's contracts and technology to be of

the utmost importance.  (*Id*. ¶¶ 40-46).  Investors regularly pressed Grace and her surrogates for

information about purported deals.  (*Id*. ¶ 40).  When e-Smart invited investor questions prior to

a December 2007 shareholder call, most of the questions concerned Grace's claims about

contracts and financing.  (*Id*. ¶ 41).  Grace reviewed these questions.  (*Id*.)  Investor interest

reflected e-Smart's disclosure in its 2006 10-K that "our assets consist principally of the contracts we have signed."

As early as 2006 and through 2011, numerous investors stated to Grace that they had directly relied on her claims about purported contracts.  For example:

- In an April of 2007 email, investor Douglas Borwick told Grace that "I believe that millions of dollars were raised over the last two years by telling investors that funding was about to take place . . . . There are many investors that believe they were told a lie regarding imminent funding, just to get their money." (*Id*. ¶ 42).

- In an October of 2006 email, Kenneth Wolkoff told Grace that another investor had just called him, and "[f]eels that we are fraudulent and open for criminal prosecution. . . . Feels that we lied and defrauded him about the funding that we said was in which lead he and friends to put in more money." (*Id*. ¶ 43).

- In an April 11, 2007 email to Grace and others, the investor Halden Shane described his reliance on Grace's claims that e-Smart had contracts "worth billions."  (*Id*. ¶ 44).  Shane forwarded $250,000 in response to Grace's "constant pressure" but demanded it back after deciding that e-Smart was, as he put it, "starting to look like a scam."

- In a March 19, 2010 email, investor Robert Aronowitz told Grace that "the financing you've been courting since our first loan in November 2009 . . . has either collapsed or vanished.  This is disappointing but not entirely unexpected, as you've continually promised and represented positive results, but in actuality have achieved little with the exception of securing our sole funding."  (*Id*. ¶ 45).

- In an October 21, 2011 email, investor William McVey told Grace that he would help "if we thought you ACTUALLY HAD A DEAL.  We are always told that you can't show us any proof that you have a deal . . . . It is always a verbal promise that never seems to ever materialize.  And then when the crisis for money occurs we are told that a new deal is only a week or two away."  (*Id*. ¶ 46) (emphasis in original).

### B. *Investors Considered Her Statements About e-Smart's Card To Be Extremely Important*

Investors have testified that they considered Grace's and e-Smart's claims about the smart card to be highly material.  (*Id*. ¶ 116).  As William McVey put it, he invested after being told e-Smart's card "was going to revolutionize all cards."  (*Id*. ¶ 117).  Contemporaneous emails

support that testimony.  As McVey emphasized to Grace in 2011: "If you have what you claim, it should be very easy to market." (*Id*.).

## VI.     Grace Diverted Tens of Millions of Dollars of Investor Money To Her Personal Use

Over the course of up to nine years, a core group of investors, including Douglas Borwick, Kenneth Wolkoff, Henry Mollett, William Sandler, William McVey, Jim Desmond, Robert Aronowitz and Tom Howard, gave Grace and e-Smart over $25 million – a figure Grace herself cites.  (*Id*. ¶ 121).  Another investor, Michael Elek, gave Grace and e-Smart $4 million, some of it through an investor and advisor to e-Smart named Roland Day.  (*Id*.).  Numerous other investors solicited directly or indirectly by Grace gave millions more.  (*Id*.)[16]

During this time period, Grace had no meaningful source of income besides her access to corporate accounts.  (*Id*. ¶ 149).  e-Smart, IVI, and Intermarket had, in total, less than $40,000 in revenues from product sales.  (*Id*. ¶¶ 1-3, 11).  The only money in the accounts for those entities came from investors.  (*Id*. ¶¶ 1-3, 11, 121, 127).

Grace's behavior and lifestyle, however, led investors and others to suspect that she mostly spent the money on herself.  (*Id*. ¶ 122).  In fact, bank records, emails and other documents show that despite her role as CEO of, and fiduciary to, e-Smart, Grace diverted most of that money to IVI accounts – accounts that Grace exclusively controlled.  (*Id*. ¶ 124).  She then used those accounts – as well as e-Smart accounts – as her personal piggy bank, drawing upon them to fund a lavish, jet-setting lifestyle.  (*Id*. ¶¶ 131-133).  To accomplish this diversion, she regularly instructed e-Smart's investors to deposit the money directly into IVI and e-Smart Korea accounts, in exchange for which they would typically receive e-Smart stock.  (*Id*. ¶¶ 124-

---

[16] Grace has not produced bank records sufficient to identify where all of this money went.

128).  The contracts she circulated also often included clauses providing that proceeds would be placed in IVI accounts.  (*Id*. ¶¶ 71, 126).[17]

Except for a non-specific disclosure in May of 2009 about payments from e-Smart,[18] Grace never disclosed how she spent the majority of investor money – particularly the money that she diverted to IVI and her personal accounts.  (*Id*. ¶ 136)  For example, in one month in September 2007, Grace spent over $177,000 from IVI accounts on rooms at the Hotel Carlyle, purchases at ultra-high-end European clothiers and jewelers, first-class travel to and within Europe, gourmet restaurants, and other extravagances.  (*Id*. ¶ 131).  That same month, Grace spent another $78,000 from an e-Smart account in a similar manner.  (*Id*. ¶ 132).

Despite e-Smart's perpetual lack of funds, that kind of spending was typical.  Based on a review of available bank records, Grace squandered investor assets from known IVI and e-Smart accounts, money that was purportedly being used to develop, manufacture and market an advanced smart card, in at least the following ways:

- cash withdrawals of $397,501 and transfers to family members of $311,319;

- retail purchases of $409,038 and restaurant charges of $59,310;

- hotel charges of $1,114,243 and other travel expenses of $356,917. (*Id*. ¶ 139).[19]

---

[17] Grace also insisted that IVI was entitled to millions of dollars in e-Smart stock and other compensation in exchange for the license it granted e-Smart.  (*Id*. ¶ 128).  Despite requests by e-Smart's outside auditor and counsel, and despite stating to the outside auditor and the e-Smart Board that she would, Grace never hired an independent examiner to analyze the value of the licensed technology.  (*Id*. ¶ 130).

