**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No.  11-895 (JEB) |
| E-SMART TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

In this civil-enforcement action, the Securities and Exchange Commission alleges that e-Smart Technologies, Inc., a public company, was a sham.  While it purported to be at the cutting edge of developing and manufacturing a biometric "smart" card, such claims, according to the Commission, were bogus.  Instead, *pro se* Defendant Mary Grace (the company's CEO) and others repeatedly misrepresented the cards' capabilities and e-Smart's success to induce investors to part with their money.  That money, in turn, was used to subsidize Grace's extravagant, globe-trotting lifestyle.

Through three years of contentious litigation, this Court has had occasion to rule on myriad motions.  It now addresses the SEC's First Motion for Summary Judgment against Grace.  That Motion seeks resolution of two of the five claims against her – namely, that she violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by making material misrepresentations in connection with the sale of securities (Count I), and that she violated Sections 5(a) and 5(c) of the Securities Act by selling unregistered securities (Count II).  Although the materials submitted are voluminous and Grace's are particularly daunting, the

1

Court believes that the SEC has proved its case.  It will therefore grant the Motion and enter judgment against Grace on both counts.

## I.    Background

On a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  As explained more fully below, however, Grace did not submit a proper Statement of Facts.  As a result, to summarize the relevant background, the Court draws primarily from the SEC's Statement of Undisputed Material Facts, ECF No. 324-1.

### A.  E-Smart's Technology

E-Smart was a publicly traded company "engaged in the business of creating, marketing, manufacturing, installing, operating and maintaining biometric identification verification systems."  Mot., Att. 165 (2006 10-K) at 3.  Its "core technology" was a "smart card" that used fingerprint matching "to positively authenticate" card users.  See Mot., Att. 162 (Amended 2005 10-K) at 5.  Such technology could be applied in a variety of contexts – such as banking or security access – to verify people's identities and protect personal information contained on, or accessed by, the cards.  See 2006 10-K at 4.

The company's research and development efforts appeared to be quite successful.  In October 2007, for example, e-Smart reported in its 2006 10-K – a mandatory annual-disclosure form for publicly traded companies – that it believed it was "the first . . . [and] only company offering a commercially available dual !SO [sic] 7816 (contact) and ISO 14443 B (wireless) compatible smart card with a fingerprint sensor onboard, biometric matching engine onboard and a multi-application processor."  Id. at 5.  In March 2008, when the company filed an amended 2005 10-K, it reported that it still believed it was the only company offering such technology.

See Amended 2005 10-K at 6.  These filings also described the card's various features, including its "unique" "Match-on-Card" capability, which enabled the card to verify a person's fingerprints without connecting to an external database or network.  See 2006 10-K at 4-5; Amended 2005 10-K at 6-7.  The company similarly announced major technological advancements in press releases and communications with investors.  See, e.g., Mot., Att. 234 (November 4, 2008, Press Release).

 B.  E-Smart's Investors

 Despite these reported achievements, e-Smart had little to no revenue.  See Mot., Att. 63 (Deposition of Mary Grace) at 155:4-156:3; 158:8-16; Att. 68 (Deposition of Charlie Black) at 50:2-4; Att. 67 (Deposition of Stewart Hung) at 37:18-38:8.  To keep the company going, its CEO, Mary Grace, was constantly seeking funds from investors and other sources.  See, e.g., Mot., Att. 58 (Deposition of William McVey) at 27:13-28:19; Att. 25 (Investigative Testimony of Michael Elek) at 36:10-23; Att. 88 (E-mail from Grace to Henry Mollett & Bill McVey (July 30, 2006, 12:46 PM)); Att. 56 (Deposition of Kenneth Wolkoff) at 30:2-31:6.

 In her communications with investors, she often explained that money was urgently needed to secure other opportunities or to protect their prior investments in the face of a funding emergency.  See E-mail from Grace to Henry Mollett & Bill McVey (July 30, 2006, 12:46 PM); Mot., Att. 101 at 5 (E-mail from Grace to "Michael and Francesca" (Oct. 22, 2008, 3:08 PM)).[1] She also frequently divulged that e-Smart had just obtained, or was about to obtain, significant contracts and investments.  See, e.g., E-mail from Grace to Henry Mollett & Bill McVey (July 30, 2006, 12:46 PM); E-mail from Grace to "Michael and Francesca" (Oct. 22, 2008, 3:08 PM); Mot., Att. 105 (E-mail from Grace to "Ron" (Feb. 22, 2008, 1:01 PM)).

---

[1] The Court should note that certain of the SEC's attachments are exhibits to depositions and contain multiple discrete documents.  In such instances, the Court does not identify the attachment generally, but rather labels the specific item and notes the precise page(s) of the attachment at which it may be found.

The company likewise publicized that it had secured profitable contracts and investments in press releases and investor updates.  See, e.g., Mot., Att. 79 (February 2005 "News from the Chairman").  In a May 2007 release, for instance, it stated that it had a "guaranty" of $50 million in funding from the Growth Enterprise Fund.  See Mot., Att. 230 (May 18, 2007, Press Release) at 1.  In a February 2008 release, similarly, it announced that it had a contract with Samsung under which e-Smart would deliver 20 million smart cards over two years.  See Mot., Att. 108 (February 26, 2008, Press Release) ("Samsung Release").

As a result of Grace's pleas and these reported successes, investors ponied up millions of dollars to the company.  See, e.g., McVey Depo. at 13:2-15; Mot., Att. 59 (Deposition of Henry Mollett) at 11:14-15:4; Att. 87 at 232-234 (E-mail from William Sandler to Grace (July 31, 2009, 10:11 AM)).  Unfortunately, the promised funding and contracts never materialized, see, e.g., Mot., Att. 117 (Letter from Charles Black, et al., to Grace, Dec. 30, 2008) at 1-2, and many investors later felt that Grace had lied to them about the supposedly imminent deals.  See, e.g., Mot., Att. 85 at 64 (E-mail from Tom Howard to Richard Dick, et al. (Sept. 14, 2009)); Att. 115 at 1-2 (E-mail from Douglas Borwick to Grace (Apr. 3, 2007, 8:04 PM)); Att. 116 (E-mail from Ken Wolkoff to Grace (Oct. 24, 2006, 9:03 PM)); Mollett Depo. at 22:5-14; Att. 78 at 4 (E-mail from Bill McVey to Grace (Oct. 21, 2011, 8:53 PM)).  They communicated their anger and frustration to her over a number of years.  For instance, one investor informed her in April 2007:

> I believe that millions of dollars were raised over the last two years by telling investors that funding was about to take place, as you did with the loans you solicited from me and Ralph. . . . There are many investors that believe they were told a lie regarding imminent funding, just to get their money.

E-mail from Douglas Borwick to Grace (Apr. 3, 2007, 8:04 PM); see also Att. 85 at 23 (E-mail from Bill McVey to Grace, et al. (Oct. 22, 2011, 9:19 AM)) (expressing frustration that he had

invested $1.5 million over nine years, and none of the deals Grace promised ever happened).

Grace, nevertheless, continued to promise investors that contracts and big investments were just

around the corner.

    C.  <u>E-Smart's Finances</u>

In addition to its ceaseless search for revenue, the company struggled to keep its books

and accounting in order.  <u>See, e.g.</u>, Mot., Att. 134 (E-mail from Stewart Hung, CPA, Horowitz &

Ullmann to Tony Russo (Nov. 16, 2007, 6:08 PM)); Att. 135 (E-mail from Hung to Russo (Mar.

