**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>     Plaintiff, <br><br>         v. <br><br> E-SMART TECHNOLOGIES, INC., *et al.*, <br><br>     Defendants. | Civil Action No.  11-895 (JEB) |

## MEMORANDUM OPINION

This case continues to provide a cautionary tale for investors.  At the center of the story is *pro se* Defendant Mary Grace, the CEO of e-Smart Technologies, Inc., a public company that was in the business of developing and marketing purported biometric "smart" cards.  Over the course of several years, the company touted significant technological advancements in SEC filings and press releases.  At the same time, Grace persuaded investors to part with millions of dollars on assurances that the company was about to obtain or had obtained significant funding and contracts.  But these great expectations rarely, if ever, were realized, and many investors later felt that Grace had misled them.  The Securities and Exchange Commission shared that sentiment and brought this civil-enforcement action against e-Smart, Grace, and several others, alleging numerous violations of federal securities laws.  At the heart of the Commission's suit is the allegation that Grace lied about e-Smart's technology and about impending contracts in order to obtain investor funds, which she then diverted to her personal use.

This Court has already granted the agency summary judgment on two of its five claims against Grace – namely, that she made material misrepresentations to the investing public and

that she participated in a convertible-loan scheme to sell unregistered securities.  Now the Court

addresses the Commission's Second Motion for Summary Judgment against Grace, which

accuses her of violating certain reporting, recordkeeping, and internal-control provisions.  As it

finds that summary judgment is warranted in favor of the SEC on two of these three counts, the

Court will grant the Motion in part and deny it in part.

## I.      Background

This Court has already described much of the relevant background in previous opinions.

See SEC v. e-Smart Technologies, Inc. (E-Smart I), 31 F. Supp. 3d 69, 74-78 (D.D.C. 2014);

SEC v. e-Smart Technologies, Inc. (E-Smart II), No. 11-895, 2014 WL 6612422 (D.D.C. Nov.

21, 2014).  It therefore only briefly summarizes the key facts here, drawing heavily from the

latter Opinion, which granted partial summary judgment to the SEC.

Grace was the President, CEO, Chief Financial Officer, and a Director of e-Smart

Technologies, Inc., see Defs.' Ans., ¶ 17, a publicly traded company that was "engaged in the

business of creating, marketing, manufacturing, installing, operating and maintaining biometric

identification verification systems."  Mot., Att. 1 (2006 10-KSB) at 3.  Its key technology was a

"smart card" that used fingerprint matching to verify card users and protect against unauthorized

use.  See E-Smart II, 2014 WL 6612422, at *1.  The company reported significant technological

achievements in its SEC filings, press releases, and other communications with investors.  See id.

For instance, it reported in its 2006 10-KSB, a mandatory annual-disclosure form for publicly

traded companies, that it believed it was "the first . . . [and] only company offering a

commercially available dual !SO [sic] 7816 (contact) and ISO 14443 B (wireless) compatible

smart card with a fingerprint sensor onboard, biometric matching engine onboard and a multi-

application processor."  See id.

Notwithstanding these reported achievements, the company struggled to stay afloat.  It had little revenue, and Grace was continually turning to e-Smart's investors to seek more funds. She frequently assured them that significant contracts and investments were in the bag, and company press releases echoed this theme.  Lured in by these promises, investors turned over millions of dollars.  But the purported contracts and investments almost never seemed to materialize, and many investors later felt that they had been deceived.  See id. at *2-3.

Agreeing, the SEC brought this civil-enforcement action on May 13, 2011, against Defendants e-Smart, Intermarket Ventures, Inc., IVI Smart Technologies, Inc., Grace, and e-Smart's Chief Technology Officer, Tamio Saito, as well as brokers Robert Rowen, George Sobol, and Kenneth Wolkoff.  The thrust of its Complaint is that e-Smart was a sham company with a bogus product.  While the company claimed to have a commercially available and advanced smart card, it, in fact, had only a prototype that did not work as promised.  The reported contracts and investments, according to the Commission, were complete fabrications intended to persuade investors to fork over their money.  The agency believes that e-Smart's "illegitimacy" is further underscored by the facts that the company frequently did not file required reports, that its books and records were in a constant state of disarray, and that it lacked virtually any system of internal controls.  Id.  It lays the blame for these problems chiefly on Grace, asserting that she exhibited a total disregard for her fiduciary duties and legal obligations as the head of a public company, and that she violated numerous securities laws as a result.

In particular, the SEC's Amended Complaint accused her of: (1) making material misrepresentations in public filings, press releases, and communications with investors, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 (Count I); (2) selling unregistered securities, in violation of Sections 5(a) and (c) of the Securities Act (Count II); (3) failing to file

required ownership statements, in violation of Section 16(a) of the Exchange Act and Rule 16a-3 (Count V); (4) certifying SEC filings that she knew were misleading or contained material omissions, in violation of Rule 13a-14 (Count VI); and (5) aiding and abetting the company's failure to file required reports, maintain accurate books and records, and implement a system of internal controls over financial reporting, in violation of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), as well as Rules 12b-20, 13a-1, 13a-11, and 13a-13 (Count VII).  On the basis of these alleged violations, the Commission seeks a host of remedies including disgorgement, civil penalties, and an injunction prohibiting Grace from participating in penny-stock offerings, serving as an officer or director of issuers of securities, and engaging in further violations of federal securities laws.

After a lengthy and contentious discovery period, the SEC filed two separate Motions for Summary Judgment against Grace.  See ECF Nos. 324, 386.  The initial one addressed the first two counts against her – i.e., that she violated Section 10(b) and Sections 5(a) and (c), along with their attendant rules.  This Court has already resolved that Motion in favor of the Commission. See E-Smart II, 2014 WL 6612422.  With respect to the Section 10(b) claim, the Court found that Grace had clearly violated the law by making material misrepresentations in a February 2008 press release about an e-Smart contract with Samsung.  See id. at *7-12.  As to Sections 5(a) and (c), the Court concluded that Grace had participated in a convertible-loan scheme designed to sell millions of unregistered shares of e-Smart stock.  See id. at *12-16.  It therefore entered judgment against her on Counts I and II.

The Court now turns to the SEC's Second Motion, which covers the three remaining counts.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would

permit a reasonable jury to find in its favor.  Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.

1987).  If the nonmovant's evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted.  Liberty Lobby, 477 U.S. at 249-50.

