**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No.  11-895 (JEB) |
| E-SMART TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

This long-running case features a civil-enforcement action brought by the Securities and

Exchange Commission, alleging that e-Smart Technologies, Inc., a public company, was a sham.

While it purported to be at the cutting edge of developing and manufacturing a biometric "smart"

card, such claims, according to the Commission, were pie in the sky.  In fact, *pro se* Defendants

Mary Grace (the company's CEO) and Tamio Saito (its Chief Technology Officer) repeatedly

misrepresented the cards' capabilities to investors.  This Court, having granted summary

judgment to the SEC on most of its claims against Grace, turns now to its allegations concerning

Saito.

The Commission moves for summary judgment on both counts asserted against him –

namely, that (1) he violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-

5 by making material misrepresentations in connection with the sale of securities, and that (2) he

violated Section 16(a) of the Act by failing to file required ownership statements.  Saito both

opposes and cross-moves for summary judgment on these claims.  Resolution of these motions,

in turn, requires the Court to rule on the parties' dueling independent motions to exclude the

others' expert reports. Having waded through the extensive submissions – including Saito's, which are particularly resistant to sensible interpretation – the Court ultimately believes that the SEC has proven its case. It will thus grant the Commission's Motion for Summary Judgment and deny Saito's.

## I.     Background

This Court has already described much of the relevant background of this case in previous lengthy Opinions. See SEC v. e-Smart Technologies, Inc. (E-Smart I), 31 F. Supp. 3d 69, 74-78 (D.D.C. 2014); SEC v. e-Smart Technologies, Inc. (E-Smart II), No. 11-895, 2014 WL 6612422, at *1-4 (D.D.C. Nov. 21, 2014); SEC v. e-Smart Technologies, Inc. (E-Smart III), No. 11-895, 2015 WL 583931, at *1-2 (D.D.C. Feb. 12, 2015). It therefore summarizes only the basic underlying facts here and sets out more details where relevant in the subsequent analysis. See Section III, infra. In so doing, the Court is aware that, on a motion for summary judgment, it must view the facts in the light most favorable to the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). As explained more fully later on, however, the filings Saito has styled "Statements of Fact" are an often-impenetrable pastiche of passages from emails, reports, and unidentified documents interspersed with commentary. As a result, to summarize the relevant background, the Court draws primarily from undisputed documents and its prior Opinions.

E-Smart was a publicly traded company "engaged in the business of creating, marketing, manufacturing, installing, operating and maintaining biometric identification verification systems." Pl. Mot., Att. 1 (2006 10-KSB) (ECF No. 388-4) at 3. According to its public filings, its "core technology" was a "state-of-the-art Super Smart Card and Biometric Verification System . . . designed to accomplish immediate, local recognition of a person's fingerprint." Id. at

4.  Key to e-Smart's card was "an on-board biometric matching engine," which enabled it to "perform identification verification without reference to any external database." Id.  According to e-Smart, this technology could be applied in a variety of contexts – such as banking or security access – to verify people's identities and protect personal information contained on, or accessed by, the cards. Id.  This, e-Smart claimed, represented a unique and highly lucrative technology. In representations to investors, it claimed to be "the first . . . [and] only company offering a commercially available [contact] . . . and . . . [wireless] . . . smart card with a fingerprint sensor onboard, biometric matching engine onboard and a multi-application processor . . . ." Id. at 5.

Notwithstanding these reported achievements, the company struggled to stay afloat.  It had little revenue and depended continuously on investors for more funds.  See E-Smart III, 2015 WL 583931, at *2.  E-Smart frequently assured such investors that significant contracts and investments were just around the corner, and its press releases echoed this theme.  Id.  The purported contracts and investments almost never seemed to materialize, however, and many investors later felt that they had been deceived.  Id.

Agreeing, the SEC brought this civil-enforcement action on May 13, 2011, against several Defendants including e-Smart and its CTO, Tamio Saito.  Id.  The crux of the SEC's Complaint against Saito is that, in his role as the principal architect of e-Smart's technology, he repeatedly lied about the actual capabilities of any product that e-Smart had produced.  Although he claimed that the company had a highly functional smart card that was ready for commercial deployment, e-Smart had in fact only developed a prototype that did not even work as promised. Based on these allegedly false statements, the Commission claims that Saito violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by making material misrepresentations in connection with the sale of securities.  See First Am. Compl. (ECF No.

169), ¶¶ 113-15.  It also alleges that he violated Section 16(a) of the Act by failing to file certain required ownership statements.  See id., ¶¶ 127-29.

As a remedy, the SEC seeks disgorgement and civil penalties.  See id. at 30-31 (Prayer for Relief).  It also seeks an injunction prohibiting Saito from participating in penny-stock offerings, serving as an officer or director of certain issuers of securities, and engaging in further securities violations.  Id.  As mentioned previously, the Court has already granted summary judgment to the SEC on the lion's share of counts related to CEO Mary Grace.  See E-Smart II, 2014 WL 6612422; E-Smart III, 2015 WL 583931.  It is now Saito's turn in the spotlight.

## II.    Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Liberty Lobby, 477 U.S. at 247-48; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v.

Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).  On a motion for summary

judgment, the Court must "eschew making credibility determinations or weighing the evidence."

Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).  The non-moving party's opposition,

however, must consist of more than mere unsupported allegations or denials and must be

supported by affidavits, declarations, or other competent evidence, setting forth specific facts

showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e); Celotex Corp. v.

Catrett, 477 U.S. 317, 324 (1986).  The non-movant is required to provide evidence that would

permit a reasonable jury to find in its favor.  Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir.

1987).  If the non-movant's evidence is "merely colorable" or "not significantly probative,"

summary judgment may be granted.  Liberty Lobby, 477 U.S. at 249-50.

## III.  Analysis

Before resolving the substantive issues raised in the parties' Cross-Motions for Summary

Judgment, the Court must attend to two threshold issues: the significant deficiencies in

Defendant's filings and the parties' competing Motions to Strike expert reports.  After clearing

away this underbrush, it will then turn to the SEC's contentions against Saito – namely, that the

undisputed material facts demonstrate that: (1) he violated Section 10(b) of the Securities

Exchange Act of 1934 and Rule 10b-5; and (2) he violated Section 16(a) of the Act.

### A.  Saito's Filings

The Court is once again astonished by the filings in this case.  Defendants have been

warned that pleadings should not "feature every font available in Microsoft Word and every

color in the rainbow, with cut-and-paste e-mails and other outside materials sprinkled throughout

the legal argument without demarcation."  E-Smart I, 31 F. Supp. 3d at 85-86.  "Further filings,"

the Court has stated bluntly, "should satisfy the basic demands of readability."  Id. at 86.  Saito's

filings – whether styled as memoranda, statements of fact, or reports – are, nonetheless, consistent in one thing only: they all ignore this admonition.  Every operative document is a potpourri of excerpted sources, interspersed with legal argument, and arranged in varied colors, fonts, and font sizes.

This presentation renders it difficult for the Court to make the determination that is pivotal on summary judgment – *viz.*, whether a dispute of material fact actually exists.  Under Local Rule 7(h), for instance, an opposition to a motion for summary judgment must "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Such statement "shall include references to the parts of the record relied on to support the statement."  LCvR 7(h)(1).  Instead of addressing the SEC's Statement, however, Saito has produced only his own multi-part "Statement of Undisputed Material Facts" – several often duplicative filings totaling 357 pages of text, diagrams, and photographs.  See ECF Nos. 492-500.  The paragraphs of these filings do not correspond to the SEC's Statement of Undisputed Material Facts.  And the only time they reference the Commission's Statement is when Defendant, intermittently and in a conclusory fashion, states that some pasted passage from another document "proves false" a long list of the SEC's facts.  This format significantly burdens the Court's efforts to determine with any precision the import of the materials he includes – let alone whether they create a dispute. As a result, Saito often leaves the Court guessing at the inferences he would have it draw from his filings.

The deficiencies in Defendant's Statements of Fact could alone warrant the grant of summary judgment in the SEC's favor.  "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are

admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition

to the motion."  LCvR 7(h)(1); see also SEC v. Banner Fund Int'l, 211 F.3d 602, 615-16 (D.C.

