**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No.  11-895 (JEB)** |
| **E-SMART TECHNOLOGIES, INC.,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

This civil-enforcement case brought by the Securities and Exchange Commission has at long last rounded the corner from the liability phase to the remedy phase.  In 2011, the SEC accused Mary A. Grace, Tamio Saito, e-Smart Technologies, Inc., Intermarket Ventures Inc., and IVI Smart Technologies, Inc., along with several individual brokers, of violating multiple provisions of the Securities Exchange Act of 1934 and the Securities Act of 1933 in connection with the unlawful sale of e-Smart securities.  In three decisions spanning 2014 and 2015, the Court granted in substantial part the SEC's Motions for Summary Judgment on the liability of Grace and Saito.  Separately, the Clerk entered a default against the three corporate Defendants – e-Smart, Intermarket, and IVI – on account of their failure to obtain counsel and defend against the SEC's accusations, and the brokers have all settled.

The Commission now moves for specific remedies, seeking permanent injunctive relief – *i.e.*, bars on violating the securities laws, serving as officers or directors of publicly traded companies, and participating in penny-stock offerings – disgorgement of all ill-gotten gains (along with pre-judgment interest), and civil penalties.  It also asks for an opportunity to move

1

for the establishment of a "Fair Fund" if the SEC manages to recoup sufficient assets to warrant distribution back to investors.  The Court will grant the Commission's Motion in part and deny it in part, with instructions to the SEC and Grace to provide supplemental submissions on several issues pertaining to disgorgement and civil remedies.

## I.       Background

The Court has already set forth detailed background facts in the four decisions leading up to this point.  See SEC v. e-Smart Technologies, Inc. (E-Smart I), 31 F. Supp. 3d 69 (D.D.C. 2014) (denying Defendants' motion to dismiss); SEC v. e-Smart Technologies, Inc. (E-Smart II), 74 F. Supp. 3d 306 (D.D.C. 2014) (granting partial summary judgment against Grace on counts I and II); SEC v. e-Smart Technologies, Inc. (E-Smart III), 82 F. Supp. 3d 97 (D.D.C. 2015) (granting summary judgment against Grace on counts V and VII and denying judgment as to count VI); SEC v. e-Smart Technologies, Inc. (E-Smart IV), 85 F. Supp. 3d 300, 2015 WL 1423495 (D.D.C. 2015) (granting summary judgment against Saito on counts I and V).  The facts recited here are limited to those necessary to resolve the SEC's remedial requests, with some additional details provided for context.

Mary A. Grace and Tamio Saito are the central players in this case.  Grace was President, CEO, Chief Financial Officer, and a director of e-Smart Technologies, Inc., a publicly traded company that directed its business activities towards creating and selling "biometric identification verification systems."  E-Smart II, 74 F. Supp 3d at 311.  The company claimed that its blockbuster product was a "smart card" that could verify its possessor's identity using fingerprint sensors.  Id.  Grace, along with e-Smart's Chief Technology Officer, Saito, sought the assistance of investors to bring this technology to market.  But in doing so, Grace, Saito, and the

corporate Defendants committed a number of violations of the securities statutes, and the SEC maintains that the whole enterprise was a sham.

In their first misstep, from early 2005 to the end of 2007, Defendants Grace and e-Smart sought investor capital by selling free-trading e-Smart shares without first registering those securities with the SEC – a violation of sections 5(a) and (c) of the Securities Act.  Id. at 324; see Mot., Declaration of Jeffrey R. Anderson, ¶ 7a-b; id., Exh. A-1 (Stock Issuance Spreadsheet); id., Exh. A-2 (Bank Deposits, 2006-2007).  The sale actually consisted of a convertible-loan scheme, in which investors would make short-term loans to two intermediary corporations controlled by Grace (Intermarket and IVI), which would then offer up their restricted e-Smart shares as collateral for the loans.  When the loans inevitably went into default, the "lenders" – i.e., investors – would be given the option to convert their notes into e-Smart stock at $0.10 per share. E-Smart II, 74 F. Supp. 3d at 325.  As a result of this scheme, "millions of dollars in 'loans' were exchanged for millions of unregistered, free-trading [e-Smart] shares," thereby circumventing the Securities Act's requirement that shares be registered.  Id.

Separately, in a bid to make the company attractive to investors, Grace and Saito in 2007 and 2008 caused e-Smart to publish several claims about its business that subsequently proved false, in violation of section 10(b) of the Securities Exchange Act and SEC Rule 10b-5. Specifically, in a public filing made to the SEC in October 2007 – the 2006 10-KSB – Saito and e-Smart made numerous "detailed technological claims about the capabilities" of e-Smart's smart-card product, many of which proved false.  E-Smart IV, 85 F. Supp. 3d at 313.  Several months later, in February 2008, Grace and e-Smart issued a press release in which the company falsely claimed to have landed a supremely profitable contract to supply the multinational corporation Samsung with 20 million smart cards.  E-Smart II, 74 F. Supp. 3d at 318.

Finally, while sitting at its helm, Grace played a key role in e-Smart's failure to keep its books in order, implement proper internal controls, and file certain mandatory reports with the SEC (violations of the Exchange Act sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), as well as Rules 12b-20, 13a-1, 13a-11, and 13a-13).

Even though e-Smart proved rather skillful at fishing for capital from investors, it had little to no revenue, notwithstanding its principals' representations that substantial income would be forthcoming.  See E-Smart II, 74 F. Supp. 3d at 312.  And, despite the anemic state of e-Smart's balance sheet, Grace had no compunction about drawing down the company's cash deposits, spending millions of dollars on hotels, travel, jewelry, clothing, restaurants, and other personal services.  Id. at 313.

The SEC filed this suit against Defendants in 2011.  After a lengthy period of discovery, the Commission moved serially for summary judgment against all Defendants, which the Court largely granted.  It held Grace liable for selling unregistered securities, making false statements in a 2008 press release, and failing to manage her business in accordance with SEC regulations. See E-Smart II, 74 F. Supp. 3d 306; E-Smart III, 82 F. Supp. 3d 97.  It also held Saito liable for making false statements in the 2006 10-KSB and failing to make certain filings required of large shareholders.  See E-Smart IV, 85 F. Supp. 3d 300.  When the three corporate Defendants failed to obtain counsel, the Court directed the Clerk to enter a default against them pursuant to Federal Rule of Civil Procedure 55(a).  See ECF No. 118 (May 7, 2013, Order granting in part SEC's Motion for Default Judgment).  With all issues of liability resolved, the SEC now seeks final judgment against all five Defendants.

## II.  Legal Standard

The substantive standards governing the SEC's particular remedial requests as to the individual Defendants will be set forth in each subsection below.  In resolving this Motion, the Court must also determine whether judgment against the three defaulting corporate Defendants is appropriate.  It therefore now summarizes the legal standard governing entry of default judgment.

Federal Rule of Civil Procedure 55 establishes a two-step process for entering a default judgment against a party that fails to plead or otherwise defend.  First, the Clerk enters the party's default, see Fed. R. Civ. P. 55(a), and then, unless the claim is for a sum certain, the Court determines whether to enter a default judgment, conducting hearings as necessary in order "to enter or effectuate judgment."  Fed. R. Civ. P. 55(b)(2).  "The determination of whether default judgment is appropriate is committed to the discretion of the trial court."  Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)).

Although default resolves the question of liability against the defaulting party, see, e.g., Boland v. Elite Terrazzo Flooring, Inc., 763 F. Supp. 2d 64, 67 (D.D.C. 2011), it does not necessarily determine Plaintiff's entitlement to all remedies requested.  See SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir. 1975) (requiring district court to "make an independent determination" regarding SEC's entitlement to equitable remedies); SEC v. One or More Unknown Traders in the Common Stock of Certain Issuers, 825 F. Supp. 2d 26, 31-32 (D.D.C. 2010) (making "independent determination" regarding amount of disgorgement to be awarded against defaulting defendants).  Where the remedy requested involves a particular sum – as in the case of disgorgement – the plaintiff "'must prove its entitlement'" to such amount, but

the court may, in resolving the motion, "'rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment.'" Teamsters Local 639-Employers Health Trust v. Davis, 736 F. Supp. 2d 168, 171 (D.D.C. 2010) (quoting Flynn v. Mastro Masonry Contractors, 237 F. Supp. 2d 66, 69 (D.D.C. 2002)).  Similarly, a plaintiff must prove its entitlement to injunctive relief based on actual evidence.  See Mgmt. Dynamics, Inc., 515 F.2d at 814.

