**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action No.  11-895 (JEB) |
| E-SMART TECHNOLOGIES, INC., *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

This Opinion marks the final chapter in a nearly five-year-long securities-fraud odyssey brought by the Securities Exchange Commission against numerous corporate and individual defendants, including e-Smart Technology, Inc., Intermarket Ventures Inc., IVI Smart Technologies, Inc., individual securities brokers, and several of e-Smart's principals, most notably CEO Mary Grace and Chief Technology Officer Tamio Saito.  Having resolved all issues of liability in three Opinions issued in 2014 and 2015, the Court in October 2015 addressed what remedies the SEC could secure against all remaining Defendants.  It resolved the bulk of the SEC's requests but asked the parties to provide supplemental submissions on the issue of disgorgement and Grace's civil penalties.  With those issues now briefed, the Court will enter a final judgment in this epic doorstop of a case.

## I.    Background

Although repetition, in certain circumstances, may possess meditative or even transcendent qualities, see T.S. Eliot, Four Quartets, "East Coker" ("You say I am repeating / Something I have said before. I shall say it again. / Shall I say it again?") (1943), reiterating the

1

facts in this case would be less mantra than surplus.  A truncated summary will do, as the Court's previous Opinions provide an exhaustive, and exhausting, treatment of this case's factual and procedural background.  See, e.g., SEC v. e–Smart Tech., Inc. (E–Smart V), 2015 WL 5952237, at *1 (D.D.C. Oct. 13, 2015) (providing factual background relevant to SEC's remedial request and summarizing prior Opinions).

In brief: the SEC sued Defendants for violating numerous provisions of the Securities Exchange Act of 1934 and the Securities Act of 1933 in connection with the sale of e-Smart securities.  The Commission largely succeeded in proving liability through its motions for summary judgment, and, as a consequence, it sought injunctive relief, an order of disgorgement (plus interest), and third-tier civil penalties against all Defendants.  Id. at *3.

In E-Smart V, the Court addressed the SEC's motion for remedies.  It concluded that, with a few exceptions, injunctive relief, disgorgement, and third-tier civil penalties were appropriate.  Id. at *17.  But it also found that the SEC had failed to carry its burden of proving the amount of disgorgement to be awarded against Defendants for selling unregistered securities through a convertible-loan scheme in violation of Section 5 of the Securities Act.  Id. at *8-11.  It thus gave the Commission "an opportunity to either file supplemental submissions that provide [such proof] . . . or to reduce the requested sum" according to the Court's guidance.  Id. at *10.

The Court found a similar failure of proof regarding the SEC's calculation of disgorgement for Grace and e-Smart stemming from their violation of Exchange Act section 10(b) and Rule 10b-5 – which occurred when Grace caused e-Smart to issue a false and misleading press release (the Samsung press release) in February 2008.  It concluded that, although disgorgement of some investor profits obtained after the press release was appropriate, disgorgement of all investor deposits for the ensuing three years was unwarranted.  Id. at *11-12.

It thus asked the Commission to reduce its disgorgement request to capture only those profits obtained by Defendants for the first 14 months following the issuance of the press release.  Id. at *12.

Because the Court gave the SEC a second bite at the apple, it also offered Grace another opportunity to reduce her total disgorgement liability by offering proof that she had not personally benefited from e-Smart's unlawful profits.  Id. at *12-13.  In placing the burden on her to identify or provide the mitigating evidence, the Court allowed her to "respond to the SEC's [supplemental filing] with any evidence showing that the sum against her is reasonably capable of apportionment."  Id. at *17.

Finally, the Court also left open the question of civil penalties against Grace.  Although it found that the most severe – i.e., third-tier – civil penalties were warranted against all Defendants, it declined to fix the precise amount that Grace would have to pay.  It refrained in order to take into consideration whatever final disgorgement figure would be assessed against her.  Id. at *15.

## II.    Analysis

With the SEC and Grace having filed their supplemental briefs, the Court now considers the vestigial issues.  First is disgorgement – namely, the proper amounts flowing from the convertible-loan scheme, e-Smart's fraudulent misrepresentations, and, as to Grace, the Samsung press release.  Second is the amount of prejudgment interest to be paid on the final disgorgement sums.  And finally, the Court will consider the amount that Grace must pay in third-tier civil penalties.  Each is addressed separately.