[18] The disclosure in the 2007 10-K – filed in May of 2009 – that e-Smart apparently paid for all of Grace's personal expenses was a little late in coming.  Grace took the position as early as 2006 with e-Smart's accountants and auditors that, because she was working virtually non-stop, e-Smart should pay for all of her expenses.  (*Id*. ¶ 137).  The 10-K did not disclose the extent of those expenditures, nor how investor money that had been put in IVI and other accounts was spent.

[19] Grace also gave huge sums to friends and affiliates.  She paid Adnan Khashoggi over $100,000, purportedly in connection with his failed efforts to procure funding for e-Smart.  (*Id*. ¶ 135).  Grace also bought him an $18,000 watch with e-Smart funds.  (*Id*.).

Not content, however, simply to use corporate accounts to fund her lifestyle, by 2012 Grace had transferred $1,371,456 million directly from corporate accounts to her personal bank accounts,[20] including hundreds of thousands of dollars simply by writing checks to herself.  (*Id.* ¶ 140).  For example, in the two and a half months between October 16, 2008 and January 7, 2009, Grace transferred $238,000 from e-Smart, IVI and e-Smart Korea accounts to one personal account.  During that time period, Grace spent the money on, among other things: nearly $22,000 at the Mirage in Dubai; over $11,000 at the Four Seasons in London; over $100,000 at Claridge's in London; over $6,000 at the Hyatt Regency in Paris; approximately $4,000 at the Hotel Delano in Miami Beach; over $16,000 at the Mariott Grand Hotel Resort in Florida; over $12,000 on an unspecified event in Cannes; thousands of dollars on what appear to be the daily expenses of someone enjoying a ski trip to Vail and Boulder; nearly $4,000 at a Palm Springs life extension spa; and retail purchases commensurate with this lifestyle, including almost $4,000 at the clothier "Just Cavalli" in Rome, over $1,100 at Luisa Spagnolli, and $420 at Sephora.  Grace also gave over $27,000 to family members.  (*Id.*).

By 2011, Grace had apparently instructed long-time investor James Desmond to wire hundreds of thousands of dollars directly to Grace's personal account at Wells Fargo.  (*Id.* ¶ 150).  In January of 2011, Grace gave $19,000 to a plastic surgeon she had earlier paid $10,000 from a corporate account.  (*Id.* ¶ 145).  As Grace well knew, however, in January of 2011, long-time employee Beverly O'Meally could not pay her rent after failing to receive any salary for

---

[20] This figure represents just the known amounts.  The SEC is not the first party to view Grace's bank account disclosures as inadequate.  In early 2008, e-Smart's auditors Horowitz & Ullman tried repeatedly and unsuccessfully to get an explanation from Grace of $600,000 in transfers from e-Smart accounts to unknown accounts located in Georgetown, D.C., where Ms. Grace resided.  (*Id.* ¶ 141).  Despite repeated questioning by e-Smart's auditor, Grace also failed in early 2008 to explain why she had provided e-Smart stock valued at millions of dollars to a long list of friends, family, "consultants," IVI, and a Grace-controlled charity.  (*Id.* ¶ 142).

two months.  (*Id*. ¶ 146).  In fact, even as she spent investor money on plastic surgery and her extravagant lifestyle, Grace repeatedly told investors that e-Smart and its employees were destitute.  (*Id*. ¶ 144).

Finally, neither Grace nor any of e-Smart's auditors or accountants is able to estimate how much money was spent on Grace's expenses.  (*Id*. ¶ 152).

## VII.   Grace Obstructs Efforts To Investigate Claims By e-Smart Insiders That Grace Committed Fraud and Other Serious Abuses of Fiduciary Duty

In 2008, e-Smart's long-time counsel, outside auditor and accountant all raised a number of questions about the relationship between IVI, Intermarket and e-Smart, as well as Grace's role in that relationship.  (*Id*. 153).  In August of that year, e-Smart's counsel, Maranda Fritz, wrote a lengthy letter to the Board detailing Grace's diversion of resources from e-Smart to IVI, her disregard of corporate structure and basic controls, her failure to conduct herself properly as the manager of a public company, her use of investor money to support herself and her family, and her fabrication of a 2007 opinion letter.  (*Id*. ¶ 154).  In the letter, Fritz accused Grace of a "pattern of specific misrepresentations," and of failing to disclose information about e-Smart's apparently diminished ownership of technology that renders "the current public filings . . . misleading and/or false."  (*Id*. ¶¶ 154-156).

The Board reacted by requiring Grace to hire an independent counsel to examine Fritz's allegations.  (*Id*. ¶ 157).  Despite the Board's repeated insistence that Grace pay the independent counsel to conduct the examination, Grace never did.  (*Id*. ¶ 158).  The examination was not performed.  (*Id*.).  e-Smart's Board resigned in 2009. (*Id*.).

Grace also fired anyone that challenged her characterization of e-Smart's finances and technology.  (*Id*. ¶ 165).  In September of 2007, Grace discharged e-Smart's Chief Operating Officer after he informed Grace that e-Smart's public claims about its technology were not

truthful.[21]  (*Id.*).  Grace also refused to keep working with Alistair Clisham, another senior

technology specialist that informed Grace in September of 2007 that e-Smart had no viable card

and no means to manufacture it.  (*Id.* ¶ 166).  In 2008, Grace terminated Anthony Russo, who

had served as e-Smart's accountant.  (*Id.* ¶ 167).  Russo had raised many of the same concerns,

set forth above, as Maranda Fritz and Horowitz & Ullman.  (*Id.*).[22]

## VIII.   Grace Was an Essential Participant In a Plan To Raise Millions of Dollars By Using a Convertible Loan Scheme to Offer and Distribute Unregistered Stock

From approximately early 2005 through 2007, e-Smart, Grace and others raised millions

of dollars through an offering of approximately 130,000,000 shares of e-Smart stock.  (*Id.* ¶ 168).