7, 2008, 5:44 PM)) (listing problems); Att. 70 (Deposition of Anthony Russo) at 42:4-16; Att. 85

at 57-58 (Letter from Henry Mollett to "Investors/ Shareholders," Mar. 9, 2010); Hung Depo. at

39:17-40:17; 112:11-113:15.  In fact, one accountant for the company did not even realize Grace

had raised millions of dollars for e-Smart because he never saw these sums deposited into the

company's accounts.  <u>See</u> Russo Depo. at 42:4-16, 48:10-49:25; 55:5-56:4.

One source of confusion may have been the way in which funds were moved among

accounts at e-Smart, Intermarket Ventures, Inc., and IVI Smart Technologies, Inc.  The latter two

companies were corporations that Grace controlled.  <u>See</u> Def. Am. Ans., ¶¶ 19, 20.  Their only

employees were Grace and e-Smart's Chief Technology Officer, Tamio Saito, and they had no

business operations other than licensing certain technology to e-Smart.  <u>See id.</u>  Over the years,

transactions involving the three companies were "commingled" on the books.  Mot., Att. 66

(Deposition of Joseph Leshkowitz, CPA) at 18:1-20:18; Russo Depo. at 42:4-16; 48:10-49:25;

55:5-56:4.  Grace also frequently directed significant numbers of e-Smart shares and investor

funds to IVI and Intermarket, saying that those funds and shares were supposed to go to those

companies.  <u>See, e.g.</u>, Mot., Att. 94 (E-mail from Grace to Emile Merzoug (May 20, 2007, 10:27

PM)); Att. 8 (Account Opening Document); Att. 2 (April 2007 Bank Record); Att. 86 at 88

(Letter from Grace to William Sandler, Jan. 26, 2009); Russo Depo. at 59:16-61:8; 92:5-94:5;

Hung Depo. at 109:20-111:19; Att. 123 (Letter from Maranda Fritz, Hinshaw & Culbertson LLP,

to David B. Deitch, Aug. 7, 2008) at 2.  E-Smart's accountants, however, did not have access to

the IVI or Intermarket accounts.  See, e.g., Russo Depo. at 23:2-5; 41:18-23; 55:11-56:4;

Leshkowitz Depo. at 58:2-9.

     D.  Grace's Spending

     Despite the company's lack of revenue, see Mot., Att. 166 (2007 10-K) at 21, Grace lived

extravagantly while CEO.  One accountant estimated that, over a four- or five-year period, her

expenses were in the millions.  See Russo Depo. at 39:9-41:12.  She spent significant sums on

hotels, travel, and personal services and items.  For example, in just one month in 2007, she

spent $177,000 from an IVI account on hotel accommodations, jewelry, clothing, and

restaurants.  See Mot., Att. 96 (September 2007 IVI Bank Statement).  That same month, she

spent tens of thousands of dollars from an e-Smart account on flights and hotels.  See Mot., Att.

4 (September 2007 e-Smart Bank Statement).

     In a review of a number of e-Smart and IVI bank accounts, the SEC found that, over the

course of several years, Grace transferred $1,371,456 to personal accounts and $311,319 to

family members, withdrew $397,501 in cash, and spent $409,038 on retail purchases, $1,114,243

on hotel charges, $59,310 on restaurant charges, and $356,917 on travel expenses.  See Mot.,

Att. 171 (Declaration of Jeffrey Anderson, CPA, SEC), ¶ 6.  She also reportedly gave friends and

family significant numbers of e-Smart shares "without any contemporaneous documentation or

authorization."  See Letter from Maranda Fritz, Hinshaw & Culbertson LLP, to David B. Deitch,

Aug. 7, 2008 at 2; see also Russo Depo. at 59:16-63:5.

Such spending continued over the years, even though the company frequently had trouble paying employees' salaries and consultants' fees.  See, e.g., Black Depo. at 94:5-14; Mot., Att. 72 (Deposition of Thomas Volpe) at 97:11-22; Att. 85. at 49 (E-mail from Beverly Caldwell to Grace, et al. (Dec. 7, 2010, 11:49 AM)); Att. 52 (E-mail from Grace to Tom Volpe, et al. (June 12, 2006, 4:59 AM)).  By 2011, the company's financial situation had reached particularly dire straits.  See Mot., Att. 98 (E-mail from Grace to Bob Aronowitz, et al. (Oct. 19, 2011, 4:39 PM)).  Grace explained in an e-mail to investors that e-Smart urgently needed money because employees had not received salaries in over three months, and they could not "pay their rent, electricity, [or] phone" bills.  Id. at 2.  She also noted that Marcello Soliven, the company's "fine and critically important wireless inventor, who ha[d] cancer, . . . [could] no longer pay for his chemotherapy treatments."  Id.  Intriguingly, over the course of that same year, one investor wired over $590,000 directly into Grace's personal accounts.  See Anderson Decl., ¶ 7.

In her defense, Grace argues that all of the expenses were legitimate business expenses or were permissible as part of her salary arrangement with e-Smart, Intermarket, and IVI. Regarding charges at designer-clothing and jewelry shops, for instance, she asserts – although she does not provide any evidence – that "many if not a majority" of those charges were for "expensive gifts which are always given in Asia as part of their culture as all companies [that] do business in Asia are aware."  Opp. at 37.  She also points out that e-Smart's 2007 10-K, filed in May 2009, disclosed that she deferred her annual salary of $250,000 as President and CEO of e-Smart, as well as her $250,000 annual salaries as President and CEO of IVI and Intermarket.  See 2007 10-K at 47.  According to the 10-K, the three companies thus had an arrangement with Grace to pay "all of [her] expenses, including lodgings, food, clothing[,] dental, medical, and preventative and alternative medical, travel, entertainment, public relations marketing, and any

and all other expenses, at any time and place where Ms. Grace is conducting company business."
Id.  Grace therefore argues that because she deferred her salary for 13 years and because she was
never repaid the money she allegedly lent e-Smart, "the [c]ompanies owe the CEO – not the
opposite."  Opp. at 37.

E.   The Lawsuit

On May 13, 2011, the SEC filed this lawsuit against Defendants e-Smart, Intermarket,
IVI, Grace, and Saito, as well as brokers Robert Rowen, George Sobol, and Kenneth Wolkoff.
The crux of its Complaint against Grace is that for years she duped investors into giving money
to e-Smart and then misappropriated those funds for her personal use.  More specifically, the
Commission asserts that through her various actions as CEO of e-Smart, Grace violated five
provisions of federal securities laws, including by making material misrepresentations in
connection with the sale of securities and by selling unregistered securities.  See Am. Compl., ¶¶
113-19, 127-138.  For example, according to the SEC, e-Smart's public filings and press releases
misrepresented the state of its technology, and the company was nowhere close to having a
commercially viable card or a card with the reported features.  The Commission also claims that
Grace incessantly told investors – through e-mails and press releases – that e-Smart had finalized
or was about to finalize major contracts and investments when none, in fact, existed, and that she
participated in a convertible-loan scheme designed to sell millions of unregistered shares.

Based on these and other alleged violations, the SEC seeks disgorgement and civil
penalties.  It also requests a permanent injunction barring Grace from participating in penny-
stock offerings, serving as an officer or director of certain issuers of securities, and engaging in
further securities violations.  See id. at 24 (Prayer for Relief).

## II.  Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Liberty Lobby, 477 U.S. at 247-48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor.  Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.

1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  <u>Liberty Lobby</u>, 477 U.S. at 249-50.

### III.    Analysis

In this First Motion for Summary Judgment, the SEC contends that the undisputed material facts demonstrate that Grace violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and that she violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).  Before turning to these separate arguments, however, the Opinion will address the significant deficiencies in Grace's Opposition.