## III.   Analysis

This Court has previously discussed, at considerable length, the various shortcomings of

Grace's pleadings in this case.  See E-Smart II, 2014 WL 6612422, at *5-6.  Unfortunately, it

once again finds itself trudging through her jumbled and confusing submissions.  That is no

small task.  It does so largely unaided by briefing, as Grace here essentially re-filed her

Opposition to the SEC's First Motion for Summary Judgment, save for a few minor changes.

Significant portions of it are, accordingly, irrelevant to the Second Motion, which deals with

different counts from the First Motion.  Indeed, in 46 pages, she devotes no more than a few

sentences to several of the key claims involved in the SEC's Second Motion.  The brief,

additionally, does not provide citations to her Statements of Fact.

Those Statements – there are multiple – also prove particularly opaque.  Over the course

of two weeks, she submitted 12 different documents labeled "Statement of Facts," totaling 579

pages.  See ECF Nos. 435-1; 437-1; 440-1; 440-2; 440-3; 440-4; 440-5; 440-6; 452-1; 458-1;

464-2; 464-3.  There is no discernible organization to these Statements, and they contain almost

no record citations to the over 6,000 pages of other material that she filed.  Instead, her

Statements consist largely of copied-and-pasted materials and unsupported assertions, the

relevance of which is often unclear.

These sorts of pleadings have made addressing the Motions for Summary Judgment in

this case extremely taxing.  But as with the SEC's First Motion, the Court is mindful of the

impact of granting summary judgment when a *pro se* litigant is involved.  It has, consequently,

waded through her Statements to determine whether she has presented evidence to establish that there are genuine disputes of material fact.  In the end, it finds that undisputed evidence shows that she violated the provisions in Count V and Count VII, but that summary judgment on Count VI would be premature on the present record.  The Court will take up the counts in this order.

A.  <u>Count V: Section 16(a) Violations</u>

Section 16(a) of the Exchange Act provides that "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security" must file ownership statements with the SEC. <u>See</u> 15 U.S.C. § 78p(a)(1).  These include initial ownership statements on Form 3, statements disclosing changes in beneficial ownership on Form 4, and annual statements on Form 5.  <u>See id.</u> § 78p(a)(2); 17 C.F.R. § 240.16a-3.  To establish a violation of these provisions, the SEC must show that Grace was an officer, director, or 10% beneficial owner and that she did not file Section 16(a) disclosures after an applicable triggering event.  <u>See</u> <u>SEC v. Prince</u>, 942 F. Supp. 2d 108, 131 (D.D.C. 2013).

As this Court mentioned in its Opinion addressing Grace's Motion to Dismiss, the D.C. Circuit has not addressed whether *scienter* is an element that the SEC must prove to establish a violation of Section 16(a).  <u>See</u> <u>E-Smart I</u>, 31 F. Supp. 3d at 86 (citing <u>Prince</u>, 942 F. Supp. 2d at 137 n.14).  Because Grace did not raise the issue at that earlier stage, the Court did not have reason to rule on it then.  <u>Id.</u>  Now, however, because the Commission has not pointed to any evidence of *scienter*, the Court must decide whether the agency must offer proof of this element.

After surveying the rather limited caselaw on Section 16(a), the Court believes that *scienter* is not required.  First, numerous district courts, including one in this jurisdiction, have

consistently held that Section 16(a) does <u>not</u> require a showing of *scienter* and have treated it as

a strict-liability provision.  <u>See</u> <u>Prince</u>, 942 F. Supp. 2d at 131 (although not reaching decision on

§ 16(a) violation, noting *scienter* is not required element); <u>SEC v. Verdiramo</u>, 890 F. Supp. 2d

257, 274 n.14 (S.D.N.Y. 2011) (stating that no showing of *scienter* is required to establish

violations of § 16(a)); <u>SEC v. Sierra Brokerage Services, Inc.</u>, 608 F. Supp. 2d 923, 957 n.32

(S.D. Ohio 2009), <u>aff'd</u>, 712 F.3d 321 (6th Cir. 2013) (same); <u>SEC v. Teo</u>, No. 04-1815, 2010

WL 3184349, at *9-10 (D.N.J. Aug. 10, 2010) (finding § 16(a) violation without addressing

*scienter*); <u>SEC v. Save the World Air, Inc.</u>, No. 01-11586, 2005 WL 3077514, at *14 (S.D.N.Y.

Nov. 15, 2005) (same); <u>SEC v. Solucorp Indus., Ltd.</u>, 274 F. Supp. 2d 379, 420 (S.D.N.Y. 2003)

(same); <u>SEC v. Poirier</u>, 140 F. Supp. 2d 1033, 1045-46 (D. Ariz. 2001) (same).

Second, the D.C. Circuit has ruled that *scienter* is unnecessary to establish a violation of

Section 13(d)(1), a very similar reporting provision.  <u>See</u> <u>SEC v. Savoy Indus., Inc.</u>, 587 F.2d

1149, 1167 (D.C. Cir. 1978).  Section 13(d)(1) provides that those who directly or indirectly

become beneficial owners of 5% or more of a class of an issuer's equity securities must file

disclosure reports with the Commission.  <u>See</u> <u>id.</u> at 1159 n.26; 15 U.S.C. § 78m(d)(1).   The

Circuit explained that "[t]he language of section 13(d)(1) indicates clearly that it is a reporting,

and not an antifraud, provision."  <u>Id.</u> at 1167.  The Supreme Court's determination in <u>Ernst &</u>

<u>Ernst v. Hochfelder</u>, 425 U.S. 185 (1976), that *scienter* was required to establish violations of the

antifraud provisions in Section 10(b) was, therefore, irrelevant.  <u>See</u> <u>id.</u>  After all, in <u>Ernst</u>, the

Supreme Court had "seized upon [Section 10(b)'s] use of the words 'manipulative,' 'deceptive,'

'device,' and 'contrivance'" to determine that it was directed at intentional conduct.  <u>Id.</u> (quoting

<u>Ernst & Ernst</u>, 425 U.S. at 197) (some internal quotation marks omitted).  "[T]he plain language

of section 13(d)(1)," by contrast, "gives no hint that intentional conduct need be found" –

instead, it "appears to place a simple and affirmative duty of reporting on certain persons." Id.

The same is true of Section 16(a). The Court thus believes that to hold Grace liable for Section

16(a) violations does not require a finding of *scienter*.