Cir. 2000) (upholding district court's grant of summary judgment for SEC because defendant

failed to follow Local Rule 7(h)).  Given this rule, the Court "is not 'obliged to sift through

hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own

analysis and determination of what may, or may not, be a genuine issue of material disputed

fact.'"  Potter v. Dist. of Columbia, 558 F.3d 542, 550 (quoting Twist v. Meese, 854 F.2d 1421,

1425 (D.C. Cir. 1988)); see Jackson v. Finnegan, et al., 101 F.3d 145, 154 (D.C. Cir. 1996).

At bottom, Local Rule 7(h) "embodies the thought that judges 'are not like pigs, hunting

for truffles buried in briefs' or the record."  Potter, 558 F.3d at 553 (Williams, J., concurring)

(quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).  This observation is

especially apt in a case like this, where a hunt through the entire record would prove toilsome

and tedious and any promise of truffles illusory.  The docket is now bloated with hundreds of

entries comprising tens of thousands of pages of documents often simply identified as "errata."

A team of pigs could root around in there for years and find nothing but dirt.

The Court, however, mindful of the impact of granting summary judgment and unwilling

to take such a step lightly, has waded through hundreds of pages of the materials that Saito

submitted in order to give him, as a *pro se* defendant, the widest latitude possible in construing

his response to the SEC's allegations.

B.  Expert Reports

The second threshold issue the Court must address relates to the parties' expert reports.

The SEC's case against Saito hinges in part on the falsity of certain technological claims made in

e-Smart's press releases and filings.  Both parties, accordingly, have marshalled evidence on the

state of e-Smart's science in the form of expert reports, and both have moved to strike the other's

report.

A district court has "'broad discretion in determining whether to admit or exclude expert

testimony.'" United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc., 608 F.3d 871, 895

(D.C. Cir. 2010) (quoting United States v. Gatling, 96 F.3d 1511, 1523 (D.C. Cir. 1996)).

Federal Rule of Evidence 702, which governs the admissibility of such testimony, provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized
> > knowledge will help the trier of fact to understand the
> > evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and
> > methods; and
> > (d) the expert has reliably applied the principles and
> > methods to the facts of the case.

Under Rule 702, trial courts are required to act as gatekeepers who may only admit expert

testimony if it is both relevant and reliable.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S.

579, 589 (1993); Calvetti v. Antcliff, 346 F. Supp. 2d 92, 110-11 (D.D.C. 2004) (describing

"gatekeeping function" of the district court).

Expert testimony is relevant if it will "help the trier of fact to understand the evidence or

to determine a fact in issue."  Fed. R. Evid. 702(a); see also Daubert, 509 U.S. at 591 ("This

condition goes primarily to relevance.  Expert testimony which does not relate to any issue in the

case is not relevant and, ergo, non-helpful.") (internal quotation marks omitted).  The trial judge,

moreover, has "considerable leeway in deciding in a particular case how to go about determining

whether particular expert testimony is reliable."  Kumho Tire Co. v. Carmichael, 526 U.S. 137,

152 (1999); see also Daubert, 509 U.S. at 588 (noting "the liberal thrust of the Federal Rules and

their general approach of relaxing the traditional barriers to 'opinion' testimony" in the context

of expert testimony) (internal quotation marks omitted).  While the way in which "reliability is

evaluated may vary from case to case," United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir.

2004) (*en banc*), in all cases, "[t]he trial judge . . . must find that [the proffered expert testimony]

is properly grounded, well-reasoned, and not speculative before it can be admitted."  Fed. R.

Evid. 702 advisory comm. notes (2000 amend.).

   *1. The SEC's Motion*

   For his part, Saito submitted a report drafted by himself and three other experts, which

the SEC seeks to exclude.  The Commission summarizes its basis for striking:

> [Saito's] report . . . does not even attempt to employ the scientific
> method, and does not in any way fit the relevant issues in this case.
> It is just a mish-mash of record evidence, reports submitted years
> ago in other contexts, and *ipse dixit* opinions from current or
> former e-Smart employees, including . . . Saito.  Moreover, the
> opinions included in the report, to the extent it is even possible to
> determine what those opinions are, are submitted by unqualified
> "experts" and are based upon inadmissible evidence.

See Pl. Mot. to Excl. (ECF No. 434) at 4.

   In the main, the SEC has accurately characterized Defendant's report.  The document

entitled "report" consists of: an index of documents; a short statement by the experts; partial

quotes from reports submitted in other contexts, interlineated with commentary by the current

experts; biographies for individuals, some of whom, it appears, are not being offered as experts;

and a conclusion, which claims that everything the SEC has said about the card is wrong.  See

Def. Exp. Rep. (ECF No. 334-1).  Saito then filed with this report hundreds of documents,

consisting of purported declarations, schematics, emails, and prior reports on unidentified

software and hardware – some of which stand alone, others of which are introduced with a few

sentences of commentary or argument.  See ECF Nos. 334-53.

In the ordinary course, such dizzying and persistent disorganization would warrant exclusion of an information dump like this – especially when proffered as an expert report.  At the summary-judgment stage in a case like this, however, the Court will not take such a drastic step.  Considering Defendant's *pro se* status, and conscious that Saito, perhaps unintentionally, often blurs the lines between expert and fact witnesses, the Court will not exclude the report.  It will, however, consider only the portions of it upon which Saito actually relies in his briefs.  In this respect, although considered, the report is rarely much help to him.

### 2.   *Defendant's Motion*

Believing that what is sauce for the goose is sauce for the gander, Saito also moves to exclude the SEC's report.  To prepare its expert report, the Commission retained R. Michael McCabe of Identification Technology Partners, Inc., a firm that "specializes in the design, development, and testing of secure systems."  See Pl. Mot., Att. 39 (ECF No. 390-10) (Expert Report of IDTP), ¶ 1.  As will be detailed more fully below, e-Smart claimed in 2007 to have a commercially available smart card that was able to accurately identify users through a fingerprint sensor while functioning both wirelessly and on contact.  IDTP was asked to evaluate these claims and did so by reviewing previous test data and deposition transcripts, and by performing tests of its own.  Saito, nonetheless, argues that the report should be stricken on several grounds.

First, he claims that the SEC's experts lack the requisite expertise to opine on the technological issues in this case.  See Def. Mot. to Excl. (ECF No. 541-1) at 37 ("Plaintiff['s] purported Expert Witnesses by their own admission and testimony, are not qualified Expert Witnesses.").  Saito's main lament is that because McCabe and the engineers he worked with – Gerald Smith and Thomas Greiner – are not experts in all aspects of "biometric match-on card smart cards with system on the card," they are not qualified to provide the opinions expressed in

the SEC's report.  Id. at 3-4.  This argument, however, misinterprets expert-witness requirements.

As the Supreme Court stated in the seminal opinion of Daubert, the trial court must determine whether the proposed expert possesses "a reliable basis in the knowledge and experience of [the relevant] discipline."  509 U.S. at 592.  "Formal education ordinarily suffices, and a person who holds a graduate degree typically qualifies as an expert in his or her field." Khairkhwa v. Obama, 793 F. Supp. 2d 1, 11 (D.D.C. 2011) (citing Lavespere v. Niagara Mach. & Tool Works, Inc., 910 F.2d 167, 176-77 (5th Cir. 1990), and Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1338-39 (11th Cir. 2009)).  At bottom, an expert witness need only wield such expertise that he is able to aid the trier of fact.  Coleman v. Parkline Corp., 844 F.2d 863, 865 (D.C. Cir. 1988).  The SEC's experts meet this standard.

McCabe has a Bachelor's of Science in Physics and a Master's Degree in Computer Applications.  See Pl. Opp. (ECF No. 562) at 11.  He has authored 20 articles on biometric-matching systems, including one on the performance of the National Institute of Science and Technology's fingerprint-matching database.  Id.  To top things off, in 2001, he received an award specifically for the development of biometric image-data-exchange standards.  Id.  Smith and Greiner are equally qualified.  Smith has over 30 years' experience as an engineer with computer electronics and smart cards, he received a Bachelor's of Science in Electrical Engineering, and he presently provides technical support on smart-card specifications.  Id. Greiner also has over 30 years' experience in electronics and computer-systems engineering, he received a degree in Electronics Technology, and he is a Certified Smart Card Alliance Professional.  Id.  These are sufficient qualifications to produce admissible opinions on the technological capacities of e-Smart's cards.  See, e.g., DaSilva v. American Brands, Inc., 845

F.2d 356, 361 (1st Cir. 1988) (rejecting defendant's argument that mechanical engineer was not qualified to opine on design of machine because his only prior experience with it was as a production-line supervisor).