The Court, therefore, will consider the merits of the SEC's particular requests for judgment against both the individual and the defaulting corporate Defendants.

## III.   Analysis

The Commission here requests four remedies.  First, a permanent injunction barring: all five Defendants from committing securities-fraud violations, Grace and Saito from serving as officers or directors of publicly traded companies, and Grace and Saito from participating in any offering of penny stock.  Second, disgorgement of $19,639,344 in ill-gotten gains and $9,332,640 in prejudgment interest from e-Smart, with the remaining Defendants jointly and severally liable for lesser portions of that total.  Third, civil penalties against e-Smart ($1,950,000), Grace ($17,250,233.60), Saito ($520,000), IVI ($650,000), and Intermarket ($650,000).  Last, the SEC requests that the final judgment include a provision allowing the SEC to move for establishment of a Fair Fund if it locates a sizeable-enough sum of Defendants' assets to warrant distribution to investors.  The Court examines each set of remedies in turn.

A.  Injunctive Relief

1.  *Securities-Violations Bar*

The SEC first asks this Court to permanently enjoin the five Defendants from future violations of the securities laws commensurate with the scope of each Defendant's liability.

Simply stated, Plaintiff seeks a broad injunction against future violations by e-Smart and Grace, and a narrower one for Saito, IVI, and Intermarket.

Section 21(d) of the Exchange Act, 15 U.S.C. § 78(u)(d), permits the SEC to seek, and district courts to grant, injunctions "commanding compliance with [federal securities] laws and regulations promulgated thereunder." SEC v. Savoy Indus., Inc., 665 F.2d 1310, 1318 n.54 (D.C. Cir. 1981). The remedy gives teeth to the securities laws by "subject[ing] defendant[s] to contempt sanctions if [their] subsequent [activity] is deemed unlawful . . . ." SEC v. Unifund SAL, 910 F.2d 1028, 1040 (2d Cir. 1990).

The essential question in deciding whether to issue a permanent injunction in light of past violations is whether there is a reasonable likelihood that the wrong will be repeated. SEC v. Bilzerian, 29 F.3d 689, 695 (D.C. Cir. 1994). In this Circuit, a court must generally consider three factors in deciding whether a future violation is reasonably likely: "'whether a defendant's violation was isolated or part of a pattern, whether the violation was flagrant and deliberate or merely technical in nature, and whether the defendant's business will present opportunities to violate the law in the future.'" Id. (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1228 (D.C. Cir. 1989)). No factor is dispositive; rather, the reasonable-likelihood-of-violation inquiry is to be answered "based on the totality of circumstances." First City, 890 F.2d at 1228. But see SEC v. Wills, 472 F. Supp. 1250, 1273 (D.D.C. 1978) (highlighting as "the most important" factor "whether the defendants' prior illegal conduct was repeated and persistent or merely amounted to an isolated incident").

As to all Defendants, the SEC has shown a reasonable likelihood that the specific wrongs will be repeated. The securities violations they committed reveal a dogged pattern of using different tactics to obtain investor funds, regardless of whether the means for doing so violated

federal law.  Beginning at least with the convertible-loan scheme, masterminded by Grace and implemented with the help of IVI and Intermarket, e-Smart and its collaborators worked closely to ensure consistent streams of investor moneys.  When the two-year period of unregistered security issuances ceased, Grace and Saito found ways of keeping investor money streaming in by misrepresenting e-Smart's revenue prospects and income potential, keeping e-Smart tenuously afloat for another three years.  In short, the violations between closely related actors were numerous and repeated, and cannot be said to comprise a single "isolated incident."  See SEC v. Johnson, 595 F. Supp. 2d 40, 43-44 (D.D.C. 2009) (distinguishing series of closely related steps taken to commit single fraudulent act – i.e., one "incident" – from "'repeated and persistent misconduct'") (quoting SEC v. Nat'l Student Marketing Corp., 457 F. Supp. 682, 715 (D.D.C. 1978)).

The violations, moreover, were flagrant and deliberate.  Defendants' actions were carried out with scienter and resulted in the loss of millions of dollars in investor capital.  Nor were the violations "merely technical."  SEC v. Savoy Indus. Inc., 587 F.2d 1149, 1165 (D.C. Cir. 1978) (defining technical violations as those that are "inconsequential" or that do not cause type of harm that statutory scheme was designed to prevent).  On the contrary, they caused precisely the kind of harm to investors and the marketplace that the securities laws are designed to prevent. Defendants' violations here thus stand near the opposite end of the spectrum from violations of the technical or malum prohibitum variety.  Cf. Black's Law Dictionary 1045 (9th ed. 2009) (defining malum prohibitum as an act that is wrongful "merely because it is prohibited by statute, although the act itself is not necessarily immoral").

Finally, the SEC has submitted undisputed evidence that Defendants' business endeavors will, absent an injunction, present ample opportunity for them to violate the securities laws

again.  See Wills, 472 F. Supp. at 1273 (framing the inquiry as determining whether defendants are "now in positions where future violations can be anticipated").  Central to the SEC's argument are indicia that e-Smart's brain trust, Grace and Saito, plan to continue developing and commercializing smart-card products of the type that landed them in hot water in the first place.

Most glaring is Grace's insistence that, despite the SEC's ongoing enforcement action and its success on summary judgment, she will continue selling, marketing, and seeking investors to support some version of a smart-card product through a non-party company, IVI Holdings, Ltd.  See Grace Opp. at 40 ("If Plaintiff will leave Defendant's business alone now, the shareholders of Defendant's companies and their investors, lenders and shareholders can finally benefit."); id. ("Defendant's [sic] have never stopped [seeking future opportunities to market their product] – it is Defendant's businesses. The survival and future of Defendant's companies, investors and shareholders depend on this. And- the product is not an 'alleged product.'").

Although there is nothing wrong with seeking investor funds to sell a product per se – assuming no securities laws are violated in the process – Grace and Saito seem determined to repeat the same missteps that brought them before this Court.  As an example, in Saito's motion seeking reconsideration of this Court's summary-judgment decision, he stated that the U.S. Patent and Trademark Office had issued five patents, filed between 2002 and 2007, covering some of the technologies e-Smart previously sought to develop.  See ECF Nos. 663 (Saito Mot. for Reconsideration), 664 (same).  Although his purpose in bringing up the patents is to show the legitimacy of his invention – which, presumably, would illustrate the illegitimacy of this Court's conclusion that the claims in the 2006 10-KSB were fraudulent, see E-Smart IV, 2015 WL 1423495, at *18-19 – his filings reveal his unyielding belief that the statements he made

contained no false information whatsoever.  In so doing, Saito sheds light on how he might treat such technology in the future, equating, as he does, the development of an <u>idea</u> (as embodied in a patent) with its reduction to practice in a commercially viable product (as was promised in the 2006 10-KSB).