A. Disgorgement

1. *Corporate Defendants*

In its initial motion for final judgment, the SEC asked this Court to hold SEC, IVI, and

Intermarket jointly and severally liable for disgorging $19,639,344. See Motion for Entry of

Final Judgment ("Mot."), ECF No. 725, at 21. This amount represents total investor proceeds

obtained by Defendant companies resulting from one violation of the Securities Act (selling

unregistered securities) and two violations of the Exchange Act (misleading investors). See Mot.

at 17-19; Am. Compl., ¶¶ 113-119. The breakdown is shown in the table below:

*Table 1 – Proceeds Obtained from Each Violation*

| Violation | Period of Liability | Proceeds |
|---|---|---|
| §§ 5(a) and (c) of Securities Act | | |
| - *Sale of Unregistered Securities* | Jan. 1, 2005 – Dec. 31, 2007 | $11,310,256 |
| | | |
| § 10(b) of Exchange Act / Rule 10b-5 | | |
| - *2006 10-KSB* | Oct. 24, 2007 – May 27, 2009 | $7,718,444 |
| - *Samsung Press Release* | Feb. 26, 2008 – Dec. 31, 2011 | $7,279,114 |

See Mot. at 17-18; id., Declaration of Jeffrey R. Anderson, ¶ 7. For simplicity's sake, all

monetary values recited herein have been rounded to the nearest dollar amount. The Court also

notes that the SEC made several transcription errors when it copied the disgorgement figures

from the declaration of its expert, Jeffery Anderson. Compare Mot. at 18 (seeking $7,718,44<u>0</u>

and $7,729,1<u>4</u>4) <u>with</u> Anderson Decl., ¶ 7 (seeking $7,718,44<u>4</u> and $7,729,1<u>1</u>4). Since the

SEC's filings relied exclusively on the Anderson Declaration to substantiate its request, the

Court will adopt those sums as the ones the SEC intended to use.

As the Court noted in <u>E-Smart V</u>, these amounts total $26,307,814, not $19,639,344. See

2015 WL 5952237, at *9. (In relying on the SEC's brief, which included the transcription error

detailed in note 1 above, <u>E-Smart V</u> in fact reported the total sum was $26,307,839, not

4

$26,307,814, which is the correct amount.)  But because the periods of liability partially overlap, and to avoid double-counting unlawful profits obtained during those periods, the SEC asked that Defendants be ordered to disgorge the total amount of investor proceeds obtained between January 1, 2005, and December 31, 2011, which was calculated to be $19,639,344.  See Anderson Decl., ¶ 7d.  In reaching that figure, the SEC's expert, Jeffrey Anderson, further broke the total down into two different periods of time: calendar years 2005-2007 and calendar years 2008-2011, as shown in the table below.

*Table 2 – SEC's Initial Disgorgement Request*

| Violation | Period of Investor Proceeds | Proceeds |
|---|---|---|
| §§ 5(a) and (c) of Securities Act<br>  - *Sale of Unregistered Securities* | Jan. 1, 2005 – Dec. 31, 2007 | $11,310,256 |
| § 10(b) of Exchange Act / Rule 10b-5<br>  - *2006 10-KSB*<br>  - *Samsung Press Release* | Jan. 1, 2008 – Dec. 31, 2011<br>(Oct. 24, 2007 – May 27, 2009)<br>(Feb. 26, 2008 – Dec. 31, 2011) | $8,329,088 |
| **Total** | | **$19,639,344** |

See Anderson Decl., ¶ 7.

For the first period, Anderson multiplied the total amount of stock that e-Smart reported it had sold in a 2007 10-K filing with the SEC – *i.e.*, 113,102,557 shares – by a stock price of $0.10 per share.  See id., ¶ 7b; Mot. at 17.  The $0.10 rate was what this Court previously found to be the share-conversion rate that e-Smart had offered its investors when converting investor debt to free-trading shares under Defendants' unlawful scheme.  See SEC v. E-Smart Techs., Inc. (E-Smart II), 74 F. Supp. 3d 306, 327 (D.D.C. 2014).  Even though the SEC estimated that e-Smart had raised upwards of $13.9 million during that period based on its review of Defendants' bank-deposit and promoter records, see Anderson Decl., ¶ 7a, it sought the lower amount – $11,310,256 – because e-Smart's own admission of its stock sales in the 2007 10-K gave the

SEC "a higher degree of certainty" that the lower figure would not overstate e-Smart's unlawful earnings.  See Mot. at 17 n.5.

The second period – January 1, 2008, to December 31, 2011 – covered two different violations of the Exchange Act: material misstatements made in e-Smart's 2006 10-KSB and material misstatements made in its 2008 Samsung press release.  See Anderson Decl., ¶ 7.  Even though the Exchange Act violations started in October 2007, the SEC ignored any profits obtained between then and January 1, 2008, because they were already captured in the first period.  To arrive at total unlawful profits obtained during the second period, then, the SEC added up all of the investors' deposits during that four-year period, using Defendant companies' bank and stock-issuance records as evidence.  See id., ¶¶ 6, 7c & Attachments A-1, A-2, & B.  It concluded that Defendants had obtained $8,329,088.  See id., ¶ 7.

Adding those two figures ($11,310,256 and $8,329,088), the SEC arrived at a total disgorgement sum of $19,639,344, excluding interest.  Id.