No registration statement existed for those shares.  (*Id.* ¶ 169).  The scheme generally worked as

follows: (1) an investor sent money to e-Smart and later signed documents purporting to

evidence a very short-term "convertible loan" to IVI or Intermarket; (2) the documents stated

that IVI or Intermarket promised to repay the "loan" in a matter of a week or two; (3) as

collateral for the investor's "loan," IVI or Intermarket pledged e-Smart shares, which e-Smart

had issued to IVI or Intermarket over time as restricted shares; (4) IVI or Intermarket defaulted

on the "loan"; (5) upon default, the investor requested e-Smart shares, generally receiving them

at a discount to the market price; (6) purporting to rely on a legal opinion letter that improperly

invoked Rule 144(d)(3) under the Securities Act, Grace authorized its transfer agent to issue e-

Smart shares from IVI or Intermarket to investors.  (*Id.* ¶ 171).

---

[21] The COO, Richard Barrett, prevailed on a claim against e-Smart that he was wrongfully discharged for engaging in protected activity related to his efforts to correct e-Smart's public claims.  (*Id.* ¶ 165).

[22] Prior to being terminated, Russo strenuously objected to Grace's claim in 2008 – made while Grace was ostensibly e-Smart's CEO – that e-Smart owed IVI $12 million for purported technology IVI licensed. (*Id.* ¶ 167).

Unrestricted shares of e-Smart were issued to the investors, on the premise that IVI or Intermarket had held the shares for more than two years and the transfer was pursuant to the default of a *bona fide* loan, as to which the securities had been pledged as collateral.[23]  (*Id.* ¶ 172).  In fact, however, the loan was not *bona fide* – investors expected shares, not repayment. (*Id.* ¶ 174).  The record contains emails sent to Grace and others where investors claimed default the same or the next business day after making their loan.  (*Id.* ¶ 176).  As one investor's email to Grace puts it, "I understand the Intermarket Ventures loan *will* be defaulting." (*Id.*) (emphasis added).  That email was sent the same day the "loan" was made.  (*Id.*).  Douglas Borwick and Kenneth Wolkoff,[24] who both invested in the convertible loan scheme and helped Grace run it, confirmed in their depositions that the lender/investors expected to get e-Smart shares.  (*Id.* ¶ 175).  Wolkoff testified that while, technically, investors could have chosen not to convert their loan, "[m]ost of the people, in fact, coming in had the intention just like I did to convert because they wanted the free trading shares."[25]  (*Id.*).

The loans had no basis in financial reality.  Neither IVI nor Intermarket had any operations, assets or cash flow; the only way they could re-pay the loans was to transfer the e-Smart shares pledged as collateral.  (*Id.* ¶ 177).  Further, upon default, investors received shares at a rate – generally $0.10 each – below e-Smart's then-current market value. (*Id.* ¶ 178).  The

---

[23] In the final step of the scheme, e-Smart issued additional restricted shares to IVI and Intermarket to replace the shares IVI and Intermarket transferred to the investor who made the loan.  (*Id.* ¶ 173).  This replenishment of shares to IVI and Intermarket was done to preserve Intermarket's and IVI's respective ownership shares in e-Smart.  (*Id.*).

[24] Wolkoff has already entered into a consent judgment with regard to his actions in the unlawful offering. (*Id.* ¶ 189).

[25] Borwick's testimony is virtually identical:  "Q: Okay.  Did they [investors] tell you that they were entering into this transaction because it was an advantageous way for them to obtain free trading stock in e-Smart?  A: I think they all understood that clearly. Q: Okay.  And is your recollection that's why they sent their money to e-Smart? A: Yes."  (*Id.* ¶ 175).

loan paperwork provided to investors was typically drafted only after investors had wired money. (*Id.* ¶ 180).

Grace, as e-Smart's CEO, and as the foremost beneficiary of the investor money, was an essential participant in the illegal offering.  (*Id.* ¶¶ 176, 178, 182, 184-188).  Grace coordinated the distribution of shares, signed the documents evidencing the agreements and provided instructions to the transfer agent.  (*Id.*).  On at least two occasions, in a January 5, 2005 memo[26] and in a frantic March 30, 2006 email, Grace explained to others at e-Smart precisely how the scheme was going to, and did, work.  (*Id.* ¶ 182).  In both cases, she emphasized that the arrangement should not diminish IVI and Intermarket's control of e-Smart.  (*Id.* ¶ 183).

The record is saturated with emails to and from Grace that reflect her immersion in the mechanics of the scheme: lists of current and potential investors; complaints from investors about not getting shares; directions to, and questions from, the stock transfer company; conversion notices; and instructions to counsel.  (*Id.* ¶ 184).  Wolkoff and Borwick make it clear that Grace was the scheme's key participant.  (*Id.* ¶ 185).  Borwick emphasizes that it was Grace who told him that the convertible loan scheme was in fact "a very advantageous way to invest" in e-Smart, and that he could obtain free-trading shares "effectively at a lower price than what it was trading out in the marketplace." (*Id.*).  Wolkoff echoes that testimony, emphasizing that it was Grace who provided him with the talking points he used to persuade investors.  (*Id.*).

Finally, Grace also had an attorney – Maranda Fritz – write opinion letters directing the transfer agent to issue unrestricted shares.  (*Id.* ¶ 186, 187). Fritz has testified that Grace perpetuated the illegal offering by forging an opinion letter and providing it to the transfer agent, and that any opinions Fritz provided were based on Grace's representations of fact.  (*Id.* ¶ 186).

---

[26] In her deposition, Grace denied drafting the memo, even though it bears her name and was distributed to all senior e-Smart personnel.  (*Id.* ¶ 182).