### A. <u>Grace's Filings</u>

The Court must note at the outset that it remains astounded by Grace's filings in this case. She has filled the docket with seemingly endless errata, failed to comply with various federal and local rules of procedure, and ignored repeated orders regarding her pleadings.  The Court, for instance, warned Grace in its Opinion denying her Motion to Dismiss that "[i]n no event should future pleadings feature every font available in Microsoft Word and every color in the rainbow, with cut-and-paste e-mails and other outside materials sprinkled throughout the legal argument without demarcation.  Further filings should satisfy the basic demands of readability."  <u>SEC v. e-Smart Technologies, Inc. (E-Smart I)</u>, No. 11-895, 2014 WL 945816, at *11 (D.D.C. Mar. 12, 2014).  She has disregarded this admonition, instead filing an Opposition that is another mish-mash of cut-and-pasted materials, interspersed among legal argument, and presented in varied colors, fonts, and font sizes.  While this Court is sympathetic to *pro se* parties' efforts to navigate procedural requirements, the instruction here did not ask for Grace's compliance with some obscure legal rule.  Instead, these are basic precepts of 8th grade composition.  Grace, moreover,

is not the typical *pro se* defendant – she is the CEO of a public company, and she has generally shown herself to be a sophisticated litigant.

This makes her failure to comply with the federal and local rules on summary-judgment filings similarly frustrating.  Specifically, under Local Rule 7(h), an opposition to a motion for summary judgment must "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  LCvR 7(h).  Such statement "shall include references to the parts of the record relied on to support the statement."  Id.  Yet, despite citing this rule in her filings, Grace has completely disregarded it.  In a long series of docket entries, she filed a five-part "Statement of Undisputed and Uncontested Material Facts."  See ECF No. 410-1 (Part 1); ECF No. 410-2 (Part 2); ECF No. 411-1 (Part 3); ECF No. 412-1 (Part 4); ECF No. 416-5 (Part 5).  The paragraphs do not correspond to the SEC's Statement of Undisputed Material Facts or even make any references to particular paragraphs in the SEC's Statement.  Her Statements, moreover, do not specify which facts are genuinely in dispute, and they contain virtually no record citations.  Instead, for the most part, Grace has copied and pasted various materials into numbered paragraphs.  For instance, paragraph 8 from Part 1 simply states: "July 30, 2007," and then includes what appears to be the entirety of a one-page e-mail.  See DSMF (Part 1) at 6-7.  Her Statements of Fact, accordingly, make it difficult to determine the significance of the materials she included and leaves the Court guessing about the inferences she would have it draw from them.

To make matters worse, Grace did not submit an affidavit affirming that the materials she submitted are true and correct copies of the originals.  This is especially troubling given that her materials are largely what appear to be Microsoft Word versions of documents, and given that

there are many instances in which documents appear to have been modified.  As an example, in

Part 5 of her Statement, she provided a declaration from Kelly O'Meara, but paragraphs 2 and 6-

8 are omitted.  See DSMF (Part 5) at 13.  As another example, in Part 1 of her Statement, she

copied two e-mails into paragraph 12, the second of which changes fonts in the middle.  See

DSMF (Part 1) at 15-17.  Such instances raise serious questions for the Court about whether she

presents materials as they were originally written or with alterations.

    Her failure to file an affidavit is also inexcusable in light of the fact that she has filed

affidavits with other motions and even with her opposition to the SEC's Second Motion for

Summary Judgment.  See ECF No. 379-1 (affidavit in support of motion for extension of time);

ECF No. 382-5 (affidavit in support of reply on motion for extension of time); ECF No. 383-1

(affidavit in support of motion for extension of time); ECF No. 384-1 (affidavit in support of

amended motion for extension of time); ECF No. 415-2 (affidavit in support of motion to accept

late filing of cross-motion for summary judgment); ECF No. 459-1 (affidavit in support of

opposition to second motion for summary judgment).  The affidavit she filed with her Opposition

to the Second Motion for Summary Judgment specifically affirms that "the statements,

documents, e-mails and exhibits submitted . . . are true and correct statements and true and

correct copies of documents and communications I either had or was sent, or was given."

Affidavit of Mary Grace, ECF No. 459-1.  No such assurances are provided for the materials she

submitted with her Opposition to the present Motion.

    These deficiencies in her Statements of Fact could alone warrant the grant of summary

judgment in the SEC's favor.  See LCvR 7(h) ("In determining a motion for summary judgment,

the court may assume that facts identified by the moving party in its statement of material facts

are admitted, unless such a fact is controverted in the statement of genuine issues filed in

opposition to the motion."); <u>see also</u> <u>SEC v. Banner Fund Int'l</u>, 211 F.3d 602, 615-16 (D.C. Cir.

2000) (upholding district court's grant of summary judgment for SEC because defendant failed

to follow Local Rule 7(h)).  Local Rule 7(h) "embodies the thought that judges 'are not like pigs,

hunting for truffles buried in briefs' or the record." <u>Potter v. Dist. of Columbia</u>, 558 F.3d 542

(D.C. Cir. 2009) (Williams, J., concurring) (quoting <u>United States v. Dunkel</u>, 927 F.2d 955, 956

(7th Cir. 1991)).  The Court, consequently, "is not 'obliged to sift through hundreds of pages of

depositions, affidavits, and interrogatories in order to make [its] own analysis and determination

of what may, or may not, be a genuine issue of material disputed fact.'" <u>Potter</u>, 558 F.3d at 550

(quoting <u>Twist v. Meese</u>, 854 F.2d 1421, 1425 (D.C. Cir. 1988)); <u>see</u> <u>Jackson v. Finnegan, et al.</u>,

101 F.3d 145, 154 (D.C. Cir. 1996).

Yet, mindful of the impact of a grant of summary judgment and unwilling to take such a

step lightly, the Court has waded through hundreds of pages of the materials that Grace

submitted in docket entries 406 to 413 and 416.  It finds that, even if Grace could provide the

evidence in proper form, there is no material fact in genuine dispute on the issues the Court now

resolves.  Summary judgment, therefore, is warranted on both Counts I and II, which the Court

treats in turn.

B.  <u>Count I: Violations of Section 10(b)</u>

Section 10(b) of the Securities Exchange Act provides that it is "unlawful for any person .

. . [t]o use or employ, in connection with the purchase or sale of any security[,] . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as

the [SEC] may prescribe."  15 U.S.C. § 78j.  Pursuant to its authority under this provision, the

SEC issued Rule 10b-5, which establishes that it is unlawful "[t]o make any untrue statement of

a material fact or to omit to state a material fact necessary in order to make the statement made . .

. not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. §

240.10b-5.  In an SEC enforcement action, a violation of Section 10(b) and Rule 10b-5 is

established where a defendant: (1) made a material misrepresentation or omission; (2) in

connection with the purchase or sale of securities; (3) with *scienter*.  See <u>E-Smart I</u>, 2014 WL

945816, at *6 (citing <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999)).

The SEC has suggested various bases for finding that Grace violated Section 10(b) and

Rule 10b-5, including misrepresentations in the company's 10-K filings and press releases, and

in Grace's e-mails to investors.  The Court need not address all of them, however, because

Grace's misrepresentations in the 2008 Samsung press release are alone sufficient to permit

judgment for the SEC on this issue.