With that issue settled, Count V is quickly resolved against Grace. E-Smart was an issuer

of securities registered under Section 78*l*(g). See 2006 10-KSB at 1; Mot., Att. 2 (2007 10-K) at

1. There is no doubt that she did not file any ownership statements, see Defs.' Am. Ans., ¶ 10,

and she was clearly required to file. In fact, she fit the bill for each of the categories of persons

obligated to file reports under Section 16(a): she was the President and CEO of e-Smart, see,

e.g., Defs.' Am. Answer, ¶ 17, and was, consequently, an "officer" of the company. See, e.g., 17

C.F.R. § 240.16a-1(f) ("The term 'officer' shall mean an issuer's president . . . ."). She also

served as one of the company's directors and was subject to Section 16(a)'s requirements in that

role as well. See Defs.' Am. Answer, ¶ 17. Finally, she was a beneficial owner of more than

10% of e-Smart's securities.

Ignoring the first two categories, either of which is sufficient for liability, Grace only

challenges the last. Determining who is a "beneficial owner" covered by Section 16(a) is guided

by the definition of that term in Section 13(d) of the Act and its attendant rules. See 17 C.F.R. §

240.16a-1(a)(1). There, "a beneficial owner of a security includes any person who, directly or

indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or

shares: (1) Voting power which includes the power to vote, or to direct the voting of, such

security; and/or, (2) Investment power which includes the power to dispose, or to direct the

disposition of, such security." 17 C.F.R. § 240.13d-3(a). Grace wielded voting power over the

majority of e-Smart's stock: she was the majority shareholder of IVI, and IVI owned a clear

majority of e-Smart's securities at various times. See Defs.' Ans., ¶ 19; 2007 10-K at 11 ("IVI

has historically had and will continue to have the ability to control the outcome of all matters requiring stockholder approval."); see also, e.g., Adoption of Beneficial Ownership Disclosure Requirements, Release No. 13291 (Feb. 24, 1977) (providing as an example of an indirect beneficial owner of an issuer under § 13(d)(1) a person who owns a majority of a corporation that, in turn, holds 5% or more of the issuer's securities).

Grace makes bald assertions in her Statements that she was not IVI's majority shareholder, suggesting that Intermarket held that role instead.  See Defs.' Statement of Facts, Part 2A, ECF No. 452-1, at 5-6.  Aside from the facts that she already admitted to having been IVI's majority shareholder, see Defs.' Ans., ¶ 19, and that the only evidence she points to is e-Smart's 2006 10-KSB, which actually contradicts her assertion, see 2006 10-KSB at 41 ("Intermarket . . . owns 37.5% of the outstanding shares of IVI."), her contention would not help her since she has also admitted that she was Intermarket's majority shareholder.  See Defs.' Ans., ¶ 20.  If she controlled IVI through Intermarket, and IVI in turn controlled e-Smart, she still would have been an indirect beneficial owner of greater than 10% of e-Smart's securities.  There is, in sum, no question that Grace was required to file – at the very least – an initial ownership statement on Form 3, but she failed to do so.

In her defense, Grace offers only a vague argument that counsel told her the disclosures in the company's 10-K filings were "adequate and accurate."  Opp. at 38.  Because *scienter* is not a required element, this assertion appears immaterial.  See, e.g., SEC v. Levy, 706 F. Supp. 61, 69 (D.D.C. 1989) (holding in related § 13(d)(1) context that relying on an attorney's advice was irrelevant because *scienter* was not required element).  Even if reliance on counsel were a good defense, however, Grace would still be out of luck as she has failed to establish the elements of such a defense.  Specifically, to demonstrate that she relied on counsel, she would

need to show that she: "(1) made a complete disclosure to counsel; (2) requested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." Zacharias v. SEC, 569 F.3d 458, 467 (D.C. Cir. 2009) (internal quotation marks and citation omitted).  She has offered nothing more than an unsupported assertion in her brief that counsel informed her that the 10-K filings were "adequate."  This does not suffice.

The Court also notes that such a defense would seem inapplicable here, given that Grace reviewed and certified the company's 10-Ks, which explicitly acknowledged that its executive officers and directors (among whom Grace was listed) were subject to Section 16(a)'s reporting requirements and that, to the best of the company's knowledge, none of its executive officers and directors had filed the necessary forms.  See 2006 10-KSB at 38; 2007 10-K at 41-42.

Because the material facts related to this count are undisputed, summary judgment in favor of the SEC is warranted.  See, e.g., Verdiramo, 890 F. Supp. 2d at 273 (granting SEC summary judgment on § 16(a) claim); Sierra Brokerage Services, Inc., 608 F. Supp. 2d at 954-57 (same).

B.  Count VII: Aiding and Abetting Violations

Section 20(e) of the Exchange Act gives the SEC the power to prosecute those who aid and abet violations of federal securities laws.  See 15 U.S.C. § 78t(e).  To establish liability for this type of violation, the SEC must prove: "(1) that a principal committed a primary violation; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor had the necessary 'scienter' . . . ."  See Graham v. SEC, 222 F.3d 994, 1000 (D.C. Cir. 2000).  There has been some debate about the type of *scienter* required to hold individuals liable under Section 20(e).  For instance, although Graham held that knowing or

reckless conduct would suffice to establish aiding-and-abetting liability, another court in this jurisdiction has pointed out that <u>Graham</u> addressed aiding and abetting in an administrative action and that, prior to 2010, the express statutory language of Section 20(e) stated that those who "knowingly" provided substantial assistance to securities violations were liable.  <u>See</u> <u>SEC v. Johnson</u>, 530 F. Supp. 2d 325, 332-33 (D.D.C. 2008).  That court, accordingly, required proof of actual knowledge.  <u>See id.</u>  The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 amended the statute, making it clear that knowing <u>or</u> reckless conduct now suffices.  <u>See</u> Pub. L. No. 111-203, § 929O.  Thankfully, the Court need not resolve whether recklessness was sufficient prior to Dodd-Frank, as it finds that Grace knowingly assisted e-Smart's pre-2010 violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), along with their attendant rules.  Each of these three provisions merits a separate analysis.

### 1. *Section 13(a) and Related Rules*

Section 13(a) requires issuers of registered securities to file with the SEC any annual reports, quarterly reports, or information and documents that the SEC may require.  <u>See</u> 15 U.S.C. § 78m(a).  Implementing that requirement, Rules 13a-1, 13a-11, and 13a-13 command issuers of registered securities to file annual (Form 10-K), current (Form 8-K), and quarterly (Form 10-Q) reports.  <u>See</u> 17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13.