Saito next contends that IDTP's approach lacked the requisite scientific methodology and rigor.  See Def. Mot. at 33.  In the SEC's report, he claims, "there was a complete lack of independent methodology which did not in any way provide any scientific or reliable testing of the SEC's key allegations . . . ."  Id.  His central complaint is that IDTP "never tested the cards – only [a] distance of the wireless technology on the card with a 'not precise' 'RULER' which shows the extent of their methodological void [sic]."  Id. at 34.  The distance test to which Saito refers, however, relates to cards manufactured after 2008.  As will be discussed below, because the Court ultimately finds summary judgment merited regarding statements Saito made before these cards were manufactured, it need not address the disputes regarding this specific test. IDTP, moreover, did perform adequately rigorous wireless and fingerprint tests on the pre-2008 cards.

Third, Saito argues that IDTP's Report "does not fit the facts of the case."  Id.  On this front, he claims that "Plaintiff's non-experts['] mish-mash of generalized assertions, without reference to dates and without conducting any specific tests, or having any first hand knowledge or experience with testing defendant's cards in nothing but just speculative conclusions, as those scattered around Plaintiff's purported Expert report, will do nothing to help the jury or Trier of Fact."  Id.  This is an ironic accusation, considering the fact that it is an apt description of Saito's filing, but does not in any way accurately describe the SEC's report.  Contrary to Defendant's contention, moreover, the expert testimony proffered by the SEC is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  Ambrosini v. Labarraque, 101

F.3d 129, 134 (D.C. Cir. 1996) (quoting and discussing Daubert, 509 U.S. at 591).  In its Report,

IDTP was asked to and did address several of the scientific issues at the heart of this case – for

example, the state of the technology claims the SEC alleges were false.

Fourth, Defendant contends that the IDTP Report should be excluded because it merely

"adopts" the statements of others.  Id. at 35.  "Having done no work of their own," he alleges,

"besides submitting documents and attachments written by others, Plaintiff's experts cannot

simply quote and endorse others."  Id.  While the SEC's experts' did rely on Defendants'

witnesses, their experts' tests, and their documents, this is a well-recognized method to gather

facts and data relied on by a party's experts.  McReynolds v. Sodexho Marriott Services, Inc.,

349 F. Supp. 2d 30, 38 (D.D.C. 2004) (citing Lewis v. Booz-Allen & Hamilton, Inc., 150 F.

Supp. 2d 81, 92 (D.D.C. 2001) ("The court recognizes that the defendant's own [] data is a

reliable source from which [plaintiff's expert] conducted his examinations.")); Adams v.

Ameritech Servs., Inc., 231 F.3d 414, 427 (7th Cir. 2000) ("The underlying information . . . came

from the defendants ultimately, and as such we see no problem in [the expert's] decision to rely

on it.").  Experts at IDTP, moreover, did not simply parrot opinions articulated elsewhere.  They

examined data, verified results, gathered their own data, and ran tests of their own.  Their

approach to the technical issues in this case was appropriate to support expert testimony.

The Court, accordingly, will not strike the SEC's report.[1]

---

[1] Saito (and Grace) submitted an additional pleading four months later entitled "Motion to Strike All or Portions of Plaintiff's Expert Report and Plaintiff's Motions for Summary Judgment and Testimony and Affidavits Which are Proven by Newly Discovered Evidence to be False."  See ECF No. 601.  Not only is this document rather difficult to follow, but Saito does not explain either how these arguments differ from those in his prior Motion to Strike or why they were not included therein.  To the extent the Court discerns the points raised, it does not believe they cast doubt on its ruling here.

C.  Count I: Violations of Section 10(b)

Having now set the table for the task at hand, the Court moves on to the substantive

questions presented by the SEC's Motion.  In Count I, the Commission alleges that Saito

violated Section 10(b) of the Securities Exchange Act and Rule 10b-5.  Section 10(b) provides

that it is "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale

of any security[,] . . . any manipulative or deceptive device or contrivance in contravention of

such rules and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. § 78j.  Pursuant to its

authority under this provision, the SEC issued Rule 10b-5, which establishes that it is unlawful

"[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in

order to make the statement made . . . not misleading . . . in connection with the purchase or sale

of any security."  17 C.F.R. § 240.10b-5.  In an SEC enforcement action, a violation of Section

10(b) and Rule 10b-5 is established where a defendant: (1) made a material misrepresentation or

omission; (2); with *scienter* (3) in connection with the purchase or sale of securities.  See E-

Smart I, 31 F. Supp. 3d at 80 (citing SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir.

1999)).

In its Complaint and briefing, the SEC appears to suggest various bases for finding that

Saito violated Section 10(b) and Rule 10b-5, including misrepresentations in e-Smart's 10-K

filings, press releases, and other publications.  The Commission, however, is decidedly imprecise

when making its case regarding any one particular statement.  For instance, after listing the

technological claims made in e-Smart's SEC filings "for the years 2002 through 2007," it

concludes summarily that "[t]hose statements were indisputably false when they were made."

Pl. Mot. at 17.  The problem with this shotgun approach is that e-Smart's technology evolved

over time.  It appears from the record, for instance, that from 2002-2007, the company developed

several versions of its smart card – each with slightly different capabilities.  During this same time period, moreover, according to e-Smart, key personnel stole its core technology, a misfortune that forced it to spend time reverse-engineering cards to recapture what was lost.  In other words, e-Smart's technological capabilities ebbed and flowed.

To further complicate matters, the communications with which the SEC takes issue vary one from another – sometimes drastically.  For instance, where Saito is quoted as saying merely "that e-Smart's Card is the first commercially viable system to protect against identity crime" in a 2003 press release, see PSOF (ECF No. 388-2), ¶ 12, e-Smart's 2006 10-KSB is replete with detailed technological claims about the capabilities of this product.  Id., ¶¶ 11-15.  Against this fluctuating backdrop, determining what was false – and known to be false – in any given timeframe requires a careful matching of the state of e-Smart's science with the representations made in its filings and press releases.  This task, regrettably, the Commission leaves largely for the Court.  Fortunately, the Court need not examine every representation the SEC mentions in its Complaint.  At the end of the day, it finds that Saito made material misrepresentations in the 2006 10-KSB that are sufficient to permit judgment for the Commission on this issue.

In considering the SEC's claim regarding that 10-KSB, the Court will proceed in five steps.  First, it will analyze to what extent e-Smart's filing misrepresented the state of the Company's technology at the time.  Second, it will address whether Saito "made" the misrepresentations contained in that filing.  Third, it will turn to whether he acted with the requisite level of *scienter* to be held liable for these misrepresentations.  Fourth, it will determine whether the misrepresentations were "material."  Finally, it will look at whether they were made "in connection with the sale of securities."

*1. Misrepresentations*

In its 2006 10-KSB, filed in October of 2007, e-Smart claimed to have a commercially available smart card with several significant features.  As its alleged misrepresentations concern technical features of the card, the Court is required to delve into the specialized and granular aspects of each feature.  Realizing that this may not be for the faint of heart, the Court will endeavor to discuss this at a science-for-poets level.  With that in mind, e-Smart claimed to have:

a.  A card with a unique fingerprint sensor that was thin, capable of working on low power, and functional regardless of the condition of the user's skin.  See 2006 10-KSB at 4.

b.  A system by which it could reduce false rejections (failure to confirm a user's identity) to approximately 0.5% and false acceptances (a mistaken acceptance of a non-user) to less than 0.2%.  Fittingly, it referred to this as its "Zero/Zero System."  Whereas previous filings seemed to imply that this system had been perfected, e-Smart softened its claim somewhat in the 2006 10-KSB, saying only that it was "continuing to develop" the technology at that time.  Id. at 5.

c.  A card with the capacity for both contact and wireless functionality.  Id. at 4.

d.  An overall platform to implement its product, which e-Smart referred to as the Biometric Identification Verification Security System or "BVS2."  BVS2 purportedly consisted of the card, card readers, operational software, and "a communication technology that ensure[d] that the transmission of data throughout the system [would be] secure and reliable."  Id. at 5.

e.  A hardware-based, software-enhanced multi-application system that would allow one card to "permit/deny access," "identify precise location and/or movement of personnel,"

and "watch list parties[,] while at the same time" "each [function would be] completely and securely isolated . . . from the other[s]." Id. at 4.

f.  A card that was compatible with certain card-reader standards.  Id. at 4-5.

g.  The capacity for immediate commercial deployment.  Id. at 5.