Grace, moreover, appears an inextricable partner in that technology's future marketing and commercialization.  The patents are held by IVI Holdings, a company that she admits she formed "to own and hold the patents which were developed and patented and originally owned by IVI Smart Technologies, Inc."  Grace Opp. at 26.  Indeed, Grace insists that, but for the existence of non-party IVI Holdings and its willingness to "revive and reactivate th[ose] patents," they would have been lost, "saving <u>defendant companies</u> from utter ruin."  <u>Id.</u> at 27 (emphasis added).  The SEC provides additional evidence that, at least as of 2012, Grace was publicly repeating the same misrepresentations regarding the smart-card technology at the center of this suit in a website for a Hong Kong-registered company named I Am Holdings.  <u>See</u> Mot., Att. D (Nov. 8, 2012, Screen Grab of www.iam-holdings.com); <u>id.</u>, Att. E (Hong Kong Registration of I AM HOLDINGS).  And Grace appears not to dispute that she intends to market and sell similar products in the future.  <u>See</u> Grace Opp. at 27 ("The alleged wrongdoing . . . has nothing to do with the patents revived by IVI Holdings or the I AM card . . . . Plaintiff is trying to . . . prevent Defendants from continuing to do business, with products and companies that were never named or accused of any wrongdoing.").

The SEC has thus established a "reasonable likelihood" that Grace and Saito would commit securities violations in the future.  And the Court sees no reason to part ways with that conclusion as applied to the corporate Defendants.  <u>See</u> <u>Chris-Craft Indus., Inc. v. Piper Aircraft Corp.</u>, 480 F.2d 341, 388 (2d Cir. 1973)  (Timbers, J., dissenting in part) ("[W]here violations of

the securities laws have been committed in the past by a corporation through its officers, the

nature of the corporation and its officers is an important consideration in determining the

likelihood of further violations.").  The Court will, therefore, impose on Grace and Saito a

lifetime injunction against violating the securities laws as specified in the Conclusion *infra*.

2.  *Officer-and-Director Bar*

The SEC also asks the Court to permanently bar Grace and Saito from serving as an

officer or director of a publicly traded company on account of their violations of section 10(b) of

the Exchange Act.  That Act provides that, in a civil-enforcement action brought by the SEC:

> [T]he court may prohibit, conditionally or unconditionally, and
> permanently or for such period of time as it shall determine, any
> person who violated [Section 10(b)] or the rules or regulations
> thereunder from acting as an officer or director of any issuer . . . <u>if
> the person's conduct demonstrates unfitness to serve as an officer or
> director</u> of any such issuer.

15 U.S.C. § 78u(d)(2) (emphasis added).

Although neither Congress nor this Circuit has elaborated on the meaning of "unfitness"

in this context, most courts have zeroed in on a series of non-exhaustive factors – derived almost

wholly from the scholarship of one law professor – that purport to identify predictors of future

unlawful behavior from known facts about a defendant's past conduct.

The Second Circuit's six-factor framework in <u>SEC v. Patel</u>, 61 F.3d 137 (2d Cir. 1995), is

the most prevalent.  In assessing "unfitness" to serve, it required an evaluation of: "(1) the

'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender'

status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's

degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that

misconduct will recur."  <u>Id.</u> at 141 (drawing from Jayne W. Barnard, <u>When is a Corporate</u>

Executive "Substantially Unfit to Serve"?, 70 N.C. L. Rev. 1489, 1492-93 (1992)).[1]

Importantly, the Patel court was careful to emphasize the importance of the "likelihood of future

misconduct" factor, requiring courts to find the facts sufficient to "justify the prediction that

future misconduct will occur" before granting an injunctive remedy.  Id. at 141.

     Two decades later – and after Congress in 2002 modified § 78u(d)(2) to require only a

showing of mere "unfitness" rather than "substantial unfitness" – a court in this district

articulated a revised, nine-factor version of the Patel test, also derived from an article written by

Professor Barnard.  See SEC v. Levine, 517 F. Supp. 2d 121, 144 (D.D.C. 2007).  Those factors

include: "(1) the nature and complexity of the scheme; (2) the defendant's role in the scheme; (3)

the use of corporate resources in executing the scheme; (4) the defendant's financial gain (or loss

avoidance) from the scheme; (5) the loss to investors and others as a result of the scheme; (6)

whether the scheme represents an isolated occurrence or a pattern of misconduct; (7) the

defendant's use of stealth and concealment; (8) the defendant's history of business and related

misconduct; and (9) the defendant's acknowledgment of wrongdoing and the credibility of his

contrition."  Id. at 145 (quoting Barnard, Rule 10b-5 and the "Unfitness" Question, 47 Ariz. L.

Rev. 9, 46 (2005)).  Recognizing that the central purpose of such injunctions was to "protect the

public against future harm" by predicting individuals who were likely to commit future

misdeeds, Barnard nevertheless omitted from the revised test the "likelihood of future

misconduct" factor, in large part because of courts' inclination to lean on the "severity of the

defendant's prior misconduct" as a predictive proxy instead of engaging in a "sincere effort to

predict the future."  Barnard, Rule 10b-5, 47 Ariz. L. Rev. at 30, 53.  Instead, the test aimed for

---

[1] The Court notes that although Barnard purports to have "establish[ed]" the test, 70 N.C. L. Rev. at 1489, see also Jayne W. Barnard, Rule 10b-5 and the "Unfitness" Question, 47 Ariz. L. Rev. 9, 15 n.30 (2005), it appears nearly identical to one articulated by the Fifth Circuit in SEC v. Blatt, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978), and cases cited therein.

greater predictive accuracy by tailoring the Patel factors to identify "only those defendants who, by their conduct and attitude both in business and before the court, have demonstrated that they are 'opportunity seekers' . . . [who] look for ways to abuse or disrupt the capital markets." Id. at 55-56.

The aim of both tests, therefore, is to separate likely recidivists from the reformed to ensure injunctions are entered only against the former.  As a result, the Court need not pick and choose among the dueling frameworks because under both, Grace's and Saito's conduct and recent representations to the Court make clear that they are likely recidivists who are "unfit[]" to serve as a director or officer – at least for the time being.  Critical here is that, as discussed previously, both Defendants readily volunteered their intent to continue seeking investor capital in promoting and selling some version of a smart-card product.  More importantly, the Defendants not only fail to accept the illegality of their previous behavior, but appear incredulous that any court could conclude that their prior statements to investors were anything but truthful.  See Grace Opp. at 5 ("No Evidence of Fraud or Extreme Recklessness regarding the Samsung Press Release"); Saito Opp. at 43-44 (insisting, as to misrepresentations in 2006 10-KSB, "I did not do [it] and it was not fraud.").  For this reason, future misrepresentations appear not only likely, but practically guaranteed.

That is not all, however.  Defendants were also the chief architects of e-Smart's fraudulent scheme, knowingly and deliberately misleading investors to obtain millions of dollars in investor capital.  In addition, the two misrepresentations were not isolated mishaps but part and parcel of a multi-year pattern of skirting federal securities laws.  And the SEC has demonstrated that Grace, at a minimum, had a substantial economic stake in her misrepresentations, spending millions of dollars of investor funds on extravagant purchases for

herself and close relations, even when e-Smart was in arrears in paying employee salaries.

E-Smart II, 74 F. Supp. 3d at 313-14.  For these reasons, the record facts show that Grace and

Saito are presently unfit to serve as a director or officer of an "issuer" – *i.e.*, a publicly traded

company having a class of securities registered pursuant to section 12 of the Exchange Act or

that is required to file reports pursuant to section 15(d) of the Exchange Act.

But how long should the bar last?  The SEC says their lifetimes, but with no justification

beyond the asserted egregiousness of Defendants' conduct.  Section 78u(d)(2), however, is not

an all-or-nothing standard; it gives courts the discretion to grant an officer-or-director bar "for

such period of time as [the court] shall determine."  And Patel suggests that lifetime bans may

not be warranted where a fixed-term bar might suffice.  Patel, 61 F.3d at 142.  Given the award

of a permanent bar on securities-law violations and the fact that neither Defendant is a repeat

offender, see SEC v. Bankosky, No. 12-1012, 2012 WL 1849000, at *2 (S.D.N.Y. May 21,

2012) (repeat offenders are those who committed securities violations outside of the ones giving

rise to the present litigation), aff'd, 716 F.3d 45 (2d Cir. 2013), the Court concludes that,

especially given her age, a ten-year bar for Grace and a five-year bar for Saito are sufficient and

appropriate.  See Johnson, 595 F. Supp. 2d at 45-46 (ordering five-year bar despite defendant's

knowing and deliberate violations because "a permanent bar . . . is far too draconian a remedy").