In E-Smart V, the Court set forth a framework for deciding whether this was an appropriate amount.  Because an "order to disgorge is not a punitive measure," SEC v. Banner Fund Int'l, 211 F.3d 602, 617 (D.C. Cir. 2000), the Court resolved that the amount must be "'causally related to the wrongdoing.'"  E-Smart V, 2015 WL 5952237, at *8 (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  In making its case, therefore, the SEC was required

> first to provide a "'reasonable approximation of profits causally connected to the violation.'"  SEC v. Whittemore, 659 F.3d 1, 7 (D.C. Cir. 2011) (quoting First City, 890 F.2d at 1231).  If the SEC does so, the burden then shifts "to the defendants to show why [the SEC's calculation] was not a reasonable approximation."  Id.  Any risk of uncertainty as to the amount of ill-gotten gains appropriately "fall[s] on the wrongdoer whose illegal conduct created that uncertainty."  First City, 890 F.2d at 1232.

Id.

The Court also concluded that the SEC could rely on total investor proceeds as a reasonable approximation of e-Smart's profits, particularly since it had already found that "e-Smart had 'little to no revenue' despite years of investor capital," and thus that there was little difference, if any, between investor proceeds and Defendant's unlawful profits. Id. at *9 (quoting E–Smart II, 74 F. Supp. 3d at 312, and citing Whittemore, 659 F.3d at 7-8, and SEC v. Platforms Wireless International Corp., 617 F.3d 1072, 1081, 1096-97 (9th Cir. 2010)).

Applying that framework to the two periods of liability, the Court found that the SEC had failed to reasonably approximate profits for either. Regarding the first, the Court agreed that Defendants' convertible-loan scheme yielded unlawful proceeds from February 2005 to May 8, 2007. E-Smart V, 2015 WL 5952237, at *10. But it found that the SEC had not shown that investor proceeds obtained between May 9, 2007, and December 31, 2007, were also garnered as part of the unlawful scheme. Id. It therefore gave the Commission an additional opportunity to identify record evidence showing that proceeds received from May to December 2007 should also be disgorged.

As to the second period (comprising the Exchange Act violations), the Court held that the SEC could recover profits beginning on October 24, 2007, which was when Defendants made their first material misrepresentation to investors in a public filing submitted to the SEC. As will be discussed in greater detail infra, however, since the Court agrees with the SEC that proceeds obtained from that date through the end of 2007 are recoverable as disgorgement for the convertible-loan scheme, the SEC may only begin tabulating disgorgement for the Exchange Act violations starting on January 1, 2008, so as to avoid double-counting that two-month period. In any event, the Court did not approve the Commission's proposed end date of December 31,

2011, because it had not carried its burden of showing that investor proceeds obtained after May

27, 2009 – when Defendants issued a corrective disclosure to the SEC – were causally related to

both Exchange Act violations.  Id. at *10-11.  It thus ordered the SEC to reduce its disgorgement

and prejudgment-interest requests to comply with the permissible time period.  Id. at *11.  The

Court addresses both periods below.

*i.*  First Period (Jan. 1, 2005 – Dec. 31, 2007)

In its supplemental submission, the SEC offers two separate and independent evidentiary

bases for concluding that $11,310,256 reasonably approximates Defendants' unlawful proceeds

from the convertible-loan scheme.  The Court agrees that each is persuasive and will thus order

disgorgement of the full sum requested.

First, homing in on the May to December 2007 time period, the SEC points to direct

record evidence that six investor deposits, made between June 20, 2007, and October 26, 2007,

and totaling $3,125,000, were also part of Defendants' convertible-loan scheme.  See SEC Supp.

Filing, ECF No. 788, at 3-5.  Each of the six payments was made by investor William Sandler to

Intermarket, and they all follow the same essential steps identified in E-Smart II as constituting

the unlawful sale of unregistered securities through a convertible-loan scheme.  See E-Smart II,

74 F. Supp. 3d at 325.  The promissory notes executed by Sandler and Grace set forth the

necessary conditions for the sale of unregistered securities to occur.  Specifically: (1) a

requirement that the borrower, Intermarket, will repay the lender, Sandler, within two weeks; (2)

collateral in the form of Intermarket's shares of e-Smart common stock; and (3) a provision that,

as a condition of default, Intermarket will issue Sandler its common stock without any

restrictions that are required by law.  See, e.g., SEC Supp. Filing, Exh. 2 at 21-22 (June 20, 2007,

Note) ("2,500,000 million [*sic*] shares" will issue upon default "without the usual and normal

restrictions"); id. at 25-26 (July 2, 2007, Note) ("in event of default, the restriction shall be

removed and become free trading"); <u>id.</u> at 27-28 (Sept. 20, 2007, Note) (same); <u>id.</u> at 33-34 (July 27, 2007, Note) (same); <u>id.</u> at 36-37 (Oct. 25, 2007, Note) (same).  Contemporaneous emails from Grace indicate that she intended the loans to follow precisely that pattern.  <u>See, e.g.</u>, <u>id.</u> at 32 (Grace Sept. 20, 2007, Email to Sandler) ("The [promissory] note reads the same as the last one, because it is required it [*sic*] to be a loan and the default allows the payment of shares to repay the loan.  Therefore the shares are issued as you detail below as in the past.").