## ARGUMENT

### I.      Standard For Entry of Summary Judgment

The Court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Boland v. Thermal Specialties, Inc.*, 950 F. Supp. 2d 146, 150 (D.D.C. 2013 (Boasberg, J.) (quoting Fed. R. Civ. P. 56(a) and *citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).   In considering a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Liberty Lobby*, 477 U.S. at 255; *Boland*, 950 F. Supp. 2d at 151. However, the "nonmoving party's opposition . . . must consist of more than mere unsupported allegations or denials and must be supported by . . . competent evidence, setting forth specific facts showing that there is a genuine issue for trial."  *Boland*, 950 F. Supp. 2d at 151 (citing Fed. R. Civ. P. 56(e) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).   As the Supreme Court explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### II.      Grace Defrauded Investors

#### A.   *The Elements of a Section 10(b) Claim*

"The SEC must show that a defendant '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'"  *SEC v. e-Smart*, No. 11-cv-895, 2014 WL 945816, *6 (D.D.C. March 14, 2014) (quoting *SEC v. Monarch Funding*, 192

F.3d 295, 308 (2d Cir. 1999)).  As set forth below, a reasonable jury could only find that Grace's

conduct met each of these elements.

B.   *Grace Made Misrepresentations and Omissions As To Which She Had a Duty To Speak*

1.   The Contracts

Grace made[27] a variety of misrepresentations about actual or imminent e-Smart contracts.

She told investors that contracts had been concluded, when in fact no such contracts existed.  She

claimed that lucrative contracts were about to be signed or otherwise "finalized," when in fact no

such contracts were imminent.  And, she serially misrepresented the nature of the contracts e-

Smart actually had.  Grace made these misrepresentations almost continually from 2006 through

the end of 2011.  While the counterparty frequently changed, the outcome was always the same –

the purported contracts generated nothing for e-Smart, while investors gave Grace tens of

millions in reliance on her claims.

The record in this case indisputably shows that:

- e-Smart never received the financing or revenues from the deals Grace described. (SOF ¶ 38).

- Grace always made claims about purported deals *before* e-Smart had received any financing or valid purchase orders. (*Id*. ¶ 66).

- Grace and e-Smart grossly mischaracterized the 2008 Samsung agreement in both a press release and direct investor communications. (*Id*. ¶¶ 27-37).

- The purported deals – and their inevitable delays – typically coincided with Grace's requests for "emergency funds." (*Id*. ¶¶ 20, 23, 44, 51, 59).

- Grace claimed to have successive deals with entities, such as "John Duff," with whom earlier deals had led to nothing. (*Id*. ¶¶ 63-64).

---

[27] The documentary and testimonial evidence, included numerous emails cited in this memo, overwhelmingly shows that Grace "made" numerous relevant statements for purposes of *Janus Capital Group, Inc v. First Derivative Traders*, 131 S. Ct. 2296 (2011), including the statements in e-Smart's 10-K's.  *See e-Smart*, 2014 WL 945816 at *6.

- Grace repeatedly claimed that deals that were nothing more than agreements to cooperate, or that did not – and could not – realistically compel a third party to provide financing or purchase cards, were worth tens, if not hundreds, of millions of dollars to e-Smart. (*Id*. ¶¶ 27-37, 68-79).

- Grace often provided little or no documentation, such as signed or even draft contracts, to corroborate her many claims. (*Id*. ¶¶ 56-62).

- While Grace freely disclosed information about purported contracts when she solicited investor money, she eventually responded to irate investors by claiming that more specific proof of contracts or negotiations was "confidential" – or even by blaming the investors for failing to pay counsel. (*Id*. ¶¶ 57-58).

- Grace and e-Smart repeatedly failed to pursue opportunities or disclose financials, at least in part because e-Smart had neither the technical, logistical nor financial wherewithal to execute the development and mass production of commercially viable smart cards, and had never demonstrated any such ability. (*Id*. ¶¶ 70, 72, 81-120).

The only possible inference from these facts is that Grace continually misrepresented the existence, likelihood, and nature of e-Smart's contracts.

2. The Card

In October of 2007, and again in March of 2008, Grace signed a public filing in which e-Smart claimed that it had a "commercially available" smart card.  That card was purportedly wireless as well as ISO certified, "rugged," and "durable," and was equipped with a multi-application processor and a "unique" sensor.  Grace repeated these claims in communications with investors.  (*Id*. ¶¶ 81-83).

At the time they were made, those statements were indisputably false.  By March of 2008, e-Smart had only a non-wireless demo card – a card that failed to perform at a presentation to Civitas.  Even accepting the testimony of e-Smart's CTO and engineers, e-Smart's first attempts at a viable wireless card and multi-application processor did not come until much later in 2008.  Grace herself forwarded a revealing July 2008 email, in which the head of e-Smart Korea listed many of the card's shortcomings – including the lack of a durable sensor or ISO

32

certification.  By August of 2009, e-Smart still did not have its own sensor, while the product it

was using on demo cards was prohibitively expensive and fragile.  (*Id.* ¶¶ 84-96, 99, 102, 108,

113).  By definition, the card was not "commercially available."[28]

In sum, the record overwhelmingly shows that Grace's statements about the contracts and

the card were blatant misrepresentations.  The opinion granting summary judgment in *SEC v.*

*StratoComm*, No. 11-cv-1188, 2014 WL 689116 (N.D.N.Y. Feb. 19, 2014) is directly on point.

In *StratoComm*, the defendants:

> "[D]isseminated fraudulent public statements designed to portray StratoComm as a
> successful company that had developed, manufactured and sold sophisticated
> telecommunications equipment for tens of millions of dollars.  However . . . the
> undisputed facts reveal that StratoComm had no products, no paying customers, and no
> revenues; and that its very existence depended on its ability to sell its securities to
> investors."

*StratoComm*, 2014 WL 689116 at *1.  While, as here, StratoComm's press releases and other

documents described huge revenues from the sales of its advanced technology, and claimed that

the technology was "presently available," StratoCommm "had not yet resolved basic design

issues relating to the [technology] and had only estimated the cost of the system at a rough

level."  *Id*. at **2, 4.  As in this case, at the time of one press release announcing a "sale,"

StratoComm "had never built or tested an operational [system] and . . . did not have the money to

do so."  *Id*. at *3.