### 1.  *Misrepresentations and Omissions*

In February 2008, e-Smart issued a press release announcing that it had signed a contract

with Samsung "to deliver to Samsung 20 million 'I AM'™ cards, the Company's most advanced

Super SMART™ Card."  Samsung Release at 1.  The release stated that Samsung was to make

"irrevocable" purchase orders for the cards, and that e-Smart believed the orders "may produce

profits in excess of $100 million."  <u>Id.</u>  It also quoted Grace as saying:

> We are pleased to announce this contract, which we believe is the
> largest order of its kind placed in the world to date for a biometric
> smart card such as e-SMART's® "I AM"™ card.  As Samsung is
> one of the leaders in smart card technology in the world, this
> contract confirms their opinion of the uniqueness and value of e-
> SMART's® "I AM"™ Super SMART Cards™.  The contract
> order is renewable and I anticipate that this is the first of a series of
> orders for our advanced "I AM"™ card, not only for Samsung and
> Korea but for many more countries with whom we have been
> closely working with over the last year.

<u>Id.</u>

These statements, however, were undeniably false.  E-Smart and Samsung had signed only a supply contract.  <u>See</u> DSMF (Part 4) at 1 (¶¶ 64, 65); Mot., Att. 167 (Samsung Supply Contract) at 1.  There was, accordingly, no agreement for e-Smart "to deliver to Samsung 20 million 'I AM'™ cards" – only an agreement that Samsung <u>could</u> order up to 20 million cards on certain agreed-upon terms, if it later chose to do so.  <u>See</u> Samsung Supply Contract.  Put another way, the contract did not include an order for any quantity of smart cards, and it did not obligate Samsung to make any orders in the future.  <u>Id.</u>  Grace and e-Smart, as a result, had absolutely no basis to believe the contract was a "contract order," "the largest order of its kind," or "the first of a series of orders," as her statement indicated.

In the materials she submitted with her Opposition, Grace highlights various words and phrases in the contract that, according to her, demonstrate the accuracy of the press release's claims.  <u>See</u> Untitled Materials, ECF No. 409-5, at 19-26.  But as this Court explained in its Opinion denying her Motion to Dismiss, "Even a cursory examination of the actual contract makes clear that such . . . claim[s] w[ere] false."  <u>E-Smart I</u>, 2014 WL 945816, at *7.

Grace also contests that the press release constituted an "omission," noting that e-Smart later filed a Form 8-K with the SEC, which disclosed the contract.  <u>See</u> Opp. at 28; DSMF (Part 4) at 1 (¶¶ 65-66); Untitled Materials, ECF No. 409-5, at 15-18; 22-26.  This argument is also unavailing.  "[I]nvestors are not generally required to look beyond a given document to discover what is true and what is not."  <u>SEC v. StratoComm Corp.</u>, 2 F. Supp. 3d 240, 255 (N.D.N.Y. 2014) (quoting <u>Miller v. Thane Int'l, Inc.</u>, 519 F.3d 879, 887 (9th Cir. 2008)) (internal quotation marks omitted).   The Form 8-K, moreover, was not even available at the time the press release was issued.  As a result, investors could not have found the relevant information, even if they had tried.

2. *The "Maker" of the Statements*

It is also clear that Grace "made" the misrepresentations in the press release.  In an attempt to escape responsibility, she denies drafting the release and says, instead, that Kelly O'Meara, a media and public-relations consultant, and Robert van Maasdijk, an interim director, wrote it.  See DSMF (Part 5) at 9-13 (¶¶ 102-103, 105); Untitled Materials, ECF No. 409-5, at 2-4.  But whether it was Grace who first put pen to paper to draft the release is immaterial.  In Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), the Supreme Court addressed when an individual or entity "makes" a statement.  It explained:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.

Id. at 2302.  Under Janus Capital, then, Grace "made" the statements if she had "ultimate authority" over the release.

The materials that she submitted show that she was in control, not just generally as CEO, but specifically in relation to the release itself.  For instance, O'Meara wrote an e-mail to Grace stating: "Attached is the FINAL Samsung release.  I think it incorporates everyone's input.  If you want it to go out tomorrow, please let me know."  Untitled Materials, ECF No. 409-5, at 12 (E-mail from O'Meara to Grace (Feb. 25, 2008, 3:15 PM)) (emphasis added).  Later, O'Meara wrote again to Grace, "This is the FINAL – Yours and Maranda's changes included.  IT is ready to go when you say."  Untitled Materials, ECF No. 409-5, at 13 (E-mail from O'Meara to Grace (Feb. 26, 2008, 1:42 AM)) (emphasis added).  Yet another e-mail from O'Meara to Grace asked,

"Do you realize that Gerard has taken out a complete paragraph?  Do you no longer wish to discuss possible profits????  We need to talk."  Untitled Materials, ECF No. 409-5, at 8 (E-mail from O'Meara to Grace (Feb. 25, 2008)).  Lastly, O'Meara wrote to Grace asking which attorney's edits to follow and stating, "I am happy to put out what you want."  Untitled Materials, ECF No. 409-5, at 15 (E-mail from O'Meara to Grace (Feb. 26, 2008, 2:31 AM)).  These materials all point to the inescapable conclusion that Grace had authority over the release's "content and whether and how to communicate it."

This is hardly a situation, furthermore, in which the drafter slipped in statements Grace would not have authorized.  Rather, her own contemporaneous words and actions show that she endorsed the statements.  Not only was she involved in reviewing and editing drafts of the release, see Untitled Materials, ECF No. 409-5, at 2-13 (e-mails), but she also wrote e-mails containing assertions similar to those made in the release.  For example, in an e-mail to an investor several days before the release went out, she claimed:

> Today we signed a contract with Samsung for $20 [sic] million cards at $21 a card.  (Our cost will be $4)[.]  Samsung is giving us an Irrevocable Purchase Order and it is bankable.  This is the largest order for biometric smart cards ever placed. . . . The Samsung contract being a $400 million contract will qualify us to move to Bulletin Board [a securities trading forum].

E-mail from Grace to "Ron" (Feb. 22, 2008, 1:01 PM).  In an e-mail to her board the day before the release went out, she stated that the large number of shares traded that day suggested people were aware e-Smart had "irrevocable purchase orders for 20 million cards at $20 a card," and that e-Smart's "profit[s] could be as high as $300 million."  Mot., Att. 107 (E-mail from Grace to Tom Volpe, et al. (Feb. 25, 2008, 10:47 PM)).  It is thus clear from the record that Grace approved of the statements in the release.

3.   *Materiality*

The misrepresentations in the release, moreover, were undoubtedly material.  For

information to be material, "there must be a substantial likelihood that the disclosure of the

omitted fact would have been viewed by the reasonable investor as having significantly altered

the total mix of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32

(1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (internal

quotation marks omitted); see Media General, Inc. v. Tomlin, 387 F.3d 865, 869 (D.C. Cir.

2004).  In other words, a fact is material if a reasonable investor would find the information

"important."  SEC v. Steadman, 967 F.2d 636, 643 (D.C. Cir. 1992) (citing Basic Inc., 485 U.S.

at 231-32).

One cannot dispute that investors in a publicly traded company – especially one that had

yet to bring in substantial revenue like e-Smart – would find the existence (or non-existence) of

large "contract orders" important.  See E-Smart I, 2014 WL 945816, at *7 (quoting Latham v.

Matthews, 662 F. Supp. 2d 441, 461 (D.S.C. 2009)) (explaining that a reasonable investor would

likely find information about whether a company had "'sales orders that would produce

revenue'" material).  Such orders would have significant effects on the company's expected

revenues, as indicated by the release and Grace's own e-mails.  See Samsung Release at 1

("[T]he Company believes the Samsung orders may produce profits in excess of $100 million.");

E-mail from Grace to "Ron" (Feb. 22, 2008, 1:01 PM) ("The Samsung contract being a $400

million contract will qualify us to move to Bulletin Board. . . . This is huge for the Company.").