Here, the Commission provides evidence that e-Smart did not file annual (10-K) reports for 2008, 2009, 2010, 2011, 2012, or 2013, and that it also did not file reports for any quarter ending after September 30, 2007.  <u>See</u> EDGAR Search Results at http://www.sec.gov/cgi-bin/browse-edgar?company=e-smart&owner=exclude&action=getcompany.  As Grace points out in her Opposition, the Commission revoked e-Smart's registration under Section 12(g) on January 23, 2012.  <u>See</u> Opp. at 38; Order Revoking Registration, <u>available at</u>

http://www.sec.gov/Archives/edgar/data/1112999/999999999712006081/filename1.pdf.  This

would seem to have ended e-Smart's reporting obligations as an issuer of securities registered

pursuant to Section 12, <u>see</u> 15 U.S.C. § 78m(a), although the company may still have been

subject to Section 13(a)'s reporting requirements pursuant to Section 15(d) of the Exchange Act.

<u>See</u> 15 U.S.C. § 78o(d).  The Court need not dwell on this issue without the aid of briefing,

however, because it is clear that, in any event, the company failed to file numerous required

reports for the years and quarters preceding its registration revocation.  These failures

unquestionably violated Section 13(a), as well as Rules 13a-1 and 13a-13.

As if that were not enough, the Commission also provides evidence that the reports e-

Smart did file were often submitted long after the applicable deadlines.  For instance, the

company's 10-Ks, which it filed as a smaller reporting company, <u>see</u> 2006 10-KSB; 2007 10-K

at 2, were due within 90 days after the close of each fiscal year.  <u>See, e.g.</u>, Form 10-K, General

Instructions, <u>available at</u> https://www.sec.gov/about/forms/form10-k.pdf; Revisions to

Accelerated Filer Definition and Accelerated Deadlines for Filing Periodic Reports, Release No.

33-8644 (Dec. 21, 2005).  But e-Smart did not file its 10-KSB for the fiscal year ending

December 31, 2006, until many months after the deadline, on October 24, 2007.  <u>See</u> 2006 10-

KSB at 47.  E-Smart was even more delinquent in filing its 10-K for the fiscal year ending

December 31, 2007 – it did not file it until May 27, 2009, fourteen months after it was due.  <u>See</u>

2007 10-K at 51.  These late filings thus also violated Section 13(a) and Rule 13a-1.  <u>See</u> 17

C.F.R. § 240.13a-1 ("Annual reports shall be filed within the period specified in the appropriate

form.");  <u>see also</u> <u>Savoy Indus.</u>, 587 F.2d at 1165 (reporting requirements "are satisfied only by

the filing of complete, accurate, and <u>timely</u> reports") (citation omitted and emphasis added); <u>SEC</u>

<u>v. IMC Intern., Inc.</u>, 384 F. Supp. 889, 893 (N.D. Tex. 1974) (company violated reporting

requirements of § 13(a) by not filing timely annual and quarterly reports); <u>SEC v. Beisinger</u>

<u>Indus. Corp.</u>, 421 F. Supp. 691, 695 (D. Mass. 1976) ("The failures to provide timely reports . . .

are offensive to the central purpose of the periodic reporting system Congress established

through the Exchange Act.  For the system to work properly the information reported must be

both current and adequate.").

 The evidence further shows that Grace provided substantial assistance with respect to e-

Smart's violations.  As CEO, she bore significant responsibility for the company's SEC filings.

<u>See, e.g.</u>, 17 C.F.R. § 240.13a-14(a) (requiring issuers' principal executives to review and certify

reports); <u>id.</u>, § 240.13a-14(c) (prohibiting principal executives from having certifications signed

on their behalf).  Yet she did not provide the resources or oversight to ensure that e-Smart

prepared and submitted reports on time.

 Grace was also clearly aware of the company's duty to file annual reports.  E-Smart had

previously filed yearly reports that she reviewed and certified.  <u>See, e.g.</u>, 2006 10-KSB.  Other

events also alerted her to this duty.  For instance, e-Smart's Board of Directors wrote to Grace in

January 2009, warning her of its members' intention to resign because of her failures to

adequately oversee the company.  <u>See</u> Mot., Att. 34 (Letter from Charles R. Black, *et al.* to

Grace, Jan. 12, 2009).  Among other things, the Board noted:

> [W]e have repeatedly cautioned you that the Company must devote
> all of the resources necessary to address . . . important issues faced
> by the Company, including the need to cooperate fully with the
> Securities and Exchange Commission ("SEC") in connection with
> its investigation of e-Smart, and to bring all of the Company's SEC
> filings current and to ensure that they remain current.

<u>Id.</u> at 1.  The letter again urged that "[a]dequate resources must be devoted to the assurance that

the Company's SEC filings are brought into full compliance."  <u>Id.</u> at 2.  Despite this strongly

worded admonition, e-Smart, with Grace at the helm, continued to neglect these reporting

14

requirements.  Indeed, aside from the 2007 10-K that was filed in May 2009, e-Smart did not file another report after this letter.

The Commission is, therefore, entitled to summary judgment against Grace on the ground that she knowingly aided and abetted e-Smart's violations of Section 13(a), along with Rules 13a-1 and 13a-13.

### 2.  *Section 13(b)(2)(A)*

Section 13(b)(2)(A) requires every issuer of registered securities to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer."  15 U.S.C. § 78m(b)(2)(A). "Reasonable detail" is defined as the "level of detail . . . [that] would satisfy prudent officials in the conduct of their own affairs."  15 U.S.C. § 78m(b)(7).  The provision "has three basic objectives: (1) books and records should reflect transactions in conformity with accepted methods of reporting economic events, (2) misrepresentations, concealment, falsification, circumvention, and other deliberate acts resulting in inaccurate financial books and records are unlawful, and (3) transactions should be properly reflected on books and records in such a manner as to permit the preparation of financial statements in conformity with [generally accepted accounting principles] and other criteria applicable to such statements."  SEC v. World-Wide Coin Investments, Ltd., 567 F. Supp. 724, 748 (N.D. Ga. 1983) (citation omitted).  Its purpose "is to strengthen the accuracy of records and the reliability of audits."  Id. at 749.

The Court need not address all of the claimed deficiencies in e-Smart's books and records because it finds that the company's concealment of a convertible-loan scheme to sell unregistered securities resulted in inaccurate financial books and records.  As explained in this Court's Opinion on the SEC's First Motion for Summary Judgment, Grace and others operated

such a scheme from 2005 to 2007 to sell unregistered shares of e-Smart stock.  See 2014 WL 6612422, at *13-16.  Under the scheme, "lenders" provided short-term loans to Intermarket and IVI, which in turn offered restricted shares of e-Smart stock as collateral.  When the loans went into default – the inevitable and intended outcome – the lenders could convert the notes to e-Smart stock at below-market rates.  Grace would then authorize e-Smart's transfer agent to issue unrestricted shares to the lenders on the basis of opinion letters from Maranda Fritz, e-Smart's outside counsel.  Later, e-Smart would issue IVI and Intermarket enough restricted shares to maintain the companies' respective ownership percentages.  As a result of this scheme, e-Smart distributed millions of unregistered, free-trading shares.  See id. at *13.