E-Smart itself summarized its product as follows: "We believe we are the first, and currently the only company offering a commercially available dual [contact and wireless] . . . smart card with a fingerprint sensor onboard, biometric matching engine onboard and multi-application processor for deployment today."  Id.

According to the SEC, each of these representations was false when made.  The Court will examine them individually in order to paint a complete picture of e-Smart's card and aid the reader in understanding how the various attributes of the cards relate to one another.  In so doing, it ultimately concludes that some are false as a matter of law, but others are not.

### a.  Fingerprint Sensor

A key component of the smart card that e-Smart claimed to have was its fingerprint sensor – that is, the actual hardware that authenticates a card's user.  In its 2006 10-KSB, e-Smart purported to have a "[u]nique" sensor that would function on "low power," would be "durable enough to be embedded in a smart card and yet not [be] effected by static electricity, the elements or the condition . . . of the user's skin."  Id. at 4.  The SEC contends that, as of 2007, this claim was not true.

According to the Commission, from 2000-2008, e-Smart did, through work with several outside entities, try to produce a satisfactory sensor.  See PSOF, ¶ 26.  All of these attempts failed.  Id.  Instead, throughout the relevant time period, e-Smart used a fingerprint sensor manufactured by another electronics company, Fujitsu.  Id., ¶ 27; Pl. Mot., Att. 52 (ECF No.

391-10) (January 1, 2008, Saito e-mail to Grace) (identifying sensor-development options with "Back Up plan" being sale of "Fujitsu version" of card).  The problem with this sensor, the SEC maintains, is that it did not live up to e-Smart's performance claims.  See PSOF, ¶ 28.  The Court agrees.

Saito himself, in a 2007 email, detailed the Fujitsu sensor's deficiencies, describing it as "not waterproof, not [electrostatic discharge] proof, not live finger and not crack proof."  Pl. Mot., Att. 106 (ECF No. 394-14) (April 4, 2007, Saito e-mail to Grace).  Others at e-Smart shared this assessment.  In July 2008, for instance, Richard Kim, e-Smart Korea's Managing Director, emailed Grace reporting, among other things, that e-Smart had persuaded a customer to accept a sample card that was "[s]till using Fujitsu sensor," which was "fragile, vulnerable to moisture, static electricity," and "expensive."  See PSOF, ¶ 86 (quoting Pl. Mot., Att. 73 (ECF No. 393-6) (July 27, 2008, Kim e-mail to Grace)).  Saito himself, moreover, confirmed in deposition testimony that "the Fujitsu sensor was insensitive to dry fingers, dry skin" and that it did "not respond[] correctly to the dry skin of the fingers."  Pl. Mot., Att. 25A (ECF No. 389-12) (Deposition of Tamio Saito) at 108:17-109:05.

For his part, Saito does not directly dispute these assertions.  The only mention of the Fujitsu sensor in his briefs is contained in the above-quoted Kim email.  See Cross-Mot. & Opp. (ECF No. 497)at 32.  And the closest his Expert Report comes to answering the allegation is a passage buried in the declaration of one of his experts, Teruhiko Tamori.  Tamori claims, among other things, that he "evaluated" sensors "made by the KyungHee University engineers and confirmed that they were] functional, pressure sensors, water proof, [and] ESD proof . . . ."  Def. Exp. Report, Declaration of Teruhiko Tamori (ECF No. 346-7), ¶ 17F.  That declaration, however, provides no timeframe for this purported evaluation, no description of his

methodology, and – most importantly – no basis to believe that these sensors were ever actually included in any smart card manufactured by e-Smart in the relevant timeframe.

The Court concludes, therefore, that the undisputed facts show that (1) e-Smart used the Fujitsu sensor in its smart cards until at least 2008, and (2) that this sensor – according to Saito himself – was neither "unique" nor able to function regardless of a user's skin condition, as claimed by e-Smart in its 2006 10-KSB.  To this extent, it is undisputed that this representation was false.

b.   Zero/Zero

E-Smart's next major claim went to its smart cards' fingerprint-recognition capabilities. Specifically, it trumpeted that it was developing a system it referred to as "Zero/Zero," by which it could reduce false rejections to approximately 0.5% and false acceptances to less than 0.2%. This is not an insignificant claim.  As a general rule, these two numbers move in an inverse relationship with one another: the lower the false-rejection rate (and less stringently the program screens fingerprints), the higher the false-acceptance rate.  Being able to lower both is a valuable accomplishment.

The SEC contends that e-Smart never achieved the level of fingerprint recognition it claimed.  The evidence on this point comes from two sources, and the easiest way to present them is chronologically.  The first test of the claim came in August 2008, when Grace, through her attorney, retained Exponent, a consulting firm, to evaluate e-Smart's performance capability. Because both parties ultimately rely on the tests Exponent ran, see, e.g., PSOF, ¶¶ 40-43; Cross-Mot. & Opp. at 6, 8, 11-12, 40-41, the Court considers the relevant portions of the firm's report in their entirety.

Exponent was specifically hired to evaluate, among other things, e-Smart's zero-zero claim as articulated in the 2006 10-KSB. As relayed in its report, the results were very good for e-Smart. The principal investigator, Brad McGoran, "enrolled [his] right pointer finger" on an e-Smart card and then "proceeded to attempt to match that finger 100 times." Exponent Report (ECF No. 499-1) at 8. The "matching success rate was 100% with no unsuccessful matching attempts when presenting the enrolled finger," a performance that "support[ed] the fact that the 'I AM' card biometric technology and matching algorithm can support a false reject rate of less than 0.2%." Id. He also found e-Smart's false-positive-rate claim borne out. Id. at 9. Based on this examination, Exponent concluded that e-Smart's card performed "consistent[ly]" with its zero-zero claim. Id. at vi.

The SEC contends, however, that this report does not tell the whole story. It notes that the first card e-Smart provided to Exponent crashed shortly after testing began. See PSOF, ¶ 40 (citing Deposition of Brad McGoran at 78:21-79:11) (not identified in PSOF but included as Att. 35A) (ECF No. 390-7)); Exponent Report at 6; Pl. Mot., Att. 40 (ECF No. 390-11) (McGoran Dep., Exh. 18). The card Exponent ultimately based its results on was similarly flawed; it only allowed a fraction of potential users to register with the card. This, the SEC argues, renders e-Smart's zero-zero claims false. According to the experts at IDTP, "International standards specifically require that fingerprint images be captured accurately in order to calculate reliable [false-acceptance] and [false-rejection] rates." Expert Report of IDTP, ¶ 46. "[I]n order to prevent failure to enroll to skew the results of FAR/FRR tests," they noted, "the standards require the failure to match rate be adjusted by the failure to enroll rate to produce a reliable false reject and false acceptance rate." Id. In other words, to claim that a fingerprint sensor is highly accurate, it must also be the case that it works with most fingers. The failure-to-enroll rate of the

e-Smart cards, IDTP concluded, refuted any claim of a low false-acceptance or false-rejection rate. Id., ¶ 47.

The Court is not persuaded. While the SEC has raised serious doubts about the viability of e-Smart's zero-zero claims, taking all of the evidence together, the Court cannot conclude that the Company's assertions in the 2006 10-KSB were false as a matter of law. In its filing e-Smart stated only that it was "continuing to develop" its zero-zero system. See 2006 10-KSB at 5 (emphasis added). This is different from averring that all cards can and always will perform at that level. And Exponent's 2008 test showing that, once a user was enrolled, e-Smart's claims were borne out, is enough evidence to arguably substantiate e-Smart's development claims – even if the technology had not yet been perfected at the time. The Court, therefore, finds that a dispute of fact remains on this issue.