### 3.   *Penny-Stock Bar*

In its final request for prospective relief, the SEC asks the Court to permanently bar

Grace and Saito from "participating in an offering of penny stock," which the Court may do if

Defendants were, "at the time of the alleged misconduct" under either the Securities Act or the

Exchange Act, "participating in . . . an offering of penny stock."  15 U.S.C. §§ 77t(g); 78u(d)(6).

Defendants do not dispute that the securities in question were "penny stock" – *i.e.*, an equity security bearing a price of less than five dollars, with exceptions (not applicable here) provided in 17 C.F.R. § 240.3a51-1.  Nor do they dispute that they participated in an "offering of penny stock," which broadly encompasses "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock."  15 U.S.C §§ 77t(g); 78u(d)(6).

The only question, then, is whether such a bar is warranted.  The statutory language offers even less guidance than the officer-or-director bar in determining when a penny-stock bar is justified.  The text permits injunctions "conditionally or unconditionally, and permanently or for such period of time as the court shall determine."  Id.  Perhaps seeking a North Star to guide their discretion, district courts have concluded – albeit with no explanation – that the Patel factors for officer-or-director bars will similarly signal when a defendant is likely to commit securities violations involving penny stocks.  See, e.g., SEC v. Cook, No. 13-1312, 2015 WL 5022152, at *30 (S.D. Ind. Aug. 24, 2015); SEC v. StratoComm Corp., 89 F. Supp. 3d. 357, 370 (N.D.N.Y. 2015); SEC v. Alliance Transcription Servs., Inc., No. 08-1464, 2010 WL 483792, at *2 (D. Ariz. Feb. 8, 2010); SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 429-30 (S.D.N.Y. 2007).  Despite their Delphic reasoning, these courts' collective decision to rely on Patel is backed up by the legislative history of the Penny Stock Reform Act of 1990, which noted as an overriding concern that the penny-stock market was "attractive to unscrupulous securities professionals" and "fraught with repeat offenders."  H.R. Rep. No. 101-617, 1990 U.S.C.C.A.N. 1408, 1422-23.  Motivating Congress's grant of this remedial authority was its desire to maintain investor confidence in incipient enterprises while protecting investors by preventing future misconduct, as predicted by specific inferences drawn from a defendant's past conduct.  Cf., e.g.,

Patel, 61 F.3d at 141; Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd, 450 U.S. 91 (1981).

Given the Court's disposition of the officer-or-director bar and its confidence that future securities violations involving penny stock are reasonably likely, it similarly concludes that a penny-stock bar of ten years for Grace and five years for Saito is warranted.  In declining to impose a lifetime bar, the Court is mindful of the guidance offiered by the Fifth Circuit in Steadman: "[W]hen the [SEC] chooses to order the most drastic remedies at its disposal, it has a greater burden to show with particularity the facts and policies that support those sanctions and why less severe action would not serve to protect investors."  Steadman, 603 F.2d at 1137.  The SEC has not explained why a lifetime bar is more appropriate than a lesser sanction.  Given the Commission's failure to do so here, the Court will not impose the most drastic remedy, deciding that a temporally limited bar is sufficient on these facts.

    B.  Disgorgement

The SEC also requests disgorgement and prejudgment interest against all five Defendants.  "Once the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996). Disgorgement serves two equitable purposes: "depriv[ing] a wrongdoer of his unjust enrichment and . . . deter[ring] others from violating the securities laws."  SEC v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C. Cir. 1989).  But, importantly, because an "order to disgorge is not a punitive measure," SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000), the disgorgement amount must be "causally related to the wrongdoing."  First City, 890 F.2d at 1231.

In determining such amounts, courts have employed a burden-shifting approach, requiring the SEC first to provide a "'reasonable approximation of profits causally connected to the violation.'"  SEC v. Whittemore, 659 F.3d 1, 7 (D.C. Cir. 2011) (quoting First City, 890 F.2d at 1231).  If the SEC does so, the burden then shifts "to the defendants to show why [the SEC's calculation] was not a reasonable approximation."  Id.  Any risk of uncertainty as to the amount of ill-gotten gains appropriately "fall[s] on the wrongdoer whose illegal conduct created that uncertainty."  First City, 890 F.2d at 1232.  How profits are defined will be discussed *infra*.

In addition to disgorgement, the SEC seeks prejudgment interest on the sums requested. Like disgorgement, such interest may be awarded in the district court's discretion when fairness so dictates.  See Blau v. Lehman, 368 U.S. 403, 414 (1962).  Courts in this district have not hesitated to award prejudgment interest on disgorgement amounts to "preclude defendants from enjoying an interest-free loan on their illicitly-obtained gains."  SEC v. Levine, 517 F. Supp. 2d 121, 141 (D.D.C. 2007).

The Court will begin by discussing the total disgorgement amount sought against e-Smart, followed by the amounts for which the remaining Defendants may be held jointly and severally liable.  It will also address interest within these analyses.

### 1.  *E-Smart*

The SEC asks the Court to order e-Smart to disgorge $19,639,344.  See Mot. at 21.  The first question is whether the Commission has met its burden of providing a reasonable approximation of profits attributable to e-Smart's wrongdoing.

In calculating profits, the SEC relies on the total amount of money gathered from investors – *i.e.*, total investor proceeds – during the periods of time that it has accused e-Smart of selling unregistered securities (violation of sections 5(a) and (c) of the Securities Act) and

misleading investors (violation of section 10(b) of the Exchange Act and Rule 10b-5). <u>See</u> Mot.

at 17-19; Am. Compl., ¶¶ 113-119. The breakdown is as follows:

| Violation | Period of Liability | Proceeds |
|---|---|---|
| §§ 5(a) and (c) of Securities Act | | |
| *Sale of Unregistered Securities* | Jan. 1, 2005 – Dec. 31, 2007 | $11,310,255 |
| | | |
| § 10(b) of Exchange Act / Rule 10b-5 | | |
| *2006 10-KSB* | Oct. 24, 2007 – May 27, 2009 | $7,718,440 |
| *Samsung Press Release* | Feb. 26, 2008 – Dec. 31, 2011 | $7,279,144 |

<u>See</u> Mot. at 17-18. These amounts total $26,307,839. But because the three periods of liability

partially overlap, and to avoid double-counting for such overlapping periods, the SEC seeks

disgorgement only of total investor proceeds brought in between January 1, 2005, and December

31, 2011, yielding a total of $19,639,344.44. <u>See</u> Anderson Decl., ¶ 7d.

As a threshold matter, the Court concludes that the SEC may rely on investor <u>proceeds</u> to

satisfy its initial burden of providing a "reasonable approximation of <u>profits</u> causally connected

to the violation." <u>Whittemore</u>, 659 F.3d at 7 (quoting <u>First City</u>, 890 F.2d at 1231) (emphasis

added). In <u>Whittemore</u>, the D.C. Circuit reviewed a number of circumstances in which the SEC

satisfied its initial burden by showing a defendant's gross proceeds, even if it had not precisely

identified the defendant's take-home profits. <u>Id.</u> at 7-8. In conducting its review, the court

approvingly cited <u>SEC v. Platforms Wireless International Corp.</u>, 617 F.3d 1072, 1081, 1096-97

(9th Cir. 2010), in which the Ninth Circuit held that the SEC had reasonably approximated

Platform Wireless's profits from their illegal sale of unregistered Pink Sheet securities by

tabulating total <u>proceeds</u> from those sales. <u>Platforms Wireless</u>, 617 F.3d at 1096. The Ninth

Circuit did not demand that the SEC chisel the figure down to arrive at net profits, particularly

where "Platforms was a low-priced penny-stock, the securities were unregistered and could not

be sold to the public at <u>all</u>, and Platforms did not have any source of income or assets, rendering any such value speculative and small." <u>Id.</u> at 1097.