In short, the evidence shows that Defendants' $3,125,000 in proceeds from Sandler were unlawfully obtained as part of their convertible-loan scheme.  Taking that amount alongside (a) total investor proceeds obtained from February 11, 2005, through May 7, 2007, (*i.e.*, $8,065,642.12) and (b) three investor deposits occurring during the same time as the Sandler payments ($163,985), the SEC has shown that at least $11,354,627.12 may be disgorged as a result of Defendants' violation of Section 5 of the Securities Act.  <u>See</u> Anderson Decl., Attach. A-1 & A-2. [1]  As that amount exceeds the figure requested by the SEC by nearly $45,000, the Court finds that the lower sum – *i.e.*, $11,310,256 – is an even more reasonable approximation of unlawful proceeds.

As an alternative basis for that award, the SEC renews its previous argument that the Court should rely on e-Smart's own admission of the total number of shares it sold as reported in its 2007 10-K filing with the SEC.  In doing so, it offers a more specific – and damaging – record citation that shows not only that e-Smart admittedly sold 113 million shares, but that those shares were also sold pursuant to its convertible-loan scheme.  In e-Smart's 2007 10-K, it reported:

> From  February  2005  through  December  2007,  the  Company

---

[1] Grace has not disputed that the three deposits totaling $163,985 follow the same pattern as the Sandler deposits. The $11,354,627.12 figure does, however, exclude four deposits made by investor Rowland Day between October 30, 2007, and December 7, 2007.  The SEC concedes that it "cannot conclusively show that [those payments, totaling $2,550,000] . . . were made pursuant to the convertible debt scheme."  Supp. Filing at 3 n.2.

collateralized loans to Intermarket and IVI with a commitment to issue shares in the event the loans are not repaid timely. The proceeds of such loans were utilized by the Company and IVI for working capital. In 2007, <u>the Company issued 113,102,557 shares to numerous creditors of Intermarket and IVI due to the failure of repayment of the loans by Intermarket and IVI</u>.

ECF No. 451 (Grace Sum. J. Opp.), Exh. 19A–4 (2007 10–K) at 31 (emphasis added). The Court agrees with the SEC that e-Smart's self-professed issuance of 113,102,557 shares pursuant to the convertible-loan scheme offers another sound basis for approximating the company's unlawful profits. It thus concludes that $11,310,256 represents a "'reasonable approximation of profits causally connected to [Defendants'] violation'" of Section 5 of the Securities Act. <u>See</u> <u>Whittemore</u>, 659 F.3d at 7 (quoting <u>First City</u>, 890 F.2d at 1231).

In responding to the SEC, Grace first attacks the Sandler payments. She argues primarily that those sums cannot be counted in tabulating the disgorgement figure because, she insists, the Sandler "loans" were *bona fide*, and, even if they were not, the shares that Sandler received bore a restrictive legend. <u>See</u> Grace Opp. at 2-5. The Court presumes that the latter assertion is meant to imply that, because the shares purportedly bore such legends, Defendants did not sell <u>unregistered</u> securities in violation of section 5 of the Securities Act. (A restrictive legend is placed on a security to "alert[ ] buyers that the security has not been registered under the Securities Act and may be offered and sold only if the security is registered, or its sale qualifies for an exemption from registration." <u>SEC v. CMKM Diamonds, Inc.</u>, 729 F.3d 1248, 1252 n.1 (9th Cir. 2013) (citations omitted)). Both arguments are unavailing.

As evidence that the Sandler payments were *bona fide* loans, Grace points to several demand letters that Sandler sent Defendants in 2012, well after his money had vanished, seeking repayment. <u>See</u> Opp. at 3-4. But it can hardly be surprising that an investor who eventually

realized substantial losses would seek every means possible to recoup his funds.  That he tried to cajole Grace into giving back his money by citing the promissory notes is not sufficient evidence to disprove that she intended his $3.1 million payments as investments rather than loan payments.