Like Grace and e-Smart, StratoComm coupled its misrepresentations about its technology

with false claims about lucrative contracts.  One StratoComm's disclosure described sales

agreements pursuant to which "the Company expects to begin receiving funds."  *Id*. at *5.  In

---

[28] e-Smart's problems were predicted in 2007.  In August and September of that year, two experienced e-
Smart technology specialists separately observed that e-Smart did not possess the technological and
manufacturing capabilities it claimed.  One of them, Richard Barrett, called e-Smart's public disclosures
"fabulous (as fables)."  (SOF ¶ 99).

granting summary judgment, however, the court found that StratoComm, like e-Smart, never received any payments from the purported sales agreements. *Id*. at **3, 4, 6.

C. *Grace's Misrepresentations Were Material*

"A fact is material if there is a 'substantial likelihood that a reasonable investor would consider it important.'" *e-Smart*, 2014 WL 945816 at *7 (quoting *SEC v. Steadman*, 967 F.2d 636, 643 (D.C. Cir. 1992)). As this Court has recognized, the reasonable investor would consider misrepresentations about the state of e-Smart's finances and technology to be material. *Id*.; *see also SEC v. Universal Express, Inc.*, 475 F. Supp.2d 412, 426 (S.D.N.Y. 2007) (Concluding that the defendants "cannot claim that statements about a company's finances, acquisitions and revenues are not material."). In fact, the record in this case demonstrates unequivocally that e-Smart investors considered those claims to be of the utmost importance. (SOF ¶¶ 42-46).

Grace's statements about e-Smart's card were also highly material. *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095 (9th Cir. 2010) ("A finished, tested product is almost certainly the single most important piece of information for an investor deciding whether to invest in a start-up company."); *StratoComm*, 2014 WL 689116 at *10 ("Statements related to whether a company has a product to sell are material as a matter of law. . . . This is particularly true for development-stage companies.") (citations omitted). e-Smart only made one product. As this Court has held, public statements that falsely claimed that e-Smart's product was viable "would be material." *e-Smart*, 2014 WL 945816 at *7.

D. *Grace's Misrepresentations Were Made In Connection With the Purchase or Sale of a Security*.

As this Court has observed, the "'in connection with' element is a broad and flexible standard and . . . any activity 'touching the sale of securities' will suffice." *e-Smart,* 2014 WL

945816 at *8 (quoting *SEC v. Levine*, 671 F.Supp. 2d 14, 31 (D.D.C. 2009)).  Here, investors

indisputably purchased tens of millions of e-Smart shares in direct reliance on Grace's claims

about contracts.  The record contains not only the many e-mails in which Grace solicited

investments by touting purported deals, but also emails and testimony from numerous investors

declaring that they directly relied on those claims.  As investor Robert Aronowitz put it to Grace

in a March 2010 email, her claims about financing "in actuality have achieved little with the

exception of securing our sole funding."[29]  (SOF ¶ 45).

Grace's public statements about contracts and the card were also made in connection with

the purchase or sale of a security.  *See e-Smart*, 2014 WL 945816 at *8 (citing authority for the

principle that when the fraud involves public dissemination of press releases and annual reports,

the "in connection with" requirement is met) (citations omitted).  The announcements about the

Samsung and WDC contracts both affected e-Smart's stock price.  (SOF ¶¶ 37, 71).  Meanwhile,

the claims about the card in e-Smart's 10-K were made in a public document "on which an

investor would presumably rely," satisfying the "in connection with" requirement.  *e-Smart*,

2014 WL 945816 at *8 (quoting *SEC v. Savoy Indus., Inc.,* 587 F.2d 1149, 1171 (D.C. Cir.

1978)).

### E.  *Grace's Misrepresentations Were Made With Scienter*

To prove scienter, the SEC must show that Grace acted with the "intent to deceive,

manipulate or defraud."  *SEC v. e-Smart*, 2014 WL 945816 at *7 (quoting *Ernst & Ernst v.

Hochfelder*, 425 U.S. 185, 193 (1976)).  Her misrepresentations must have been made either

intentionally or with "extreme recklessness."  *Dolphin & Bradbury, Inc. v. SEC*, 512 F.3d 634,

639 (D.C. Cir. 2008).  "Extreme recklessness goes beyond 'a should have known standard' and

---

[29] The record also contains dozens of confirmations – most of them from Grace herself – and
other documents describing the share purchases.

involves conduct that 'presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'"  *e-Smart*, 2014 WL 945816 at *7 (quoting *Dolphin & Bradbury*, 512 F.3d at 639).

Unsupported claims of naievete or pure motives do not entitle a defendant to a jury trial. Grace cannot "defeat summary judgment by the mere denial of subjective knowledge of the risk that a statement could be misleading."  *Platforms Wireless,* 617 F.3d at 1094 (affirming summary judgment against defendants and reasoning that "a defendant with knowledge of the relevant facts cannot manufacture a genuine issue of material fact merely by denying (or intentionally disregarding) what any reasonable person would have known."); *see also SEC v. Ficken*, 546 F.3d 45, 51 (1st Cir. 2008) (Nonmovants cannot "rest merely upon . . . improbable inferences [] and unsupported speculation" to defeat summary judgment on scienter) (quotation and citations omitted).

Courts do not hesitate to grant summary judgment to the SEC when the undisputed facts demonstrate, like they do here, a defendant's scienter.  *See, e.g., SEC v. Monterosso*, Nos. 13-10341, 10342, 10464, 2014 WL 815403, *6 (11th Cir. March 3, 2014) (citation omitted); *see also SEC v Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (Posner, J.) (Citing a "mountain" of circumstantial evidence, and explaining that "[e]ven when a party's subjective beliefs are critical to liability, it is not always true that the case cannot be decided on summary judgment – as the present case illustrates."); *SEC v. Constantin*, 939 F. Supp. 2d 288, 309 (S.D.N.Y. 2013) (relying on "circumstantial evidence" to grant summary judgment to SEC on defendant's "state of mind.").  For example, in *SEC v. Milan Group, Inc*, No. 11-cv-2132, 2013 WL 4505714, *11 (D.D.C. Aug. 26, 2013), Judge Collyer rejected the defendant's argument that summary judgment is inappropriate because, the defendant claimed, the "SEC has no direct testimony or

evidence that she possessed the requisite fraudulent intent." Judge Collyer found instead that "the written record is clear: she acted with extreme recklessness." *Id.*

Here, the record vividly depicts Grace's intentional and/or extremely reckless behavior. As the judge in *StratoComm* recently explained in finding, on facts that resonate here, that the defendants had the requisite scienter:

> These undisputed statements [claiming the technology was presently available], together with the . . . press releases announcing two "sales" worth $60 million (which were, at best, signing of some contracts where no money ever exchanged hands), leave an indelibly false and misleading impression that the company had a developed, tested, and presently available product when, in fact, it did not.