Her e-mails also explicitly recognized the significance of this type of information to investors.

See Mot., Att. 106 (E-mail from Grace to Charlie Black, *et al.* (Feb. 25, 2008, 3:58 PM))

(commenting that large volume of e-Smart stock being traded and increase in stock's value

18

suggested that "the value of this a [*sic*] huge contract [wa]s known" by some investors). Whether e-Smart had, in fact, sold 20 million cards was obviously something investors would have found important.

### 4.   *In Connection with the Purchase or Sale of Securities*

The misrepresentations were also made "in connection with" the purchase or sale of securities.  "The Supreme Court has held that the 'in connection with' element is a broad and flexible standard and that any activity 'touching the sale of securities' will suffice."  SEC v. Levine, 671 F. Supp. 2d 14, 31 (D.D.C. 2009) (quoting Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971)).  "Where the fraud alleged involves public dissemination in a document such as a press release, annual report, [or] investment prospectus . . . on which an investor would presumably rely," this burden is met.  SEC v. Rana Research, Inc., 8 F.3d 1358, 1362 (9th Cir. 1993); see also SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1171 (D.C. Cir. 1978) (noting this "requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon").  Because the Samsung release was a public document on which investors would rely, the misrepresentations were made "in connection with" the sale of securities.  See, e.g., StratoComm Corp., 2 F. Supp. 3d at 258-59 (press release satisfied the "in connection with" requirement).

### 5.   Scienter

Finally, Grace acted with the requisite mental state to establish liability.  In Section 10(b) and Rule 10b-5 enforcement actions, the Commission must prove that the defendant acted with *scienter*.  See Aaron v. SEC, 446 U.S. 680, 691 (1980); Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008).  This translates as "a mental state embracing intent to deceive,

manipulate, or defraud." Aaron, 446 U.S. at 686 n.5 (quoting Ernst & Ernst v. Hochfelder, 425

U.S. 185, 194 n.12 (1976)). This Circuit has held that it encompasses both intentional

wrongdoing and conduct undertaken with extreme recklessness. See Dolphin & Bradbury, 512

F.3d at 639 (citing Steadman, 967 F.2d at 641). Extreme recklessness is more than "a should

have known standard[;] . . . [r]ather, it is an extreme departure from the standards of ordinary

care . . . which presents a danger of misleading buyers or sellers that is either known to the

defendant or is so obvious that the actor must have been aware of it." Id. (quoting Steadman,

967 F.2d at 641-42) (internal quotation marks omitted). Courts have resolved issues of *scienter*,

in appropriate cases, at the summary-judgment stage. See, e.g., SEC v. Milan Group, Inc., 962

F. Supp. 2d 182, 201 (D.D.C. 2013); SEC v. Monterosso, 756 F.3d 1326, 1336 (11th Cir. 2014);

SEC v. George, 426 F.3d 786, 795 (6th Cir. 2005); SEC v. Platforms Wireless Int'l Corp., 617

F.3d 1072, 1095-96 (9th Cir. 2010).

     In this case, it is not possible to believe that Grace, as CEO, did not know whether a

contract her company had entered into was a supply contract or an actual order. This is

especially so, considering that the contract (if it was, in fact, an order) had the potential to

generate upwards of $100 million in profits for the revenue-strapped company. Such an

assertion also appears ludicrous in light of the fact that Grace constantly claimed to be traveling

around the world negotiating and finalizing the company's contracts. See, e.g., Mot., Att. 192

(E-mail from Grace to "Christopher" (Sept. 21, 2007, 4:42 AM)) ("I may have to fly to NY for a

few days to close the Bintusa deal. . . . Either from Rome, or NY, I will fly to Morocco from

there to sign a $35million contract with the Military. . . . After Morocco, I will then fly to South

Africa with them to negotiate the takeover of the Net1 contract there, and then fly back through

Equatorial Guinea, Angola and Maritania to sign contracts there."); Att. 43 at 1 (E-mail from

Grace to Stewart Hung, *et al.* (Mar. 13, 2006, 2:28 AM)) ("I am in Europe closing the first deal

here for $15 million."); Att. 113 (E-mail from Grace to Charlie Black, *et al.* (Sept. 10, 2007, 5:05

AM)) ("I am still in Europe and have finalized one contract in Italy and one with Abu Dabi [*sic*]

and Dubai for $35m.[]  I am finalizing the one with Citigroup and Prince Waleed bin Talal this

week here.); Att. 195 at 1 (E-mail from Grace to Charlie Black, *et al.* (Nov. 29, 2007, 9:17 AM))

("I am in Switzerland working to finalize the first financing transaction. . . . [T]hen I will travel

to Korea to meet with Samsung, Daewoo to conclude agreements with them . . . and to have

further talks with NEC.").  Indeed, the record compels the conclusion that she was e-Smart's

primary negotiator of contracts, and she does not offer any evidence to show that, for some

reason, she was not involved in negotiating and finalizing this particular agreement.

But even if she had not been involved, when it comes to such a significant event, one

would expect the CEO to verify the agreement's most basic details before announcing it

publicly.  This is especially true here, where Grace knew that some investors felt the company

had lied in the past about deals and had been "fraudulent and open for criminal prosecution."  E-

mail from Ken Wolkoff to Grace (Oct. 24, 2006, 9:03 PM); see, e.g., E-mail from Douglas

Borwick to Grace (Apr. 3, 2007, 8:04 PM); Mot., Att. 199 (E-mail from Douglas Borwick to

Grace (Dec. 27, 2007, 1:18 AM)); Mot., Att. 196 (E-mail from Grace to Fritz, *et al.* (Dec. 18,

2007, 11:34 AM)).

Prior to issuing the release, however, Grace never contacted anyone at Samsung to

confirm the order, see PSMF, ¶ 31, and even a perfunctory review of the contract would have

revealed that it was nothing more than a supply contract.  See Samsung Supply Contract.  She

has also failed to present any evidence showing that she had a legitimate basis to believe the

statements that she made.  Other courts in this District have determined that "[s]cienter is

established where representations or opinions are given without basis and in reckless disregard of their truth or falsity." SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 10 (D.D.C. 1998) (citations omitted); see also Milan Group, Inc., 962 F. Supp. 2d at 196 (quoting Chill v. General Electric Co., 101 F.3d 263, 269 (3d Cir. 1996) (internal quotation marks omitted) ("An egregious refusal to see the obvious, or to investigate the doubtful, may . . . give rise to an inference of . . . recklessness.").  Also notable is the fact that, despite her own e-mails proclaiming the importance of the alleged contract to investors, and despite her knowledge that some investors felt they had been lied to in the past, she never took steps to correct the misrepresentations in a subsequent release.

It also must have been obvious, even to a layperson, that since the statements in the release grossly misrepresented the nature of the Samsung contract, they presented a serious danger of misleading investors.  The release conveyed, in no uncertain terms, that e-Smart would deliver 20 million cards over two years, and that the company believed it was the largest order in the world for smart cards.  See Samsung Release at 1.  That these statements could mislead investors was "so obvious that [Grace] must have been aware of it." Steadman, 967 F.2d at 641-42.

In her defense, Grace asserts that it is "most plausible to infer that . . . [she] genuinely believed the challenged statements" because she never sold any of her shares in e-Smart.  While it is true that courts find stock sales relevant to issues of *scienter*, "the lack of stock sales by a defendant is not dispositive." No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp., 320 F.3d 920, 944 (9th Cir. 2003).  In this case, Grace's decision to maintain her shares does not defeat the other strong indicia of *scienter*, especially because Grace would clearly have had other motives, beyond a rise in the stock price, to misrepresent e-

22

Smart's success to investors.  Without wading into questions about which expenses were legitimate and which were not, the Court notes that investor funds in e-Smart, Intermarket, and IVI accounts were what enabled Grace to spend lavishly on hotels, flights, restaurants, clothing, and other items.