This scheme necessarily distorted e-Smart's books.  For instance, in its 2007 10-K, the company reported that it had issued 113,102,557 shares to IVI and Intermarket's creditors for the loans, the proceeds of which were used as "working capital" for e-Smart and IVI.  See 2007 10-K at 31.  According to the 10-K, IVI and e-Smart had agreed to count the value of the shares it distributed on behalf of those companies ($6,740,157) as payments for license fees that e-Smart owed to IVI.  See id.  But as discussed above and in this Court's prior Opinion, these transactions were, in fact, disguised sales of e-Smart stock.  Its books and records, therefore, in no way "accurately and fairly" reflected the nature of e-Smart's transactions or the disposition of its assets.  See SEC v. Black, No. 04-7377, 2008 WL 4394891, at *15 (N.D. Ill. 2008) (finding on summary judgment that § 13(b)(2)(A) was violated where payments were incorrectly characterized in company's 10-K).

Grace also knowingly provided substantial assistance to this falsification of e-Smart's books.  She was heavily involved in the loan scheme, see E-Smart II, 2014 WL 6612422, at *15-16, and knew that this depiction of the transactions and their accounting on e-Smart's books did

not reflect reality.  See id. at *14.  Indeed, in a June 2006 e-mail to e-Smart's Board of Directors about fundraising, Grace had explained, in an apparent reference to the $0.10-share conversion rate under the loan scheme, that "there [wa]s not a shortage of shareholders who would buy stock at $.10," because "[t]he market [wa]s at $0.12."  Id. (citation omitted and emphasis added).  As CEO and CFO of e-Smart, she knowingly allowed this improper accounting to stand.

Her only response to the SEC's allegations about the company's books and records is to maintain that outside auditors prepared and confirmed the company's financial statements.  See Opp. at 38.  She does not, however, provide any evidence regarding the representations that were made to outside auditors about the loan transactions.  She has therefore failed to show that the auditors certified the accounting of the loans with an accurate understanding of the transactions.

The Court thus finds that e-Smart violated Section 13(b)(2)(A) and that Grace aided and abetted these violations with *scienter*.  See SEC v. Monterosso, 768 F. Supp. 2d 1244, 1270 (S.D. Fla. 2011) (granting summary judgment to SEC on claim that defendants aided and abetted § 13(b)(2)(A) violation where defendants falsified invoices).

### 3. *Section 13(b)(2)(B)*

Section 13(b)(2)(B) requires issuers to develop and maintain adequate internal controls over financial reporting.  More specifically, issuers must have internal accounting controls that provide "reasonable assurances" that (1) "transactions are executed in accordance with management's general or specific authorization; (2) transactions are recorded "as necessary . . . to permit the preparation of financial statements in conformity with generally accepted accounting principles" and "to maintain accountability for assets"; (3) "access to assets is permitted only in accordance with management's general or specific authorization"; and (4) "the recorded accountability for assets is compared with existing assets at reasonable intervals and

appropriate action is taken with respect to any differences."  15 U.S.C. § 78m(b)(2)(B)(i)-(iv).  A

"reasonable" degree of assurance is one that "would satisfy prudent officials in the conduct of

their own affairs."  15 U.S.C. § 78m(b)(7).  "Examples of internal controls include manual or

automated review of records to check for completeness, accuracy and authenticity; a method to

record transactions completely and accurately; and reconciliation of accounting entries to detect

errors."  McConville v. SEC, 465 F.3d 780, 790 (7th Cir. 2006).  Here, the Commission argues

that the company lacked virtually any internal accounting controls to ensure that its financial

records and reports were accurate and to ensure that corporate assets were not misappropriated.

It has marshaled substantial evidence in support of these claims.

To begin, the company conceded that it had numerous internal-control failings when it

filed its 2007 10-K in May 2009.  See 2007 10-K at 35-38.  Those admitted weaknesses included

the following:

- "Many of the stock transactions lacked proper indication of issuance, cancellation, or

  redemption."

- "[T]he Company's board minutes [we]re not always current."

- "[S]ignatures were missing on most of the [board] minutes, and the ones that were

  signed were frequently signed several months after the date of the appropriate

  meeting."

- The company "d[id] not have a formal policy regarding employee conflicts of

  interest," and having such a policy was "especially important considering the

  magnitude of related part [*sic*] transactions."

- There was poor communication among staff and outside consultants and "[o]ften times, this included frequent misunderstandings that led to significant inaccurate information."

- There were "several instances where loans were made or received without a signed loan agreement or having a note payable prepared and executed as appropriate evidence."

- "Th[e] Company d[id] not have regular board meetings."

- The accounting staff needed "adequate training to become familiar with the necessary procedures to complete the year-end accounting."

- The accounting process "lack[ed] a higher-level supervisory or review function typically performed by a Chief Financial Officer (CFO) or equivalent."

- "During [the] audit process, [the company] encountered inconsistencies in the supporting schedules of the following: fixed assets, inter-company accounts, and equity transactions."

2007 10-K at 37-38.

It is also clear that these were not new problems. Indeed, the lack of internal controls at e-Smart was evident at least as early as the beginning of 2007. At that time, e-Smart's outside auditor, Horowitz & Ullmann, provided the company's officers with a memo containing the firm's observations regarding a lack of controls and providing recommendations about policies and procedures that the company could implement. See Mot., Att. 20 (Auditor Control Recommendations); see also Att. 7 (Deposition of Stewart Hung) at 52:23-59:5. This memo highlighted, among other things, that "[m]anagement is dominated by one person, the CEO, who unilaterally makes the decisions for the Company." Auditor Control Recommendations at 1.

The CEO also "control[led] the bank accounts." Id.  These circumstances created an ability, on

the part of management, "to override controls," which elevated the risk of fraud, including the

risk that assets would be misappropriated and the risk of fraudulent financial reporting.  Id.  On a

related note, the memo noted "a significant lack of segregation of duties . . . with respect to the

management of the Company's funds," as "[t]he CEO [wa]s the sole signatory on most, if not all,

of the Company's bank accounts" and "ha[d] the ability to disburse Company funds to any

individual or business without receiving any authorization from other members of management."