### c.   Wireless Capability

The SEC next contends that e-Smart's card did not have the wireless capabilities claimed in the 2006 10-KSB. A quick note is in order here. Whereas, in the normal course, a person may think of wireless capabilities primarily in terms of data transfer between a smart card and a reader, the central question in this case is actually the cards' ability to draw power wirelessly from the reader. A smart card such as the one e-Smart claimed to have can only function in a non-contact way if it is able to draw power from a wireless reader. In this way, a reader both supplies the power to the card (when in close enough proximity) and sends and receives data from the card. See id. at 4 ("The e-Smart product . . . will work . . . with a reader that does not require physical contact, as power and data are transferred to each card through an electro-magnetic field generated by such a card reader.").

The SEC contends that e-Smart did not have a wireless card in 2007.  To substantiate this argument, it relies on IDTP's report as well as the testimony of e-Smart engineers.  In its evaluation of e-Smart's wireless claims, IDTP examined three exemplar e-Smart cards purportedly assembled prior to mid-2008.  Two of these, the Flag Card and "I Am Card," were presented to a wireless reader, which showed that the cards did not have any wireless capability. See Expert Report of IDTP, ¶¶ 14-17.  IDTP then examined the third, called the "Mybi card," and found that the fingerprint-matching portion of the card was not connected to the wireless antenna.  Id., ¶¶ 14, 16.  IDTP concluded, based on these tests, that the e-Smart cards assembled prior to mid-2008 did not contain an antenna connected to the fingerprint-matching components as would be required to power their operations.  Id., ¶ 18.  IDTP also examined cards produced after mid-2008 and ran separate tests on these, the validity of which Saito hotly contests.  Because the Court limits its findings to cards that pre-date the 2006 10-KSB, however, it need not weigh in on this dispute.

As for pre-2008 wireless capacity, Saito replies in his Motion – with typical understatement – that the SEC's claims are "preposterous" because "Plaintiff's own witness produced a wireless card of defendant's that he manufactured for plaintiff in 2005 with a Declaration stating the same."  Cross-Mot. & Opp. at 40.  Unfortunately, Saito fails to identify the purported witness.  To support the proposition, moreover, he cites enigmatically to Attachment A, Exhibit 24.  See id.  The Court interprets this as directing it to the Index of Exhibits accompanying Saito's Motion, see ECF No. 497-2, and indeed, at Number 24, among other things, appears the phrase "preposterous claims that e-Smart did not have wireless card" (in all caps) with a list of purported supporting documents.  See id., ¶ 24.  The problem is that no Exhibit 24 was ever appended to the Motion – and no documents matching the descriptions

provided in the Index are to be found in the docket.  This is a glaring omission, considering the

fact that, according to Defendant, the exhibit – whatever it is – proves false no fewer than 22

paragraphs of the SEC's Statement of Facts.  See Cross-Mot. & Opp. at 40.

In one of his Statements of Facts, Saito does paste in portions of a declaration of Michael

Gardiner, an engineer who had worked on cards for e-Smart prior to 2005.  See DSOF (ECF No.

496-1) at 61-63.  In Gardiner's declaration, he identified prototype smart cards, photos of which

include the words "wireless power" and a "July 2005" date notation.  Id. at 62.  Of these cards,

Gardiner stated in his declaration, "wireless power was designed to permit micro-payments

through a multi-application smart card chip."  Id. at 62.  This mention of "wireless power," Saito

concludes, proves the Commission's claims false.

In response, the SEC contends that Gardiner's Declaration actually reinforces its

evidence that e-Smart's cards did not have a commercially viable wireless function.  See Resp. to

DSOF (ECF No. 522-1) at 19.  Specifically, in the same declaration to which Saito adverts,

Gardiner made clear that "[n]one of the prototype e-Smart cards contained a consistent wireless

power capability designed or created by e-Smart and/or Tamio Saito."  Pl. Reply, Att. 10 (ECF

No. 522-12) (Declaration of Michael Gardiner), ¶ 5.  In the passage quoted by Defendant,

moreover, Gardiner's entire claim is illuminating:

> To the extent that the wireless power was designed to permit
> micro-payments through a multi-application smart card chip, those
> capabilities were not an e-Smart product and belonged to a
> company other than e-Smart for whom the card was designed.  The
> configuration . . . was also supposed to enable a biometric circuit
> to perform the biometric matching function without the card being
> plugged into a smart card reader for power.  While we had been
> able to make that function work occasionally in the laboratory, the
> card did not consistently and reliably perform this function
> wirelessly. . . . [A]nd the card . . . did not perform wireless
> biometric matching for micro-payments.

Id., ¶ 12 (emphasis added).  This is a significant concession, considering this capability was at the heart of e-Smart's representations.  Specifically, e-Smart claimed that it had a "[]wireless[] compatible smart card with a <u>fingerprint sensor onboard, biometric matching engine onboard and a multi-application processor</u> [ready] for <u>deployment today</u>."  2006 10-KSB at 5 (emphases added).  That its card at that time could not even wirelessly authenticate fingerprints is a drastic departure from its representations.  Taken as a whole, the Court agrees with the SEC: Gardiner's testimony supports, rather than contradicts, its contentions.

Based on the undisputed facts, therefore, the Court concludes that, as of 2007, e-Smart did not have a commercially available smart card that could perform its biometric-matching functions wirelessly, as it claimed in its SEC filing.

### d.  BVS2 System

The SEC next contends that e-Smart never successfully developed the overall implementing architecture it claimed to have available for its smart card – the system it referred to as BVS2.  The Commission's evidence on this point comes from Thomas Huffman, an engineer who identified himself as "the designer" of the BVS2 system.  See Pl. Mot., Att. 22 (ECF No. 389-9) (Deposition of Tom Huffman) at 93:8.  According to him, when he left e-Smart in 2008, he still had not completed development on BVS2 – a fact that he relayed to Saito at the time.  See id. at 95:17-98:2.  A system that was not developed by 2008, the SEC concludes, could not have been commercially available in 2007, as claimed in e-Smart's 2006 10-KSB.

Saito fails to dispute the SEC on this point; he mentions the BVS2 system only once in his Motion – in an excerpted portion of an August 2007 business plan authored by then-COO Richard Barrett identifying the system by name.  See Cross-Mot. & Opp. at 36.  Even if he had produced this plan in its complete and admissible form, however, the fleeting mention of the

24

BVS2 it contains does not rebut the facts as presented by the SEC: it does not establish the system's existence, change the fact that the system was aspirational in 2007, or refute Huffman's claim that he told Saito of its nonexistence in 2008.  In other words, Saito does not raise a dispute as to the existence of the BVS2 system.  The Court, therefore, concludes that it did not exist in 2007.

> e.  Multi-Application System

The SEC next claims that, contrary to e-Smart's representations, it did not have a card in 2007 capable of multiple independent applications – that is, it could not function simultaneously as a bank card, an access card, and an identification card.  See PSOF, ¶ 23.  In relation to this claim, the Commission again relies on the testimony of Huffman, who testified that the e-Smart cards he was exposed to through 2009 did not have a multi-application capability.  See id.; Huffman Dep. at 88:8-89:9.  The SEC also presents the deposition of Todd Carper, an engineer with whom e-Smart consulted in attempts to create multi-application software.  In his deposition, Carper testified that, by the time he stopped interacting with e-Smart in 2006, he had not licensed any software to e-Smart because it had failed to pay his invoices.  See Pl. Mot., Att. 28 (misidentified as Att. 24) (ECF No. 390-2) (Deposition of Todd Alan Carper) at 56:9-61:17. Finally, to round out its case, the SEC notes that Saito himself admitted that Carper's was the only operating system that existed at the time to allow e-Smart's card to perform securely in a multifunctional environment.  See PSOF, ¶ 24.