Translating <u>Platforms Wireless</u> into the context of <u>Whittemore</u>, in which a defendant was found liable for violating Section 10(b) and Rule 10b-5 of the Exchange Act in a "pump and dump" scheme, the D.C. Circuit similarly concluded that the SEC had met its initial burden by pointing to total proceeds of stock sales made by the defendant, even though it had not teased out the "fair market value" of the stocks at the time of the sales. <u>Whittemore</u>, 659 F.3d at 7-8. Doing so, it concluded, was unnecessary, particularly where ascertaining the pre-fraud fair market value of the shares was difficult, if not impossible, given that the securities involved were "Pink Sheet stocks with no significant trading volume." <u>Id.</u> at 8. The same is true here, where e-Smart had "little to no revenue" despite years of investor capital. <u>E-Smart II</u>, 74 F. Supp. 3d at 312. The Court thus finds that total investor proceeds may serve to reasonably approximate e-Smart's profits.

Given its default, e-Smart has offered nothing to rebut the SEC's assertions. The Court is nevertheless obliged to make an "independent determination" regarding the SEC's disgorgement figure. <u>One or More Unknown Traders</u>, 825 F. Supp. 2d at 31. It will accordingly evaluate the three periods of liability to determine whether the SEC has met its burden of reasonably approximating profits "causally connected to the violation[s]." <u>Whittemore</u>, 659 F.3d at 7.

i. Sale of Unregistered Securities (Jan. 1, 2005 – Dec. 31, 2007)

The SEC argues that the clock for tabulating proceeds should begin on January 1, 2005, citing this Court's opinion in <u>E-Smart II</u> for the proposition that the convertible-loan scheme ran from "2005-2007." <u>See</u> Mot. at 17 & n.3. Although this Court did state in general terms that the scheme spanned that two-year period, it never explicitly concluded that the scheme began on New Year's Day. <u>See</u> <u>E-Smart II</u>, 74 F. Supp. 3d at 324 ("The SEC offers evidence that from

2005 to 2007, Grace and others participated in [the] convertible-loan scheme . . . .").  The Court

did find, however, that the plan to sell unregistered securities was hatched at <u>some point</u> in

January 2005, though without identifying a precise date.  <u>Id.</u> at 325-26.  Ultimately, whether the

clock begins on January 1, 2005, or sometime later that month is unimportant because no "sale"

took place – and thus no proceeds were obtained – until February 11, 2005.  <u>See</u> Anderson Decl.,

¶ 7a.  The Court determines, therefore, that February 11, 2005, will act as the starting point.

The Court is unpersuaded, however, that the SEC has shown facts sufficient to use

December 31, 2007, as the cut-off date for when e-Smart stopped selling unregistered securities.

Although the Court in <u>E-Smart II</u> found that the company continued its scheme through at least

May 8, 2007, <u>id.</u> at 327 (describing forged opinion letter Grace issued to transfer agent to issue

new shares), it found no facts regarding when the scheme ended, nor did the SEC ask the Court

to do so.  <u>See</u> SEC Mot. for Sum. J. against Grace, ECF No. 324, Attach. 1 (Plaintiff's Statement

of Undisputed Facts), ¶ 168 (defining period of violations as running "[f]rom approximately

early 2005 through 2007" but without specifying an end date).  As a result, the Court is unable to

determine which sales occurring after May 2007 constituted sales of unregistered securities in

violation of Securities Act sections 5(a) and (c).

Perhaps recognizing that the dates bracketing e-Smart's Securities Act liability were

somewhat fuzzy, the SEC proposed that, instead of tabulating all sales made during 2005-2007 –

which add up to $13,904,627.12, <u>see</u> Anderson Decl., ¶¶ 7a – the SEC would seek only

disgorgement of the total investor proceeds <u>reported by</u> e-Smart in its 2007 10-K for the time

period in question – <i>i.e.</i>, $11,310,255 (113,102,557 shares at a price of $0.10 per share).  <u>Id.</u>

¶ 7b; <u>see</u> Mot. at 17.  The SEC contends somewhat cryptically that this lower figure "provides a

higher degree of certainty" than the $13.9 million figure and that it represents "an admission by

e-Smart regarding how much it raised during the relevant period." Id. at 17 n.5. But this logic

does not account for the SEC's failure to show that proceeds raised from mid-May 2007 through

e-Smart's second securities violation (the 2006 10-KSB) on October 24, 2007, also resulted from

sales of unregistered securities. Such a deficiency would not matter if the proceeds raised during

that period were nominal. But the spreadsheets provided by the SEC demonstrate that e-Smart

raised a sizeable amount – roughly $3.2 million – between May 8, 2007, and the next-in-time

violation on October 24, 2007. See Anderson Decl., Attach. A-2 (2006-2007 Bank Deposits) at

1, 2.

Because any proceeds lawfully obtained should not be included within the disgorgement

figure, the Court will not grant the full sum requested by the SEC. Instead, the Commission will

be given an opportunity to either file supplemental submissions that provide facts showing that

the May-October 2007 sales were unlawful or to reduce the requested sum appropriately. See

SEC v. Constantin, 939 F. Supp. 2d 288, 311 (S.D.N.Y. 2013) ("[S]upplemental submissions are

required to more clearly explain the parties' calculations as to the appropriate amount of

disgorgement.").

ii.   2006 10-KSB (Oct. 24, 2007 – May 27, 2009)

As to the second period of liability for misrepresentations made in e-Smart's 2006 10-

KSB, the Court agrees with the SEC's start and cut-off dates. The parties do not dispute that the

filing was issued on October 24, 2007. And the SEC has reasonably proposed May 27, 2009 –

the date on which the misrepresentations were "modified" or in some way corrected in e-Smart's

2007 10-K – as a cut-off date for e-Smart's liability on this basis. The Court finds that this cut-

off date is particularly reasonable, given that, as discussed infra, it overlaps with profits obtained

after a second misrepresentation made by e-Smart in the 2008 Samsung Press release. It thus

concludes that the SEC has met its burden of reasonably approximating e-Smart's profits by showing it received $7,718,440 in proceeds during that period.

iii.   Samsung Press Release (Feb. 26, 2008 – Dec. 31, 2011)

Finally, the Court concludes that the SEC has failed to carry its initial burden of showing that all proceeds obtained by e-Smart in the 46-month period spanning February 26, 2008, to the end of December 2011 were "causally connected to" the fraudulent press release. The starting date of February 26, 2008, poses no problem: the Samsung press release was indisputably issued on that date. See E-Smart, 74 F. Supp. 3d at 312. But the SEC's proposed cut-off date of December 31, 2011, is temporally remote from that violation, and intervening events likely severed or substantially weakened any causal connection between the violation and subsequent investor proceeds.

Most critical is that, a month after the February 2008 press release, an accurate copy of the Samsung contract became publicly available through one of e-Smart's public filings. See Reply at 11; PSUF, ¶¶ 33-34; E-Smart II, 74 F. Supp. 3d at 318 (citing Part 4 of Grace's "Statement of Undisputed and Uncontested Material Facts," ECF No. 412-1, ¶¶ 65-66). Although the Court agrees that Grace never issued a corrective press release, had an investor wished to verify her claims by reading the contract, "even a perfunctory review of [it] would have revealed that it was nothing more than a supply contract," with no obligation by Samsung to purchase anything at all. E-Smart II, 74 F. Supp. 3d at 322.