As to Grace's second argument, even if she is correct that the shares ultimately issued to Sandler bore a restrictive legend – an assertion that remains unsupported – the securities were still unregistered.  Grace offers no authority for the proposition that Defendant's sale of those shares through the same convertible-loan scheme does not constitute a sale of unregistered securities under the statute.  See Zacharias v. SEC, 569 F.3d 458, 464 (D.C. Cir. 2009) ("Sections 5(a) and (c) of the Securities Act prohibit the 'sale' and 'offer for sale' of any securities unless a registration statement is in effect or there is an applicable exemption from registration.") (citing 15 U.S.C. §§ 77e(a), (c)).  She provides no sound argument that the "sale" of shares bearing a restrictive legend necessarily exempts that sale from the Securities Act's registration requirements.  See, e.g., id. ("Once participation in an unregistered sale has been shown, [Defendants] have the burden of proving an exemption to the registration requirements.") (cting SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)).

Grace also argues that the SEC's alternative method for estimating disgorgement – by relying on e-Smart's own admissions of the shares it sold – is inaccurate.  See Opp. at 8-9.  In so doing, she does not dispute that e-Smart did, in fact, issue 113,102,557 shares to its "creditors" in 2007.  Instead, she disputes only the share price, arguing that "Defendants['] accountants, lawyers and auditors" valued e-Smart stock at an average of $0.06 per share, not $0.10 per share.  Id. at 8.  But in granting summary judgment to the SEC, the Court already found that the stock-

conversion rate was $0.10 per share, <u>see</u> <u>E-Smart II</u>, 74 F. Supp. 3d at 325, and thus it will not permit Grace to challenge that factual finding at this late stage.

 For these reasons, the Court concludes that the SEC's proposed disgorgement figure of $11,310,256 reasonably approximates the corporate Defendants' profits from their Section 5 violations, and that Defendants have failed to rebut that showing in any meaningful way.

<em>ii.</em> Second Period (Jan. 1, 2008 – Dec. 31, 2011)

 The SEC also readjusted its request for disgorgement relating to Defendants' two Exchange Act violations.  In its initial filing, the SEC argued that e-smart had obtained $7,718,440 in profits for its first violation (the 2006 10-KSB) from October 24, 2007, to May 27, 2009.  See <u>E-Smart V</u>, 2015 WL 5952237, at *8.  This Court agreed that the Commission was entitled to seek disgorgement of that amount.  <u>See id.</u> at *10.  The SEC also argued that the company obtained $7,279,144 in profits from its second violation (the Samsung press release) from February 26, 2008, to December 31, 2011.  <u>Id.</u> at *8.  The Court held that profits obtained from February 26, 2008, through May 27, 2009, were recoverable, but that any deposits received after May 27, 2009, were not.  <u>Id.</u> at *11.

 The Commission has now revised its request.  To avoid double-counting disgorgement from the convertible-loan scheme, which ran through the end of 2007, it excluded all proceeds obtained before January 1, 2008.  <u>See</u> Supp. Filing at 10.  And in compliance with the Court's instructions in <u>E-Smart V</u>, it removed all proceeds obtained after May 27, 2009.  <u>Id.</u>  The resulting amount is now $5,043,444, which represents all recorded investor deposits into Defendants' accounts between January 1, 2008, and May 27, 2009.  <u>See</u> Supp. Filing at 10; Anderson Decl., Attach. E.  The Court agrees that this figure reasonably approximates Defendants' profits from their two Exchange Act violations and that disgorgement of that amount is warranted.

12

\* \* \*

The Court will thus order a total disgorgement of $16,353,700, which comprises $11,310,256 for the Section 5 violations from 2005 to 2007, and $5,043,444 for Defendants' Exchange Act violations from January 2008 to May 2009.

*Table 3 – Disgorgement to Be Awarded*

| Violation | Period of Liability | Proceeds |
|---|---|---|
| §§ 5(a) and (c) of Securities Act | | |
|   *- Sale of Unregistered Securities* | Jan. 1, 2005 – Dec. 31, 2007 | $11,310,256 |
| | | |
| § 10(b) of Exchange Act / Rule 10b-5 | Jan. 1, 2008 – May 27, 2009 | $5,043,444 |
|   *- 2006 10-KSB* | (Jan. 1, 2008 – May 27, 2009) | |
|   *- Samsung Press Release* | (Feb. 26, 2008 – May 27, 2009) | |

2. *Grace*

Next up is the issue of what amount of disgorgement Grace herself must pay. As the Court concluded in <u>E-Smart V</u>, she is jointly and severally liable with the corporate Defendants for violating Section 5 of the Securities Act. She will thus be ordered to disgorge $11,310,256 of those ill-gotten gains.