*StratoComm*, 2014 WL 689116 at *12. Grace solicited tens of millions of dollars by continually misrepresenting the financial prospects and technology of a company she exclusively controlled – a company with only a handful of employees, with little respect for corporate formalities or internal controls, with a CEO that routinely breached her fiduciary duty by diverting resources to private entities she controlled – a company that was, in short, a "sham."[30]

As e-Smart's CEO and unopposed authority, Grace then diverted much of that investor money to her personal use. *See SEC v. George*, 426 F.3d 786, 795-96 (6th Cir. 2005) (diversion of shareholder money to personal use is "a fact that itself establishes the requisite state of mind for committing securities fraud") (citations omitted); *In re Advanced Battery Techs., Inc. Sec. Litig.*, 2012 WL 3758085, *11 (S.D.N.Y. Aug. 29, 2012) (diverting shareholder money to personal use gives rise to inference of fraudulent intent that "is not merely strong, it is inescapable"); *Lyttle*, 538 F.3d at 604 (defendants "pocket[ed] several million dollars of the invested money")); *Milan Group*, 2013 WL 4505714 at *11; *Constantin*, 939 F.3d at 309. Tellingly, Grace engaged in this looting while claiming repeatedly that e-Smart was destitute and

---

[30] *See e-Smart Tech., Inc. v. Drizin*, No.06-cv-5528, 2011 WL 2020710, *2 (N.D.Cal. May 24, 2011) (holding e-Smart in contempt).

in dire need of "emergency funds."  (SOF ¶¶ 20, 23, 44, 51, 59, 144).  Grace's undisclosed use of

investor assets underscores why no reasonable jury could find in her favor.  *See, e.g, SEC v.*

*Brown,* 658 F.3d 858, 863 (8th Cir. 2011) (Loken, J., concurring in judgment on liability)

(Concluding that "no reasonable jury could doubt that Brown had acted with scienter" where

"large portions of the diverted funds were used for Brown's personal expenses").  She starved e-

Smart of cash while spending prodigiously; millions went to hotels, restaurants and retail while

the company lacked sufficient funding to develop and manufacture a card.[31]  In short, e-Smart

was structured more for Grace's personal benefit than for the development and marketing of a

viable card.  The steps she took to conceal this fact, such as severing e-Smart's relationship with

everyone that questioned her management and/or e-Smart's legitimacy, confirm her culpability.

Grace cannot plausibly claim that she was naïve or merely negligent.  She was e-Smart's

CEO, promoter and, for investors, a primary source of information.  By 2009, she was virtually

alone at e-Smart, having shed e-Smart's Board and two Chief Operating Officers, as well as e-

Smart's long-time counsel, outside auditor, and accountant, and having alienated all but a small

group of investors.  She claimed repeatedly to be personally negotiating the "commitments" and

"signed" deals she described.  She authorized and edited numerous public statements about the

card.  The only possible inference from these facts is that she possessed the requisite scienter.

Nor can Grace avoid summary judgment by claiming that she acted in good faith.  In *SEC*

*v. Universal Express, Inc.,* 475 F. Supp.2d 412 (S.D.N.Y. 2007), the defendants issued press

releases touting hundreds of millions of dollars in "funding commitments" and "letters of intent."

*Universal Express*, 475 F. Supp. 2d at 420-21.  As in this case, the defendants also announced

---

[31] That ugly contrast is only deepened by her diversion of resources from e-Smart – a company she served
as fiduciary and CEO – to private companies and personal accounts she controlled.  By 2012, Grace had
dispensed with any pretense of corporate purpose, apparently instructing investor James Desmond to
deposit hundreds of thousands of dollars directly into her personal account.  (SOF ¶ 150).

deals that they projected would amount to hundreds of millions of dollars in revenues. *Id*. at 421. The defendants argued, as Grace has and will in this case, that those claims were made in good faith, and were based on "documents received from the various funding sources and substantive conversations." *Id*. at 427.  The court rejected this argument, noting that many of the documents were created at defendants' behest, that the documents themselves were misleading, and that there was no other evidence to substantiate defendants' claims. *Id*.  In awarding summary judgment, the court found that defendants' unsupported assertions about their good faith would seem "flatly ludicrous" at trial. *Id*. at 428.

Moreover, as early as 2006 and repeatedly thereafter, investors warned Grace, in the starkest possible terms, that they considered her claims about financing and revenues to be deceptive.  (SOF ¶¶ 42 ("investors . . . were told a lie"), 43 ("fraudulent . . . criminal"), 44 ("scam")).  The danger that further empty promises about contracts would mislead investors was manifestly "known to the defendant."  *Dolphin & Bradbury*, 512 F.3d at 639.  Yet Grace continued to promise investors through 2011 that e-Smart had commitments or imminent deals for financing and revenues.[32]  (SOF ¶¶ 54, 62).  She made every single one of those statements without first waiting until money or valid purchase orders had been received.  She also made many of these statements without actually having any written agreement.  (SOF ¶¶ 56-57, 59-62).  In light of the concerns investors had previously expressed, that conduct was, at best, extraordinarily reckless.