The cases Grace offers on *scienter* do not help her.  See Opp. at 27, 29 (citing <u>Gompper v. VISX, Inc.</u>, 298 F.3d 893, 896-97 (9th Cir. 2002); <u>Ronconi v. Larkin</u>, 253 F.3d 423, 430 (9th Cir. 2001); <u>In re Vantive Corp. Sec. Litig.</u>, 283 F.3d 1079, 1085 (9th Cir. 2002), <u>abrogated by South Ferry LP, No. 2 v. Killinger</u>, 542 F.3d 776, 784 (9th Cir. 2008)).  She cites these opinions to suggest that the SEC is "attempt[ing] to plead fraud by hindsight," and that it has failed to show she did not optimistically believe the statements.  Opp. at 27-28.  But these cases address pleading requirements when the statements at issue are <u>forward looking</u>.  See <u>Gompper</u>, 298 F.3d at 896-97; <u>Ronconi</u>, 253 F.3d at 430.  The false statements at issue here were not predictions about the future – they purported to represent e-Smart's then-current state of affairs.  As a result, the cases are completely off point.

In sum, a reasonable jury could only find that Grace acted, at the very least, with extreme recklessness, if not with the specific intent to misrepresent e-Smart's success.

### 6.  *Reliance on Counsel*

Grace's other principal defense is that Maranda Fritz, outside counsel to e-Smart, was a "central participant" in drafting the release and "approved" it.  See Opp. at 29; Untitled Materials, ECF No. 409-5, at 1.  It is "an open question in this circuit whether reliance on the advice of counsel is a good defense to a securities violation."  <u>Zacharias v. SEC</u>, 569 F.3d 458, 467 (D.C. Cir. 2009).  Assuming that it is, the defense hardly seems appropriate here, where Grace was merely describing a straightforward contract.  Rather, it is more suitable for situations

in which the legality of a contemplated action is a close call or ones that involve the interpretation of complex legal documents.  As noted above, the Samsung contract was quite obviously a supply contract, and the statements in the press release were unquestionably misleading.  It would not take a lawyer's advice to comprehend either of these things.

But even assuming that the defense is available and appropriate in a situation like this, Grace cannot establish the required elements.  Specifically, to demonstrate that she relied on counsel, Grace would need to show that she: "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice."  Id.  Although there appears to be conflicting evidence in the record about whether Fritz even saw a copy of the Samsung contract, compare DSMF (Part 5) at 8 (¶ 101) with Reply, Att. E (Second Investigative Testimony of Maranda Fritz) at 114:8-9, Grace has not provided any evidence showing that she asked Fritz to review the contract to determine whether it was legally permissible to interpret it as an order for 20 million cards.  In fact, Fritz testified that Grace represented the terms of the contract to her, and that she was not providing a legal opinion with the edits she made to the release.  See Fritz Second Test. at 114:1-3; 114:12-15.  Grace, therefore, cannot hide behind Fritz.

### 7. *Other Defenses*

Finally, Grace repeats two defenses that this Court disposed of in denying her Motion to Dismiss.  The first is that the press release was "normal 'puffing' . . . and [wa]s not fraud."  Opp. at 29.  Statements are puffery – as opposed to actionable misrepresentations – when they are "generalized statements of optimism that are not capable of objective verification."  Freeland v. Iridium World Communications, Ltd., 545 F. Supp. 2d 59, 76 (D.D.C. 2008).  This Court explained earlier that the statements at issue in the release were not "generalized statements of

optimism" but were specific, verifiable statements.  See <u>E-Smart I</u>, 2014 WL 945816, at *9.  For instance, the claim that the Samsung contract was an order for 20 million smart cards is hardly a vague, atmospheric hope.  She cannot claim, consequently, that the release was mere puffery.

She also contends, again, that the release did not contain misrepresentations because it included a safe-harbor statement specifically cautioning readers about the reliability of its "forward-looking statements."  <u>See</u> Opp. at 29-30; Untitled Materials, ECF No. 409-5, at 26-27.  The Private Litigation Securities Act of 1995 provides that, in certain circumstances, individuals are not liable for forward-looking statements under Rule 10b-5.  <u>See</u> 15 U.S.C. § 78u-5.  Yet there are two significant problems with Grace asserting this defense, both of which this Court explained in its earlier Opinion.  The first is that the safe-harbor provision applies "in any private action," not in an SEC enforcement action.  <u>See</u> 15 U.S.C. § 78u-5(c); <u>see also</u> <u>SEC v. U.N. Dollars Corp.</u>, No. 01-9059, 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003) (not reported).  The second is that the misrepresentations were not "forward looking" – they were framed in the present tense.  This defense, then, is similarly unsuccessful.

In sum, the record on summary judgment is clear: Grace made material misrepresentations in the Samsung press release with *scienter*.  The SEC has, therefore, established that she violated Section 10(b) and Rule 10b-5, and it is entitled to summary judgment against her on Count I.

   C.  <u>Count II: Violations of Sections 5(a) and 5(c)</u>

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), (c), "prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration."  <u>Zacharias</u>, 569 F.3d at 464.  "To show a violation . . . , the SEC must show that the investments offered are securities, and that the Defendant[] offered

or sold these securities without first filing a registration statement." Milan Group, Inc., 962 F.

Supp. 2d at 192 (internal quotation marks and citation omitted). The burden then shifts to the

defendant to prove that an exemption from registration applied. Zacharias, 569 F.3d at 464

(citing SEC v. Ralston Purina, 346 U.S. 119 (1953)). This Circuit has not resolved whether the

defendant must have acted with *scienter* to be liable for Section 5 violations. See Zacharias, 569

F.3d at 466.

The SEC offers evidence that from 2005 to 2007, Grace and others participated in a

convertible-loan scheme designed to sell shares of e-Smart stock. See Mot., Att. 102 (Memo

from Grace to "All Management & Directors" at e-Smart, Intermarket, and IVI, Jan. 5, 2005)

("Grace Memo"). Shares of stock are clearly "securities" within the meaning of the statute. See

15 U.S.C. § 77b(a)(1) ("security" includes "stock"); SEC v. Edwards, 540 U.S. 389, 393 (2004)

(definition of "security" includes "stock"). There is, furthermore, no dispute that the shares were

not registered, see Mot., Att. 176 (SEC Attestation), and Grace does not assert that a registration

exemption applied. The only question is whether Grace "offered" and "sold" securities through

the loan scheme.