Id.  Other observations included "a lack of controls with respect to the accumulation of proper

documentation to support the Company's disbursements," "a lack of controls with respect to the

segregation of personal and business expenses," the lack of an independent audit committee, the

"relatively inactive role" that the Board played in the company, and "a lack of controls . . . with

respect to the recording and reconciling of the issuance of common stock."  Id. at 1-2.

        Other evidence that the SEC offers further demonstrates that the company lacked basic

controls, particularly with respect to stock issuances.  For instance, the outside auditors found

that the company would issue more shares than were authorized.  In November 2007, Stewart

Hung, one of e-Smart's outside auditors, wrote to Anthony Russo, e-Smart's accountant, stating:

> I see that you have a huge problem with the shares.  By the end of
> March 2007, you have over 498M shares issued.  But you are only
> authorized to issue 490M in common shares.  To date you have
> 753M share [*sic*] issued, but only authorized for 730M in common
> shares.
>
> These are seriously [*sic*] problem that you need to get [Grace] in
> the office to discuss face-to-face.  I will have a lot of issues with
> the numbers as well as the dollar value.  Even at the price of $.03,
> she has to account for over 7.6M in cash just in the first quarter
> alone.

Att. 24 (E-mail from Stewart Hung to Tony Russo (Nov. 16, 2007, 6:08 PM)); Hung Dep. at

94:4-95:4.  Outside auditors were also frequently forced to seek additional information about

stock issuances because they did not receive adequate supporting documentation and because the

company would report stock issuances as canceled when they had not been.  See Mot., Att. 29

(E-mail from Russell Greenblatt to Tony Russo (July 18, 2008, 4:51 PM)) at 1.  Those auditors

even wrote to e-Smart's Board in July 2008 to call its attention to 195,000,000 shares issued to

employees, consultants, directors, and others – amounting to approximately $13,400,000 charged

against the company's income – that did not appear to have been approved by the Board.  See

Mot., Att. 30 (Letter from Stewart Hung, CPA, Horowitz & Ullman, P.C. to "The Board of

Directors," July 30, 2008) at 1.

　　　Those inside the company similarly expressed concerns that e-Smart had significant

problems documenting Grace's share issuances and that many of those issuances involved

possible conflicts of interest.  For instance, Russo testified that Grace issued millions of e-Smart

shares to family members and others, such as a woman who watched her apartment in

Manhattan, without documentation.  See Mot., Att. 9 (Deposition of Anthony Russo) at 61:17-

63:5.  According to him, "She kept insisting they provided the company with services," but no

documentation was provided to that effect – it was "just her word."  Id. at 62:17-63:5.  E-Smart's

long-time outside counsel Maranda Fritz also wrote a letter to the company's Board in August

2008, disclosing a host of concerns about e-Smart's management and controls, including that:

> Grace ha[d] continuously caused the issuance of substantial
> quantities of e-Smart stock to companies or entities controlled by
> her and to family members.  Those hundreds of thousands of
> shares ha[d] been issued without any contemporaneous
> documentation or authorization and under circumstances which
> involve[d] substantial conflicts of interest, appear[ed] to lack
> substance or adequate consideration, and generally redound[ed] to
> the substantial detriment of the public company.

21

Mot., Att. 33 (Letter from Maranda Fritz to David B. Deitch, Aug. 7, 2008) at 2.[1]

To be fair, the 2007 10-K, filed in May 2009, did claim that management was "in the process of implementing remediation efforts with respect to the material weaknesses." Id. at 38. It stated, for instance, that the company had hired "an assistant controller in the New York office as well as an outside accounting firm to supervise the [accounting] department and to work with them to improve the quarter-end and year-end accounting procedures." Id.  The executive secretary in New York had also been assigned the task of maintaining proper Board minutes. Other planned efforts included making "a concentrated effort . . . to assure the board minutes are signed timely," "implementing a policy of monthly board meetings with appropriate minutes signed in a timely matter [sic]," developing a "formal policy regarding employee conflicts of interest drafted and implemented in 90 days," and considering the development of a formal audit committee. Id. at 38-39.

These remediation efforts, while commendable in theory, only highlight that e-Smart had significant and longstanding internal-control problems.  The Court notes, additionally, that they did not address many of e-Smart's shortcomings, including, for example, that Grace solely controlled e-Smart's accounts or that transactions frequently lacked documentation.  And aside from submitting evidence that an outside accounting firm was retained to help straighten out e-Smart's books, Grace has not shown that the remainder of the proposed efforts were implemented or that they remedied the deficiencies.

---

[1] Grace submits evidence that Fritz wrote this letter shortly after she was terminated as e-Smart's counsel, suggesting the potential that the assertions were biased.  See Opp., Statement of Facts, Part 2A, ECF No. 452-1, at 51-55.  The concerns expressed in Fritz's letter, however, are consistent with the SEC's other evidence, and Grace does not submit any evidence to contradict the claim that she issued shares without prior authorization or documentation in situations involving conflicts of interest.

Grace's Opposition, in fact, does not mention the company's internal controls. Even had she relied on the outside-auditor certifications here, as she did with respect to the books-and-records issue, <u>see</u> Opp. at 38, the Court finds that those certifications do not create a material dispute as to whether the company satisfied its obligations under Section 13(b)(2)(B). For one thing, e-Smart conceded that it had extensive problems with respect to its internal controls. For another, the auditors' certifications were of the company's financial statements and did not appear to address the adequacy of e-Smart's controls. The auditor certification in the 2007 10-K, for instance, specifically stated that the firm had not been "engaged to perform[] an audit of [e-Smart's] internal controls over financial reporting," and that it expressed no opinion on their effectiveness. <u>See</u> 2007 10-K at 19. Horowitz & Ullmann's certifications of the 2005 10-KSB/A and the 2006 10-K, additionally, made no mention of the company's controls, and Grace does not offer any evidence that the firm was retained to evaluate them. <u>See</u> 2005 10-KSB/A at 32; 2006 10-KSB at 21.