The Court notes, however, that while Saito did aver as much in a declaration, that statement pre-dated the communications at issue in the 2006 10-KSB by a year.  See Pl. Mot., Att. 54 (misidentified as Att. 26) (ECF No. 391-11) (October 4, 2006, Declaration of Tamio Satio), ¶ 16.  And in his declaration, Saito makes clear that it was in "early 2006" that he

believed Carper's operating system was the only solution for e-Smart.  Id.  At most, this

concession – combined with Carper's departure around the same – establishes that e-Smart was

unable to develop a multifunctioning operating system with Carper in early 2006.  Yet this leaves

an entire year in which e-Smart could have developed that technology through other means.

Huffman, moreover, only testified to never being "exposed" to a multifunctioning card – an

assertion that falls short of establishing that such technology did not exist throughout the relevant

timeframe.

 The Court, consequently, concludes that a dispute remains on multi-functionality.

   f. ISO 7816 Compliance

 The SEC next claims that, contrary to representations in 2007, the e-Smart card was not

ISO 7816 compliant because it was too thick to satisfy this standard.  For the reader without a

doctorate in electrical engineering, ISO 7816 is the international standard for electronic ID cards

with contacts – cards like e-Smart's.  ISO 7816, in turn, substantially adopts the physical

characteristics required by ISO 7810, which is the international standard for ID cards.  The SEC

claims that e-Smart's card did not meet these standards, and it points to two pieces of evidence to

make its case: McGoran's deposition testimony and a thickness test upon which Exponent relied

that concluded e-Smart cards were too thick to meet the ISO 7810 standard.  See Pl. Mot., Att.

37 (ECF No. 390-9) (August 7, 2008, Eclipse Laboratories Report); McGoran Dep. at 72:2-

73:16.

 Notwithstanding this data, Exponent did not conclude that e-Smart's ISO 7816 claims

were false.  The consulting firm noted that "[t]he height and width dimensions on the 'I AM'

card measured within the ISO requirement, as stated in ISO/IEC7810.  The thickness dimension

measured slightly outside the ISO requirement as is common with cards containing such

embedded technologies." Exponent Report at 10 (emphasis added). Exponent, accordingly, concluded that e-Smart's card was "physically compatible and interoperable with most ISO7816 readers," and that it met "the height, width, location of contacts, surface profile of contacts, warpage, and opacity requirements specified by ISO 7810." Id. at 19.

Based on this evidence, the Court concludes that the SEC is not entitled to summary judgment on this issue. E-smart's 2006 10-KSB did not mention any specific ISO 7810 or ISO 7816 requirements. The company claimed, instead, only that the card was ISO 7816 "compatible." 2006 10-KSB at 5. Exponent's conclusion that the card was compatible and interoperable with most ISO 7816 readers arguably substantiates e-Smart's claim on this front. The Court, therefore, cannot conclude that e-Smart's ISO 7816 claims in the 2006 10-KSB were false as a matter of law.

g. Commercial Availability

Finally, the SEC maintains that, no matter what features e-Smart had successfully realized in any prototype cards, they were prohibitively expensive to manufacture as late as 2008, and therefore not commercially available. See PSOF, ¶ 55. According to the SEC:

> The e-Smart business plan was based on [its] ability to sell its
> smart cards for $20 per card. The cost of just three hardware
> components purportedly on e-Smarts cards exceed $28 per card,
> which does not include, among others, the software license fees,
> the costs to assemble the cards, and the related travel and overhead
> costs.

Id. The Commission's case is strong on this point. As it points out, Saito admitted in his deposition that "the main issue" e-Smart faced with the Fujitsu Sensor – which e-Smart was using at that time – was that it "cost $20 per unit, and [e-Smart] wanted to provide a card at the price of $20 a piece, so it would not pay." See Pl. Mot., Att. 25B (ECF No. 389-13) (Deposition

of Tamio Saito) at 171:15-18.  A card that could not be manufactured for less than its sales price, the SEC concludes, could not be available for immediate commercial deployment.

Saito, for his part, never argues that a card sold at significant loss could nonetheless be "commercially available."  His main dispute comes from an email dated August 21, 2007, a portion of which he has pasted into his brief.  In the email, then-COO Barrett stated, "Conversations were very productive, and I look forward to continuing dialog as we deliver the first 3,000 units."  See Cross-Mot. & Opp. at 37.  "COO Barrett's . . . reference," Defendant argues, to "the IMMEDIATE delivery of 3000 cards . . . proves false Plaintiff's [accusations] regarding the 'commercially available' [sic] e-Smart Card."  Id.  Saito is wrong.  He provides no detail about what these "units" were, evidence that they were in fact "delivered," or reason to believe that they were not still prohibitively expensive to produce.

Saito also points to a business plan that Barrett drafted in August 2007, see Cross-Mot. & Opp. at 36, with the same conclusory assertion about availability.  As the SEC points out in response, however, Barrett made clear in that same business plan that e-Smart could not be expected to have a cost-effective sensor until "late 2008."  See Pl. Rep. at 12 (quoting id., Att. 4 (ECF No. 522-6) (2007 Business Plan) at 19).  The goal for 2008, Barrett said, was merely to continue to analyze the prototype unit, with the aim of developing a card with "adequate reliability."  2007 Business Plan at 22.  Far from showing that e-Smart had a commercially available card in 2007, this plan actually supports the SEC's allegations.

The Court concludes, therefore, that it is undisputed that the prototypes e-Smart had produced as of filing its 2006 10-KSB were too expensive to be economically viable.  This fact might not be enough to render e-Smart's availability claims actively misrepresentative; perhaps a card sold at a loss could still be technically "commercially available" for "deployment today."

At the very least, however, e-Smart's failure to disclose the extent of such loss alongside its boasts of immediate availability amounts to a significant omission, the materiality of which will be explored below.

*       *       *

Before summarizing its findings regarding falsity, the Court pauses briefly to address two global arguments Saito raises throughout briefing.  First, he frequently references generalized phrases provided by experts on smart-card technology and seems to imply that these statements prove the SEC's allegations false.  For instance, he repeatedly quotes language from the Exponent Report in which it "deemed . . . [e-Smart's card] an 'advanced technological device' and an 'advanced scientific achievement.'"  Cross-Mot. & Opp. at 6 (quoting Exponent Report at vii).  He also quotes one of his experts, Dr. Behnan Bavarian, whom he identifies as "the father of AFIS and Biometrics," id. at 8, and who opined, among other things, that "biometric smart cards are on the leading edge of technology."  Declaration of Dr. Behnan Bavarian (ECF No. 500-2), ¶ 16.  Defendant appears to conclude that such generalized praise proves true everything specific that e-Smart said about its card.  To state the argument, however, is to recognize it is as baseless.

Second, Saito also occasionally pastes in evidence that purports to show that e-Smart was able to provide some clients with cards in pilot programs.  See, e.g., Cross-Mot. & Opp. at 35. Saito suggests from such claims (unsupported by documentary evidence) that the 2006 10-KSB included no misrepresentations.  The problems with Saito's argument, however, are that: (1) he provides no timeframe for when these pilots were supposedly implemented (and there is good reason to believe they occurred after the relevant timeframe here), see id. (quoting a report from April 8, 2009); (2) he provides no description of the capabilities of any of the cards that might

have been deployed in these pilots; and (3) he does not establish that, even if available for

prototype or pilot deployment, e-Smart's cards were economically feasible to produce.  In other

words, even this evidence does not contradict the facts that the SEC has established in its

Motion.

Nonetheless, as discussed above, the Court concludes that summary judgment is not

appropriate on the SEC's allegations that e-Smart lied about its developing a zero-zero system,

its smart cards' ISO-compatibility, or their multi-functionality.

Summary judgment is, however, warranted on the accusations that, contrary to its claims

in the 2006 10-KSB:

- E-Smart used a fingerprint sensor that was neither unique nor able to function

  regardless of a user's skin condition;

- E-Smart did not have a commercially available smart card that could perform its

  biometric-matching functions wirelessly;

- The BVS2 system e-Smart claimed could run its entire system did not exist; and

- E-Smart could not produce a card that was commercially available and ready for

  "deployment today."

To this extent, the Court concludes that e-Smart's filing constituted a misrepresentation

as a matter of law.