Undoubtedly, with respect to thinly traded and undeveloped securities, courts have treaded cautiously in presuming that publicly available information will necessarily and efficiently make its way to investors. See, e.g., In re Laser Arms Corp. Sec. Litig., 794 F. Supp. 475, 490 (S.D.N.Y. 1989) (finding that theory of efficient markets is "more questionable in situations involving new issues in an undeveloped market") (citation and quotation marks

22

omitted).  But the SEC's evidence suggests that its investors suspected that Grace was fibbing about e-Smart's supposedly lucrative contracts in the months and years following the press release, seeking additional assurances from her and independent verification that their investments would bear fruit.  For instance, "[i]nvestors repeatedly noted the lack of third-party corroboration for Grace's contract claims," PSUF, ¶ 39 (citing a 2011 email), and "regularly pressed Grace and her surrogates . . . for information on the deals." Id., ¶ 40 (citing emails in 2010 and 2011); see also id., ¶ 48 ("Many investors accused Grace of misleading them.") (citing emails in 2008 and 2010).  Some investors were even willing to continue providing capital notwithstanding their clear doubts that any deals were in place to sell e-Smart products.  See id., ¶ 45 ("In a March 19, 2010 email, after giving Grace another $175,000 in 'emergency' funds, investor Robert Aronowitz told Grace that 'the financing you've been courting since our first loan in November 2009 . . . has either collapsed or vanished. This is disappointing but not entirely unexpected, as you've continually promised and represented positive results, but in actuality have achieved little with the exception of securing our sole funding.").

Further weakening the link between the press release and more temporally distant investor proceeds, the release itself stated that the contractual performance period was limited to two years – a fact that likely would have tipped off investors that, by 2011, they could not reasonably put any stock, so to speak, in the press release's claims.  The correspondence collected by the SEC, moreover, suggest that the "but for" cause of much of the investment from 2008 to 2010 was not the press release, but rather personal assurances from Grace that funding was imminent.  See id., ¶¶ 45-47, 50-51, 54, 56, 59, 62.  Even if the release itself initially caused a "spike in the price and trading volume of e-Smart stock," id., ¶ 37, the SEC has failed to carry

its burden of proving that all proceeds gathered over the proposed time period are causally connected to the February 2008 press release.

The Court, accordingly, will not order disgorgement of any proceeds obtained by e-Smart after May 27, 2009 – the date that the Court accepted as the cut-off date for e-Smart's liability for its 2006 10-KSB's misrepresentations.  In sum, the SEC may obtain disgorgement for most of the timeframe applicable to the first two violations, but not the third.  And, as has been explained, the Commission shall recalculate the disgorgement sums as to the first and revise its prejudgment-interest request based on that amount.  The Court agrees that prejudgment interest shall be awarded on those revised sums, and it agrees with the SEC that IRS rates for calculating interest on underpaid taxes is the appropriate rate to use in that calculation.  See One or More Unknown Traders, 825 F. Supp. 2d at 32; 26 U.S.C. § 6621(a)(2).

2. *Grace*

The SEC seeks to hold Grace jointly and severally liable with e-Smart for selling unregistered securities ($11,310,255) and misleading investors with the Samsung press release ($7,279,144) for a total of $18,589,399.

The first question is whether Grace should be held jointly and severally liable at all. District courts enjoy "'broad discretion in subjecting the offending parties on a joint-and-several basis to the disgorgement order.'"  Whittemore, 659 F.3d at 9 (quoting SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir. 1997)).  "'Joint-and-several liability is appropriate in securities cases when two or more individuals or entities collaborate or have [] close relationships in engaging in the illegal conduct.'"  Id. at 10 (quoting Hughes Capital, 124 F.3d at 455) (emphasis in Whittemore).  In addition, although our circuit has not spoken to the issue, other courts imposing joint liability have also required that the individuals profit from the ill-gotten gains.

24

See <u>SEC v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1475 (2d Cir. 1996) (joint and several liability

appropriate where corporation's "owner and chief executive officer has collaborated in [the

unlawful] conduct <u>and has profited from the violations</u> . . . .") (emphasis added).  Once the SEC

establishes collaboration or a close relationship in carrying out the illegal acts, the burden shifts

to the defendant to prove apportionment – *i.e.*, that she should only be held responsible for

certain amounts that she personally benefited from.  See <u>Whittemore</u>, 659 F.3d at 11-12; <u>Hughes</u>

<u>Capital</u>, 124 F.3d at 445 ("The burden is on the tortfeasor to establish that the liability is capable

of apportionment.").

 The Court concludes that Grace should be held jointly and severally liable with e-Smart

for both violations.  She was a key player in both the convertible-loan scheme and the fraudulent

Samsung press release.  See <u>E-Smart II</u>, 74 F. Supp. 3d at 318, 328.  And the SEC presented

facts that she benefited extensively from her efforts.  <u>Id.</u> at 322-23 ("[I]nvestor funds . . . were

what enabled Grace to spend lavishly . . . .").

 The second question is what sums are in play for Grace's two violations.  Because the

Court has already instructed the SEC to either substantiate or reduce its disgorgement figure for

e-Smart's Securities Act section 5 violation – *i.e.*, the convertible-loan scheme – it need not

rehash those points here.  The SEC, moreover, cannot rely on the $7,279,144 figure for Grace's

Exchange Act violations – *i.e.*, the Samsung press release – as it has failed to carry its burden of

showing that all proceeds obtained by e-Smart in the ensuing years were causally connected to

that violation.  Instead, the Court repeats that the May 27, 2009, cut-off date serves to more

reasonably approximate e-Smart profits causally connected to Grace's violation.  Falling

approximately 14 months after the release of the Samsung press release, the date comes towards

the end of a period of time in which investors became increasingly suspicious of e-Smart's

claims and either did or could have easily discovered the true nature of the Samsung contract, thereby breaking any causal connection between the original misrepresentations and subsequent investor proceeds.  Along with its revised calculations for e-Smart's liability, the SEC shall therefore revise the disgorgement figure for which Grace should be held jointly and severally liable, along with the corresponding amount of prejudgment interest.

A final note on Grace's disgorgement figure: she has failed to offer any concrete evidence to show that the sums are reasonably capable of apportionment.  But because the SEC must revise the total disgorgement amount it will seek against both e-Smart and Grace, the Court will allow her one last chance to prove – with concrete evidence – that the ill-gotten gains she benefited from may clearly and easily be segregated from e-Smart's overall profits.  But see Hughes Capital, 124 F.3d at 445 ("Although in some cases, a court may be able easily to identify the recipient of ill-gotten profits and apportionment is practical, that is not usually the case."). The court advises Grace, however, that, on account of the severity of her violations and the losses they caused, it will not consider her inability to pay in determining the final disgorgement figure, and thus she need not raise the same argument again in her submission.  SEC v. Universal Exp., Inc., 646 F. Supp. 2d 552, 565 (S.D.N.Y. 2009) ("In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship.").

> 3. *Saito*

The SEC also asks the Court to hold Saito jointly and severally liable for disgorging $7,718,440 – an amount corresponding to e-Smart's disgorgement liability for misrepresentations made in its 2006 10-KSB in violation of Exchange Act section 10(b) and Rule 10b-5.

Like Grace, the Court has little trouble concluding that Saito collaborated with and was

closely connected to e-Smart in committing the specific violation at issue.  But it is unwilling to

hold Saito jointly and severally liable for the full sum requested, largely because the SEC has not

clearly identified what benefit, if any, Saito obtained because of his fraudulent acts.

Although "a personal financial benefit" is not necessarily "a prerequisite for joint and several

liability," Platforms Wireless, 617 F.3d at 1098, courts have not hesitated to exercise their

discretion in reducing or rejecting joint-tortfeasor liability when particular defendants "have

differing levels of culpability" for securities-law violations or have received different amounts of

"illicit profits" from those violations.  SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 330

(S.D.N.Y. 2007).  That is precisely the case here.  The SEC seems to recognize that Saito's

culpability pales in comparison to Grace's.  See Reply at 15.  And it offers no evidence showing

that he profited from his efforts.  It states rather breezily that Saito "directly benefitted from the

misrepresentations," Mot. at 20, but it neither identifies nor quantifies what those benefits are.