But Grace must also disgorge profits obtained from violating Exchange Act section 10(b) and Rule 10b-5 by misleading investors with a February 26, 2008, press release in which e-Smart falsely claimed to have landed a whopper of a contract with Samsung. In <u>E-Smart V</u>, the Court concluded that, although the SEC was entitled to some amount of disgorgement, it had failed to show that <u>all</u> investor proceeds following that press release were causally connected to Defendants' violations. <u>See</u> <u>E-Smart V</u>, 2015 WL 5952237, at \*12. As noted *supra*, the SEC had originally requested a disgorgement figure of $7,279,144, which included all investor proceeds beginning on February 26, 2008, and ending on December 31, 2011. <u>See</u> <u>id.</u> at \*10. The Court declined to accept that sum in full, expressing concern that, as time went on, the

causal connection between investments and the press release became more and more tenuous. See id. (noting that "the SEC's proposed cut-off date of December 31, 2011, is temporally remote from [the press release], and intervening events likely severed or substantially weakened any causal connection between the violation and subsequent investor proceeds"). It thus instructed the SEC to reduce the disgorgement amount, using May 27, 2009, as the cut-off date for investor proceeds rather than December 31, 2011. Id. at *11.

In its supplemental filing, the SEC dramatically reduced its request from $7.2 million to $264,985. The new amount consists only of two deposits made by a single investor, Michael Elek. See Supp. Filing at 5-6. In substantiating that amount, the Commission points to specific evidence that Elek relied on the press release in investing his money. See Supp. Filing at 5-6. Although the SEC may have misunderstood the Court's instructions in E-Smart V – it did not state that disgorgement was warranted only if the SEC could provide direct proof of investor reliance – the Court nevertheless easily finds the new amount to constitute profits unlawfully obtained by Grace. Both deposits were made between February 26, 2008, and May 27, 2009, and this Court already concluded that investor deposits made during those 14 months are causally connected to Grace's fraud. See E-Smart V, 2015 WL 5952237, at *10-12. In addition, the SEC points to investigative testimony from Elek in which he stated that he relied "[v]ery heavily" on the Samsung press release in deciding whether to invest in e-Smart. See Supp. Filing, Exh. 2 (Elek Testimony). For these reasons, $264,985 reasonably approximates Grace's unlawful profits.

The next question is whether Grace has successfully rebutted the SEC's showing. She has not. In her supplemental filing, Grace offers only a series of excerpted emails between her and Elek that purportedly show that his investments were not made in reliance on the press

release.  See Opp. at 12-13.  Whatever these ambiguous communications show, they certainly do

not undermine the SEC's evidence that Elek relied on the press release in making his

investments.  She also argues that because the deposits flowed into IVI accounts, Elek was not

investing in e-Smart, and thus the Samsung release had no bearing on his decision to invest.  But

as the numerous Opinions from this Court have made clear, IVI and Intermarket were merely

tools in Defendants' belt that were used to unlawfully obtain investor monies.  That Elek sent his

money to e-Smart's subsidiary instead of to e-Smart itself is of no moment.

Grace has also failed to provide any evidence showing that she did not personally benefit

from the unlawful proceeds, and thus that she should not be responsible for disgorging those

amounts.  See E-Smart V, 2015 WL 5952237, at *13 (instructing Grace that she would be given

one last chance to "prove – with concrete evidence – that the ill-gotten gains she benefited from"

pertaining to her Exchange Act violations were "clearly and easily . . . segreg[able] from

e-Smart's overall profits").  Ignoring the Court's explicit entreaty, Grace baldly asserts that some

(or all) of the money was spent on certain unspecified but purportedly legitimate business

expenses, and that she, too, is a victim, with the Companies owing her $4.25 million in salary

and other expenses that she has yet to receive.  See Opp. at 15.  Grace offers the Court no basis

upon which it can apportion liability based on specific legitimate expenses, and thus it will order

Grace to pay the full sum of $264,985, jointly and severally along with e-Smart, for the Samsung

press release.

B.  Prejudgment Interest

The SEC also seeks prejudgment interest on disgorged profits running from the day the

violations began through the date of the Court's entry of judgment, using the IRS tax-

underpayment rate.  See Supp. Filing at 10; id., Exh. 3 (SEC Interest Calculations).  As the Court

previously concluded, "Prejudgment interest shall be awarded" on the final disgorgement figure,

and "IRS rates for calculating interest on underpaid taxes is the appropriate rate to use" in

calculating the final interest amount.  See E-Smart V, 2015 WL 5952237, at *11.  The only issue

left to decide is what sum is due.

According to the SEC, the following figures represent the prejudgment interest that must

be paid jointly and severally by Defendants on the disgorgement now approved:

*Table 4 – SEC's Request for Prejudgment Interest*

| Violation | Defendants | Period of Liability | Disgorge-ment | Prejudgment Interest | Total |
|---|---|---|---|---|---|
| Securities Act Section 5 - *Convertible Loan Scheme* | e-Smart, Intermarket, IVI, Grace | Feb. 11, 2005 - Dec. 31, 2007 | $11,310,256 | $7,217,843 | $18,528,099 |
| Exchange Act Section 10(b) and Rule 10b-5 - *2006 10-KSB* - *Samsung Press Release* | e-Smart | Jan. 1, 2008 - May 27, 2009 | $5,043,444 | $1,686,248 | $6,729,692 |
| Exchange Act Section 10(b) and Rule 10b-5 - *Samsung Press Release* | Grace | Feb. 26, 2008 - Apr. 20, 2009 | $264,985 | $84,608 | $349,593 |

See Supp. Filing at 10-11.