The same reasoning applies to Grace's claims about the card.  Grace issued the 2006 10-K and the Amended 2005 10-K despite blunt and specific warnings by Richard Barrett and

---

[32] As *StratoComm* and *Universal Express* make clear, Grace's claims about contracts are indisputably actionable.  *See also Goldstein v Solucorp Indus. Ltd*., No. 11-cv-6227, 2013 WL 1812005, *6 (S.D.N.Y. March 19, 2013) ("[D]etailed statements concerning the existence of specific contracts and agreements go well beyond expressions of puffery and corporate optimism.) (quotation and citation omitted).

Alistair Clisham that e-Smart had no viable card.  (SOF ¶¶ 98-103).  Grace also knew that e-Smart had lost its purported technology, and that Saito had only returned to e-Smart in March of 2007.  (Id. ¶ 114).  At a minimum, Grace knew there was an enormous danger that investors would be deceived.

Moreover, Grace's failure to amend or correct e-Smart's claims about the card – in truth, her habit of repeating those claims – further reinforces her scienter.[33]  *See Freeland v. Iridium World Comm's, Ltd.*, 545 F.Supp. 2d 59, 78 (D.D.C. 2008) ("Corrective information must be conveyed to the public with a degree of intensity and credibility sufficient to counter-balance any misleading information created by the alleged misstatements").  e-Smart was still taking its first tentative steps towards a wireless, multi-application card in mid to late 2008.  (SOF ¶¶ 84-93).  By 2009, it still had not developed a commercially viable sensor.  (*Id.* ¶ 96).  At that time, Grace knew about the card's persistent defects, having directly communicated with engineers about the problems that continue to plague it, including failed demos, the commercially unusable sensor and a lack of third party certification.  (*Id.* ¶¶ 94, 96, 100-101, 103, 108).  Under those circumstances, it was extremely reckless – and probably much worse – to allow the public to believe that e-Smart had a wireless, multi-application, certified and "commercially available" card.[34]  *Milan Trading*, 2013 WL 4505714 at * 16 ("[R]epresentations and opinions given

---

[33] Grace also neglected to update investors on the status of the many purported deals she announced, even as she must have known that funding and revenues would not be forthcoming.

[34] The problems with the card also directly impact the scienter analysis for Grace's claims about contracts. Despite the card's problems and the dire warnings, Grace continued to tell investors that deals to manufacture and provide millions of smart cards – including *20 million* to Samsung – were imminent. (SOF ¶¶ 26-31).  Even if there was some conceivable basis (which, in fact, there is not) for Grace to think that e-Smart might have a viable product, it is extremely reckless to promise investors that e-Smart is going to manufacture millions of cards when there is a regiment of red flags – including direct warnings from senior technology personnel – that no such capacity exists.

without basis and in reckless disregard of their truth or falsity establish scienter under Rule 10b-5") (quotation and citations omitted).

Further, in both public statements and direct communications to investors, Grace wildly misstated the terms and potential value of the 2008 Samsung contract.  (SOF ¶¶ 27-36).  Given the enormous importance of that contract to e-Smart, and given the fact that she was quoted extensively in the relevant press release, Grace, as CEO, either knew her claims were false, or was extremely reckless in failing to verify such claims by reference to the terms of the contract – or by contacting a Samsung representative. *See Platforms Wireless*, 617 F.3d at 1095 (Concluding that defendant was "deliberately reckless" for issuing press release that touted technology but failed to disclose that technology did not yet exist, even though defendant made "self-serving" argument that he "subjectively believed" press release's claims); *see also SEC v. Aqua Vie Beverage Corp.*, No. 04-414, 2007 WL 2025231, *5 (D. Idaho July 9, 2007) (Granting summary judgment where "neither declarant mentions any factual support for his 'belief' that the projected $7 million revenue was reasonable or attainable.").

Finally, Grace continued to make promises about deals with John Duff and other counterparties even when earlier promises about similar deals had proven false.  (SOF ¶ 63).  In 2006, Grace claimed widely that John Duff was going to inject hundreds of millions of dollars into e-Smart.  No money arrived.  Grace made identical claims in 2007.  No money arrived.  The same pattern recurred in 2008.  Making identical claims in 2009, as Grace did, is the epitome of extreme recklessness.  *See SEC v. Resnick*, 604 F. Supp.2d 773, 782 (D.Md. 2009) ("[R]epeated misrepresentations over a period of years also suggests a substantial degree of scienter.").[35]

---

[35] Grace cannot avoid summary judgment by claiming that she relied on others, or by claiming that she had no technical expertise.  As CEO and the primary beneficiary of investor funds, her failure sufficiently to investigate the basis for her many misrepresentations is itself compelling evidence of scienter. *Milan Group*, 2013 WL 4505714, **11, 16 ("Even crediting her statements of ignorance, such statements only

### III.     Grace Violated Section 5 of the Securities Act

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), "'prohibit the 'sale'and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration.'"  *SEC v. e-Smart*, 2014 WL 945816 at *10 (quoting *Zacharias v. SEC*, 569 F.3d 458, 464 (D.C. Cir. 2009)).  To show a violation, "'the SEC must show that the investments offered are securities, and that the Defendants offered or sold these securities without first filing a registration statement.'"  *Id.* (quoting *Milan Group*, 2013 WL 4505714, at *7)).  "Grace is liable if she was a 'necessary participant or substantial factor' in the Section 5 violation.'"  *Id.* (quoting *SEC v. Calvo*, 378 F.3d 1211, 1215 (11th Cir. 2004)); *see also Zacharias v. SEC*, 569 F.3d 458, 464-67 (D.C. Cir. 2009) (discussing findings that defendant was "'necessary participant' or 'substantial factor' in the violation").

A reasonable jury could only find that Grace violated Section 5.  There is no genuine dispute of a material fact as to any of the required elements.  e-Smart, Grace and others offered and sold at least 113,102,557 shares of e-Smart stock through a convertible loan scheme.  As a matter of law, those shares are securities.  *e-Smart,* 2014 WL 945816 at *11 ("[T]he sale of stock is indisputably the sale of a security.").  No registration statement was filed prior to their sale.