1.   *The Sale of Unregistered Securities*

The evidence unequivocally demonstrates that she did sell securities. In essence, under

the scheme, "lenders" provided short-term loans (often of 1-2 weeks) to Intermarket and IVI, the

two private companies that Grace controlled. See, e.g., Mot., Att. 29 at 3-7 (Promissory Note for

H. Bloomfield); Att. 33 (E-mail from Larry Weinberg to Grace (June 26, 2006, 1:30 PM)); Grace

Depo. at 189:9-192:21. Those companies offered their restricted e-Smart stock as collateral on

the loans. See Mot., Att. 30 (E-mail from Gary Abrams to Grace, *et al.* (June 28, 2006, 9:49

AM)); Att. 27 (Investigative Testimony of Maranda Fritz) at 65:18-21; Att. 49 (Letter from Fritz

to Sharon Owen, President, Holladay Stock Transfer, Aug. 25, 2005). When the loans went into

default – an outcome that was virtually guaranteed because Intermarket and IVI had no revenues

– the "lenders" could convert the notes to e-Smart stock at $0.10 a share, which was typically

below market rates. See Mot., Att. 23 (Investigative Testimony of Douglas Borwick) at 74:2-18;

78:2-14; Att. 29 at 1-2 (E-mail from Borwick to "Harold" (Mar. 27, 2006, 9:13 PM)); E-mail

from Gary Abrams to Grace et al. (June 28, 2006, 9:49 AM); Grace Memo at 1; Def. Am. Ans.,

¶¶ 19, 20. Grace would then authorize the transfer agent to issue the shares without their

restrictive legends, based on opinion letters from attorney Fritz, thereby transforming the shares

into unrestricted stock. See Mot., Att. 41 at 2-3 (Letter from Grace to Fritz, July 19, 2005);

Letter from Fritz to Sharon Owen, President, Holladay Stock Transfer, Aug. 25, 2005. Later, e-

Smart would issue IVI and Intermarket enough restricted shares to maintain the companies'

respective ownership percentages. See Grace Memo at 2; Mot., Att. 103 at 1 (E-mail from Grace

to Tony Russo, et al. (Mar. 30, 2006, 8:12 AM)). In the end, millions of dollars in "loans" were

exchanged for millions of unregistered, free-trading shares. See 2007 10-K at 31; SEC

Attestation.

In her Opposition, Grace does not appear to dispute these facts, see Opp. at 37-38, other

than to claim that "lenders" only made loans to Intermarket, not IVI. See DSMF (Part 5) at 16-

17 (copying and pasting "Testimony of Douglas Borwick"). Even if that were true, such a point

is immaterial since using either entity to distribute unregistered shares through sham loans would

violate the statute. In her supporting materials, she does, however, make several comments that

the "threshold issue is whether the loans constituted an offer and sale of securities for the

purpose of the Securities Act and Exchange Act." See Materials Titled "C.) LEGAL REPORTS,

TESTIMONY & SUMMARY," ECF No. 407-2, at 10 ("Grace Legal Reports").

The Court has no trouble finding that they did.  The loans were not genuine, and the purpose of the arrangement was clear: to sell unregistered e-Smart shares in order to obtain funds from investors.  A January 2005 memo to "All Management & Directors" at Intermarket, IVI, and e-Smart explained, for example, that the task of raising "the Investment" e-Smart needed to carry out its business plan was "being hindered by the fact that [e-Smart] ha[d] reached [its] limit to issue new shares to raise capital."  Grace Memo at 1.  The memo further explained that the "Company [wa]s capitalized with 200 million authorized shares and all [were] . . . accounted for."  Id.  While the company planned to have a meeting to authorize additional shares, it was going to use "an alternative plan" to raise funds in the meantime – *i.e.*, distribute shares of e-Smart through the loan scheme.  Id.

Although the memo suggested that the companies would pay off the loans "in the event" Grace was able to secure funding before they became due, that was not truly part of the plan.  Intermarket and IVI did not have revenues with which to repay the loans, and the loans were generally due within a very short timeframe.  E-mails about the scheme also demonstrate that the "lenders" believed they were investing in e-Smart, not making loans to Intermarket or IVI.  For example, one "lender" wrote to Ken Wolkoff, who helped oversee the transactions, to complain: "I have never received my shares for the $10,000 investment I made to e-Smart in September of 2005, at your recommendation.  Up until now, it appears I have made a $10,000 donation to this company."  Mot., Att. 32 at 2 (E-mail from Devon Ronner to Kenneth Wolkoff (Apr. 30, 2006, 7:51 PM)).  An e-mail from another "lender" to Douglas Borwick, who also helped administer the scheme, stated: "[T]hank you for the e-mail you sent me tonight with the note, security agreement, etc[.] for the $150,000 investment that I made in e-Smart on June 16th.  On Friday, June 23rd, I wire-transferred an additional $50,000 to e-Smart.  Please send me additional

paperwork for my new $50,000 investment."  Mot., Att. 36 (E-mail from Michael Stone to Borwick, *et al.* (June 25, 2006, 10:17 PM)).

Other e-mails are even more transparent about the fraudulent nature of the loans. Borwick, for instance, wrote to one lender: "I have your name on a list that says you made a convertible loan to Intermarket Ventures. . . . <u>When Intermarket Ventures defaults on the loan (in one week)</u> and you wish to convert under the default to $.10 shares, you need to send an e-mail to [Mary Grace and others]."  E-mail from Gary Abrams to Grace, *et al.* (June 28, 2006, 9:49 AM) (emphasis added).  Another "lender" wrote to Mary Grace on the day he made a loan, saying "I understand the Intermarket loan <u>will be</u> defaulting and I wish to convert the loan under the default to $.10 shares."  Mot., Att. 34 (E-mail from [redacted] to Grace (June 26, 2006, 6:21 PM)) (emphasis added).

Borwick and Wolkoff's testimony is similarly revealing about the true purpose of the loans.  Wolkoff, for instance, admitted that his own reason for participating in the transaction was to acquire stock.  <u>See</u> Wolkoff Depo. at 15:25-16:5.  He further explained that, while people "had the option to leave it as a loan and not convert it, . . . [m]ost of the people, in fact, coming in had the intention just like [he] did to convert because they wanted the free trading shares."  <u>Id.</u> at 28:24-29:7.  Borwick, who put in $100,000 and received 1,000,000 unrestricted shares after the loan went into default, likewise testified that he invested "with the hope that they wouldn't pay [him] back," and "that [he] could get free-trading shares at ten cents a share."  <u>See</u> Borwick Test. at 74:7-14; 78:12-14.  When asked, "Did [the lenders] tell you they were entering into this transaction because it was an advantageous way for them to obtain free trading stock in e-Smart?" he responded, "I think they all understood that clearly."  Mot., Att. 57 (Deposition of

Douglas Borwick) at 20:24-21:2.  Perhaps unsurprisingly, Borwick also testified that he did not believe Intermarket ever paid anyone back for the loans.  Borwick Test. at 77:24-78:1.

The evidence thus shows that the scheme was a method to offer and sell unregistered shares of e-Smart stock, and Grace has not established an exemption from registration.  See SEC v. Aqua Vie Beverage Corp., No. 04-414, 2007 WL 2025231, at *3-4 (D. Idaho July 9, 2007) (upholding magistrate judge's finding that "debt conversion scheme," through which unregistered shares were distributed to the public, violated Sections 5(a) and 5(c)).

    2.  Scienter

Grace asserts that she is not liable, however, because she did not act with *scienter*.  See Grace Legal Reports at 9.  As noted above, this Circuit has not decided whether *scienter* is an element of a Section 5 violation.  The Court need not resolve the issue now, however, because it is clear that Grace satisfied the requirement by acting intentionally or with extreme recklessness.

For one thing, contrary to the assertions in her Opposition, see Opp. at 1-2, Grace knew that the loans were not *bona fide*.  An e-mail she wrote to e-Smart's Board of Directors in June 2006 is especially telling.  Apparently referencing the $0.10-share conversion rate under the loans, she informed the Board that "there [wa]s not a shortage of shareholders who would buy stock at $.10," because "[t]he market [wa]s at $0.12."  E-mail from Grace to Tom Volpe, *et al.* (June 12, 2006, 4:59 AM) (emphasis added).  Grace was, additionally, the recipient of e-mails in which "lenders" claimed default only days after making loans and was, at the same time, the President and CEO of both Intermarket and IVI and therefore the best positioned to know that the companies could not repay loans on such short timetables.