In her Statements, Grace disputes that she had "exclusive control" over e-Smart's business and financial matters, arguing that she obtained approval from the Board of Directors. In support, she offers a series of unsigned minutes from Board meetings, <u>see</u> Statement of Facts, Part 2A, ECF No. 452-1, at 6-22, and a handful of e-mails and snippets of testimony indicating that the Board reviewed the 2006 10-K and ratified stock issuances. <u>See</u> <u>id.</u> at 37, 61. Whether the Board subsequently ratified some of her decisions, however, is immaterial. As noted previously, the company conceded in its 2007 10-K that it had numerous control problems (including the relative inactivity of its Board). The fact that the Board may have subsequently approved the issuance of stock does not speak to many of the control problems that were identified, such as the lack of documentation for loans and stock issuances, the lack of training

and supervision for the "accounting department," and the lack of systems to identify

inconsistencies in the company's financial records prior to the outside auditing process.  It is

highly ironic that Grace submits unsigned Board minutes as evidence of internal controls when

e-Smart listed as one of its weaknesses the fact that Board minutes were often not current and

that most lacked signatures.  In sum, it is clear that e-Smart violated Section 13(b)(2)(B)'s

mandate to develop, implement, and maintain a system of internal controls.

It is likewise clear that Grace substantially assisted these violations.  She was e-Smart's

CEO and CFO and, consequently, bore special responsibilities with respect to the company's

internal controls.  See, e.g., 15 U.S.C. § 7241; 17 C.F.R. § 240.13a-14.  Yet she failed to adopt

policies and procedures to ensure that transactions were appropriate and that improper or poorly

documented transactions were quickly remedied.  Many of the shortcomings in the company's

internal controls, furthermore, related specifically to Grace's conduct.  As an example, she was

largely, if not solely, responsible for the stock issuances that lacked supporting documentation.

See, e.g., Hung Dep. at 94:23-95:4 (Grace was the only person who authorized the issuance of

shares); Russo Dep. at 81:22-82:3; 88:10-93:2 (the stock-transfer agent only took direction from

Grace, and she was responsible for the issuance of shares without documentation).

Grace also clearly knew that the company lacked essentially all forms of internal

controls.  She was, after all, the source of the problems: she regularly issued stock without

adequate supporting documentation, see, e.g., Russo Dep. at 61:17-63:5; she served on the

Board, which rarely met and rarely signed off on the minutes; she was the Chief Financial

Officer and could see that the accounting department was not adequately supervised; and she

knew that outside auditors frequently had trouble reconciling e-Smart's transactions.  See, e.g.,

E-mail from Russell Greenblatt to Tony Russo (July 18, 2008, 4:51 PM); Letter from Hung to "The Board of Directors," July 30, 2008.

She also signed certifications of the 10-K reports, which stated that she had evaluated the company's internal controls over financial reporting, thus indicating that she was aware of the need to have and maintain internal controls.  See, e.g., Certification of 2006 10-KSB.  She repeatedly claims in her Opposition that others affixed her signatures to these documents and that she never reviewed them. See, e.g., Opp. at 14.  The Court finds such assertions troubling coming from the person whom the securities laws expressly tasked with reviewing and certifying those documents.  See 17 C.F.R. § 240.13a-14(c) ("A person required to provide a certification . . . may not have the certification signed on his or her behalf pursuant to a power of attorney or other form of confirming authority.").  But, more importantly, she does not provide any evidence of this fact.

The Court is mindful that, in general, claims that issuers violated Section 13(b)(2)(B) or that others aided and abetted such violations are not well suited for summary judgment.  Determinations about what is reasonable will often vary from company to company and require "a fact-intensive inquiry."  Black, 2008 WL 4394891, at *15 (citations omitted).  There can be no dispute, however, that e-Smart – led by Grace – failed to establish even basic controls to ensure that the company's dealings were adequately documented and conducted in accordance with appropriate authorization.  Summary judgment in favor of the SEC is therefore warranted.  See McConville, 465 F.3d at 790 (affirming SEC's finding that CFO failed to implement internal accounting controls where company's finance department was in disarray and company's records did not accurately reflect financial transactions).

C.  <u>Count VI: Rule 13a-14 Violations</u>

Rule 13a-14 requires that certain reports, including 10-K reports, be accompanied by

certifications.  <u>See</u> 17 C.F.R. § 240.13a-14.  Specifically, "[e]ach principal executive and

principal financial officer of the issuer . . . must sign a certification," <u>id.</u>, that "based on the

officer's knowledge, the report does not contain any untrue statement of a material fact or omit

to state a material fact."  15 U.S.C. § 7241(a)(2).  They must also state that "based on such

officer's knowledge, the financial statements, and other financial information included in the

report, fairly present in all material respects the financial condition and results of operations of

the issuer."  <u>Id.</u>, § 7241(a)(3).

As this Court noted in its Opinion on Grace's Motion to Dismiss, there is some

disagreement among courts regarding whether the SEC may bring actions for violations of Rule

13a-14.  <u>See</u> <u>E-Smart I</u>, 31 F. Supp. 3d at 86 (citing <u>SEC v. Brown</u>, 740 F. Supp. 2d 148, 164

(D.D.C. 2010)).  The Court declined to decide the issue at that time, since Grace did not

challenge the SEC's right to bring such a claim.  <u>Id.</u> at 87.  Now that the Commission moves for

summary judgment, the Court cannot defer judgment on the issue any longer.

Based upon a review of the applicable statutes, rule, and caselaw, it is ultimately

persuaded that the SEC may bring such actions.  As another court in this jurisdiction explained,

the Commission is empowered, under Section 21(d)(1) of the Exchange Act, to bring civil-

enforcement actions to enjoin violations of Title 15 and the rules and regulations promulgated

under it.  <u>See</u> <u>Brown</u>, 740 F. Supp. 2d at 165 (citing 15 U.S.C. § 78u(d)(1)).  This includes Rule

13a-14.  Courts have, accordingly, "routinely permitted" such claims when brought by the SEC.

<u>Id.</u> at 164-65 (collecting cases).  The Court therefore considers the Commission's claim that

Grace violated the Rule by knowingly certifying filings that were false or contained material omissions.

The SEC bases its Rule 13a-14 claim here on Grace's certifications of the company's annual 10-K reports.  <u>See</u> Mot. at 8; <u>see also</u> Mot., Att. 17 (Certification of 2005 10-KSB/A); Att. 15 (Certification of 2006 10-KSB); Att. 16 (Certification of 2007 10-K).  According to the Commission, the Amended 2005 and 2006 10-KSBs materially misrepresented the state of the company's technology.  <u>See</u> Mot. at 8.  Those two reports, the SEC claims, also omitted material financial information by failing to disclose that the company was paying Grace's personal expenses and by failing to disclose the amount of those expenses.  <u>See</u> <u>id.</u>  Finally, it argues that she stated in the certifications that she had reviewed the company's internal controls over financial reporting and determined that they were effective when she knew full well that the company lacked meaningful controls.  <u>See</u> <u>id.</u>  The Court will address these arguments in reverse order.