### 2. The "Maker" of the Statements

Of course, to be liable for the misrepresentations in e-Smart's 2006 10-KSB, Saito must

have been their "maker."  On this front, even though he signed the filing, Saito alleges that he

did not make the statements contained therein.  In an attempt to escape responsibility, he denies

drafting the filing and says, instead, that e-Smart's COO and securities lawyer wrote it.  In fact, a

great deal of Saito's briefing concerns the fact that he was not copied on emails sending around versions of the 2006 10-KSB throughout its drafting.  See, e.g., Cross-Mot. & Opp. at 12-14 (excerpting emails regarding the drafting of the 10-KSB); but see PSOF, ¶ 72; Pl. Mot., Att. 65 (ECF No. 462-3) (testimony of then-securities attorney, Maranda Fritz, confirming that Saito was exposed to the 10-KSB draft language).

Whether it was Saito who first put pen to paper to draft the filing, however, is immaterial. In Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011), the Supreme Court addressed when an individual or entity "makes" a statement.  It explained:

> For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.  Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.  One who prepares or publishes a statement on behalf of another is not its maker.  And in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by – and only by – the party to whom it is attributed.

Id. at 2302.  Under Janus Capital, then, Saito "made" the statements in the filing if he had "ultimate authority" over their content.

The Commission argues that Saito fits this bill.  As it points out, "[P]ersons who sign statements filed with the Commission, such as Forms 10-K, are typically found to be makers of the statements and primarily liable for them."  Pl. Mot. at 16 (citing, e.g., SEC v. Brown, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) (CFO was maker of statements under Janus in SEC periodic reports that she signed)).  And as CTO, Saito was clearly the party with "ultimate authority" over e-Smart's technology claims.  The 2006 10-KSB itself divulges: "Except for Tamio Saito, our Chief Technical Officer, none of our management team has ever operated a smart card business or has any experience with the manufacture and marketing of smart card products."  2006 10-

KSB at 10 (emphasis added).  It identifies Saito as the "Chief inventor of [the] BVS2™ and Super Smart Card™ technology" and notes that he was "the individual best able to continue to refine, to present and to customize the use of e-Smart's system and oversee its installation."  Id. It is clear based on the text of the 10-KSB that – of all the signatories – Saito was likely the only one who could have verified the accuracy of its technology claims.  See Defs.' Am. Answer (ECF No. 59), ¶ 18 (admitting "that Defendant Saito . . . led the technology development at e-Smart from 2000 to approximately 2008").  In other words, he had "ultimate authority" over representations regarding the state of e-Smart's science.  Once signed by him, they became his statements.

Saito, however, disputes this point as well.  At various points in his briefing, he indicates that he did not himself sign the 2006 10-KSB.  See, e.g., Cross-Mot. & Opp. at 17-18 ("As usual, upon approval of Counsel the acting CFO Anthony Russo . . . who filed the document affixed CTO Saito and CEO Grace's signature to the Certification.").  But such passing aspersions will not save Saito.  He provides no documentary evidence whatsoever to support such a serious allegation, see, e.g., id. (citing merely to the 2006 10-KSB that includes his signature), nor does he include with his Motion a sworn declaration or affidavit averring that he never received the 10-KSB or that someone else fraudulently signed his name in his place without his permission.  This omission cannot be chalked up to his ignorance as a *pro se* litigant. He verified all of his exhibits with a declaration and has shown the capacity to submit substantive declarations when they fit his purpose in the past.  See, e.g., ECF No. 139-3 (September 17, 2013, declaration submitted and signed by Saito).

The Court, therefore, concludes that because Defendant was the principal authority on e-Smart's technology and because he signed the 2006 10-KSB, he "made" the misrepresentations regarding e-Smart's card contained therein.

   *3.*   Scienter

The Court turns next to the question of whether Saito acted with the requisite mental state to establish liability.  In Section 10(b) and Rule 10b-5 enforcement actions, the Commission must prove that the defendant acted with *scienter*.  See Aaron v. SEC, 446 U.S. 680, 691 (1980); Dolphin & Bradbury, Inc. v. SEC, 512 F.3d 634, 639 (D.C. Cir. 2008).  This translates to "a mental state embracing intent to deceive, manipulate, or defraud."  Aaron, 446 U.S. at 686 n.5 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)).  This Circuit has held that it encompasses both intentional wrongdoing and conduct undertaken with extreme recklessness. See Dolphin & Bradbury, 512 F.3d at 639 (citing SEC v. Steadman, 967 F.2d 636, 641 (D.C. Cir. 1992)).  Extreme recklessness is more than "a should have known standard[;] . . . [r]ather, it is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Id. (quoting Steadman, 967 F.2d at 641-42) (internal quotation marks omitted).  Courts have resolved issues of *scienter*, in appropriate cases, at the summary-judgment stage.  See, e.g., SEC v. Milan Group, Inc., 962 F. Supp. 2d 182, 201 (D.D.C. 2013); SEC v. Monterosso, 756 F.3d 1326, 1336 (11th Cir. 2014); SEC v. George, 426 F.3d 786, 795 (6th Cir. 2005); SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1095-96 (9th Cir. 2010).

Given Saito's role at e-Smart, there is simply no way he could have been mistaken about the state of its technology.  As noted above, he was the only member of e-Smart's management team that had "ever operated a smart card business or [had] any experience with the manufacture

and marketing of smart card products," and as far as e-Smart's core technology was concerned, he purportedly <u>invented</u> it. <u>See</u> 2006 10-KSB at 10. There is no way that the only person in a company who could verify the truth of its technological claims could be confused about those claims when making them.

Nor could Saito have been in the dark on the various aspects of e-Smart's technological development. As he himself asserts in briefing, "Policies and Procedures were implemented that required <u>every</u> employee to make reports in writing – so the company had records – and so they could be translated – and the company would have a record of the daily and weekly activities related to all information from each office and lab, which was required to be put into <u>daily and weekly reports</u>." Cross-Mot. & Opp. at 3 (emphases added). Because of such procedures, Saito contends, he "received <u>all the reports and data on the technical research and development and advancement of the technologies</u>, which is compiled in Defendant's Experts Report . . . , recording the status of the technology from its inception through the relevant years of this complaint, which is invaluable to prove that all Defendant[']s claims in the 10K and other public disclosures is [<i>sic</i>] accurate at the time they were made which is at issue in this case." <u>Id.</u> at 4 (emphasis added). Other than referring to the fact that his Expert Report exists, Saito unfortunately does not follow through and demonstrate where the supposed reports are or what they show. The net result of all of this is that Saito has made clear that he stayed abreast of e-Smart's research and development efforts by way of frequent internal reports, but he has not provided any evidence that those reports substantiated his claims in the 2006 10-KSB.

Saito's other arguments on <i>scienter</i> are bewildering. To fully follow them, a bit of background is in order. Robert Barrett, who has been mentioned in passing in this Opinion, was hired in 2006 to serve as COO, but his tenure at e-Smart was short lived. According to his

testimony in an earlier employment action, he was fired because he disagreed with the

technology claims e-Smart's management wanted to include in the 2006 10-KSB.  See Pl. Mot.,

Att. 62C (ECF No. 392-10) (Testimony of Richard Barrett).  These disputes are memorialized, in

part, in emails he exchanged with other members of e-Smart's management team in the fall of

2007.  Barrett ultimately claimed that Grace pushed him out of the picture when he refused to toe

the line on e-Smart's technology.

 Saito's argument goes to the exchanges Barrett had regarding the drafts of the disputed

10-KSB and the SEC's subsequent allegations against e-Smart.  Specifically, he claims that the

SEC failed to "prove that the CTO Saito []or the CEO Grace was ever told or ever knew that

COO Barrett made a claim that he believed that [the] zero[-]zero and multi[-]application [claims]

in the 10K were inaccurate and/or had not been tested, until they were told that an allegation had

been made to this effect by Plaintiff, long after the event occurred . . . ."  Cross-Mot. & Opp. at

3.  "The case against the CTO and CEO," he goes on to say, "is based on one thing[:] did the

CTO and CEO know, and was [*sic*] the CTO and CEO told of any of the alleged inaccuracies in

the 10K, and if there were in fact any inaccuracies in the subject 10K's at all."  Id.  "A

preponderance of [the] evidence," he concludes, "proves that . . . the alleged inaccuracies were

never reported to either the CTO or CEO (during the relevant time period) and that the CTO and

CEO only heard of them after the SEC made the allegations . . . ."  Id.; see also id. at 5

("Through October 2007 neither the CTO nor the CEO received any report of any of the

allegations in the [First Amended Complaint] and therefore did not know and could not have

known about them if they were never reported and therefore could not have acted with

[s]cienter.").