Unlike Grace – who, to support her profligate spending, tapped directly into investor accounts

and kept the spigot open – Saito appears to have had no direct access to investor proceeds and

received only two potential benefits while serving as e-Smart's CTO: (1) $274,166 in salary

from 2006 to 2007; and (2) 12.5 million shares of e-Smart stock.  See ECF No. 451 (Grace Sum.

J. Opp.), Exh. 19A-4 (2007 10-K) at 42-43; see also Reply at 8 n.7 (pointing to e-Smart's 2007

10-K as evidence of Saito's "salary and other benefits").

A defendant may certainly be ordered to disgorge salary payments when such payments

are tied to unlawful acts.  See SEC v. Merch. Capital, LLC, 486 F. App'x 93, 96 (11th Cir. 2012)

("We know of no authority . . . which holds that salaries received . . . cannot be considered ill-

gotten gains.").  But that such payments may be subject to disgorgement does not relieve the

SEC of its burden to reasonably approximate profits and tie those profits to benefits received by Saito.  See, e.g., SEC v. Chapman, 826 F. Supp. 2d 847, 859 (D. Md. 2011) (rejecting SEC's request for disgorgement of salary where "[t]he SEC has not shown a causal relationship between [defendant's] salary and bonuses and the fraud."); SEC v. Resnick, 604 F. Supp. 2d 773, 783 (D. Md. 2009) (rejecting disgorgement of chief marketing officer's salary where SEC failed to show salary was causally linked to the unlawful conduct); SEC v. Church Extension of Church of Church, Inc., 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005) (ordering disgorgement of one-half of senior officer's salary where, "[b]ut for the securities violations, [the organization] would have collapsed earlier, so the violations enabled the defendants to continue their employment" and receive salary payments); SEC v. Hughes Capital Corp., 917 F. Supp. 1080, 1087 (D.N.J. 1996) (same), aff'd, 124 F.3d 449 (3d Cir. 1997).

The SEC's passing claim that Saito's salary constitutes unlawful profit provides an insufficient basis on which to order its disgorgement – let alone the $7.7 million figure that the Commission requests – as most of the salary appears to have been earned before the violation at issue.  The SEC also appears to claim that Saito benefited by receiving 12.5 million shares of e-Smart stock.  But e-Smart issued the shares to Saito months before the fraudulent communication, see 2007 10-K at 42-43 & n.2 (indicating stock was issued on May 9, 2007), and even if the "market value" of e-Smart shares increased after the 2006 10-KSB, the Commission has simply not shown that Saito received any benefit by virtue of holding that stock.  On the contrary, the SEC appears not to dispute that Saito never realized any gains from those shares, as they remain unsold.  See Reply at 4.  Like his salary, his possession of shares does not offer a reasonable basis for holding Saito jointly and severally liable for disgorging e-Smart proceeds. See SEC v. Wyly, 71 F. Supp. 3d 399, 420 (S.D.N.Y. 2014) ("I cannot agree that including

<u>unrealized</u> gains from securities that were never sold is a reasonable approximation of [defendants'] ill-gotten gains."); <u>SEC v. Todd</u>, No. 03-2230, 2007 WL 1574756, at *18 (S.D. Cal. May 30, 2007) (concluding that SEC failed to establish a "nexus between the supposed ill-gotten gains and the requested disgorgement" where defendants "did not cash in [their] stock options"), <u>aff'd in part, rev'd in part on other grounds</u>, 642 F.3d 1207 (9th Cir. 2011).  The Court thus declines to hold Saito jointly and severally liable for disgorging the $7.7 million in proceeds that e-Smart obtained by virtue of his misrepresentations.  In fact, it will require no disgorgement from him at all.

### 4.  *IVI and Intermarket*

Finally, the SEC seeks disgorgement of $11,310,255 from both IVI and Intermarket based on those entities' involvement in the fraudulent sale of unregistered securities.  Although the Court agrees that the companies may, on account of the critical role they played in carrying out the convertible-loan scheme, be held jointly and severally liable for the Securities Act section 5 violations, the $11.3 million figure must be revised in accordance with the Court's directions regarding the calculation of that sum.  The Court will issue a final order of disgorgement upon the SEC's substantiation or revision of that figure along with its calculation of prejudgment interest.

### C.  <u>Civil Penalties</u>

Last, the SEC seeks third-tier civil penalties against all Defendants.  Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d)(1), and section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d)(3)(A), authorize the SEC to seek, and district courts to award, monetary penalties in addition to disgorgement whenever an individual or entity has violated a provision of those statutes or rules promulgated thereunder.  The penalties are divided into three tiers, with the third

and most severe tier appropriate for violations that (1) "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "resulted in substantial losses or created a significant risk of substantial losses to other persons." § 77t(d)(2)(C); § 78u(d)(3)(B)(iii).  If the Court concludes that such penalties are warranted, it must then fix the amount "in light of the facts and circumstances" of the case.  Id. § 77t(d)(2)(A); § 78u(d)(3)(B)(i).   The statutes provides a ceiling on the amount recoverable, however, allowing the Court to award the greater of either a statutory sum – $130,000 per violation for an individual or $650,000 per violation for an entity – or "the gross amount of pecuniary gain to such defendant as a result of the violation."  Id.; 17 C.F.R. § 201.1003 & Pt. 201, Subpt. E, Tbl. III (adjusting civil monetary penalties for inflation).

Third-tier penalties are warranted against all Defendants.  In granting summary judgment on liability for the SEC, the Court concluded that both individual Defendants acted with *scienter*. See E-Smart II, 74 F. Supp. 3d at 321-23, 327-28; E-Smart IV, 85 F. Supp. 3d at 323-25. There can be no doubt, therefore, that the violations satisfy the first prong of the statutory standard for imposing third-tier penalties.  And, given the millions of dollars in investor proceeds frittered away, it is clear that the violations "resulted in substantial losses" to investors.  The corporate Defendants are similarly responsible, as the individual Defendants' violations may be imputed to them based on the former's wrongful intent.  See United States v. Philip Morris USA Inc., 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("Corporations may be held liable for specific intent offenses based on the knowledge and intent of their employees.") (internal quotations omitted); E-Smart II, 74 F. Supp. 3d at 313 (finding that Grace and Saito were CEO and CTO of all three corporations, and were the only employees of IVI and Intermarket).

The Court now considers the penalty amounts to be awarded against each Defendant.

1.   *E-Smart, IVI, and Intermarket*

The SEC seeks maximum statutory penalties for the three corporate Defendants:

$1,950,000 against e-Smart ($650,000 per violation for the unregistered stock offering, the 2006

10-KSB, and the Samsung press release); and $650,000 each against IVI and Intermarket for

their participation in the illegal stock offering.  The Court agrees that the statutory penalties are

appropriate for the corporate Defendants.

2.   *Grace*

For Grace, the SEC seeks "the gross amount of pecuniary gain" obtained by the violation

rather than fixed statutory penalties.  See Mot. at 22.  The SEC calculates that sum as

$17,250,233.60, see id. at 22 n.8. which is the Commission's requested disgorgement figure less

any proceeds obtained before May 13, 2006, which proceeds would not be recoverable because

of a statutory five-year time limitation on civil penalties.  See 28 U.S.C. § 2462; SEC v.

Amerindo Inv. Advisors Inc., No. 05-5231, 2014 WL 2112032, at *11 (S.D.N.Y. May 6, 2014)

("[G]ross pecuniary gain, unlike disgorgement, may consider gains only from frauds occurring

within the five-year statute of limitations for civil penalties.") (citing Gabelli v. SEC, 133 S. Ct.