The Court cannot concur in the Commission's method of calculating prejudgment

interest.  Specifically, Plaintiff proposes that interest should accrue on the full disgorgement sum

beginning on the date that the applicable violation began.  Using the convertible-loan scheme as

an example, the SEC argues that interest on the full $11,310,256 should begin accruing in March

2005, which is when the first payments under that scheme were just beginning to trickle in.  See

SEC Interest Calculations at 1.  Such methodology would grossly inflate the Commission's

recovery.  The SEC's own documentation shows that Defendants had nowhere near $11.3

million in unlawfully obtained profits at that point.  Indeed, Defendants had only received around

$180,000 in investor deposits at the beginning of March 2005.  See Anderson Decl., Attach A-1.

They obtained the remaining $11.1 million in dribs and drabs over the ensuing two years.  See

id., Attach A-2 & B.  The SEC nevertheless demands that Defendants pay interest on the full

$11.3 million from day one.

This makes little sense.  As the Court has previously noted, a central objective of

prejudgment interest is to "preclude defendants from enjoying an interest-free loan on their

illicitly-obtained gains," SEC v. Levine, 517 F. Supp. 2d 121, 141 (D.D.C .2007), which means

that there must be some "gain" upon which to calculate interest.  Courts have routinely refused to

award prejudgment interest when defendants are unable to use or secure a benefit from their

illegal profits.  See, e.g., SEC v. Razmilovic, 738 F.3d 14, 36 (2d Cir. 2013) (affirming district

court's denial of prejudgment interest where defendant was "denied the use of" unlawful profits

because "some or all of his assets [were] frozen at the behest of the government in connection

with the enforcement action"); SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998) (prejudgment

interest may be awarded for period of time that "'defendant . . . had use of unlawful profits'")

(quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996)); SEC v. Tavella, 77

F. Supp. 3d 353, 361 (S.D.N.Y. 2015) (prejudgment interest "intended to 'reasonably

approximate[ ] ... the benefit[ ] the defendant derived from' the time value of possession of the

defendant's ill-gotten gains") (emphasis added) (quoting First Jersey, 101 F.3d at 1476); SEC v.

Whittemore, 744 F. Supp. 2d 1, 9 (D.D.C. 2010) (interest proper so long as defendant "benefitted

from the use of the funds").

Here, there is no question that Defendants did not "use" or "benefit" from funds that were

yet to be deposited into their accounts.  Although admittedly a rather time-consuming process,

had the SEC disaggregated incoming deposits and calculated interest on those amounts based on the date that they were received, the Court would agree that such an award would have been proper.  Absent such calculations, the Court believes it fairer to simply determine interest starting on the last day of the liability period.  The revised interest figures are therefore shown below.

*Table 5 – Prejudgment Interest Owed by Defendants*

| Violation | Defendants | Accrual Period | Disgorge-ment | Prejudgment Interest | Total |
|---|---|---|---|---|---|
| Securities Act Section 5 - *Convertible Loan Scheme* | e-Smart, Intermarket, IVI, Grace | Jan. 1, 2008 – Jan. 14, 2016 | $11,310,256 | $3,807,030 | $15,117,286 |
| Exchange Act Section 10(b) and Rule 10b-5 - *2006 10-KSB* - *Samsung Press Release* | e-Smart | May 28, 2009 - Jan. 14, 2016 | $5,043,444 | $1,225,742 | $6,269,186 |
| Exchange Act Section 10(b) and Rule 10b-5 - *Samsung Press Release* | Grace | May 28, 2009 - Jan. 14, 2016 | $264,985 | $64,401 | $329,386 |

C.  Grace's Civil Penalty

The final question is what amount Grace must pay as a third-tier penalty for her violations.  The Court has already concluded that such a sanction is warranted against her, see E-Smart V, 2015 WL 5952237, at *15, leaving the amount to be fixed after a review of the parties' supplemental submissions.