Further, while investors did not buy the stock directly, e-Smart and Grace did, in fact, "offer" and "sell" it.  The "loans" in this case were simply delayed purchases of stock.  *See Pinter v. Dahl,* 486 U.S. 622, 643 (1988) (Stating that Congress intended to define the terms

---

demonstrate extreme recklessness, not innocence.") (citations omitted); *see also SEC v. Kenton Capital, Ltd*., 69 F. Supp. 2d 1, 10 (D.D.C. 1998) (Awarding summary judgment to the SEC in part because "Kenton's failure to conduct due diligence in connection with the program it was promoting indicates recklessness."); *Constantin*, 939 F. Supp. 2d at 309.

"offer" and "sell" in the Securities Act "broadly," and that "transactions other than traditional sales of securities are within the scope of § 2(3)") (citations omitted).  IVI and Intermarket had neither the means nor the intent to re-pay the extremely short-term loans.  The undisputed record shows that, instead, everyone involved in the transactions – including Grace, the promoters, and investors – understood that the loans were simply a means to acquire e-Smart stock.  (SOF ¶¶ 174-178).  *See Aqua Vie*, 2007 WL 2025231 at *3 (Finding defendant liable under Section 5 for "debt conversion scheme" that was "fashioned under the assumption" that seller would receive stock and other benefits in exchange for loaning proceeds of stock sales to defendant).

In short, e-Smart and Grace sought investor money.  They knew that for investors, the true incentive to provide funding would not be short-term promissory notes from private, inert entities; it would be the promise of an equity position in a public company, obtained at a below-market price.  Grace admitted as much in a June 2006 financing "update" to the e-Smart Board, wherein she reassured the Board that "there is not a shortage of shareholders who would buy stock at $.10.  The market is at $.12…" (SOF ¶ 178).  Any argument that the loans were *bona fide* is thus "blatantly contradicted by the record."  *Harris*, 550 U.S. at 380.

Grace was also indisputably both a "necessary participant" and "substantial factor" in the transaction.  *SEC v. e-Smart*, 2014 WL 945816 at * 10 (citing *Calvo*, 378 F.3d at 1215).  She circulated memos describing how the scheme would work.  She solicited and provided opinion letters.  She described the scheme's purpose.  (SOF ¶¶ 181-186).  She was essential to the actual distribution of stock, coordinating with investors and promoters to meet conversion requests, while at the same time providing instructions to, and responding to questions from, the stock transfer company.  (SOF ¶ 184).  *See, e.g., StratoComm,* 2014 689116 at *17 (Defendant CEO was necessary and substantial participant where "as StratoComm's CEO . . ., [defendant]

authorized StratoComm's stock sales and directed the transfer agent to issue stock certificates.").
And, more broadly, her extensive and unopposed control over e-Smart makes it unthinkable that
e-Smart would have issued over 113,000,000 million shares and brought in millions of dollars
over a period of at least two years without her substantial involvement.

The record also reflects Grace's utter lack of good faith. Indeed, whether or not the SEC
is required to show Grace's scienter,[36] the evidence is overwhelming that she intended to profit
from an unlawful scheme.[37] The basic structure of the scheme speaks volumes: issuing more e-
Smart stock diluted its existing investors, while at the same time investor funds were placed in
accounts for IVI that Grace exclusively controlled. As detailed above, Grace then used those
funds to support her lavish lifestyle.

In addition, Grace activated the scheme by soliciting opinion letters. Then, in January
2007, Grace forged an opinion letter to keep the scheme going. (SOF ¶ 186). The opinion letter
was a modified version of one of Fritz's 2005 opinion letters, but it had an incorrect address for
Ms. Fritz, numerous typographical errors, purported to be from "Maranda E. Fritz, P.C." more
than a year after Fritz had stopped practicing as a solo practitioner, and lacked Fritz's signature.
(*Id.*). Grace also soothed the concerns of the transfer agent. (*Id.* ¶ 188).

Finally, Grace bears the burden to show that the sale of over 113,000,000 shares of e-
Smart stock qualifies for an exemption from registration. *Zacharias*, 569 F.3d at 464. Given

---

[36] While this Court has previously concluded that the issue of whether Section 5 requires scienter
"remains open" in this Circuit, *SEC v. e-Smart*, 2014 WL 945816 at *10, the SEC respectfully notes
Judge Collyer's recent conclusion that "There is no scienter requirement under Section 5." *Milan
Capital*, 2013 WL 4505714 at *7 (quoting *SEC v. Parkersburg Wireless LLC*, 991 F.Supp. 6, 9 (D.D.C.
1997)).

[37] Grace cannot prevail by arguing that, given the involvement of various attorneys, she thought the
scheme was legal. There is no evidence that she specifically sought an opinion on the overall legality of
using a convertible loan scheme to distribute unregistered shares, much less that she relied in good faith.
*Zacharias*, 569 F.3d at 466 (setting forth elements of an advice of counsel defense).

that the conduct at issue here is a convertible loan scheme premised on the widespread use of illegitimate "loans," the SEC believes that no such exemption exists.

## **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that this Court find that Grace violated Section 10(b) and Section 5.  .

Dated: June 2, 2014                          Respectfully submitted,


                                             /s/ Daniel Maher
                                             Daniel Maher
                                             Kenneth J. Guido
                                             U.S. Securities and Exchange Commission
                                             100 F Street, N.E.
                                             Washington, DC 20549-4030
                                             (202) 551-4737
                                             E-mail: maherd@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

        I certify that on June 2, 2014, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will serve by email any counsel who has appeared in this case and any pro se defendant who has answered the Complaint.

        I also certify that on June 2, 2014, I caused the foregoing to be served by electronic mail on the following persons at the addresses listed below:

Mary A. Grace
16 Chautauqua Park
Boulder, Colorado 80302
mgrace@e-smart.com
marygrace.esmart@gmail.com;

Tamio Saito
78Tateminani Watari Mchi
Watari gun Myagi ken
JAPAN
atenmonad@gmail.com

Robert J. Rowen
321 South Main Street #537
Sebastopol, CA 95472; and
drrowen@att.net

                                        /s/ Daniel J. Maher
                                        Daniel J. Maher