Far more ruinous to her claims of innocence, however, was her employment of a forged opinion letter to further the scheme in May 2007.  As part of the share-distribution scheme, e-

Smart's counsel, Maranda Fritz, had issued opinion letters in 2005 expressing that e-Smart's transfer agent could remove the restrictive legends on the stock certificates issued to "lenders." A restrictive legend is placed on a security to "alert[] buyers that the security has not been registered under the Securities Act and may be offered and sold only if the security is registered, or its sale qualifies for an exemption from registration."  SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1252 n.1 (9th Cir. 2013) (citations omitted).  Removing these legends makes the securities "more saleable," id. (citations omitted), and thus more enticing to investors.  See Grace Depo. at 163:8-164:5.  Here, Fritz issued letters wrongly claiming that the restrictive legends could be removed under Rule 144.  See, e.g., Letter from Fritz to Sharon Owen, President, Holladay Stock Transfer, Aug. 25, 2005.  Her reasoning was based, in part, on the fact that the shares were transferred to lenders after the default of *bona fide* loans.  See, e.g., id.  She issued several of these letters for transactions that took place in 2005.  See Fritz Test. at 63:10-80:9; Grace Depo. at 163:8-164:5.

Later, in 2007, Grace repeatedly asked Fritz to write another opinion letter that would enable the agent to issue unrestricted shares to a new set of investors.  See Fritz Test. at 81:10-85:11.  Each time, Fritz declined to issue one.  Id. at 90:12-17; 98:19-99:7.  Then, after being refused several times, Grace told Fritz that she was not sure she needed a new opinion letter anyway.  She explained that, in her view, the new stock transfers should be treated the same way as the 2005 transactions and should therefore be covered by the original 2005 opinion letter.  Id. at 90:12-93:11.  Fritz testified that she would have been "very surprised" if the transfer agent had agreed with Grace.  Id.

It appears Fritz was right, because on May 8, 2007, Grace sent the transfer agent several documents for the new set of "lenders," including an updated opinion letter that covered

transactions through March 2007.  See Mot., Att. 51 (E-mail from Grace to Sharon Owen (May

8, 2007, 12:28 PM)).  But Grace had not retained another attorney to write that letter.  Instead,

although the letter did not bear Fritz's signature, it concluded: "Very truly yours, Maranda E.

Fritz."  Id.  Fritz denies issuing this letter, see Fritz Test. at 98:11-99:7; see also Letter from

Maranda Fritz, Hinshaw & Culbertson LLP to David B. Deitch, Aug. 7, 2008, and Grace offers

no evidence to contradict the SEC's contention that she used a forged letter in May 2007.[2]  Such

conduct to further the scheme unquestionably demonstrates that she acted with *scienter*.

### 3.    *"Substantial Factor"*

Grace also argues that her role was not sufficient to make her liable.  Specifically, she

asserts that she did not conceive of the scheme or oversee the loans.  See Opp. at 38.  Yet she

need not have thought up the plan or even been the primary person overseeing it to be held

responsible.  She is liable if she was a "necessary participant or substantial factor" in the Section

5 violation.  E-Smart I, 2014 WL 945816, at *10 (quoting SEC v. Calvo, 378 F.3d 1211, 1215

(11th Cir. 2004), and citing Zacharias, 569 F.3d at 464).

The undisputed evidence here shows that Grace played a significant and necessary role in

perpetuating the scheme.  In one e-mail, for example, she explained the scheme, corrected others

on how it would operate, and coordinated work related to it.  See E-mail from Grace to Tony

Russo, *et al.* (Mar. 30, 2006, 8:56 AM).  She was also kept in the loop about the transactions and

was involved in decisionmaking regarding them.  See, e.g., Mot., Att. 31 (E-mail from Borwick

---

[2] Grace may have used multiple fraudulent opinion letters in 2007 to advance the scheme.  The record references another opinion letter, dated January 25, 2007, that was purportedly written by Fritz, but that Fritz did not write.  See Fritz Test. at 78:9-81:8.  Fritz reported Grace's apparent use of a "[f]abricated January 2007 opinion letter" to e-Smart's Board in August 2008.  Letter from Maranda Fritz, Hinshaw & Culbertson LLP, to David B. Deitch, Aug. 7, 2008.  Specifically, Fritz informed the Board that the SEC was "in possession of evidence demonstrating that, in 2007, Mary Grace created or obtained a fraudulent opinion letter," which appeared to be "a scanned and altered version of a letter that [Fritz] had issued in the fall of 2005."  Id.  She further noted that "[t]here [wa]s reason to believe that the fabricated letter was displayed by Mary Grace to at least one investor to induce him to enter into additional loan transactions."  Id.  The SEC, however, did not specifically reference the January 2007 letter in its Statement of Undisputed Facts and has not, at this point, submitted that letter as part of the record.

to Grace & O'Meally (May 14, 2006, 10:22 PM)) (emphasis added) ("Dear Mary and Beverly, Here is the 8th Group to get shares. . . . Michele Mumford Sephton loaned $21757.29 and is asking to get $14,757.29 back.  This will have to be discussed with Mary."); Borwick Test. at 92:7-93:9 (explaining Grace's involvement in setting transaction terms, such as length of "loans" and share-conversion rates); Wolkoff Depo. at 22:8-23:11 (noting Grace approved shortening loan times to entice investors).  She additionally signed promissory notes, see Promissory Note for H. Bloomfield, representation letters on behalf of Intermarket, see Att. 41 at 2-3 (Letter from Grace to Fritz, July 19, 2005), and letters authorizing and instructing the transfer agent to issue unrestricted stock certificates.  See, e.g., id. at 4-10 (Letter from Grace to Sharon Owen, President, Holladay Stock Transfer, July 6, 2005).  The record is replete with other evidence as well that Grace was a substantial and necessary participant in the scheme.  See, e.g., Borwick Depo. at 19:15-20:6; Borwick Test. at 57:20-25; see also PSMF, ¶ 184 (citing additional exhibits).  The fact that there may have been other "central participants" in the scheme, see Grace Legal Reports at 12-13, does not detract from this fact.

### 4.  *Reliance on Counsel*

Grace's only remaining defense to the Section 5 violation is that the SEC has failed to show that she "ever knew or was told other than what counsel testified to that the loans were bonafide [*sic*] loans."  Opp. at 1-2.  As noted previously, this Circuit has not ruled on whether reliance on the advice of counsel is even an adequate defense to a securities-law violation. Zacharias, 569 F.3d at 467.  If such a defense is available, Grace must establish that she made a complete disclosure to counsel, specifically requested counsel's advice on the legality of the transaction, got advice that it was legal, and relied in good faith on that advice.  Id.  This she has not done.

The first problem for Grace is that, as discussed previously, she knew the loans were not *bona fide*. The second and much more obvious problem, however, is that she used a forged opinion letter in 2007 to perpetuate the scheme and issue free-trading shares to a new set of investors. Even assuming, then, that she relied in good faith on the advice of counsel in relation to the pre-2007 transactions, she cannot claim good-faith reliance for the ones in 2007. As noted previously, her attorney repeatedly refused to issue new opinion letters in 2007. Modifying and using the attorney's 2005 opinion letter, especially after such refusals, defeats any possible reliance-on-counsel defense.

As a result, there is no factual dispute that Grace's participation in the loan scheme violated Sections 5(a) and 5(c) of the Securities Act, thus entitling the SEC to summary judgment against her on Count II as well.

## IV.    Conclusion

For the foregoing reasons, the Court will grant the SEC's First Motion for Summary Judgment against Grace on Counts I and II of its Amended Complaint. Because the SEC's Second Motion for Summary Judgment is still pending, the Court will not resolve the issue of remedies at this juncture. A contemporaneous Order will so state.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  November 21, 2014