1. *Effectiveness of Internal Controls*

In rather cursory fashion, the Commission argues that Grace certified that the company's internal controls were effective when she knew that they were not.  Although it is not clear from the agency's Motion, this argument clearly pertains only to the 2005 Amended 10-KSB and the 2006 10-KSB since the company disclosed in its 2007 10-K that Grace had found e-Smart's internal controls wanting.  <u>See</u> 2007 10-K at 35-36.  Looking, then, at Grace's certifications of the company's 2005 10-KSB/A and 2006 10-KSB, which stated that e-Smart had effective internal controls for financial reporting during those fiscal years, <u>see, e.g.</u>, 2006 10-KSB at 32, the Court finds that it cannot conclude, as a matter of law, that she signed the certifications knowing at the time that they were false.

This may seem to be an odd result in light of the Court's detailed finding above that e-Smart lacked internal controls and that Grace was aware of those deficiencies.  But the evidence that the SEC has presented on these issues relates almost exclusively to 2007 and onward – that is, after the time period that the 10-Ks address.  At a hearing on this Motion, the SEC argued that this evidence is relevant to fiscal years 2005 and 2006 because the internal-control issues were not the types that just happen to arise.  The SEC might be right.  The Court, however, cannot find as a matter of law that this is so.

2. *Grace's Personal Expenses*

In a similarly perfunctory manner, the SEC contends that Grace violated Rule 13a-14 by certifying the Amended 2005 10-KSB and the 2006 10-KSB even though those filings omitted material financial information.  The only specific omission noted in the agency's brief is that the reports did not "disclose[] that e-Smart was paying Grace's business <u>and</u> personal expenses, much less the amount of those expenses."  Mot. at 8.  The Commission does not explain its precise theory for why that information should have been disclosed.  The Court assumes that the agency believes such disclosure was necessary because companies are required to include a "clear, concise and understandable disclosure" of any compensation "awarded to, earned by, or paid to" certain executive officers, including the principal executive officer.  <u>See</u> 17 C.F.R. § 229.402(a)(2)-(3).  If the company was paying Grace's personal expenses on top of her reported salary of $250,000, then it would need to disclose the amount of those expenses as additional compensation.

The problem is that there appear to be disputes of material fact with respect to whether Grace's personal expenses were reportable "compensation."  The 2007 10-K, in which the company first divulged that it covered her personal expenditures, stated that "[e]xpenses deemed

to be strictly personal and unrelated to business by the companies' management are deducted from the total deferred compensation owed Ms. Grace by the respective companies." 2007 10-K at 31. She additionally provides testimony from Anthony Russo, the company's accountant, that over two fiscal periods in 2005 and 2006, "detailed tests" were conducted to determine that approximately 23% of Grace's expenses were personal, and that the company used that percentage to calculate the amount of expenses that should be subtracted from her deferred compensation. See Opp., Statement of Facts Part 1A, ECF No. 435-1, at 41-42; Unnumbered Att. (Deposition of Anthony Russo), ECF No. 448-1, at 69:3-22. Hung also stated that when the auditors could not identify some of her expenses as "legitimate business expense[s]" or when they appeared "personal in nature," they reclassified them as compensation. See Opp., Statement of Facts Part 1A, ECF No. 435-1, at 3. Based on this, the Court cannot conclude that the 2005 Amended 10-KSB and 2006 10-KSB materially misrepresented her compensation when they stated that "the aggregate compensation paid to, accrued by or set aside for" Grace was $250,000. See 2005 10-KSB/A at 55, available at http://www.sec.gov/Archives/edgar/data/ 1112999/000119312507095481/d10ksba.htm; see also 2006 10-KSB at 39.

Assuming, alternatively, that the Commission believes this type of arrangement should have been disclosed regardless of whether the expenses were additional compensation, the Court cannot conclude as a matter of law that this omission was material. As noted above, Rule 13a-14 requires officers to certify that a filing does not contain material misrepresentations or omissions. For information to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (internal

quotation marks omitted); see Media General, Inc. v. Tomlin, 387 F.3d 865, 869 (D.C. Cir.

2004).  In other words, facts are material if a reasonable investor would find them "important."

SEC v. Steadman, 967 F.2d 636, 643 (D.C. Cir. 1992) (citing Basic Inc., 485 U.S. at 231-32).

Because materiality is a mixed question of law and fact, it is often difficult to resolve such issues

on summary judgment.  See TSC Indus., 426 U.S. at 450 ("Only if the established omissions are

'so obviously important to an investor, that reasonable minds cannot differ on the question of

materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by

summary judgment.") (quoting John Hopkins Univ. v. Hutton, 422 F.2d 1124, 1129 (4th Cir.

1970)); Media General, 387 F.3d at 869 ("Whether alleged misrepresentations or omissions are

material under the securities laws is a mixed question of law and fact that is particularly well

suited for jury determination.").  Here, it seems that reasonable minds could disagree as to

whether investors would find it important that a company was paying its executive $250,000 in

cash versus $250,000 through some combination of cash and reimbursements for personal

expenses.  The Court, accordingly, finds that it cannot grant summary judgment on this basis.

### 3.  *The State of E-Smart's Technology*

Finally, the Commission suggests that Grace violated Rule 13a-14 by certifying e-

Smart's 10-Ks even though she knew that they contained material misrepresentations about the

company's technology.  See Opp. at 8.  On this issue, it relies primarily on the arguments and

facts laid out in its First Motion for Summary Judgment, where it contended that Grace had also

violated Section 10(b) of the Exchange Act and Rule 10b-5 as a result of those

misrepresentations.  In resolving that First Motion, the Court did not reach this complex

technical issue because it found that she had violated Section 10(b) and Rule 10b-5 as a result of

her statements in the 2008 Samsung-contract press release.

The Court remains loath to enter this thicket now, before ruling on the SEC's Motion for Summary Judgment against Saito, which concerns similar and related technological issues. The Court, accordingly, feels that it is more prudent and efficient to deny summary judgment at this time on this asserted basis for Rule 13a-14 violations. It does so without prejudice, leaving open the possibility of revisiting this claim after it rules on the SEC's Saito Motion.

The Court, consequently, denies summary judgment on Count VI.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant the SEC's Second Motion for Summary Judgment against Grace on Counts V and VII of its Amended Complaint, and deny that Motion as to Count VI. A contemporaneous Order will so state.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  February 12, 2015