This argument is strange for several reasons.  First, it appears that Saito is arguing that he could not have known that e-Smart's technology did not perform as claimed until the SEC told him so.  But, of course, it is not the contents of the SEC's allegations that would establish his knowledge of the science – presumably, it would be his first-hand exposure to it.  Second, Saito seems to imply that the question of *scienter* goes to whether he knew there was a dispute about the language of the 10-KSB during its drafting.  This argument also misses the mark.  To make its case, the SEC need not show that Saito knew of internal conflicts regarding the 10-KSB language; it must instead show that he knew of – or at least was reckless in disregarding – the falsity of e-Smart's claims.  Again, his knowledge of this fact as the principal architect of e-Smart's technology would come from his first-hand exposure to that technology.  To say, "I did not know our cards did not work, because no one in management or the SEC told me so," ignores the fact that he was the authority upon whom everyone else relied.  Finally, his argument is confusing in its preoccupation with Grace's knowledge of the state of e-Smart's science.  Saito explains this in part by saying that the "CEO is included in this Motion as it is relevant to know if the CEO was given the information and did not provide it to the CTO or if both the CTO and CEO were never told or ever knew of any alleged inaccuracies."  Id.  Yet this explanation presents the exact same problem as his arguments above.  It ignores the fact that Saito should be the one confirming the accuracy of e-Smart's representations in the 10-KSB.  It is unclear why he would need to rely on Grace to learn of the state of e-Smart's science.

Given the uncontroverted evidence, no reasonable jury could believe that Saito, as CTO, did not know that the product he claimed to have ready for deployment in 2007 was, in fact, lacking in both significant technological respects and prohibitively expensive to manufacture.

### 4. Materiality

The misrepresentations in the 2006 10-KSB, moreover, were undoubtedly material.  For information to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) (internal quotation marks omitted); see also Media General, Inc. v. Tomlin, 387 F.3d 865, 869 (D.C. Cir. 2004).  In other words, a fact is material if a reasonable investor would find the information "important."  Steadman, 967 F.2d at 643 (citing Basic Inc., 485 U.S. at 231-32).

One cannot dispute that investors in a company built on the development and marketing of a single product would rely heavily on the description of that product when deciding whether and to what extent to invest.  As this Court has recognized previously, a reasonable investor would consider misrepresentations about the state of e-Smart's technology to be material.  E-Smart I, 31 F. Supp. 3d at 80-81.  Indeed, for a company like e-Smart that only makes one thing, its claims about its product are material as a matter of law.  See SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1095 (9th Cir. 2010) ("A finished, tested product is almost certainly the single most important piece of information for an investor deciding whether to invest in a start-up company."); see also StratoComm, 2 F. Supp. at 257 ("Statements related to whether a company has a product to sell are material as a matter of law. . . . This is particularly true for development-stage companies.") (citations omitted).

In this case, Saito falsely represented significant aspects of e-Smart's purported product. He boasted, contrary to the truth, that e-Smart used a fingerprint sensor that was unique and able to function regardless of a user's skin condition.  He claimed that e-Smart had a commercially

available smart card that could perform its biometric-matching functions wirelessly, when it did

not.  He touted e-Smart's so-called BVS2 system, which did not exist.  And he represented that

e-Smart's card was ready for deployment when, in fact, it could not even be feasibly produced.

Any one of these misrepresentations on its own would be material to an investor; added up, they

show the yawning gap between e-Smart's representations and the reality of its product.  A

reasonable investor would want to know that, instead of a highly functional and commercially

available product, e-Smart actually had only prototypes with limited features that were too

expensive to manufacture.  Saito's misrepresentations would have been material to investors.

     *5.   In Connection With*

Finally, the Court concludes that the misrepresentations were made "in connection with"

the purchase or sale of securities.  "The Supreme Court has held that the 'in connection with'

element is a broad and flexible standard and that any activity 'touching the sale of securities' will

suffice."  SEC v. Levine, 671 F. Supp. 2d 14, 31 (D.D.C. 2009) (quoting Superintendent of Ins.

v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971)).  "Where the fraud alleged involves public

dissemination in a document such as a press release, annual report, [or] investment prospectus . .

. on which an investor would presumably rely," this burden is met.  SEC v. Rana Research, Inc.,

8 F.3d 1358, 1362 (9th Cir. 1993); see also SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1171

(D.C. Cir. 1978) (noting this "requirement is satisfied whenever it may reasonably be expected

that a publicly disseminated document will cause reasonable investors to buy or sell securities in

reliance thereon").  Because the 10-KSB was the kind of document upon which an investor

would regularly rely, the misrepresentations it contained were made "in connection with" the

sale of securities.  See E-Smart I, 31 F. Supp. 3d at 82 (citing Rana Research, 8 F.3d at 1362);

see also Savoy Indus., 587 F.2d at 1171.

*     *     *

In conclusion, the undisputed facts establish that Saito knowingly made material misrepresentations in connection with the sale of securities in the 2006 10-KSB.  He is thus liable for violating Section 10(b) and Rule 10b-5.

D.  Section 16(a) Violations

The SEC's second claim is, thankfully, much more easily resolved than the first.  Here, it alleges that Saito failed to file certain statements as required by Section 16(a) of the Exchange Act.  That provision provides that "[e]very person who is directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* of this title, or who is a director or an officer of the issuer of such security" must file ownership statements with the SEC.  See 15 U.S.C. § 78p(a)(1).  These include initial ownership statements on Form 3, statements disclosing changes in beneficial ownership on Form 4, and annual statements on Form 5.  See id. § 78p(a)(2); 17 C.F.R. § 240.16a-3.  To establish a violation of these provisions, the SEC must show that Saito was an officer, director, or 10% beneficial owner and that he did not file Section 16(a) disclosures after an applicable triggering event.  See SEC v. Prince, 942 F. Supp. 2d 108, 131 (D.D.C. 2013).

As this Court concluded in ruling on an earlier motion, it does not appear that *scienter* is required to establish liability.  See E-Smart III, 2015 WL 583931, at *4-5 (citing cases from other district courts so holding and a D.C. Circuit decision so holding as to an analogous provision).  As a result, the claim is quickly resolved against Saito.  E-Smart was an issuer of securities registered under Section 78*l*(g).  See 2006 10-KSB at 1; Pl. Mot., Att. 2 (ECF No. 388-5) (2007 10-K) at 1.  Although Saito argues that he was not a beneficial owner of more than 10

percent of e-Smart stock, the plain language of the rule covers him as a director and officer of e-Smart.  E-Smart III, 2015 WL 583931, at *5.  Saito is and has been e-Smart's CTO.  See PSOF, ¶ 5.  He also served as one of the company's directors and was subject to Section 16(a)'s requirements in that role as well.  See Defs.' Am. Answer, ¶ 18.  And, as e-Smart reported in its June 25, 2009, Preliminary Information Statement under Section 14(c), he has never filed an ownership statement with the Commission.  See PSOF, ¶ 10.  Because the material facts related to this count are undisputed, summary judgment in favor of the SEC is warranted.  See, e.g., Verdiramo, 890 F. Supp. 2d at 273 (granting SEC summary judgment on § 16(a) claim); Sierra Brokerage Services, Inc., 608 F. Supp. 2d at 954-57 (same).

## IV.    Conclusion

Having sifted through the sprawling and sometimes impenetrable filings in this case, the Court concludes that the undisputed facts show that Saito made material misrepresentations in connection with the sale of securities in violation Section 10(b) and Rule 10b-5 and that he violated Section 16(a) by failing to file required statements.  The Court will, accordingly, grant the SEC's Motion for Summary Judgment and deny Defendant's.  A contemporaneous Order will so state.  The Court will address the question of remedies in a subsequent proceeding.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: March 30, 2015