1216, 1220-21 (2013)).  In light of the Court's request that the SEC provide supplemental

briefing on Grace's disgorgement figure, the Court will similarly postpone its determination on

the penalty amount.  The SEC's future submissions shall contain a revised penalty request.  The

Court further urges the Commission to be mindful of the full barrage of remedies it seeks against

Grace, including injunctive relief, disgorgement, and prejudgment interest, to ensure that the

penalty is not excessive.  Although "imposing a civil penalty in addition to disgorgement is not

repetitive," SEC v. Milan Grp., Inc., No. 11-2132, 2015 WL 5076971, at *4 (D.D.C. Aug. 27,

2015), the Court will, in fixing the appropriate penalty, "tak[e] into account the substantial

financial disgorgement and prejudgment interest that will [likely] be imposed against [Grace]; the [fact] that some investors" appear to have "invested in [e-Smart] knowing that it did not have the contracts it professed it had . . . ; [and] the penny stock and officer and director bars imposed." <u>SEC v. StratoComm Corp.</u>, No. 11-1188, 2015 WL 1013792, at *11 (N.D.N.Y. Mar. 9, 2015).

        3.  *Saito*

Finally, the SEC seeks statutory penalties against Saito totaling $520,000, which consists of the statutory amount of $130,000 per violation for natural persons, multiplied by the "four misrepresentations the Court found Saito made in e-Smart's 2006-10-K." Mot. at 23. While the $130,000-per-violation figure is warranted due to Saito's *scienter* and the substantial losses suffered by investors, the SEC's position assumes that each discrete falsehood, even if contained in a single public filing and made about a single product, may be used as a multiplier for quadrupling the penalty. The SEC cites no case for this proposition, which is unsurprising since the law appears to hold to the contrary.

The civil-penalty provisions permit imposition of a fixed penalty "for each violation," 15 U.S.C. § 77t(d)(2); <u>id.</u> § 78u(d)(3)(B), but do not otherwise define what constitutes a "violation." As it turns out, courts have taken widely divergent approaches to this question, interpreting the phrase "for each violation" to mean: "(1) per <u>claim</u> brought against the defendant, <u>SEC v. Shehyn</u>, 04–2003, 2010 WL 3290977, at *8 (S.D.N.Y. Aug. 9, 2010); (2) per <u>misrepresentation</u> made by the defendant, <u>SEC v. Coates</u>, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001); and (3) per <u>investor</u> defrauded by the defendant, <u>SEC v. Kenton Capital, Ltd.</u>, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998)." <u>SEC v. Bravata</u>, 3 F. Supp. 3d 638, 663 (E.D. Mich. 2014) (emphasis added);

see also SEC v. GTF Enterprises, Inc., No. 10-4258, 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (cataloguing approaches).

On the surface, Coates' "per misrepresentation" approach would seem to support the SEC's position here, but in that case, the defendant made four different misrepresentations to shareholders in numerous discrete communications taking place on different dates. See Coates, 137 F. Supp. 2d at 424-27. The court found that each misrepresentation constituted a distinct "violation" of Exchange Act section 10(b) and thus used the number four as the multiplier for imposing statutory penalties. Id. at 430; accord SEC v. Tourre, 4 F. Supp. 3d 579, 592-94 (S.D.N.Y. 2014) (concluding that one email containing two false statements constitute a single "violation" for purposes of penalty multiplication). That is quite different from Saito's single public filing, which involved a single document in which four out of seven specific claims describing features of e-Smart's sole product were demonstrably false. See E-Smart IV, 85 F. Supp. 3d at 321 (concluding that the 10-KSB "filing constituted a misrepresentation").

The Court thus concludes that Saito was responsible for a single violation of the Exchange Act, and it will award a penalty in the amount of $130,000. See SEC v. Blackout Media Corp., No. 09-5454, 2012 WL 4051951, at *2 (S.D.N.Y. Sept. 14, 2012) (imposing single $130,000 penalty against individual who made "repeated misrepresentations"); SEC v. Manterfield, No. 07-10712, 2009 WL 935953, at *2 (D. Mass. Apr. 8, 2009) (same); SEC v. eConnect, No. 00-2959, 2002 WL 34465925, at *13 (C.D. Cal. Dec. 2, 2002) (same). The penalty will not be reduced despite Saito's conclusory statement that he is unable to pay, see Saito Opp. at 44, particularly given the nature of his misrepresentations and the substantial losses caused as a result. See Milan Grp. Inc., 2015 WL 5076971, at *4 (declining to reduce penalty for claimed financial hardship in part because of severity of defendant's conduct).

D. <u>Fair Fund</u>

The SEC's last request is that the final judgment "include a provision that the SEC may seek to establish a Fair Fund if [it] finds assets subject to disgorgement sufficient to warrant a distribution to investors." Mot. at 23. The securities laws permit the SEC to move for an order establishing such a fund if the SEC obtains a civil penalty in its enforcement action. <u>See</u> 15 U.S.C. § 7246(a). Having determined that civil penalties will be awarded – albeit with the precise sum in flux as to Defendant Grace – the SEC will be permitted to make such a motion in the future. At that time, the Court will expect the Commission to provide a distribution plan that proposes a fair and reasonable allocation of recovered funds to investors. <u>See</u> <u>Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC</u>, 467 F.3d 73, 81, 85 (2d Cir. 2006).

**IV. Conclusion**

For the foregoing reasons, the Court will issue a contemporaneous Order granting in part and denying in part the SEC's Motion for Final Judgment. The Court will specifically:

(1) Grant the SEC's request to permanently enjoin Defendants from violating the securities laws as follows:

    a. E-Smart will be permanently enjoined from violating Securities Act sections 5(a) and (c) and Exchange Act sections 10(b), 13(a), 13(b)(2)(A) and (B) and Rules 10b-5, 12b-20, 13a-1, 13a-11, and 13a-13;

    b. Grace will be permanently enjoined from violating Securities Act sections 5(a) and (c) and Exchange Act sections 10(b) and 16(a) along with Rules 10b-5 and 16a-3, and will be enjoined from aiding or abetting violations of Exchange Act sections 13(a), 13(b)(2)(A) and (B) and Rules 12b-20, 13a-1, 13a-11, and 13a-13;

    c. Saito will be permanently enjoined from violating Exchange Act sections 10(b) and 16(a) and Rules 10b-5 and 16a-3;

    d. IVI will be permanently enjoined from violating Securities Act sections 5(a) and (c); and

    e. Intermarket will be permanently enjoined from violating Securities Act sections 5(a) and (c);

(2) Grant in part and deny in part the SEC's request to permanently bar the individual

Defendants from serving as officers and directors of securities issuers as follows:

    a.  Grace will be barred from serving as an officer or director for 10 years; and

    b.  Saito will be barred from serving as an officer or director for 5 years;

(3) Grant in part and deny in part the SEC's request to permanently bar the individual

Defendants from participating in penny-stock offerings as follows:

    a.  Grace will be barred from participating in any penny-stock offering for 10 years; and

    b.  Saito will be barred from participating in any penny-stock offering for 5 years;

(4) Deny without prejudice the SEC's request for disgorgement and prejudgment interest

with instructions as follows:

    a.  The SEC shall, by October 27, 2015, substantiate or revise its disgorgement figure pertaining to e-Smart's, Grace's, IVI's, and Intermarket's violations of Securities Act sections 5(a) and (c) consistent with the guidance provided in this Opinion;

    b.  The SEC shall, in the same submission, revise its disgorgement figure pertaining to Grace's violations of Exchange Act section 10(b) and Rule 10b-5;

    c.  The SEC shall, in the same submission, revise its request for prejudgment interest against e-Smart, Grace, IVI, and Intermarket to account for any changes in its disgorgement figure;

    d.  Defendant Grace shall, by November 17, 2015, respond to the SEC's modified disgorgement request with any evidence showing that the sum against her is reasonably capable of apportionment; and

    e.  No disgorgement and interest shall apply to Saito;

(5) Grant in part and deny in part the SEC's request for third-tier civil penalties as follows:

    a.  E-Smart will be ordered to pay $1,950,000;

    b.  IVI will be ordered to pay $650,000;

    c.  Intermarket will be ordered to pay $650,000;

    d.  Saito will be ordered to pay $130,000; and

    e.  The Court will determine civil penalties to be awarded against Grace after reviewing the parties' supplemental submissions; and

(6) Grant the SEC's request to permit it to move in the future for establishment of a Fair

Fund.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 13, 2015