"Beyond setting maximum penalties, the statutes leave 'the actual amount of the penalty . . . up to the discretion of the district court.'"  Razmilovic, 738 F.3d at 38 (quoting SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005)); accord SEC v. Garfield Taylor, Inc., No. 11-2054, 2015 WL 5692825, at *2 (D.D.C. Sept. 28, 2015).  Courts have considered a variety of factors in fixing the precise amount.  Ones that may militate in favor of a higher penalty include: "(1) the

egregiousness of the defendant's conduct; (2) the degree of scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; [and] (4) whether the conduct was isolated or recurrent."  SEC v. Milan Grp., Inc., No. 11-2132, 2015 WL 5076971, at *3 (D.D.C. Aug. 27, 2015).  But the Court may also mitigate the penalty by considering: (5) demonstrated financial hardship, see id., (6) whether the Court has imposed an award of "substantial financial disgorgement and prejudgment interest"; (7) whether some investors gave money notwithstanding their suspicions that Defendants were misleading or lying to them; and (8) whether any injunctive relief was also awarded against Defendants.  See SEC v. StratoComm Corp., 89 F. Supp. 3d 357, 373 (N.D.N.Y. 2015).

In E-Smart V, the Court explicitly noted that, in fixing the amount, it would take into consideration Grace's total disgorgement liability along with the prospective remedies awarded against her – i.e., a permanent injunction against violating the securities laws, a 10-year officer-and-director bar, and a 10-year penny-stock bar.  See id. at *15, *17.  It thus asked the SEC to be mindful of the "full barrage" of remedies awarded against her and to consider carefully whether its initial request for civil penalties equaling "the gross amount of pecuniary gain" – then calculated to be $17,250,233.60 – was appropriate.  Id. at *15 (quoting 15 U.S.C. § 77t(d)(2)(C); § 78u(d)(3)(B)(iii))

In its supplemental briefing, the SEC first appears to double down, requesting once again a penalty equal to the "gross amount of pecuniary gain," albeit with revised disgorgement figures.  The new amount is thus $10,236,076, which consists of the two requested disgorgement sums ($11,310,256 plus $264,985) less $1,339,165, which is the amount of proceeds that are not recoverable because they fall outside of the statutory five-year time limitation on civil penalties. See Supp. Filing at 6; E-Smart V, 2015 WL 5952237, at *15 (discussing limitations period).

Recognizing that the Court might find that amount excessive, Plaintiff also offers two alternative methods for calculating the penalty that it considers appropriate.

One is to use the amount of proceeds that this Court concluded that Grace personally consumed while working at the helm of e-Smart: $4,019,784.  See E-Smart II, 74 F. Supp. at 313-14.  Another is to use a "per violation" approach, awarding a pre-set statutory penalty of $150,000 multiplied against either (a) the total number of securities-fraud provisions that the defendant violated (*i.e.*, ten); or (b) the total number of investors defrauded by Grace (although the SEC does not provide this number).  See 15 U.S.C. §§ 77t(d)(2)(C) & 78u(d)(3)(B)(iii); 17 C.F.R. § 201.1003 & Pt. 201, Subpt. E, Tbl. III (adjusting civil monetary penalties for inflation).

The Court chooses the first of those alternative approaches, but it finds that half of the sum requested – *i.e.*, $2 million, not $4 million – is the appropriate penalty.  See Razmilovic, 738 F.3d at 39 (third-tier penalty of half of defendant's "fraud-enabled pecuniary gains" was "within the bounds of the district court's discretion").  This amount takes into consideration both the factors weighing in favor of a sizeable penalty – namely, Grace's *scienter*, the millions of dollars of investor losses, and Grace's refusal to recognize the wrongfulness of her actions, see E-Smart V, 2015 WL 5952237, at *5, *14-15 – alongside those counseling a reduced penalty – *i.e.*, "the substantial financial disgorgement and prejudgment interest that will be imposed against [Grace]; the . . . evidence that some investors invested in [e-Smart] knowing that it did not have the contracts it professed it had or the capability to put into work the technology the company was based upon; [and the injunctive relief,] penny stock[,] and officer and director bars imposed." StratoComm Corp., 89 F. Supp. 3d at 373.  The Court will thus assess a third-tier civil penalty in the amount of $2 million.

III.    **Conclusion**

For these reasons, the Court will issue a final judgment incorporating the disgorgement, prejudgment-interest, and civil-penalty amounts set forth below:

(1)     E-Smart, IVI, Intermarket, and Grace are jointly and severally liable for disgorging $15,117,286 relating to their Securities Act Section 5 violation (comprising $11,310,256 principal and $3,807,030 interest);

(2)     E-Smart must disgorge $6,269,186 relating to its two Exchange Act violations (comprising $5,043,444 principal and $1,225,742 interest);

(3)     Grace is, on account of her single Exchange Act violation, jointly and severally liable with e-Smart for disgorging $329,386 of the $6,269,186 total disgorgement figure (comprising $264,985 principal and $64,401 interest); and

(4)     Grace will be assessed a third-tier civil penalty of $2,000,000.

The final judgment will also incorporate the injunctive remedies and civil-penalty amounts ordered in the Court's October 13, 2015, Memorandum Opinion.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date:   January 14, 2016

21